No. 14-15408

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

───────────────

LEONARD FYOCK, et al.,
*Plaintiffs-Appellants*,

v.

CITY OF SUNNYVALE, et al.,
*Defendants-Appellees*.

─────────────────────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(CV 13-05807-RMW)

─────────────────────────────

**APPELLANTS' OPENING BRIEF**

─────────────────────────────

C. D. Michel (S.B.N. 144258)
Clinton B. Monfort (S.B.N. 255609)
Sean A. Brady (S.B.N. 262007)
Anna M. Barvir (S.B.N. 268728)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Tel. No: (562) 216-4444
Fax No: (562) 216-4445
E-mail: cmichel@michellawyers.com

**Counsel for Plaintiffs-Appellants**

# **TABLE OF CONTENTS**

**PAGE(S)**

STATEMENT OF JURISDICTION. ........................................................ 1

STATEMENT OF THE ISSUE PRESENTED. ....................................... 1

STATEMENT REGARDING ADDENDUM. .......................................... 2

STATEMENT REGARDING ORAL ARGUMENT ............................... 2

STATEMENT OF THE CASE ................................................................ 2

I.  RELEVANT PROCEDURAL HISTORY. ................................................. 2

II.  SUNNYVALE MUNICIPAL CODE SECTION 9.44.050:
MAGAZINE POSSESSION BAN. ......................................................... 4

III.  THE BANNED MAGAZINES ARE STANDARD EQUIPMENT FOR
COMMON FIREARMS OWNED BY MILLIONS OF LAW-ABIDING
CITIZENS.............................................................................................. 5

A.  Magazines Over Ten Rounds Are Commonly
Possessed by Law-Abiding Citizens—Accounting
for Nearly Half of All Magazines........................................ 5

B.  Americans Routinely Select the Prohibited
Magazines for Both Self-Defense and Sport. ..................... 7

C.  The "Large Capacity" Label Is a Misnomer. ................................. 9

IV.  THE DISTRICT COURT'S RULING. ................................................. 10

SUMMARY OF ARGUMENT. ........................................................... 12

ARGUMENT. ...................................................................................... 16

i

## TABLE OF CONTENTS (CONT.)

PAGE(S)

I.  STANDARD OF REVIEW ON MOTION FOR PRELIMINARY INJUNCTION. ........... 16

II. FYOCK IS LIKELY TO SUCCEED ON THE MERITS OF HIS SECOND
    AMENDMENT CLAIM. ..................................................................... 18

    A.    The District Court Correctly Found the Prohibited
    Magazines Are Typically Possessed by Law-Abiding
    Citizens for Lawful Purposes and Thus Protected Under
    the Second Amendment .................................................... 18

    B.    Because the Ordinance Destroys the Right of Law-Abiding
    Citizens to Possess Constitutionally Protected Magazines,
    the District Court Erred in Failing to Find it Categorically
    Invalid ............................................................................. 19

    C.    If the Court Selects a Level of Means-End Review, Strict
    Scrutiny Must Apply; the District Court Erred in Selecting
    a Lesser Standard. ............................................................ 25

    D.    The Ordinance Is Invalid Under Either Strict or
    Intermediate Scrutiny. ..................................................... 33

        1.    The District Court Erred by Finding the Government
        May Take Constitutionally Protected Arms from Law-
        Abiding Citizens to Reduce Criminal Misuse .......................... 35

        2.    The District Court Erred in Applying a Toothless
        Intermediate Scrutiny That Never Held the City to
        Its Burden, Giving Improper Weight to its Evidence
        and Largely Ignoring Fyock's Counter-Evidence .................. 38

# TABLE OF CONTENTS (CONT.)

PAGE(S)

a. The District Court Erred in Finding That the City's Evidence Established the Required Fit Between the Ordinance and Its Public Safety Interests.......................................................... 40

i. Opinion Testimony That the Ordinance *Might* Possibly Reduce Violent Crime is Unfounded and Cannot Validate the City's Total Ban. ........................................... 41

ii. Characteristics of Protected Arms That Make Them Dangerous in the Hands of Criminals Cannot Warrant a Complete Ban on Lawful Possession................................... 44

iii. Evidence That Protected Arms Are Used Against Law Enforcement Does Not Justify Taking Them From All Law-Abiding Citizens................................. 47

b. The District Court Erred in Ignoring Fyock's Counter-Evidence Establishing that the Ordinance Is Unlikely to Advance the City's Public Safety Interest.................................. 49

III. THE REMAINING PRELIMINARY INJUNCTION FACTORS SUPPORT TEMPORARY RELIEF..................................................... 52

A. Irreparable Harm Should Have Been Presumed Because the Ordinance Violates Fyock's Second Amendment Rights............................................. 52

iii

## **TABLE OF CONTENTS (CONT.)**

**PAGE(S)**

B.    The Harms to Fyock and to the Public Should Have Been Presumed to Outweigh Any Harm to the City. ........................ 54

CONCLUSION. .................................................................... 57

STATEMENT OF RELATED CASES. ................................. 59

CERTIFICATE OF COMPLIANCE. .................................... 61

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

## <u>FEDERAL CASES</u>

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996). ................................................................... 39

*Am. Trucking Ass'ns v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009). ..................................................... 16

*Baker v. Kealoha*,
    No. 12-16258, 2014 WL 1087765 (9th Cir. Mar. 20, 2014). ................. 59, 60

*Callaway v. Block*,
    763 F.2d 1283 (11th Cir. 1985). .................................................... 17

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010). .................................................................. 27

*Clark v. Jeter*,
    486 U.S. 456 (1988). .................................................................. 25

*Coal. For Econ. Equity v. Wilson*,
    122 F.3d 692 (9th Cir. 1997). ....................................................... 17

*Dep't of Hous. & Urban Dev. v. Rucker*,
    535 U.S. 125 (2002). ............................................................. 16, 17

*District of Columbia v. Heller*,
    554 U.S. 570 (2008). ........................................................... *passim*

*Elrod v. Burns*,
    427 U.S. 347 (1976). .................................................................. 52

v

# TABLE OF AUTHORITIES (CONT.)

PAGE(S)

## FEDERAL CASES (CONT.)

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011). ...................................................... 53

*Haynes v. Office of the Att'y Gen. Phill Kline*,
    298 F. Supp. 2d 1154 (D. Kan. 2003). .................................... 54, 56

*Heller v. District of Columbia* (*Heller II*),
    670 F.3d 1266 (D.C. Cir. 2011)........................................... *passim*

*Int'l Molders' & Allied Worker's Local Union v. Nelson*,
    799 F.2d 547 (9th Cir. 1986). ...................................................... 17

*Jackson v. City and County of San Francisco*,
    No. 12-17803, 2014 WL 1193434
    (N.D. Cal. Mar. 25, 2014).................................................. *passsim*

*Kachalsky v. County of Westchester*,
    701 F.3d 81 (2d Cir. 2012). ........................................................ 20

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009). ........................................ 54, 55, 56

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001). ............................................................ 39, 43

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994). ................................................................... 39

*McDonald v. City of Chicago*,
    __U.S.__, 130 S. Ct. 3020, 3043-44 (2010). .................................. 25, 39, 53

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

### FEDERAL CASES (CONT.)

*McLean v. 988011 Ontario, Ltd.*,
　　224 F.3d 797 (6th Cir. 2000). ...................................................... 43

*Monterey Mech. Co. v. Wilson*,
　　125 F.3d 702 (9th Cir. 1997). ...................................................... 53

*Moore v. Madigan*,
　　702 F.3d 933 (7th Cir. 2012). ...................................................... 20

*Morris v. U.S. Army Corps of Enginrs.*,
　　No. 13-00336, 2014 WL 117527
　　(D. Idaho Jan. 10, 2014). ............................................................ 28

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
　　No. 13-291S, 2013 WL 6909955,
　　(W.D.N.Y. Dec. 31, 2013) ............................................................ 38

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
　　460 U.S. 37 (1983). ...................................................................... 25

*Peruta v. County of San Diego*,
　　742 F.3d 1144 (9th Cir. 2014). .......................................... *passsim*

*Preminger v. Principi*,
　　422 F.3d 815 (9th Cir. 2005). ...................................................... 55

*R.A.V. v. City of St. Paul*,
　　505 U.S. 377 (1992). .................................................................... 39

*Richards v. Prieto*,
　　No. 11-16255, 2014 WL 843532 (9th Cir. Mar. 5, 2014). .................... 59, 60

vii

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

### FEDERAL CASES (CONT.)

*Robb v. Hungerbeeler*,
370 F.3d 735 (8th Cir. 2004). ........................................................ 35

*Rucker v. Davis*,
237 F.3d 1113 (9th Cir. 2001). ........................................ 16, 17, 34

*Russell v. Gregoire*,
124 F.3d 1079 (9th Cir. 1997). ..................................................... 17

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
411 U.S. 1 (1973). ........................................................................ 25

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975). .................................................................... 35

*S.F. Veteran Police Officers Ass'n v. City & County of San Francisco*,
No. 13-05351, 2014 WL 644395,
(N.D. Cal. Feb. 19, 2014). ........................................................... 38

*Shew v. Malloy*,
No. 13-739, 2014 WL 346859,
(D. Conn. Jan. 30, 2014)............................................................... 38

*Sports Form, Inc. v. United Press Int'l, Inc.*,
686 F.2d 750 (9th Cir. 1982). ...................................................... 17

*Tardy v. O'Malley*,
No. 13-2861, TRO Hr'g Tr.,
at 66-73 (D. Md. Oct. 1, 2013). ................................................... 38

viii

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

### FEDERAL CASES (CONT.)

*Tucson Woman's Clinic v. Eden*,
  379 F.3d 531 (9th Cir. 2004). ....................................................... 25

*United States v. Booker*,
  644 F.3d 12 (1st Cir. 2011). ......................................................... 32

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010). .................................... 27, 32, 33, 39

*United States v. Chovan*,
  735 F.3d 1127 (9th Cir. 2013). ............................................ *passsim*

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir. 2011). .............................................. 22, 32

*United States v. Marzzarella*,
  614 F.3d 97 (3d Cir. 2010). ......................................................... 32

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000). ................................................................... 33

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010). .............................................. 25, 32

*United States v. Williams*,
  616 F.3d 685 (7th Cir. 2010). ....................................................... 32

*Vincenty v. Bloomberg*,
  476 F.3d 74 (2d Cir. 2007). ......................................................... 35

ix

# TABLE OF AUTHORITIES (CONT.)

PAGE(S)

## FEDERAL CASES (CONT.)

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008). ........................................................... 16

*World Wide Rush, LLC v. City of Los Angeles*,
606 F.3d 676 (9th Cir. 2010). ........................................ 34

*Zepeda v. U.S. INS*,
753 F.2d 719 (9th Cir. 1983). ....................................... 54, 55


## STATUES, RULES & REGULATIONS

Cal. Penal Code § 32310. ................................................... 10

Colo. Stats. H.B. 13-1224. ................................................. 10

Conn. Acts P.A. 13-3 § 23. ................................................. 10

Haw. Rev. Stat. § 134-8(c). ................................................ 10

Mass. Gen. Laws Ann. Ch. 140, § 121. ............................... 10

Mass. Gen. Laws Ann. Ch. 140, § 131M. ............................ 10

Md. Sess. Laws ch. 427, § 1. .............................................. 10

N.J. Stat. Ann. § 2C:39-1(y). ............................................. 10

N.J. Stat. Ann. § 2C:39-3(j). .............................................. 10

N.Y. Sess. Laws ch. 1, § 38. .............................................. 10

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

**STATUES, RULES & REGULATIONS (CONT.)**

N.Y. Sess. Laws ch. 1, § 41-b. ............................................................... 10

Fed. R. App. Proc. 3. ............................................................................... 1

Fed. R. App. Proc. 4. ............................................................................... 1

Fed. R. App. Proc. 34. ............................................................................. 2

Ninth Cir. L. Rule 3-1. ............................................................................. 1

Ninth Cir. L. Rule 3-2. ............................................................................. 1

Ninth Cir. L. Rule 3-3. ............................................................................. 1

Ninth Cir. L. Rule 3-4. ............................................................................. 1

S.F., Cal., Police Code § 619(a)(4). ....................................................... 9

Sunnyvale, Cal., Muni. Code § 1.04.010. ............................................... 4

Sunnyvale Cal., Muni Code § 9.44.050. .............................................. 2, 4


**BOOKS, ARTICLES, EDITORIALS & OTHER AUTHORITY**

11A Charles Alan Wright et al.,
    *Federal Practice and Procedure* § 2948.1 (2d ed. 1995). ............................. 53

Chad Adams,
    *Complete Guide to 3-Gun Competition* 89 (2012). ........................................ 9

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

### BOOKS, ARTICLES, EDITORIALS & OTHER AUTHORITY

Caroline Wolf Harlow,
    Bureau of Justice Statistics, U.S. Dep't of Justice,
    *Firearm Use by Offenders* 3 (Nov. 2001),
    http://www.bjs.gov/content/pub/pdf/fuo.pdf)......................................... 37, 38

Nicholas J. Johnson,
    *Supply Restrictions at the Margins of Heller and the Abortion
    Analogue: Stenberg Principles, Assault Weapons, and the
    Attitudinalist Critique*, 60 Hastings L.J. 1285 (2009). ................................ 46

Rudyard Kipling,
    *The Elephant's Child*, in Just So Stories 31 (Acra Found. 2013)................. 33

Allen Rostron,
    *Justice Breyer's Triumph in the Third Battle Over the Second
    Amendment*, 80 Geo. Wash. L. Rev. 703, 757 (2012). ................................. 40

Marianne Zawitz,
    Bureau of Justice Statistics, U.S. Dep't of Justice,
    *Guns Used in Crime* 3 (July 1995),
    http://www.bjs.gov/content/pub/pdf/GUIC.PDF). ....................................... 37

## STATEMENT OF JURISDICTION

This suit arises under the Constitution and laws of the United States. The district court had original jurisdiction pursuant to 28 U.S.C. § 1331. Because this is a 42 U.S.C. § 1983 action, the court also had jurisdiction pursuant to 28 U.S.C. § 1343(a)(3).

On March 5, 2014, the district court denied Plaintiffs' Motion for Preliminary Injunction. Pursuant to 28 U.S.C. § 1292(a)(1), this Court has jurisdiction over interlocutory appeals of a district court order refusing to issue an injunction.

Plaintiffs-Appellants filed a notice of appeal on March 5, 2014, pursuant to Federal Rules of Appellate Procedure 3 and 4 and Ninth Circuit Rules 3-1–3-4.

## STATEMENT OF THE ISSUE PRESENTED

The Second Amendment guarantees the right of law-abiding adults to use arms that are typically possessed by law-abiding citizens for lawful purposes. Millions of law-abiding Americans possess ammunition magazines capable of holding more than ten rounds for defense of "hearth and home"—the Second Amendment interest that is "elevated above all others," *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The City of Sunnyvale enacted an ordinance banning all law-abiding adults from possessing and using these magazines in their

1

homes for any purpose. Does the City's ordinance violate the Second Amendment?

## STATEMENT REGARDING ADDENDUM

An addendum reproducing relevant constitutional and statutory provisions is bound with this brief.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1), Plaintiffs-Appellants request the opportunity to present oral argument. Oral argument is appropriate as this is a case of first impression, involving critical constitutional issues that, once clarified, will further inform the scope of the right to keep and bear arms.

## STATEMENT OF THE CASE

### I.    RELEVANT PROCEDURAL HISTORY

This case presents a Second Amendment challenge to Sunnyvale Municipal Code section 9.44.050, adopted by the City of Sunnyvale in November 2013 and enforced by the Mayor and the Chief of the Department of Public Safety. E.R. V 663. With limited exceptions, the challenged law prohibits the possession of ammunition magazines capable of holding more than ten rounds within the City. Sunnyvale, Cal., Muni. Code § 9.44.050 (Addend. 102).

On December 16, 2014, Plaintiffs-Appellants Leonard Fyock, Scott

Hochstetler, William Douglas, David Pearson, Brad Seifers, and Rod Swanson (collectively, "Fyock") brought suit against the City of Sunnyvale, Mayor Anthony Spitaleri, and Chief Frank Grgurina ("the City"). E.R. V 657-75.

Seven days later, Fyock filed a motion for preliminary injunction to prevent the violation of his fundamental rights pending resolution on the merits. E.R. V 664. The district court denied his motion for temporary relief on March 5, 2014—just one day before he would be dispossessed of his arms. E.R. I 001-19. The district court found that the magazines are protected under the Second Amendment, but remarkably held that the government can nonetheless ban their possession and use outright without offending the Constitution. E.R. I 011-19.

Fyock immediately filed a notice of appeal to the Ninth Circuit, seeking to overturn the denial of his Motion for Preliminary Injunction. E.R I 020-42. On the same day, he filed an emergency motion for an injunction pending the appeal. The Ninth Circuit denied Fyock's request. E.R. V 676-90.

Following this Court's denial of his emergency motion, Fyock filed an Emergency Application for Injunction Pending Appeal to the Honorable Justice Anthony Kennedy. After ordering responsive briefing from the City, Justice Kennedy denied the emergency application without further comment.

3

II.     **SUNNYVALE MUNICIPAL CODE SECTION 9.44.050: MAGAZINE POSSESSION BAN**

On November 5, 2013, the City of Sunnyvale passed Measure C (Addend. 104), which in part amended the Sunnyvale Municipal Code to incorporate section 9.44.050 ("the Ordinance") and banned the possession of ammunition feeding devices or magazines with the capacity to accept more than ten rounds. Sunnyvale, Cal. Muni. Code § 9.44.050(a) (Addend. 102). The Ordinance took effect on December 6, 2013, ten days after the City Council certified the election results.[1] Any person in lawful possession of such magazines when the law took effect had only ninety days to remove them from the City, surrender them to the Department of Public Safety for destruction, or sell or transfer them to a properly licensed vendor in accordance with state law. *Id.* § 9.44.050(b) (Addend. 102).[2] Anyone who fails to comply with the ban is subject to criminal penalties, including incarceration. *Id.* § 1.04.010 (Addend. 101).

Fyock and all appellants are responsible, law-abiding residents of Sunnyvale who are not prohibited from owning or possessing firearms. E.R. V 596, 600, 604, 608, 612, 659-62. They each own magazines capable of holding

---

[1] The results were scheduled to be certified in January 2014, but the Council expedited the certification of the vote on November 26, 2013.

[2] Because the Ordinance took effect on December 6, 2013, all persons were required to divest themselves of their magazines by March 6, 2014.

4

more than ten rounds of ammunition that were lawfully acquired prior to December 6, 2013, but the Ordinance prohibited them from continuing to possess those magazines within the City. E.R. V 596, 600, 604, 608, 612, 659-62. Each plaintiff complied with the Ordinance to avoid prosecution, but each of them would immediately possess these magazines within the City for self-defense and other lawful purposes should the Court enjoin enforcement of the Ordinance. E.R. V 597, 601, 605, 609, 613, 659-62.

## III. THE BANNED MAGAZINES ARE STANDARD EQUIPMENT FOR COMMON FIREARMS OWNED BY MILLIONS OF LAW-ABIDING CITIZENS

The facts overwhelmingly support the district court's finding that magazines capable of holding more than ten rounds are commonly possessed and preferred by law-abiding citizens. Indeed, the court found that these magazines are among the most preferred in the nation to keep and use for both self-defense and sport, accounting for approximately 47 percent of the magazines in circulation. E.R. I 011; V 617.

### A. Magazines Over Ten Rounds Are Commonly Possessed by Law-Abiding Citizens—Accounting for Nearly Half of All Magazines

Firearms with magazines capable of holding more than ten rounds are typically possessed by law-abiding citizens for lawful purposes, including self-defense and sport. Such magazines are *standard equipment* for many of the most

5

popular pistols and the predominant brands of rifles used for both self-defense and recreational purposes. E.R. IV 429, 431-523; V 617, 623-24. Standard-issue magazines for common pistols typically have capacities ranging from eleven to twenty rounds, with many having a capacity between fifteen and seventeen.[3] Magazines for tens of millions of rifles possessed by law-abiding citizens have capacities over ten rounds. E.R. V 617, 620. These are the "standard capacities" for many of the most popular firearms in American society.[4]

Today, a large percentage of pistols, perhaps a majority, are manufactured with magazines holding more than ten rounds. E.R. V 623-24; *see also* E.R. II 077-80; IV 432-65; V 622 (approximately one-third of the semiautomatic handgun models listed in *Gun Digest*, a reference work that catalogues currently available firearms, are normally sold with magazines over ten rounds). And millions of rifles equipped with such magazines are privately owned throughout the United States. E.R. IV 481-93; V 617-18, 620 (approximately two-thirds of the distinct models of semiautomatic, centerfire rifles listed in *Gun Digest* are regularly sold with

---

[3] E.R. V 623-24 (listing the many examples of common handguns, including the widely popular 17-round Glock 17); *see also* E.R. IV 525-49.

[4] Firearms and magazines over ten rounds date "to the dawn of firearms." E.R. V 623-24 (describing the historical development and use of magazines with capacities over ten rounds from the fifteenth century to the present).

6

detachable magazines over ten rounds).

At minimum, there are tens of millions of magazines capable of holding more than ten rounds in the hands of the American public. E.R. V 616-18. A 2004 report estimated the number of such magazines to be 72 million—a figure that does not even include the millions that have been imported or manufactured in the last ten years. E.R. III 312.

## B. Americans Routinely Select the Prohibited Magazines for Both Self-Defense and Sport

There are a number of reasons why so many Americans choose magazines over ten rounds. Importantly, these standard-capacity magazines decrease the risk of running out of ammunition before one can successfully repel a criminal attack.[5] The availability of more ammunition in a firearm for self-defense is particularly preferable given that: (1) violent crimes often involve multiple attackers, increasing the likelihood that a greater number of defensive discharges will be required to eliminate the threat, E.R. V 560, 630-35; (2) the stress of a criminal attack greatly reduces the likelihood that shots fired will hit the aggressor, E.R. V

---

[5] Magazines over ten rounds were specifically developed to increase their effectiveness for self-defense, E.R. V 623-25, and manufacturers market them for their self-defense capabilities. E.R. IV 429, 494-523. As evidenced by the fact that U.S. consumers acquire firearms specifically developed and marketed for personal defense on a massive scale, E.R. V 617-18, 620, they are preferred by millions of law-abiding Americans for that purpose.

7

560-61; *see also* E.R. V 638; and (3) a single shot that does strike will rarely incapacitate the aggressor before he or she can complete his or her attack, E.R. V 631-32.[6]

In light of these realities, Americans commonly choose standard magazines over ten rounds so that they won't be left defenseless after expending ten rounds of ammunition. Active, off duty, and retired law enforcement officers also prefer magazines over ten rounds to increase their chances of surviving a criminal attack. E.R. V 596-97, 600-01, 604-05, 608-09, 612-13, 625, 637.[7]

Further, many Americans commonly select magazines over ten rounds because they are essential in the most popular competitive shooting sports in

---

[6] Americans also routinely prefer magazines over ten rounds rather than relying on multiple, smaller-capacity magazines. Criminal attacks occur without notice, taking the victim by surprise, usually at night and in confined spaces, and victims rarely have multiple magazines available for reloading. E.R. V 559-60; 635-36. Even if one were fortunate enough to have additional magazines available, magazines over ten rounds are nonetheless preferable given that it is extremely difficult—and potentially deadly—to change magazines under the stress of a criminal attack. E.R. V 562-63, 638.

[7] Civilians have historically modeled their choice of firearms on what police carry. E.R. V 624-25, 637. Glock pistols with 15-17 round magazines, the most popular handguns among law enforcement, are "hugely popular" for home and personal defense. E.R. II 080. It seems Sunnyvale's own officers also prefer magazines over ten rounds for personal defense. Indeed, the City recently opined (implausibly) that the Ordinance exempts off-duty officers and their *personally owned* magazines. E.R. II 085; III 388; *but see* Addend. 104.

America. For example, standard ammunition capacities over ten rounds are required for the famed "3-Gun Competition," the fastest-growing shooting sport in America, where participants use magazines over ten rounds while testing their marksmanship skills using rifles, shotguns, and handguns. E.R. V 647; *see* Chad Adams, *Complete Guide to 3-Gun Competition* 89 (2012).

### C.    The "Large Capacity" Label Is a Misnomer

As explained by renowned firearms historian Steven Helsley, the standard magazine for a given firearm is one that was originally designed for use with that firearm, regardless of its capacity. E.R. V 623. Nonetheless, the City pejoratively refers to the banned magazines as "large-capacity magazines." Proponents of bans on standard magazines capable of holding more than ten rounds have even started referring to them as "mega-magazines." Cal. Leg. S. 396, 2013-2014 Reg. Sess. (Cal. 2013); Bill Analysis, S. 396, 2013-2014 Reg. Sess., at 5 (Cal. 2013). San Francisco went so far as to adopt a finding describing the prohibited magazines as "typically associated with machine guns or semi-automatic assault weapons," S.F., Cal., Police Code § 619(a)(4) (Addend. 88), despite their being standard equipment for tens of millions of *handguns*. *See supra* Part III.A.

Not surprisingly, the vast majority of jurisdictions in the United States do not consider magazines over ten rounds to be "large capacity." To Fyock's

knowledge, while one state has attempted to set the limit at seven rounds, four have

set it at ten, and two have a fifteen-round maximum—only *forty-three* states have

no such limit. Ninety percent of states are not in line with the City. E.R. II 093-94.[8]

And the City cited only three municipalities—*out of more than 19,000*—with

magazine limitations similar to its own. Enacting an ordinance that removes

standard magazines from the homes of law-abiding citizens, the City has

positioned itself at the extreme end of the gun control continuum.

## IV.  THE DISTRICT COURT'S RULING

The district court employed the two-step analytical framework adopted by

this Court in *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013), and

acknowledged in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014),

looking first to whether the law burdens conduct protected by the Second

Amendment and then examining the law under the appropriate level of scrutiny.

E.R. I 010-12.

The court began its analysis by correctly finding that the banned magazines

---

[8]  Cal. Penal Code § 32310 (Addend. 2); 2013 Conn. Acts P.A. 13-3 § 23 (Addend. 8); Haw. Rev. Stat. § 134-8(c) (Addend. 11); 2013 Md. Sess. Laws ch. 427, § 1 (Addend. 17); Mass. Gen. Laws Ann. Ch. 140, § 121 (Addend. 12); Mass. Gen. Laws Ann. Ch. 140, § 131M (Addend. 16); 2013 N.Y. Sess. Laws ch. 1, § 38 (Addend. 83); 2013 N.Y. Sess. Laws ch. 1, § 41-b (Addend. 85); 2013 Colo. Stats. H.B. 13-1224 (Addend. 3); N.J. Stat. Ann. § 2C:39-1(y) (Addend. 79); N.J. Stat. Ann. § 2C:39-3(j) (Addend. 81).

constitute arms that are "in common use," are not dangerous and unusual, and are within the scope of and protected by the Second Amendment. E.R. I 007.[9] The court further found that the City's ban burdens Fyock's Second Amendment rights because it forbids possession of the protected magazines "in all locations—in the home and in public—and for all purposes—self-defense or otherwise," thus satisfying the first step of the *Chovan* test. E.R. I 009.

Turning to the second step of deciding the appropriate level of scrutiny, the court correctly found that the ban burdens conduct "near the core of the Second Amendment right," even noting that its "conclusion points to strict scrutiny as the proper standard in this case." E.R. I 011. Its analysis goes astray, however, when it turns to the second prong of step two: assessing the burden imposed by the ban. The court found that the burden imposed by the total ban on a large class of popular—and constitutionally protected—arms is "light." E.R. I 011. Specifically, the court reasoned that the banned magazines were "hardly crucial for citizens to exercise their right to bear arms," that "countless other handgun and magazine options" were available, and that the banned magazines make up "just one subset

---

[9] The court rejected the argument that the magazines are not protected because they are not often "used" for self-defense, holding that the Supreme Court's "common use" test requires only that the arms are typically *possessed* by law-abiding citizens for lawful purposes, not that they are commonly *used* in self-defense. E.R. I 008 (citing *Heller*, 554 U.S. at 625).

of magazines." E.R. I 011.

Having found the total ban on nearly half of all magazines imposed "only the most minor burden on the Second Amendment," the court decided that intermediate scrutiny was proper. E.R. I 012. It then found that the ban survived intermediate scrutiny, in large part because the alleged benefit of "potentially" reducing the availability of magazines over ten rounds for *use by criminals* was substantially related to an important government interest in public safety. E.R. I 013-14. The court suggested that the ban's potential benefit outweighed the costs of banning the protected magazines' *use by law-abiding citizens* in self-defense, noting that "in only very rare circumstances is it necessary to possess a larger magazine in self-defense." E.R. I 015.

Based on its finding that the Ordinance would pass intermediate scrutiny, the court dispensed with the preliminary injunction factors, and denied Fyock's motion. E.R. I 016-19.

## SUMMARY OF ARGUMENT

The very enumeration of the right takes out of the hands of government-even the Third Branch of Government-the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.

*District of Columbia v. Heller*, 554 U.S. 570, 634.

By prohibiting the possession of magazines capable of holding more than ten

rounds, the City has banned a broad class of arms that are used by tens of millions of law-abiding citizens for lawful purposes. The district court acknowledged that the banned magazines make up approximately 47 percent of all magazines, and found that they easily pass the "in common use" test established by the Supreme Court to determine which arms are protected by the Second Amendment.

Because these protected magazines are so common, it is not surprising that they are sometimes used by criminals and, on rare occasions, the mentally ill to commit crimes. Likewise, it is not surprising that, in addition to being preferred by millions of Americans for sporting and self-defense purposes, they are also preferred by law enforcement personnel, including the City's own police force, both while on-duty and off-duty in their homes.

Statistically speaking, banning the possession of magazines holding more than ten rounds likely will do little or nothing to reduce criminal violence—it may have the opposite effect. And to be fair, it may not often impact the ability of law-abiding citizens to defend themselves. Of course, when one is under attack by a group of violent criminals and in need of a few extra rounds, no matter how infrequent that might be, the consequences of such a ban cannot be any more severe. In any event, the court is ill-equipped to deal with such issues. These are matters of policy.

13

But these particular policy matters are necessarily limited by the constitutional rights of the millions of Americans who possess protected arms. Whether, on balance, a ban will do more good than harm is not for the courts to decide. The Constitution, as interpreted by the Supreme Court, already made that decision; it necessarily takes some policy choices off the table. *Id*. at 635. One of those choices is banning and confiscating protected arms from law-abiding citizens because they are sometimes misused by criminals and other protected arms are available. But that is exactly what the City has done here and what the lower court mistakenly upheld.

The court did so reasoning that the magazines represent "just one subset" of arms, "hardly crucial" or necessary for self-defense. E.R. I 014-15. In effect, the court found that, on balance, the right of law-abiding citizens to possess the protected magazines was not a right "really worth insisting upon." The *Heller* Court addressed these issues and came to the opposite conclusion. *Id.* at 634.

The *Heller* Court invalidated a ban on handguns and, in doing so, rejected D.C.'s argument that handguns are used in *most* crimes and other arms are readily available for in-home self-defense. The Court found those arguments irrelevant, and barely addressed them. *See, e.g.*, *id*. at 629 ("It is no answer to say . . . other firearms [are] allowed."). Under *Heller*, the question of whether certain subsets of

14

arms may be banned has nothing to do with whether they are "crucial" or even "necessary" for self-defense. Rather, the test is what firearms and magazines are "typically possessed" or "preferred" by "law-abiding citizens for lawful purposes." *Id.* at 624-25, 628-30. Legislative diktat to the contrary cannot override public choice. The City's disagreement with typical citizens' preferences for magazines in this case is no more valid than D.C's was in *Heller*, and its ban should likewise be stricken.

In sum, the City cannot ban protected arms by arguing its ban imposes "only the most minor burden on the Second Amendment"—even if the ban applies to "just one subset" of protected arms and other arms remain available. *Heller* explicitly bars such an approach. Arms are either protected, or they are not. The fact that people do not *need* a .44 magnum to defend themselves does not mean the government is free to ban them. Allowing local governments to prohibit arms in common use, one subset at a time, will lead inexorably to a point where there is no "set" left, and the right simply disappears. The district court failed to appreciate this concept.

This underlying conceptual error led to the court's failure to find the ban categorically invalid, as would have been mandated by a faithful application of *Heller*. *See infra* Part II.B. It also led to the court's errors in choosing and applying

15

intermediate scrutiny. *See infra* Parts II.C and II.D. Ultimately, it led to the court's error in denying Fyock's Motion for Preliminary Injunction based on its assessment that he would not prevail on the merits.

While the government might lawfully place some upper limit on ammunition capacity, the City's ten-round limit is well below that which the American people find suitable for self-defense. This Court need not decide what limit might serve the government's interest while still comporting with constitutional protections. It need only acknowledge that the City's ban goes too far.

## ARGUMENT

## I. STANDARD OF REVIEW ON MOTION FOR PRELIMINARY INJUNCTION

Applicants seeking a preliminary injunction must establish: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Generally, the appellate standard of review for a preliminary injunction order is abuse of discretion. *See, e.g.*, *Rucker v. Davis*, 237 F.3d 1113, 1118 (9th Cir. 2001) (en banc), *rev'd on other grounds*, *Dep't of Hous. & Urban Dev. v.*

16

*Rucker*, 535 U.S. 125 (2002). A district court, however, never has discretion to apply the wrong legal standard. *Id.* at 1118; *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982) ("misapprehend[ing] the law with respect to the underlying issues in litigation" constitutes reversible legal error). So if the district court "applied incorrect substantive law," its ruling denying preliminary relief must be reversed. *Int'l Molders' & Allied Worker's Local Union v. Nelson*, 799 F.2d 547, 550 n.1 (9th Cir. 1986).

Insofar as a denial rests on a premise concerning the pertinent rule of law, those issues are reviewed de novo, as is "the conclusion that plaintiffs are likely to fail on the merits of those issues." *Russell v. Gregoire*, 124 F.3d 1079, 1083 (9th Cir. 1997). If the appellate court holds a view of the applicable legal principle that differs from that of the district court, it has a duty to apply the principle which it believes proper and sound. *Coal. For Econ. Equity v. Wilson*, 122 F.3d 692, 701 n.9 (9th Cir. 1997) ("Where the issue is whether the district court got the law right in the first place," this Court does "not defer review and thereby allow lawsuits to proceed on potentially erroneous legal premises.").

Further, where application of the correct rule compels resolution of the ultimate issues, the court of appeals may reach the merits. *Rucker*, 237 F.3d at 1118-19; *see also Callaway v. Block*, 763 F.2d 1283, 1287 n.6 (11th Cir. 1985)

17

(citing authority that "courts may, and have, ruled on legal issues and claims on the merits in the course of reviewing interlocutory orders . . . denying preliminary injunctions").

## II. FYOCK IS LIKELY TO SUCCEED ON THE MERITS OF HIS SECOND AMENDMENT CLAIM

### A. The District Court Correctly Found the Prohibited Magazines Are Typically Possessed by Law-Abiding Citizens for Lawful Purposes and Thus Protected Under the Second Amendment

A historical analysis of the Second Amendment confirms that it protects arms "typically possessed by law-abiding citizens," or those that are "in common use at the time." *Heller*, 554 U.S. at 624-25; *see also* E.R. II 082-86; V 643-48. Conversely, it "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Put another way, the Second Amendment does not protect arms "that are highly unusual in society at large," but it definitively protects those in common use for lawful purposes. *Id.* at 627. This distinction is supported by the historical prohibition on carrying arms that are both "dangerous *and* unusual." *Id.* (emphasis added).

In line with this precedent, the district court properly applied *Heller*'s "common use" analysis, concluding that "magazines having a capacity to accept more than ten rounds are in common use, and therefore are not dangerous and unusual." E.R. I 007. Magazines with capacities over ten rounds, and firearms

18

equipped with them, are routinely chosen and preferred by Americans for self-defense and other lawful purposes. *See supra* Part II.A-B. The court acknowledged that magazines over ten rounds make up approximately half of all magazines owned and that a large share of the firearms in the United States are sold with such magazines as standard equipment. E.R. I 007; *see also* E.R. II 075-80, 082-86; IV 428-30, 431-549; V 596-97, 600-01, 604-05, 608-09, 612-13, 615-20, 621-28, 629-41, 643-48. Indeed, many of the most popular models of handguns available have capacities ranging from fifteen to seventeen rounds. E.R. IV 429, 431-93, 495-523; V 623.

Although the law carves out a number of narrow exceptions for the possession of these magazines, none of them applies to the average law-abiding citizen. E.R. I 009. Accordingly, the district court properly found the Ordinance prohibits the possession of constitutionally protected magazines. E.R. I 005-09.

### B. Because the Ordinance Destroys the Right of Law-Abiding Citizens to Possess Constitutionally Protected Magazines, the District Court Erred in Failing to Find it Categorically Invalid

It is a fundamental principle of both law and logic that, where the constitution protects the possession or use of an item, a total ban on such possession or use will be an unconstitutional infringement of that right, regardless of the level of scrutiny applied. To this end, courts properly forgo application of

19

means-end review when considering flat prohibitions on constitutionally protected conduct. E.R. II 086-88; V 648-650.[10]

Here, the Ordinance is invalid because it imposes an outright ban on the possession of magazines the court found are protected by the Second Amendment. Rather than regulate these protected magazines, the City has flatly banned all law-abiding citizens from possessing them in their homes. The City's ordinance is thus irreconcilable with the Second Amendment's protections for these magazines under any test, and the Court need not select a level of scrutiny in declaring it invalid.

This approach is consistent with the analysis undertaken by the Supreme Court in *Heller*, where it found that a ban on a protected class of firearms necessarily violates the Second Amendment under any test. 554 U.S. at 628-29, 635. While the handgun ban would fail "any of the standards of scrutiny that [the

---

[10]   *See, e.g.*, *Heller*, 554 U.S. at 635; *Moore v. Madigan*, 702 F.3d 933, 940, 941 (7th Cir. 2012) (striking ban on carrying firearms outside the home, the court eschewed the levels of scrutiny analysis it had applied in other Second Amendment contexts); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 n.9 (2d Cir. 2012) (recognizing that "where a state regulation is entirely inconsistent with the protections afforded by an enumerated right—it is an exercise in futility to apply means-end scrutiny"); *see also*, *Stanley v. Georgia*, 394 U.S. 557 (1969) (holding that a ban on the private possession of obscene material violated the First and Fourteenth Amendments); *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965) (declaring a ban on contraceptives unconstitutional); *Lamont v. Postmaster Gen. of the U.S.*, 381 U.S. 301 (1965) (holding that a ban on access to materials deemed "communist political propaganda" violated the First Amendment).

courts have] applied to enumerated constitutional rights," *id.* at 628, the Court made a point of not applying any of those standards. Instead, it categorically invalidated the ban because it flatly prohibited a class of arms "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense. *Id.* at 628-29. That it did so without selecting a level of scrutiny is unsurprising. For the Second Amendment would mean little if the application of a particular test would permit the government to ban the very arms the Second Amendment protects.

Categorical invalidation of a ban on protected Second Amendment conduct is also consistent with the approach recently taken by this Court in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014). Invalidating a regulatory scheme that denied most individuals the right to carry a loaded firearm outside the home, *Peruta* confirmed that laws that destroy a right central to the Second Amendment are necessarily invalid regardless of the level of scrutiny applied. "A law that 'under the pretence of regulating, amounts to a destruction of the right' would not pass constitutional muster '[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights.' " *Id.* at 1167(quoting *Heller*, 554 U.S. at 628-29). "For if self-defense outside the home is part of the core right to 'bear arms' and the California regulatory scheme prohibits the exercise of that right, no amount of interest-balancing under a heightened form of means-end

21

scrutiny can justify" the challenged government action. *Id.* The possession and use of protected arms for self-defense is part of the core right to keep and bear arms, and the City's absolute ban on protected magazines cannot be squared with the Second Amendment's protections for them.

This Court's recent decision in *Jackson v. City and County of San Francisco*, No. 12-17803, 2014 WL 1193434 (Mar. 25, 2014), does not foreclose invalidation of the Ordinance without resort to means-end review. There, this Court upheld San Francisco's ban on the retail sale of a class of ammunition under intermediate scrutiny. *Id.* at *13. The *Jackson* panel found it inappropriate to categorically invalidate the ordinance for two reasons, each of which is readily distinguished here.

First, the *Jackson* panel viewed the right at issue as a generalized right to self-defense, rather than the right to acquire and possess a protected class of ammunition *for that purpose*. *Id.* at *11. While self-defense is indeed "central" to the right to arms, the Second Amendment guarantees the right to *keep and bear arms* that fall within the constitution's protections *for* lawful purposes, including but not limited to self-defense. *Heller*, 554 U.S. at 624-25. To be clear, Fyock does not allege that the Ordinance destroys his right to use a firearm for self-defense. Rather, just as Mr. Heller sought to possess a protected *handgun* for self-defense,

Fyock seeks to vindicate his right to keep and bear common, protected *magazines* for that purpose.

Second, the *Jackson* panel found it significant that San Francisco did not deny Ms. Jackson the use of protected ammunition because she could access it elsewhere for possession and use within San Francisco. *Id.* That is not the case here. To the contrary, Sunnyvale has completely destroyed the right of residents to possess the now-prohibited magazines anywhere within its borders.

Because the Ordinance eviscerates the right to possess and use common, protected magazines for self-defense, the district court erred in finding that it does not amount to the "destruction" of a Second Amendment right. In support of its conclusion, the court noted that the Ordinance "does not ban all, or even most, magazines." E.R. I 010. The court's reliance on this finding marks a startling departure from *Heller*.

Under the district court's rationale, the *Heller* handgun ban itself would not have "destroyed" the right to possess and use arms for self-defense, and thus could not have been categorically stricken by the Supreme Court. *But it was*—even though it did not ban "all, or even most," firearms. And the basis for the district court's holding that the Ordinance is not per se invalid was *emphatically* rejected by the Supreme Court: "It is *no answer* to say, as [the District does] that it is

23

permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629 (emphasis added).

In *Heller*, the handgun ban was plainly unconstitutional regardless of the standard of review applied—not because it destroyed the right to keep arms in the home altogether—but because it flatly banned the possession of *handguns*, arms overwhelmingly chosen by the American people that account for roughly forty percent of all firearms. Respondent's Brief at 47, *District of Columbia v. Heller*, 554 U.S. 470 (2008) (No. 07-290), 2008 WL 336304. Because the handgun ban was inimical to the right to possess and use *those particular* protected arms for self-defense, it was found unconstitutional. *Heller*, 554 U.S. at 629-35.

The Sunnyvale Ordinance similarly destroys the right to possess and use magazines overwhelmingly chosen by law-abiding citizens, that account for roughly forty-seven percent of all magazines. Just as the handgun ban was categorically invalidated despite the fact that it did not ban "all, or even most" firearms, the Ordinance need not ban *all* magazines to be categorically stricken. *But see* E.R. I 010.

In sum, the Ordinance is inimical to the Second Amendment's protections for the now-prohibited magazines. As was the case with the handgun ban in *Heller* and the effective ban on the right to publicly carry a loaded firearm in *Peruta*, the

24

Ordinance's total ban on the possession of protected magazines destroys the right to use them for the core lawful purpose of self-defense. The Ordinance should be held invalid without expedition into the "levels of scrutiny" quagmire. *See United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc).

C.    **If the Court Selects a Level of Means-End Review, Strict Scrutiny Must Apply; the District Court Erred in Selecting a Lesser Standard**

When a law interferes with "fundamental constitutional rights," it generally is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973); *see also, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Further, "a law is subject to strict scrutiny . . . when that law *impacts* a fundamental right, not when it infringes it." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 544 (9th Cir. 2004); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution"). In *McDonald*, the Supreme Court confirmed the right to keep and bear arms is fundamental, and it silenced any claim that the right should not be afforded the same status as other fundamental rights. 130 S. Ct. at 3044-48. In short, strict scrutiny is the "default" standard for reviewing laws that impact fundamental rights—and the right to arms is no exception. Should means-end scrutiny be used at all, strict scrutiny must

apply. Finding that the ban's "burden on the Second Amendment is light" because reduced-capacity magazines remain available, E.R. I 011, the court misapplied binding precedent from the Ninth Circuit and the Supreme Court and improperly selected intermediate scrutiny.

In *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013), this Court upheld a ban on the possession of arms by convicted domestic violence misdemeanants. After concluding the law affected Second Amendment conduct, the Court considered the law's proximity "to the core of the Second Amendment" and "the severity of the law's burden" to determine the appropriate level of heightened scrutiny. *Id.* at 1138. In selecting intermediate scrutiny, the Court explained that Chovan's claims were outside the core of the right because his conviction excluded him from the "law abiding," and although the ban imposed a "quite substantial" burden, the law's many exceptions "lightened" it. *Id.*

Here, while the district court properly concluded the Ordinance does burden core Second Amendment conduct because it strikes at the possession of protected arms by the law abiding for in-home self-defense, it improperly held the burden on that conduct insufficient to warrant strict scrutiny. E.R. I 010-12. In doing so, the district court viewed *Chovan* as requiring that a law *both* impact core conduct *and* impose a severe burden to trigger strict scrutiny. E.R. I 011-12. But *Chovan* does

26

not compel such a mechanical approach.

Rather, *Chovan* and the cases it relies on apply intermediate scrutiny after finding the laws at issue to be *outside* the core and to place varying degrees of burden on the right. 735 F.3d 1138; *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1266, 1257-58 (D.C. Cir. 2011); *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 97 (3d Cir. 2010). *Chovan* does *not* foreclose application of strict scrutiny to laws that, although not reaching the core, severely burden protected conduct. More importantly, it in *no way* mandates that intermediate scrutiny apply to those laws that strike at the Second Amendment's core unless the burden is independently deemed severe. If we are guided by First Amendment principles—and *Chovan* holds that we are, 735 F.3d at 1138—laws regulating core conduct command strict scrutiny *no matter how severe the burden*. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). Just as "*any* law regulating the content of speech is subject to strict scrutiny, . . . *any* law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (emphasis added).[11]

───────────────

[11] As one post-*Chovan* opinion explains, "[a] regulation that threatens a core Second Amendment right is subject to strict scrutiny, while a less severe regulation

27

Regardless, the burden imposed on core conduct in this case is particularly severe. It does not simply regulate "the *manner* in which" Fyock may exercise his rights, *Chovan*, 735 F.3d at 1138, but rather *directly* bans the possession and use of constitutionally protected arms by forcing him and all other law-abiding citizens to remove them from their homes—under threat of criminal penalty. The district court tried to minimize the severity of this burden, reasoning that magazines over ten rounds, a "subset of magazines," are not "crucial for citizens to exercise their right bear arms" and that citizens may exercise their rights with smaller magazines. E.R. I 011. That reasoning is fundamentally flawed for two reasons.

First, it improperly identifies the right at issue as a generalized right to self-defense. Again, while self-defense is a key component of the right to arms, the Second Amendment enshrines a related, but distinct, right to keep and bear common arms *for that purpose* (and others). *Heller*, 554 U.S. at 624-25. Here, Fyock seeks to vindicate his right to possess and use constitutionally protected magazines. Because the court did not identify this as the right at issue, it consequently failed to recognize that a full and complete ban on that protected conduct is a severe burden on that right commanding strict scrutiny.

———————————

that does not encroach on a core Second Amendment right is subject to intermediate scrutiny." *Morris v. U.S. Army Corps of Enginrs.*, No. 13-00336, 2014 WL 117527, at *2 (D. Idaho Jan. 10, 2014).

Second, such reasoning highlights the inherent problem with judicial approval of bans on "subsets" of protected arms, which by their nature leave alternative arms available for self-defense and would, in the district court's view, always warrant only intermediate scrutiny. Taking that analysis to its natural conclusion, only total bans on all arms would trigger strict scrutiny because otherwise alternative avenues for self-defense will always remain. But *Heller* explicitly rejects the district court's rationale that a city may ban protected arms so long as others remain available. 554 U.S. at 629. And Judge Kavanaugh's dissent in *Heller II*, wherein he quotes the *Heller* majority, provides the most adept response to such reasoning:

> [It's] a bit like saying books can be banned because people can always read newspapers. That is not a persuasive or legitimate way to analyze a law that directly infringes an enumerated constitutional right. *Indeed, Heller itself specifically rejected this mode of reasoning: "It is **no answer** to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."*

*Id.* at 1289 (quoting *Heller*, 554 U.S. at 629) (Kavanaugh, J., dissenting) (emphasis added).

The district court thus erred in judging the "burden" on Fyock's rights according to how "necessary" or "crucial" magazines over ten rounds are for self-defense and whether other magazines are available for that purpose. E.R I 011,

014-15. Nowhere in the 66-page *Heller* opinion does the majority engage in a discussion about whether handguns are "crucial" for self-defense. And it never entertains arguments that leaving Americans to choose from the 60 percent of firearms that were not banned is not a severe burden. Instead, the Court simply acknowledged that there are a number of reasons that Americans so commonly choose handguns. *Heller*, 554 U.S. at 629. *Heller* is clear that whether individuals may keep and bear certain arms does not turn on how difficult it may be to engage in self-defense with *other* arms the government has not banned.

As is the case with handguns, there are a number of reasons that millions of Americans possess magazines over ten rounds. *See supra* Part II.B. It is simply *no answer* to say the Ordinance does not ban all or even most magazines, or that some lawyers, lawmakers, or judges may believe that Fyock can sufficiently exercise his right to arms with reduced-capacity magazines. The ban's burden on the right to own protected magazines over ten rounds is no less severe because the right to own other magazines remains intact.

This Court's recent decision in *Jackson* also compels the application of strict scrutiny here. The *Jackson* panel applied intermediate scrutiny to the City's ban on the retail sale of hollow-point ammunition in San Francisco because it "neither regulates conduct at the core of the Second Amendment right nor burdens that right

30

severely." 2014 WL 1193434 at *11. In reaching that conclusion, the Court reasoned that the ammunition sales ban only indirectly "burdens the core right of keeping firearms for self-defense," "because Jackson is not precluded from using the hollow-point bullets in her home if she purchases such ammunition outside of San Francisco's jurisdiction." *Id.* The Court also reasoned that the law only made "it more difficult to purchase certain types of ammunition," leaving her access to fully-jacketed ammunition inside the city and to hollow-point bullets outside the city. *Id.* Because Ms. Jackson could access the banned ammunition elsewhere and keep it in her home for self-defense if she desired, the Court deemed the burden less severe. *Id.*

By contrast, the City's ban, far from simply requiring that Fyock acquire the protected magazines elsewhere, forces him to remove them from his home altogether. He cannot access or possess them anywhere in Sunnyvale. And he can never use them for self-defense in his home (or anywhere within the City) under any circumstance. The Ordinance even goes so far as to demand that Fyock dispossess himself of his previously lawfully owned property. The burden on Fyock's right to own and use protected magazines for in-home self-defense is as direct and severe as it gets. *At least* strict scrutiny must apply.

Application of strict scrutiny in this case comports with the decisions of

31

other circuits. While the district court noted that many courts have evaluated

Second Amendment claims under intermediate scrutiny, E.R. I 012, they have

routinely done so where the interest asserted does *not* involve core Second

Amendment conduct.[12] That is not the case here. The City's flat ban on the lawful

possession of arms overwhelmingly chosen by American society for self-defense

lies at the very heart of the Second Amendment, and strict scrutiny must apply.

   *Heller II*, the lone circuit opinion to apply intermediate scrutiny to a ban on

the possession of common arms by law-abiding citizens, also suggests that strict

scrutiny is appropriate in this case. There, the D.C. Circuit applied lesser scrutiny,

reasoning that there was little evidence the banned arms were "well-suited to or

preferred" for self-defense and sporting purposes. *Heller II*, 670 F.3d at 1262.

Controlling Supreme Court precedent provides no support for such a test. But even

if it did, the wealth of evidence that firearms equipped with magazines over ten

rounds are both highly effective and hugely popular for self-defense and sport,

---

   [12] Circuit cases applying intermediate scrutiny almost invariably involve conduct determined to be outside the core. *See, e.g.*, *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (possession by violent misdemeanant); *Masciandaro*, 638 F.3d at 471 (possession of loaded firearms in vehicle in sensitive public place); *United States v. Chester*, 628 F.3d 673, 680, 682-83 (4th Cir. 2010) (possession by violent misdemeanant); *United States v. Reese*, 627 F.3d, 792 802 (10th Cir. 2010) (possession while subject to a domestic violence protective order); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (possession by felons); *Marzzarella*, 614 F.3d at 98 (possession of firearms with obliterated serial numbers); *Skoien*, 614 F.3d at 641-42 (possession by violent misdemeanant).

*supra* Part II.B, establishes that strict scrutiny is appropriate even under the novel test imposed by *Heller II*.

In sum, if the Court opts to apply a level of means-end scrutiny, it should keep Kipling's six honest serving-men in mind.[13] Here, they each point directly to strict scrutiny. For, at all times ("when"), the law flatly bans the exercise of the core right ("how") of law-abiding citizens ("who") to possess and use protected arms ("what") in the sanctity of their homes ("where") for the purpose of self-defense ("why")—the Second Amendment interest that is "surely elevate[d] above all other[s]." *Heller*, 554 U.S. at 635. The district court erred in applying lesser judicial scrutiny to Fyock's claims.

### D.    The Ordinance Is Invalid Under Either Strict or Intermediate Scrutiny

Strict scrutiny requires the City to prove that its magazine ban is "narrowly tailored" to serve a "compelling Government interest." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 804 (2000). Even under intermediate scrutiny, the City must establish a "reasonable fit" or a "substantial relationship" between the ban and a "significant, substantial, or important" government objective. *Chovan*, 735 F.3d at 1139 (citing *Chester*, 628 F.3d at 683). Such a fit requires that the law

---

[13]  "I keep six honest serving-men (They taught me all I knew); Their names are What and Why and When and How and Where and Who." Rudyard Kipling, *The Elephant's Child*, in *Just So Stories* 31 (Acra Found. 2013).

is "not more extensive than necessary" to serve its interest. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 825 (9th Cir. 2013) (citing *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010)). The Ordinance fails either test.

The City failed to establish, and the district court improperly held, that the City's outright ban on the possession of protected arms is substantially related, and appropriately tailored, to its interest in reducing misuse by criminals and unauthorized users. E.R. II 089-91; V 643-56; *but see* E.R. I 012-15. The court's error was two-fold. First, it ignored the Supreme Court's clear guidance that the City's approach to addressing the problem of gun violence—i.e., taking protected arms from the homes of all law-abiding citizens—is not a constitutionally permissible means of accomplishing its goal under *any level of scrutiny*. E.R. II 089-91; V 643-56; *Heller*, 554 U.S. at 628-29. Second, the court applied a weakened form of intermediate scrutiny that did not hold the City to its burden under heightened review, giving far too much weight to the City's unreliable evidence and largely ignoring Fyock's. Both errors are rooted in a vital misunderstanding and misapplication of binding authority, and they should be reviewed de novo. At least, the court's misunderstanding of the relevant legal principles is an abuse of its discretion. *See Rucker*, 237 F.3d at 1118.

34

1.    **The District Court Erred by Finding the Government May Take Constitutionally Protected Arms from Law-Abiding Citizens to Reduce Criminal Misuse**

The City seeks to reduce injuries from the criminal misuse of protected magazines by banning the use of those arms by the law abiding based *not* on the harm they themselves may cause, but on potential, future violence stemming from criminals who might steal those firearms from gun owners. But to ban certain arms because criminals might misuse them is to tell law-abiding citizens that their liberties depend not on their own conduct, but on the conduct of the lawless few who abuse those liberties—a perverse message indeed.[14] The notion that the government may flatly ban constitutionally protected activity on the grounds that the activity could lead to abuses has been squarely rejected in other contexts, and should be rejected here. For " 'a free society prefers to punish the few who abuse [their] rights . . . after they break the law than to throttle them and all others beforehand.' " *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)) (upholding injunction against enforcement of a ban on sale to and possession of spray paint and broad-

---

[14] Just as the First Amendment "knows no heckler's veto," the Second Amendment cannot tolerate restrictions on law-abiding citizens' right to keep and bear protected arms based on the threat to public safety posed not by those citizens but by criminals who may obtain such firearms illegally. *See Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004).

tipped markers by persons under 21 to combat graffiti).

Ultimately, the City's ban represents a policy choice as to the types of arms it desires its residents to use. But *Heller* is clear that such policy choices are off the table when considering commonly used, constitutionally protected arms. *See* 554 U.S. at 636. There, D.C. sought to ban handguns for the *same reasons* the City wishes to ban its residents from having common, standard-capacity magazines over ten rounds—i.e., to decrease criminal misuse and prevent injuries through decreased availability. *Id*. at 682, 694 (Breyer, J., dissenting). Despite these interests, D.C.'s handgun ban would "fail constitutional muster" under "any of the standards of scrutiny the Court has applied" to fundamental rights. *Id*. at 628-29 (maj. opn.).

If the D.C. handgun ban could not even pass intermediate scrutiny (i.e., it was not "substantially related" to the government's public safety interests), it follows that the City's ban on arms equipped with standard-capacity magazines cannot survive such scrutiny either. For if prohibiting law-abiding citizens from possessing protected arms in their homes were a valid method of reducing criminal access and misuse, *Heller* would have been decided differently. Certainly, the justifications for a ban on handguns are substantially more related to the government's public safety objectives than a ban on firearms with magazines

36

holding over ten rounds. While criminals might sometimes misuse magazines over ten rounds, criminal misuse of handguns is all too common. Handguns are involved in the vast majority of firearm-related homicides in the United States. *See id.* at 697-99 (Breyer, J., dissenting) (some 81 percent from 1993 to 1997). They are misused by criminals in most violent gun crimes by far.[15] And they make up the great majority of all guns stolen.[16] But despite the government's clear and compelling interest in keeping concealable firearms out of the hands of criminals and unauthorized users, *Heller* could not have been more clear that a ban on the possession of those protected arms by the law abiding lacks the required fit under *either strict or intermediate scrutiny*. *Id*. at 628-29 (maj. opn.).

The district court flatly ignored *Heller*'s critical instruction on this point. Though it properly found the magazines at issue to be constitutionally protected, it remarkably held that the City's flat ban on their possession and use by the law abiding survived intermediate scrutiny. E.R. I 010-15. But the court offered no explanation as to why a ban on handguns *is not* substantially related to the

---

[15]  *Id.* at 698 (citing Caroline Wolf Harlow, Bureau of Justice Statistics, U.S. Dep't of Justice, *Firearm Use by Offenders* 3 (Nov. 2001), http://www.bjs.gov/content/pub/pdf/fuo.pdf).

[16]  *Id.* (citing Marianne Zawitz, Bureau of Justice Statistics, U.S. Dep't of Justice, *Guns Used in Crime* 3 (July 1995), http://www.bjs.gov/content/pub/pdf/GUIC.PDF).

37

government's public safety interests under *Heller*, but how a similar ban on magazines over ten rounds *is* related to those interests, even though such magazines are used in crime far less often. E.R. I 012-15; *see also* Harlow, *supra*, 3 (for a comparison of handgun use and semiautomatic use by state and federal inmates). That is because there is no such explanation. For just as the *Heller* handgun ban was not tailored to prevent rampant criminal misuse of those arms, the City's outright ban on roughly half of the magazines possessed by law-abiding Americans is not sufficiently tailored to its interest in keeping those magazines from criminals.[17]

> ### 2. The District Court Erred in Applying a Toothless Intermediate Scrutiny That Never Held the City to Its Burden, Giving Improper Weight to its Evidence and Largely Ignoring Fyock's Counter-Evidence

Under heightened scrutiny, whether intermediate or strict, a challenged law is *presumed* unconstitutional, and the government bears the burden of justifying it.

---

[17] The handful of courts that have denied injunctions or otherwise upheld similar magazine bans have committed the same error the district court was guilty of here. They each improperly selected intermediate scrutiny and, in applying that test, ignored clear guidance from *Heller* that removing constitutionally protected arms from the homes of law-abiding Americans lacks the required fit under *any* level of scrutiny. *See Heller II*, 670 F.3d at 1262-64; *S.F. Veteran Police Officers Ass'n v. City & County of San Francisco*, No. 13-05351, 2014 WL 644395, at *5 (N.D. Cal. Feb. 19, 2014); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, No. 13-291S, 2013 WL 6909955, at *17-18 (W.D.N.Y. Dec. 31, 2013); *Shew v. Malloy*, No. 13-739, 2014 WL 346859, at *9 (D. Conn. Jan. 30, 2014); *Tardy v. O'Malley*, No. 13-2861, TRO Hr'g Tr., at 66-73 (D. Md. Oct. 1, 2013).

*See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *see also Chester*, 628 F.3d at 680. While the government has a compelling interest in promoting public safety and preventing crime, *see, e.g., Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994), to satisfy even intermediate scrutiny the City must demonstrate the law is likely to advance that interest "to a material degree," *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996). The City's "burden is not satisfied by mere speculation or conjecture"; instead, it "must demonstrate that the harms it recites are real and that its restriction will *in fact alleviate them . . . ." Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001).

The City failed to meet that burden, and the district court refused to consider whether the magazine ban was likely to yield any positive results at all. E.R. I 012-15. Instead, it improperly reasoned that "*irrespective of how Sunnyvale's law impacts public safety*, the means-end scrutiny test must concentrate more on the relationship between the challenged ordinance and public safety than on the exact effect the law may have." E.R. I 013 (emphasis added).[18]

_____

[18] To support its novel application of the intermediate scrutiny test, the district court quotes *Heller* and *McDonald* and reasons that consideration of the law's effectiveness will reduce means-end analyses "to courts making policy judgments better left to legislatures and the people." E.R. I 013 (citing *Heller*, 554 U.S. at 634 ("A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."); *McDonald*, 130 S. Ct. at 3050 (Second Amendment analysis does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in

39

So the court took the City at its word that its magazine ban "is substantially related to the compelling government interest in public safety," while largely ignoring the wealth of evidence Fyock provided showing that no such relationship can reasonably be established. E.R. I 015; *but see* E.R. II 089-91. What resulted was a novel and toothless form of intermediate scrutiny that provided no real protection to the important Second Amendment right at issue—a test resembling something more akin to rational basis review.

> **a. The District Court Erred in Finding That the City's Evidence Established the Required Fit Between the Ordinance and Its Public Safety Interests**

Ultimately, the district court held that the City submitted "substantial evidence that a ban on the possession of magazines having a capacity to accept more than ten rounds may reduce the threat of gun violence." E.R. I 013-14. But to

---

an area in which they lack expertise.").

But these quotes hardly support the application of a special—and especially weakened—form of intermediate scrutiny to the Second Amendment. They more accurately caution against the application of intermediate scrutiny in the Second Amendment context, since intermediate scrutiny *requires* courts to weigh conflicting evidence and determine whether a law effectively advances the government's interests. *See* Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 757 (2012) ("[T]he lower courts have essentially wound up embracing the sort of interest balancing that Justice Breyer recommended and that Scalia vociferously denounced."). This warning is particularly well-taken in the most extreme cases, like this one, where protected arms are taken from the homes of law-abiding citizens.

40

reach this conclusion, the court relied heavily on unsubstantiated and contradicted

opinion testimony, as well as evidence that has been rejected by the Supreme Court

as a basis to establish the required fit between an interest in reducing criminal

misuse of protected arms and a law that divests the citizenry of those arms.

Because the court improperly relied on this evidence, it erred in concluding that the

Ordinance survived intermediate scrutiny.

              **i.**      **Opinion Testimony That the Ordinance *Might* Possibly Reduce Violent Crime is Unfounded and Cannot Validate the City's Total Ban**

The district court's finding was heavily based on the unreliable and largely

unfounded opinions of Dr. Charles Koper—specifically, his claims that the

Ordinance had the "potential to (1) reduce the number of crimes committed with

[magazines over ten rounds]; (2) reduce the number of shots fired in gun crimes;

(3) reduce the number of gunshot victims in such crimes; (4) reduce the number of

wounds per gunshot victim; (5) reduce the lethality of gunshot injuries when they

do occur; and (6) reduce the substantial societal costs that flow from shootings."

E.R. I 014. But to rely so heavily on these opinions, the court necessarily had to

ignore the inconsistencies in Koper's conclusions over time and the fatal flaws of

the studies he relied on to inform them.

Most notably, the court disregarded the fact that in 2004, before Koper was

41

drafted to testify in support of the Ordinance, he stated that "we cannot clearly credit the [federal] ban [on magazines over ten rounds] with any of the nation's recent drop in gun violence." E.R. III 343. In his 2004 study, Koper could establish no causal link between the use of magazines over ten rounds in crime and increased casualties. E.R. III 249, 343. Indeed, he concluded that "there has been no discernible reduction in the lethality and injuriousness of gun violence" as a result of the nationwide ban. E.R. III 343.

And when Koper examined his own studies for trends in the use of guns with such magazines in Baltimore, Milwaukee, Anchorage, and Louisville, he admitted that the available data in those cities "were too limited and inconsistent to draw any clear overall conclusions in this regard." E.R. III 236-37. He also recently admitted that the Jersey City study, *his most comprehensive data set*, ***cannot support a finding that pistols with magazines over ten rounds are any more lethal than revolvers (which almost always hold less than ten rounds)***. E.R. II 108-110; III 331. While Koper now asserts that, if given more time, the federal ban "could" have produced data supporting his conclusions, E.R. III 237, he has no data or evidence to support this claim other than his own post-hoc supposition for why the effects of the federal ban did not have the effects he expected. E.R. V 564.

In an attempt to provide any data that might support his beliefs, Koper

42

incredulously cited a non-scholar reporter's "investigation" of the use of magazines capable of holding more than ten rounds in Virginia. E.R. III 237. But this third-party newspaper article provides *no evidence* that more shots were fired in Virginia or that gun shot injuries increased after the federal ban expired. And neither Koper's declaration nor the article discusses the methodology used in the journalist's investigation. Nor did Koper ever assess the study's reliability or consider any reasonable explanation for the outcome.

In short, Koper's study of the federal ban found no evidence of any reduction in lethality of firearm-related violence. Thus, as he implicitly acknowledges, Koper's opinion is not based on valid data or actual evidence. *But see McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (expert's opinion "must have a basis in established fact").

Because Koper's ultimate opinions are highly unreliable, and given the wealth of evidence that a similar (but much more widespread) federal sales ban yielded no material public safety benefit, the district court was unjustified in relying on Koper's conclusory beliefs that a ban that removes them from law-abiding citizens in one City might, possibly, work in the future. *Lorillard Tobacco Co.*, 533 U.S. at 555 (the government's burden is not satisfied by mere speculation or conjecture).

43

Even if Koper's conclusions were reliable, they simply cannot justify an outright ban on the possession of protected arms by all law-abiding citizens. An undoubted many believe that banning the protected arms at issue in *Heller* would surely have some measurable impact on violent crime. *See, e.g.*, Brief for Petitioners at 50-55, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 102223. Yet the *Heller* Court did not detain itself with such opinions to assess the constitutionality of the handgun possession ban under any level of heightened scrutiny. The district court thus erred in upholding the City's total ban on the possession of protected magazines based on Koper's beliefs.

> ii. **Characteristics of Protected Arms That Make Them Dangerous in the Hands of Criminals Cannot Warrant a Complete Ban on Lawful Possession**

The district court also cited Koper's claim that magazines over ten rounds have characteristics that make them "particularly dangerous." E.R. I 014. But *Heller* makes clear that such evidence will not establish the required fit between a law banning the lawful possession of protected arms and its goal of curbing criminal misuse. To be sure, the government may properly restrict law-abiding citizens to using arms that are not "dangerous and unusual." *See supra* Part II.A. But the government cannot claim that the features of protected arms that make them desired by millions of Americans, but also make them more dangerous in the

44

hands of criminals, justify removing protected arms from the homes of law-abiding citizens.

In *Heller*, D.C. argued that handguns could validly be banned because, "[b]y their nature, [they] are easy to steal and conceal, and especially effective for robberies and murders. The dangers those weapons cause are particularly acute in the District." Brief for Petitioners at 49, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 102223. But the Supreme Court did not agree that the characteristics of handguns that make them particularly dangerous when used by criminals could justify banning the possession of those arms by law-abiding citizens. *See Heller*, 554 U.S. at 636. It did not give this evidence *any* weight and simply ruled that taking handguns from the law abiding necessarily fails even intermediate scrutiny, *id.* at 658-29, regardless of their potential for danger.

The take-away is that evidence of characteristics that make an otherwise protected arm more dangerous in the hands of criminals does not establish the necessary "fit" with the goal of reducing the criminal misuse of those arms. And surely, this must be. For, as is the case with handguns, it is often those "dangerous" characteristics themselves that lead to the common use of certain arms for self-defense. *See id.* at 629 (discussing various reasons that handguns, because of their

45

small size, are attractive for in-home self-defense). It defies logic that the very characteristics that advance an arm's constitutional protection would justify its confiscation.[19]

Despite *Heller*, the district court relied on evidence that magazines over ten rounds "are particularly dangerous because they facilitate the rapid firing of high numbers of rounds," potentially increasing the number of fatalities resulting from gun violence. E.R. I 014; III 228. Admittedly, magazines with greater capacities can facilitate the firing of a higher number of rounds. But that is the primary characteristic that compels millions of upstanding Americans to choose them for the core, lawful purpose of self-defense. *See supra* Part III.B. The people of Sunnyvale understandably wish to thwart criminal access to and possession of dangerous firearms. But the *Heller* Court's refrain from entertaining evidence of the inherent and particular dangerousness of a class of protected arms instructs that such evidence cannot justify taking protected arms from law-abiding citizens to advance an interest in combating criminal gun violence. The district court should

---

[19]  Judge Kavanaugh explains that the distinction between offensive and defensive weapons is illusory. *Heller II*, 670 F.3d at 1290 (Kavanaugh, J., dissenting). Professor Johnson has called this phenomenon the "regulatory paradox"—observing that the same characteristics that make a firearm especially useful also make it dangerous. *See* Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 Hastings L.J. 1285 (2009).

46

not have relied on this evidence to uphold the City's complete ban on magazines the court itself found to be protected.

### iii. Evidence That Protected Arms Are Used Against Law Enforcement Does Not Justify Taking Them From All Law-Abiding Citizens

Finally, the district court took special note of the City's evidence that magazines over ten rounds are used against law enforcement officers. E.R. I 014. But, as with evidence of a firearm's characteristics that make them attractive to criminals, *Heller* teaches that such evidence is irrelevant to determining whether a ban on possession by law-abiding citizens is substantially related to the government's interest in improving public safety.

In *Heller*, the petitioners argued that handguns "pose particular dangers to police officers . . . . Of the 55 police officers killed in felonies in 2005, 42 deaths were from handguns." Brief for Petitioners at 51-52, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 102223. But despite that tragic fact, the *Heller* Court gave D.C.'s evidence *no weight* in determining the validity of D.C.'s handgun ban. Instead, the Court held the law could not survive even intermediate scrutiny—i.e., the evidence did not establish a substantial relationship between banning handguns and reducing criminal misuse to improve public safety. *Heller*, 554 U.S. at 628-29, 635-36.

47

Here, the district court spotlighted evidence that magazines over ten rounds have been used in 31-41 percent of firearm-related police homicides. E.R. I 014; *see also* E.R. III 229. As an initial matter, this evidence does not indicate whether the magazine's capacity had any impact on the outcome of the attack. But even if it did, both the outcome and analysis of *Heller* instruct that the court's reliance on such evidence was improper. The district court failed to explain why statistics regarding the use of protected arms against police were wholly irrelevant to the consideration of D.C.'s ban on handguns, but are somehow determinative of the validity of Sunnyvale's ban on protected magazines.

While addressing violent crime, including violence against law enforcement officers, is a worthy goal, and while some may believe that prohibition is the answer, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table," *including* the prohibition of protected arms in common use for self-defense. *See Heller*, 554 U.S. at 636. The court's reliance on evidence that protected arms can also be used against law enforcement to uphold a complete ban on those protected items by all law-abiding citizens ignores *Heller*'s clear message on this point.

48

b. **The District Court Erred in Ignoring Fyock's Counter-Evidence Establishing That the Ordinance Is Unlikely to Advance the City's Public Safety Interest**

Applying its neutered intermediate scrutiny test, the district court was satisfied that the City had provided sufficient evidence of an appropriate fit between its total ban on protected magazines and its interest in reducing gun violence through decreased availability of the magazines. E.R. I 012-15. As described above, the court's finding was in error, but the court also ignored evidence and counter-argument offered by Fyock casting doubt on Koper's beliefs. E.R. I 014-15. And it addressed only portions of Fyock's evidence regarding the negative public impact of magazine bans, ignoring the rest. E.R. I 014-15.[20]

The district court reasoned that it cannot know, and should not be in the business of deciding, whether banning magazines over tens rounds will be effective. E.R. I 013. But this simply illustrates the court's refusal to consider evidence that the City's policy has *already* proven ineffective—evidence that the *nationwide* ban on the same magazines was so ineffective in reducing violent crime that it was allowed to expire. E.R. V 652. For "[t]here was no evidence that lives

---

[20] For example, the court found anecdotal evidence of self-defense scenarios requiring more than ten rounds unpersuasive. But it wholly ignored pages of expert testimony detailing the realities of self-defense emergencies that make the availability of more than ten rounds advisable. *Compare* E.R. I 014-15; *with* E.R. V 559-564, 635, 637-38.

49

were saved [and] no evidence that criminals fired fewer shots during gun fights. . . ." E.R. V 652; *see also* E.R. V 564.

The court also ignored empirical evidence demonstrating that restrictions on magazines over ten rounds will not further public safety because, in the vast majority of gun crimes, criminals rarely fire more than ten shots. E.R. V 552-53; *see also* E.R. III 330. It refused to consider a wealth of evidence that a ten-round limit would likely have no impact at all even in those rare instances, like mass shootings, where more than ten shots are fired. E.R. I 012-15; *but see* E.R. V 554-59, 566-67, 636-37; *see also* E.R. II 108-10 (Koper's recent concession that he could not say that bans would likely reduce mass shootings or the number of people injured in those incidents).

Regarding the ban's negative impact on public safety, the court disregarded evidence of the disparate impact that magazine limits have on criminals versus victims. The court never acknowledged that a criminal shooter is unlikely to be impacted by the ban (if he complied with it at all) because he controls the circumstances of his attack, unlike a victim who does not know when or where she will be attacked until it happens. *Compare* E.R. I 014-15; *with* E.R. V 554, 559-564, 630-640. In light of this reality, a self-defense expert and a criminologist

found the ban will disadvantage law-abiding citizens defending against attack, E.R.

V 559-64, 630-40, an impact that "is more likely, on net, to harm the safety of [the

City's] citizens than to improve it." E.R. V 564. The City provided *no expert in*

*any relevant field* to rebut this evidence—instead relying on statements submitted

by an economic consultant who is an expert in the fields of securities and finance,

mass torts, and product liability. E.R. IV 413.

The district court's failure to properly consider Fyock's counter-evidence

and argument is a misapplication of intermediate scrutiny that requires reversal.

Had the court considered such, at minimum it would have found there to be

inconclusive evidence offered by both sides regarding the impact of the law. Thus,

the enumeration of the fundamental right at issue necessarily should have tipped

the analysis in Fyock's favor. It was not for the district court to determine that, in

its estimation, the Second Amendment's protections for commonly-owned

magazines were not "*really worth* insisting upon" because the City's evidence gave

the court hope that doing away with those protections *might* potentially have some

impact on public safety. *See Heller*, 554 U.S. at 570.

But again, the court's struggle over the weight of the parties' evidence was

wholly unnecessary in the first place. As *Heller* makes clear, banning the lawful

51

possession of items protected by the Second Amendment is *not* a proper means to prevent their criminal misuse. *See supra* Part II.D.1. *Such a law necessarily fails either strict or intermediate scrutiny*. The City's totalitarian removal of constitutionally protected magazines from the many is far too broad a means of attempting to combat the unlawful use of those arms by the few.

## III. THE REMAINING PRELIMINARY INJUNCTION FACTORS SUPPORT TEMPORARY RELIEF

Erroneously finding Fyock had not proven he was likely to succeed on the merits, the district court could not give proper consideration to the significance of the harm Fyock had suffered and continues to suffer or to the importance of the interests he asserted. E.R. I 016-19. Instead, the court presumed some level of irreparable hardship to Fyock, but summarily cast such injury aside as insufficient to warrant preliminary relief. E.R. I 016-19. But because Fyock is likely to succeed and the City's magazine ban violates his fundamental rights, the remaining factors necessarily weigh in his favor.

### A. Irreparable Harm Should Have Been Presumed Because the Ordinance Violates Fyock's Second Amendment Rights

Generally, once a plaintiff shows a likelihood of success on the merits of a constitutional claim, irreparable harm is presumed. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of

time, unquestionably constitutes irreparable injury."); 11A Charles Alan Wright et

al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995). The Ninth Circuit has

routinely imported the First Amendment's "irreparable-if-only-for-a-minute"

concept to cases involving other constitutional rights and, in doing so, have held a

deprivation of these rights constitutes irreparable harm, per se. *Monterey Mech.*

*Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). The Second Amendment should

be treated no differently. *Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir.

2011) (holding that a deprivation of Second Amendment rights is "irreparable and

having no adequate remedy at law"); *see also McDonald*, 130 S. Ct. at 3043-44.

Here, because Fyock is likely to succeed on the merits of his Second

Amendment claim, irreparable harm should have been presumed. Although any

further analysis is superfluous, the irreparable harm caused by the Ordinance is

easily demonstrable. Indeed, the district court acknowledged "that individuals who

turn their prohibited magazines in to the Sunnyvale Department of Public Safety

would likely suffer irreparable harm from the subsequent destruction of their

property." E.R. I 016. While correct, the court neglected to consider that the

irreparable harm stems from a larger violation beyond the destruction of mere

property.

Chiefly, the irreparable harm invited upon Fyock results from the denial of

53

the exercise of his constitutional rights—namely, the denial of the exercise of the right to use and possess commonly owned magazines for self-defense in the home—and the potentially deadly consequences that can arise when the right is restricted. Every minute Sunnyvale's law-abiding residents are stripped of their constitutional rights, they suffer irreparable harm. Because the district court ultimately ruled that Fyock was unlikely to succeed on his Second Amendment claim, it gave insufficient weight to the inherent harm inflicted when a person is denied the exercise of a constitutional right. E.R. I 016.

Because Fyock has here established a likelihood of success on the merits, he has necessarily established irreparable harm sufficient to warrant preliminary relief.

**B.     The Harms to Fyock and to the Public Should Have Been Presumed to Outweigh Any Harm to the City**

When plaintiffs challenge government action that affects the exercise of constitutional rights, "[t]he balance of equities and the public interest . . . tip *sharply* in favor of enjoining the ordinance." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (emphasis added). The City "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Haynes v. Office of the Att'y Gen. Phill Kline*, 298 F. Supp. 2d 1154, 1160 (D. Kan. 2003) (citing *Zepeda v. U.S. INS*, 753 F.2d 719, 727

54

(9th Cir. 1983)).

Here, Fyock seeks to vindicate his fundamental Second Amendment rights. As the Ninth Circuit has made clear, "all citizens have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Accordingly, not only Fyock's rights are at stake, but so are the rights of all those seeking to engage in Second Amendment conduct that is prohibited by the City's law. The balance of equities and the public interest thus tip *sharply* in Fyock's favor. *See Klein*, 584 F.3d at 1208.

Because the district court took a wrong turn early in its analysis, failing to find that Fyock was likely to succeed on the merits of his constitutional claim, its subsequent analysis of the remaining factors was destined never to arrive at the proper conclusion. *See* E.R. I 016 ("[B]ecause Plaintiffs have failed to show a likelihood of success on the merits, it is unlikely that enforcement of Sunnyvale's ordinance will infringe their constitutional rights."); E.R. I 017-18 ("Again, due to Plaintiffs' failure to prove a likelihood of success on the merits, it is unlikely that the Sunnyvale ordinance infringes the public's constitutional rights, so the court gives this consideration less weight."). Once the court determined that Fyock would not succeed on the merits, it necessarily followed that his claims would

55

never receive the treatment set out by *Klein* and *Haynes* described above. While a constitutional right is of "paramount importance," E.R. I 018, the court deflated Fyock's interest to a property right and found the balance of the hardships to be neutral. Had the court found Fyock's constitutional claim to be meritorious, however, the City's alleged public safety interest in banning protected items could not have overcome Fyock's Second Amendment interest.

Below, the City seemed to argue the public interest prong tipped in its favor because some 66 percent of Sunnyvale residents voted to adopt the Ordinance, suggesting that it had a mandate from the people to enforce the law and that an injunction would thwart their will. E.R. I 018. Because the district court did not find Fyock was likely to succeed on his the Second Amendment claim, it gave undue weight to the City's argument, finding "the fact that the great majority of Sunnyvale voters favor the ordinance supports denial of the preliminary injunction." E.R. I 018. But the court rightly recognized that if Fyock had raised a meritorious constitutional claim, majority rule would certainly buckle under the great weight of the constitutional right—even if only exercised by the minority. Indeed, the trial court rightly acknowledged that it should "*necessarily* invoke the Second Amendment to protect the minority against the ordinance's infringement on their rights. *In that case, the consideration that a 66 percent majority passed the*

56

*law would not weigh against an injunction*." E.R. I 018 (emphasis added).

The sale of standard-capacity magazines over ten rounds is already unlawful in California, so the City will not be flooded with new ones if an injunction is granted. On the other hand, granting an injunction will end the ongoing violation of Fyock's rights, allowing him the freedom to exercise those rights without fear of prosecution and allowing residents to continue possessing their lawfully acquired, common magazines in their homes. Had the district court followed the proper path—viewing the Ordinance as a violation of a constitutional right—it, admittedly, would have found both that the balance of the hardships and the public interest weigh *sharply* in favor of granting Fyock's motion for temporary relief.

## CONCLUSION

The Second Amendment extends protections to arms typically possessed by responsible citizens. Magazines over ten rounds are standard for millions of firearms commonly owned in modern American society. Accounting for roughly half of all magazines in circulation, the district court properly found that magazines over ten rounds are routinely selected for self-defense and thus protected by the Second Amendment.

Fearing that certain members of society may misuse these arms, the City has prohibited all law-abiding citizens from possessing or using them for self-defense

in their homes. The courts have often described the impropriety of this approach with the phrase *abusus non tollit usum*—as abuse is not a valid argument against proper use.

Just as the government may not strip "smart phones" from the law abiding on the basis that drug dealers frequently use them to facilitate sales, or because terrorists can use them to detonate explosives in a mass killing, the City cannot deny law-abiding citizens the right to keep and use protected arms because they might be misused by criminals. While the Supreme Court has not yet ruled that the constitution guarantees protections for common tools of communication, like smart phones, it is self-evident that the First Amendment would not tolerate such government action. In the Second Amendment context, it is even more clear, for the Court has expressly announced protection for common arms.

In direct conflict with this principle, the district court improperly held that the government may remove constitutionally protected arms from the homes of law-abiding citizens to reduce the potential misuse of those items by criminals. The court's error stemmed in large part from a profoundly mistaken assumption that constitutionally protected arms can be taken from law-abiding citizens if other arms are available—an assumption that has been emphatically rejected by the Supreme Court. The City cannot divest residents of constitutionally protected arms

58

because it has not banned all or most arms, any more than the government can remove protected books from the homes of the American people because other books are available.

The Court should reverse the denial of Fyock's motion for preliminary injunction to prevent the ongoing deprivation of his fundamental right to continue possessing his constitutionally protected magazines in his home.

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Fyock identifies the following cases as potentially related to the case briefed herein:

- *Jackson v. City and County of San Francisco*, No. 12-17803
- *Peruta v. County of San Diego*, No. 10-56971
- *Richards v. Prieto*, No. 11-16255
- *Baker v. Kealoha*, No. 12-16258

All four cases deal with critical Second Amendment issues, were previously heard in the Ninth Circuit, and are being or will be considered for en banc review.

*Jackson* is related insofar as appellants in both cases advocate that a ban on arms commonly used for self-defense is categorically invalid without resort to means-end scrutiny. *Peruta* is also instructive, for it outlines the proper means of analyzing Second Amendment challenges to laws that destroy a right protected by

the Second Amendment. Because *Richards* and *Baker* rely entirely on *Peruta*, they too are potentially related.

Date: May 16, 2014                                    MICHEL & ASSOCIATES, P.C.


                                                       /s/ C. D. Michel
                                                       C. D. Michel
                                                       Attorney for *Plaintiffs-Appellants*

60

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the attached opening brief complies with Rule 32(a)(7)(c) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 13922 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in WordPerfect X5.

 Date: May 16, 2014                     MICHEL & ASSOCIATES, P.C.


                                         /s/ C. D. Michel
                                        C. D. Michel
                                        Attorney for *Plaintiffs-Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2014, an electronic PDF of

**APPELLANTS' OPENING BRIEF** was uploaded to the Court's CM/ECF

system, which will automatically generate and send by electronic mail a Notice of

Docket Activity to all registered attorneys participating in the case. Such notice

constitutes service on those registered attorneys.

Date: May 16, 2014                    MICHEL & ASSOCIATES, P.C.


/s/ C. D. Michel _____
C. D. Michel
Attorney for *Plaintiffs-Appellants*

62

# ADDENDUM

# INDEX TO ADDENDUM

**PAGE**

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend.1

Cal. Penal Code § 32310. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 2

Colo. Stats. H.B. 13-1224. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 3

Conn. Acts P.A. 13-3 § 23.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 8

Haw. Rev. Stat. § 134-8(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 11

Mass. Gen. Laws Ann. Ch. 140, § 121. . . . . . . . . . . . . . . . . . . . . . . Addend. 12

Mass. Gen. Laws Ann. Ch. 140, § 131M. . . . . . . . . . . . . . . . . . . . . Addend. 16

Md. Sess. Laws ch. 427, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 17

N.J. Stat. Ann. § 2C:39-1(y). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 79

N.J. Stat. Ann. § 2C:39-3(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 81

N.Y. Sess. Laws ch. 1, § 38. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 83

N.Y. Sess. Laws ch. 1, § 41-b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 85

S. F., Cal., Police Code § 619(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . Addend. 88

Sunnyvale, Cal., Muni. Code § 1.04.010. . . . . . . . . . . . . . . . . . . . . Addend. 101

Sunnyvale, Cal., Muni. Code § 9.44.050. . . . . . . . . . . . . . . . . . . . . Addend. 102

Sunnyvale, Cal., Proposed Ordinance Measure C. . . . . . . . . . . . . . Addend. 104

Amendment II. Right To Bear Arms, USCA CONST Amend. II

United States Code Annotated
   Constitution of the United States
      Annotated
         Amendment II. Right to Bear Arms

U.S.C.A. Const. Amend. II

Amendment II. Right To Bear Arms

Currentness

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

Notes of Decisions (280)

U.S.C.A. Const. Amend. II, USCA CONST Amend. II
Current through P.L. 113-92 (excluding P.L. 113-79 and 113-89) approved 3-25-14

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

§ 32310. Prohibition on manufacture, import, sale, gift, loan,..., CA PENAL § 32310

West's Annotated California Codes
  Penal Code (Refs & Annos)
    Part 6. Control of Deadly Weapons (Refs & Annos)
      Title 4. Firearms (Refs & Annos)
        Division 10. Special Rules Relating to Particular Types of Firearms or
        Firearm Equipment (Refs & Annos)
          Chapter 5. Large-Capacity Magazine (Refs & Annos)
            Article 1. Rules Governing Large-Capacity Magazines (Refs & Annos)

West's Ann.Cal.Penal Code § 32310

§ 32310. Prohibition on manufacture, import, sale, gift, loan,
purchase, or receipt of large-capacity magazines; punishment

Effective: January 1, 2014
Currentness

(a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing January 1, 2000, any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b) For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

**Credits**
(Added by Stats.2010, c. 711 (S.B.1080), § 6, operative Jan. 1, 2012. Amended by Stats.2012, c. 43 (S.B.1023), § 107, eff. June 27, 2012; Stats.2013, c. 728 (A.B.48), § 1.)

**Editors' Notes**

**LAW REVISION COMMISSION COMMENTS**

2010 Addition



HOUSE BILL 13-1224

BY REPRESENTATIVE(S) Fields, Court, Fischer, Hullinghorst, Labuda, Levy, Melton, Pabon, Rosenthal, Schafer, Williams, Young, Buckner, Ferrandino;
also SENATOR(S) Hodge, Aguilar, Guzman, Heath, Nicholson, Ulibarri, Morse.

CONCERNING PROHIBITING LARGE-CAPACITY AMMUNITION MAGAZINES.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1.** In Colorado Revised Statutes, **add** part 3 to article 12 of title 18 as follows:

PART 3
LARGE-CAPACITY AMMUNITION MAGAZINES

**18-12-301. Definitions.** AS USED IN THIS PART 3, UNLESS THE CONTEXT OTHERWISE REQUIRES:

(1) "BUREAU" MEANS THE COLORADO BUREAU OF INVESTIGATION CREATED AND EXISTING PURSUANT TO SECTION 24-33.5-401, C.R.S.

(2) (a) "LARGE-CAPACITY MAGAZINE MEANS:

(I)  A FIXED OR DETACHABLE MAGAZINE, BOX, DRUM, FEED STRIP, OR SIMILAR DEVICE CAPABLE OF ACCEPTING, OR THAT IS DESIGNED TO BE READILY CONVERTED TO ACCEPT, MORE THAN FIFTEEN ROUNDS OF AMMUNITION;

(II)  A FIXED, TUBULAR SHOTGUN MAGAZINE THAT HOLDS MORE THAN TWENTY-EIGHT INCHES OF SHOTGUN SHELLS, INCLUDING ANY EXTENSION DEVICE THAT IS ATTACHED TO THE MAGAZINE AND HOLDS ADDITIONAL SHOTGUN SHELLS; OR

(III)  A NONTUBULAR, DETACHABLE MAGAZINE, BOX, DRUM, FEED STRIP, OR SIMILAR DEVICE THAT IS CAPABLE OF ACCEPTING MORE THAN EIGHT SHOTGUN SHELLS WHEN COMBINED WITH A FIXED MAGAZINE.

(b)  "LARGE-CAPACITY MAGAZINE" DOES NOT MEAN:

(I)  A FEEDING DEVICE THAT HAS BEEN PERMANENTLY ALTERED SO THAT IT CANNOT ACCOMMODATE MORE THAN FIFTEEN ROUNDS OF AMMUNITION;

(II)  AN ATTACHED TUBULAR DEVICE DESIGNED TO ACCEPT, AND CAPABLE OF OPERATING ONLY WITH, .22 CALIBER RIMFIRE AMMUNITION; OR

(III)  A TUBULAR MAGAZINE THAT IS CONTAINED IN A LEVER-ACTION FIREARM.

**18-12-302.  Large-capacity magazines prohibited - penalties - exceptions.** (1) (a)  EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION, ON AND AFTER JULY 1, 2013, A PERSON WHO SELLS, TRANSFERS, OR POSSESSES A LARGE-CAPACITY MAGAZINE COMMITS A CLASS 2 MISDEMEANOR.

(b)  ANY PERSON WHO VIOLATES SUBSECTION (1) OF THIS SECTION AFTER HAVING BEEN CONVICTED OF A PRIOR VIOLATION OF SAID SUBSECTION (1) COMMITS A CLASS 1 MISDEMEANOR.

(c)  ANY PERSON WHO VIOLATES SUBSECTION (1) OF THIS SECTION COMMITS A CLASS 6 FELONY IF THE PERSON POSSESSED A LARGE-CAPACITY MAGAZINE DURING THE COMMISSION OF A FELONY OR ANY CRIME OF VIOLENCE, AS DEFINED IN SECTION 18-1.3-406.

PAGE 2-HOUSE BILL 13-1224

(2) (a)  A PERSON MAY POSSESS A LARGE-CAPACITY MAGAZINE IF HE OR SHE:

(I)  OWNS THE LARGE-CAPACITY MAGAZINE ON THE EFFECTIVE DATE OF THIS SECTION; AND

(II)  MAINTAINS CONTINUOUS POSSESSION OF THE LARGE-CAPACITY MAGAZINE.

(b)  IF A PERSON WHO IS ALLEGED TO HAVE VIOLATED SUBSECTION (1) OF THIS SECTION ASSERTS THAT HE OR SHE IS PERMITTED TO LEGALLY POSSESS A LARGE-CAPACITY MAGAZINE PURSUANT TO PARAGRAPH (a) OF THIS SUBSECTION (2), THE PROSECUTION HAS THE BURDEN OF PROOF TO REFUTE THE ASSERTION.

(3)  THE OFFENSE DESCRIBED IN SUBSECTION (1) OF THIS SECTION SHALL NOT APPLY TO:

(a)  AN ENTITY, OR ANY EMPLOYEE THEREOF ENGAGED IN HIS OR HER EMPLOYMENT DUTIES, THAT MANUFACTURES LARGE-CAPACITY MAGAZINES WITHIN COLORADO EXCLUSIVELY FOR TRANSFER TO, OR ANY LICENSED GUN DEALER, AS DEFINED IN SECTION 12-26.1-106 (6), C.R.S., OR ANY EMPLOYEE THEREOF ENGAGED IN HIS OR HER OFFICIAL EMPLOYMENT DUTIES, THAT SELLS LARGE-CAPACITY MAGAZINES EXCLUSIVELY TO:

(I)  A BRANCH OF THE ARMED FORCES OF THE UNITED STATES;

(II)  A DEPARTMENT, AGENCY, OR POLITICAL SUBDIVISION OF THE STATE OF COLORADO, OR OF ANY OTHER STATE, OR OF THE UNITED STATES GOVERNMENT;

(III)  A FIREARMS RETAILER FOR THE PURPOSE OF FIREARMS SALES CONDUCTED OUTSIDE THE STATE;

(IV)  A FOREIGN NATIONAL GOVERNMENT THAT HAS BEEN APPROVED FOR SUCH TRANSFERS BY THE UNITED STATES GOVERNMENT; OR

(V)  AN OUT-OF-STATE TRANSFEREE WHO MAY LEGALLY POSSESS A LARGE-CAPACITY MAGAZINE; OR

PAGE 3-HOUSE BILL 13-1224

(b) AN EMPLOYEE OF ANY OF THE FOLLOWING AGENCIES WHO BEARS A FIREARM IN THE COURSE OF HIS OR HER OFFICIAL DUTIES:

(I) A BRANCH OF THE ARMED FORCES OF THE UNITED STATES; OR

(II) A DEPARTMENT, AGENCY, OR POLITICAL SUBDIVISION OF THE STATE OF COLORADO, OR OF ANY OTHER STATE, OR OF THE UNITED STATES GOVERNMENT; OR

(c) A PERSON WHO POSSESSES THE MAGAZINE FOR THE SOLE PURPOSE OF TRANSPORTING THE MAGAZINE TO AN OUT-OF-STATE ENTITY ON BEHALF OF A MANUFACTURER OF LARGE-CAPACITY MAGAZINES WITHIN COLORADO.

**18-12-303. Identification markings for large-capacity magazines - rules.** (1) A LARGE-CAPACITY MAGAZINE THAT IS MANUFACTURED IN COLORADO ON OR AFTER THE EFFECTIVE DATE OF THIS SECTION MUST INCLUDE A PERMANENT STAMP OR MARKING INDICATING THAT THE LARGE-CAPACITY MAGAZINE WAS MANUFACTURED OR ASSEMBLED AFTER THE EFFECTIVE DATE OF THIS SECTION. THE STAMP OR MARKING MUST BE LEGIBLY AND CONSPICUOUSLY ENGRAVED OR CAST UPON THE OUTER SURFACE OF THE LARGE-CAPACITY MAGAZINE.

(2) THE BUREAU MAY PROMULGATE SUCH RULES AS MAY BE NECESSARY FOR THE IMPLEMENTATION OF THIS SECTION, INCLUDING BUT NOT LIMITED TO RULES REQUIRING A LARGE-CAPACITY MAGAZINE THAT IS MANUFACTURED ON OR AFTER THE EFFECTIVE DATE OF THIS SECTION TO BEAR IDENTIFYING INFORMATION IN ADDITION TO THE IDENTIFYING INFORMATION DESCRIBED IN SUBSECTION (1) OF THIS SECTION.

(3) A PERSON WHO MANUFACTURES A LARGE-CAPACITY MAGAZINE IN COLORADO IN VIOLATION OF SUBSECTION (1) OF THIS SECTION COMMITS A CLASS 2 MISDEMEANOR AND SHALL BE PUNISHED IN ACCORDANCE WITH SECTION 18-1.3-501.

**SECTION 2. Effective date.** This act takes effect July 1, 2013.

**SECTION 3. Safety clause.** The general assembly hereby finds,

PAGE 4-HOUSE BILL 13-1224

determines, and declares that this act is necessary for the immediate preservation of the public peace, health, and safety.

_____    _____
Mark Ferrandino                         John P. Morse
SPEAKER OF THE HOUSE          PRESIDENT OF
OF REPRESENTATIVES              THE SENATE

_____    _____
Marilyn Eddins                        Cindi L. Markwell
CHIEF CLERK OF THE HOUSE       SECRETARY OF
OF REPRESENTATIVES              THE SENATE

       APPROVED_____

_____
John W. Hickenlooper
GOVERNOR OF THE STATE OF COLORADO

PAGE 5-HOUSE BILL 13-1224

2013 Conn. Legis. Serv. P.A. 13-3 (S.B. 1160) (WEST)

CONNECTICUT 2013 LEGISLATIVE SERVICE

2013 January Regular Session of the General Assembly

Additions are indicated by Text; deletions by
Text .
Vetoes are indicated by Text ;
stricken material by Text .

P.A. No. 13–3
S.B. No. 1160
FIREARMS—OMNIBUS AMENDMENT

AN ACT CONCERNING GUN VIOLENCE PREVENTION AND CHILDREN'S SAFETY.

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. Section 29–37a of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 29–37a >>

(a) For the purposes of this section, "long gun" means a firearm, as defined in section 53a–3, other than a pistol or revolver.

(b) (1) Except as provided in subdivision (2) of this subsection, no person, firm or corporation may sell, deliver or otherwise transfer, at retail, any long gun to any person under eighteen years of age.

(2) No person, firm or corporation may sell, deliver or otherwise transfer, at retail, any semi-automatic centerfire rifle that has or accepts a magazine with a capacity exceeding five rounds to any person under twenty-one years of age. The provisions of this subdivision shall not apply to the sale, delivery or transfer of such a rifle to any person who is a member or employee of an organized local police department, the Department of Emergency Services and Public Protection or the Department of Correction or a member of the military or naval forces of this state or of the United States for use in the discharge of their duties.

(c) On and after April 1, 2014, no person may purchase or receive any long gun unless such person holds a valid long gun eligibility certificate issued pursuant to section 2 of this act, a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29–28, as amended by this act, a valid permit to sell at retail a pistol or revolver issued pursuant to subsection (a) of section 29–28 or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29–36f, as amended by this act, or is a federal marshal, parole officer or peace officer.

(a) (d) No person, firm or corporation may deliver, at retail, sell, deliver or otherwise transfer, at retail, any firearm, as defined in section 53a–3, other than a pistol or revolver, long gun to any person unless such person makes application on a form prescribed and furnished by the Commissioner of Emergency Services and Public Protection, which shall be filed and retained by the transferor for at least twenty years or, if the transferor is a federally licensed firearm dealer, attached by the vendor transferor to the federal sale or transfer document and filed and retained by the vendor transferor for at least twenty years or until such vendor transferor goes out of business. Such application shall be available for inspection during normal business hours by law enforcement officials. No sale or delivery of any firearm shall be made until the expiration of two weeks from the date of the application, and No such sale, delivery or other transfer of any long gun shall be made until the person, firm or corporation

Addend.000008

Sec. 23. (NEW) (Effective from passage)

(a) As used in this section and section 24 of this act:

(1) "Large capacity magazine" means any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition, but does not include: (A) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition, (B) a .22 caliber tube ammunition feeding device, (C) a tubular magazine that is contained in a lever-action firearm, or (D) a magazine that is permanently inoperable;

(2) "Lawfully possesses", with respect to a large capacity magazine, means that a person has (A) actual and lawful possession of the large capacity magazine, or (B) constructive possession of the large capacity magazine pursuant to a lawful purchase of a firearm that contains a large capacity magazine that was transacted prior to the effective date of this section, regardless of whether the firearm was delivered to the purchaser prior to the effective date of this section; and

(3) "Licensed gun dealer" means a person who has a federal firearms license and a permit to sell firearms pursuant to section 29–28 of the general statutes.

(b) Except as provided in this section, on and after the effective date of this section, any person who, within this state, distributes, imports into this state, keeps for sale, offers or exposes for sale, or purchases a large capacity magazine shall be guilty of a class D felony. On and after the effective date of this section, any person who, within this state, transfers a large capacity magazine, except as provided in subsection (f) of this section, shall be guilty of a class D felony.

(c) Except as provided in this section and section 24 of this act: (1) Any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained prior to the effective date of this section shall commit an infraction and be fined not more than ninety dollars for a first offense and shall be guilty of a class D felony for any subsequent offense, and (2) any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained on or after the effective date of this section shall be guilty of a class D felony.

(d) A large capacity magazine may be possessed, purchased or imported by:

(1) Members or employees of the Department of Emergency Services and Public Protection, police departments, the Department of Correction or the military or naval forces of this state or of the United States for use in the discharge of their official duties or when off duty;

(2) Employees of a Nuclear Regulatory Commission licensee operating a nuclear power generating facility in this state for the purpose of providing security services at such facility, or any person, firm, corporation, contractor or subcontractor providing security services at such facility; or

(3) Any person, firm or corporation engaged in the business of manufacturing large capacity magazines in this state that manufactures or transports large capacity magazines in this state for sale within this state to persons specified in subdivision (1) or (2) of this subsection or for sale outside this state.

(e) A large capacity magazine may be possessed by:

(1) A licensed gun dealer;

(2) A gunsmith who is in a licensed gun dealer's employ, who possesses such large capacity magazine for the purpose of servicing or repairing a lawfully possessed large capacity magazine;

(3) Any person who has declared possession of the magazine pursuant to section 24 of this act; or

(4) Any person who is the executor or administrator of an estate that includes a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 24 of this act, which is disposed of as authorized by the Probate Court, if the disposition is otherwise permitted by this section and section 24 of this act.

(f) Subsection (b) of this section shall not prohibit:

(1) The transfer by bequest or intestate succession of a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 24 of this act;

(2) The transfer of a large capacity magazine to a police department or the Department of Emergency Services and Public Protection; or

(3) The transfer of a large capacity magazine to a licensed gun dealer in accordance with section 24 of this act.

(g) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection (h) of section 29–33 of the general statutes, as amended by this act.

Sec. 24. (NEW) (Effective from passage)

(a) Any person who lawfully possesses a large capacity magazine prior to January 1, 2014, shall apply by January 1, 2014, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by January 1, 2014, because such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection to declare possession of such magazine. Such application shall be made on such form or in such manner as the Commissioner of Emergency Services and Public Protection prescribes.

(b) In addition to the application form prescribed under subsection (a) of this section, the department shall design or amend the application forms for a certificate of possession for an assault weapon under section 53–202d of the general statutes, as amended by this act, or for a permit to carry a pistol or revolver under section 29–28a of the general statutes, a long gun eligibility certificate under section 2 of this act, an eligibility certificate for a pistol or revolver under section 29–36f of the general statutes, as amended by this act, or any renewal of such permit or certificate to permit an applicant to declare possession of a large capacity magazine pursuant to this section upon the same application.

(c) The department may adopt regulations, in accordance with the provisions of chapter 54 [1] of the general statutes, to establish procedures with respect to applications under this section. Notwithstanding the provisions of sections 1–210 and 1–211 of the general statutes, the name and address of a person who has declared possession of a large capacity magazine shall be confidential and shall not be disclosed, except such records may be disclosed to (1) law enforcement agencies and employees of the United States Probation Office acting in the performance of their duties, and (2) the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a–500 of the general statutes, as amended by this act.

(d) Any person who moves into the state in lawful possession of a large capacity magazine shall, within ninety days, either render the large capacity magazine permanently inoperable, sell the large capacity magazine to a licensed gun dealer or remove the large capacity magazine from this state, except that any person who is a member of the military or naval forces of this state or of the United States, is in lawful possession of a large capacity magazine and has been transferred into the state after January

Addend.000010

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-8

§ 134-8. Ownership, etc., of automatic firearms, silencers, etc., prohibited; penalties

Currentness

(a) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134-4(e); automatic firearms; rifles with barrel lengths less than sixteen inches; shotguns with barrel lengths less than eighteen inches; cannons; mufflers, silencers, or devices for deadening or muffling the sound of discharged firearms; hand grenades, dynamite, blasting caps, bombs, or bombshells, or other explosives; or any type of ammunition or any projectile component thereof coated with teflon or any other similar coating designed primarily to enhance its capability to penetrate metal or pierce protective armor; and any type of ammunition or any projectile component thereof designed or intended to explode or segment upon impact with its target.

(b) Any person who installs, removes, or alters a firearm part with the intent to convert the firearm to an automatic firearm shall be deemed to have manufactured an automatic firearm in violation of subsection (a).

(c) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of detachable ammunition magazines with a capacity in excess of ten rounds which are designed for or capable of use with a pistol is prohibited. This subsection shall not apply to magazines originally designed to accept more than ten rounds of ammunition which have been modified to accept no more than ten rounds and which are not capable of being readily restored to a capacity of more than ten rounds.

(d) Any person violating subsection (a) or (b) shall be guilty of a class C felony and shall be imprisoned for a term of five years without probation. Any person violating subsection (c) shall be guilty of a misdemeanor except when a detachable magazine prohibited under this section is possessed while inserted into a pistol in which case the person shall be guilty of a class C felony.

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XX. Public Safety and Good Order (Ch. 133-148A)
Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 121

§ 121. Firearms sales; definitions; antique firearms; application of law; exceptions

Effective: September 13, 2004
Currentness

As used in sections 122 to 131P, inclusive, the following words shall, unless the context clearly requires otherwise, have the following meanings:--

"Ammunition", cartridges or cartridge cases, primers (igniter), bullets or propellant powder designed for use in any firearm, rifle or shotgun. The term "ammunition" shall also mean tear gas cartridges, chemical mace or any device or instrument which contains or emits a liquid, gas, powder or any other substance designed to incapacitate.

"Assault weapon", shall have the same meaning as a semiautomatic assault weapon as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a) (30) as appearing in such section on September 13, 1994, and shall include, but not be limited to, any of the weapons, or copies or duplicates of the weapons, of any caliber, known as: (i) Avtomat Kalashnikov (AK) (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR and FNC; (vi) SWD M-10, M-11, M-11/9 and M-12; (vi) Steyr AUG; (vii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (viii) revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12; provided, however, that the term assault weapon shall not include: (i) any of the weapons, or replicas or duplicates of such weapons, specified in appendix A to 18 U.S.C. section 922 as appearing in such appendix on September 13, 1994, as such weapons were manufactured on October 1, 1993; (ii) any weapon that is operated by manual bolt, pump, lever or slide action; (iii) any weapon that has been rendered permanently inoperable or otherwise rendered permanently unable to be designated a semiautomatic assault weapon; (iv) any weapon that was manufactured prior to the year 1899; (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable assault weapon; (vi) any semiautomatic rifle that cannot accept a detachable magazine that holds more

than five rounds of ammunition; or (vii) any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.

"Conviction", a finding or verdict of guilt or a plea of guilty, whether or not final sentence is imposed.

"Firearm", a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured; provided, however, that the term firearm shall not include any weapon that is: (i) constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun including, but not limited to, covert weapons that resemble key-chains, pens, cigarette-lighters or cigarette-packages; or (ii) not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk- through metal detectors.

"Gunsmith", any person who engages in the business of repairing, altering, cleaning, polishing, engraving, blueing or performing any mechanical operation on any firearm, rifle, shotgun or machine gun.

"Imitation firearm", any weapon which is designed, manufactured or altered in such a way as to render it incapable of discharging a shot or bullet.

"Large capacity feeding device", (i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(31) as appearing in such section on September 13, 1994. The term "large capacity feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber ammunition.

"Large capacity weapon", any firearm, rifle or shotgun: (i) that is semiautomatic with a fixed large capacity feeding device; (ii) that is semiautomatic and capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device; (iii) that employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm; or (iv) that is an assault weapon. The term "large capacity weapon" shall be a secondary designation and shall apply to a weapon in addition to its primary designation as a firearm, rifle or shotgun and shall not include: (i) any weapon that was manufactured in or prior to the year 1899; (ii) any weapon that operates by manual bolt, pump, lever or slide action; (iii) any weapon that is a single-shot weapon; (iv) any weapon that has been modified so as to render it permanently inoperable or otherwise rendered permanently unable to

be designated a large capacity weapon; or (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable large capacity weapon.

"Length of barrel" or "barrel length", that portion of a firearm, rifle, shotgun or machine gun through which a shot or bullet is driven, guided or stabilized and shall include the chamber.

"Licensing authority", the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them.

"Machine gun", a weapon of any description, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged by one continuous activation of the trigger, including a submachine gun.

"Purchase" and "sale" shall include exchange; the word "purchaser" shall include exchanger; and the verbs "sell" and "purchase", in their different forms and tenses, shall include the verb exchange in its appropriate form and tense.

"Rifle", a weapon having a rifled bore with a barrel length equal to or greater than 16 inches and capable of discharging a shot or bullet for each pull of the trigger.

"Sawed-off shotgun", any weapon made from a shotgun, whether by alteration, modification or otherwise, if such weapon as modified has one or more barrels less than 18 inches in length or as modified has an overall length of less than 26 inches.

"Semiautomatic", capable of utilizing a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and requiring a separate pull of the trigger to fire each cartridge.

"Shotgun", a weapon having a smooth bore with a barrel length equal to or greater than 18 inches with an overall length equal to or greater than 26 inches, and capable of discharging a shot or bullet for each pull of the trigger.

"Violent crime", shall mean any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or possession of a deadly weapon that would be punishable by imprisonment for such term if committed by an adult, that: (i) has as an element the use, attempted use or threatened use of physical force or a deadly weapon against the person of another; (ii) is burglary, extortion, arson or kidnapping; (iii) involves the use of explosives; or (iv) otherwise involves conduct that presents a serious risk of physical injury to another.

"Weapon", any rifle, shotgun or firearm.

Where the local licensing authority has the power to issue licenses or cards under this chapter, but no such licensing authority exists, any resident or applicant may apply for such license or firearm identification card directly to the colonel of state police and said colonel shall for this purpose be the licensing authority.

The provisions of sections 122 to 129D, inclusive, and sections 131, 131A, 131B and 131E shall not apply to:

(A) any firearm, rifle or shotgun manufactured in or prior to the year 1899;

(B) any replica of any firearm, rifle or shotgun described in clause (A) if such replica: (i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition; or (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; and

(C) manufacturers or wholesalers of firearms, rifles, shotguns or machine guns.

**Credits**
Amended by St.1934, c. 359, § 1; St.1957, c. 688, § 4; St.1959, c. 296, § 1; St.1960, c. 186; St.1968, c. 737, § 1; St.1969, c. 799, § 1; St.1971, c. 456, § 1; St.1973, c. 892, § 1; St.1983, c. 516, § 1; St.1984, c. 116, § 1; St.1989, c. 433; St.1990, c. 511, § 1; St.1996, c. 151, §§ 300, 301; St.1998, c. 180, § 8; St.1999, c. 1, § 1; St.2004, c. 150, §§ 1 to 3, eff. Sept. 13, 2004.

Notes of Decisions (88)

M.G.L.A. 140 § 121, MA ST 140 § 121
Current through Chapter 97 of the 2014 2nd Annual Session

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
 Part I. Administration of the Government (Ch. 1-182)
  Title XX. Public Safety and Good Order (Ch. 133-148A)
   Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 131M

§ 131M. Assault weapon or large capacity feeding device not lawfully
possessed on September 13, 1994; sale, transfer or possession; punishment

Currentness

No person shall sell, offer for sale, transfer or possess an assault weapon or a large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Whoever not being licensed under the provisions of section 122 violates the provisions of this section shall be punished, for a first offense, by a fine of not less than $1,000 nor more than $10,000 or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment, and for a second offense, by a fine of not less than $5,000 nor more than $15,000 or by imprisonment for not less than five years nor more than 15 years, or by both such fine and imprisonment.

The provisions of this section shall not apply to: (i) the possession by a law enforcement officer for purposes of law enforcement; or (ii) the possession by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving such a weapon or feeding device from such agency upon retirement.

**Credits**
Added by St.1998, c. 180, § 47.

M.G.L.A. 140 § 131M, MA ST 140 § 131M
Current through Chapter 97 of the 2014 2nd Annual Session

   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

MARTIN O'MALLEY, Governor                    Ch. 427

# Chapter 427

### (Senate Bill 281)

AN ACT concerning

### Firearm Safety Act of 2013

FOR the purpose of *establishing a certain exception to the prohibition against carrying a deadly weapon on public school property; making it a misdemeanor to possess or use certain firearm ammunition during and in relation to the commission of a certain crime of violence;* altering the authorization for a person to wear, carry, or transport a handgun to be within certain limitations; designating certain firearms as assault weapons; prohibiting, with certain exceptions, a person from transporting an assault weapon into the State or possessing, selling, offering to sell, transferring, purchasing, or receiving an assault weapon; ~~authorizing certain licensed firearms dealers to continue to possess, sell, offer for sale, or transfer assault long guns or copycat weapons~~ providing that certain prohibitions relating to certain assault weapons and detachable magazines do not apply to certain persons under certain circumstances; authorizing a person to transport certain assault weapons under certain circumstances; authorizing certain persons to continue to possess assault long guns or copycat weapons under certain circumstances; ~~providing that certain registration requirements for certain assault weapons do not apply under certain circumstances;~~ altering the maximum capacity of rounds of ammunition allowable to be manufactured, sold, offered for sale, purchased, received, or transferred for a firearm, *with certain exceptions*; making it a misdemeanor to use an assault long gun or a copycat weapon or a magazine that exceeds a certain maximum capacity of rounds of ammunition in the commission of a felony or a crime of violence; requiring a certain hearing officer, after making a certain determination, to order certain individuals to surrender ~~or consign~~ firearms in the individual's possession under certain circumstances; prohibiting an individual, while hunting for any wild bird or mammal, from shooting or discharging a firearm within a certain distance of a public or nonpublic school during certain times; *repealing certain duties of the Police Training Commission relating to a certain firearms safety training course;* requiring the Secretary of State Police to disapprove an application for a State–regulated firearms dealer's license if the Secretary determines that the applicant intends a certain person to participate or hold a certain interest in the management or operation of the business for which the license is sought; ~~requiring that~~ *requiring the Secretary to include certain information in a certain notice if a State–regulated firearms dealer's license application is denied; authorizing* the Secretary *to* suspend a dealer's license if the licensee is not in compliance with certain record keeping and reporting requirements; *authorizing the Secretary to lift a certain license suspension under certain circumstances;* prohibiting a certain person from

Addend.000017

selling, purchasing, renting, transferring, or receiving a certain regulated firearm unless the person presents or possesses a certain handgun qualification license issued by the Secretary ~~of State Police~~ <u>or certain credentials or identification; providing for certain exceptions to the requirement to present and possess a certain handgun qualification license under certain circumstances;</u> establishing certain requirements and procedures for the issuance and renewal of a certain handgun qualification license; authorizing the Secretary to revoke a certain handgun qualification license under certain circumstances; requiring a certain person to return a certain handgun qualification license under certain circumstances; <u>establishing certain requirements and procedures for the issuance of a replacement handgun qualification license under certain circumstances;</u> requiring certain fees; requiring a certain licensee or designated law enforcement agency to transfer a certain firearm application to the Secretary in an electronic format; authorizing a certain hearing for a certain aggrieved person under certain circumstances; <u>altering the information required in a certain statement for a certain firearm application;</u> altering the circumstances under which a person is prohibited from possessing a certain regulated firearm; making it a misdemeanor for a certain person to possess certain ammunition if the person is prohibited from possessing a certain firearm under certain circumstances; establishing certain penalties; requiring certain persons to provide certain data about a certain person to a certain federal index in a certain manner under certain circumstances; authorizing a certain person who is subject to certain prohibitions from possessing certain firearms to apply for certain relief from certain prohibitions under certain circumstances; establishing the procedures and requirements for a person who is subject to certain prohibitions on the possession of certain firearms to apply for certain relief for certain prohibitions; ~~requiring certain persons to enter into a certain memorandum of understanding~~ <u>*authorizing the Secretary of Health and Mental Hygiene to adopt certain regulations; providing that certain individuals may not be held criminally or civilly liable for certain actions*</u>; requiring a person who moves into the State for the purpose of establishing residency to register certain firearms within a certain time period with the Secretary in a certain manner; <u>requiring that a licensed dealer keep records of all receipts, sales, and other dispositions of firearms affected in connection with the licensed dealer's business; requiring the Secretary to adopt certain regulations specifying certain information; requiring that the records that licensed dealers maintain include certain information; specifying certain record keeping requirements to be met when a firearms business is discontinued; requiring that a licensee respond in a certain way after receipt of a request from the Secretary for certain information; authorizing the Secretary to implement a system by which a certain person may request certain information; requiring the Secretary to inspect the inventory and records of a licensed dealer under certain circumstances; authorizing the Secretary to conduct a certain inspection during a certain time;</u> *<u>requiring certain persons who sell or transfer regulated firearms to notify certain purchasers or recipients at the time of purchase or transfer that the purchaser or</u>*

Addend.000018

MARTIN O'MALLEY, Governor                    Ch. 427

*recipient is required to report a lost or stolen regulated firearm to a certain law enforcement agency; requiring the owner of a regulated firearm to report the loss or theft of the regulated firearm to a certain law enforcement agency within a certain period of time after the owner discovers the loss or theft; requiring a law enforcement agency on receipt of a report of a lost or stolen regulated firearm to enter certain information into a certain database;* providing that certain information is not open to public inspection; prohibiting a certain person from possessing a rifle or shotgun under certain circumstances; <u>repealing a provision of law that prohibits a certain person from possessing a rifle or shotgun unless the person possesses a certain physician's certificate;</u> requiring a certain applicant for a certain firearm permit to complete a certain firearm training course under certain circumstances; exempting a certain applicant for a permit from a certain training requirement under certain circumstances; <u>authorizing the Secretary to issue a certain handgun qualification license without an additional application or fee under certain circumstances;</u> *prohibiting public inspection of the records of certain regulated firearm dealers, owners, or permit holders; authorizing the individual named in the record and the individual's attorney to view certain records; providing that this Act does not prohibit the Department of Public Safety and Correctional Services and the Department of State Police from accessing certain records in the performance of official duties;* defining certain terms; *requiring the Department of State Police to make certain investigations and to report its findings to the Governor and the General Assembly on or before a certain date; providing for the termination of certain provisions of this Act;* and generally relating to firearms.

*BY adding to*
 *Article – Criminal Law*
 *Section 4–110*
 *Annotated Code of Maryland*
 *(2012 Replacement Volume and 2012 Supplement)*

BY repealing and reenacting, with amendments,
 Article – Criminal Law
 Section *4–102,* 4–203(b)*,* and 4–301 through 4–306 <u>to be under the amended subtitle "Subtitle 3. Assault Weapons and Detachable Magazines"</u>
 Annotated Code of Maryland
 (2012 Replacement Volume and 2012 Supplement)

BY adding to
 Article – Health – General
 Section 10–632(g)
 Annotated Code of Maryland
 (2009 Replacement Volume and 2012 Supplement)

<u>BY repealing and reenacting, with amendments,</u>
 <u>Article – Natural Resources</u>

– 3 –

Ch. 427                    2013 LAWS OF MARYLAND

Section 10–410(g)
Annotated Code of Maryland
(2012 Replacement Volume)

BY repealing and reenacting, with amendments,
        Article – Public Safety
        Section *3–208*, 5–101, 5–110(a) *and (b)*, 5–114(a), 5–115, 5–118(b)(2) and (3),
                5–120, 5–133, 5–143, 5–205, 5–206, 5–301, and 5–306
        Annotated Code of Maryland
        (2011 Replacement Volume and 2012 Supplement)

BY adding to
        Article – Public Safety
        Section 5–117.1, 5–118(b)(4), 5–133.1, 5–133.2, 5–133.3, ~~and 5–143~~ 5–143, ~~and~~
                5–145, *and 5–146*
        Annotated Code of Maryland
        (2011 Replacement Volume and 2012 Supplement)

BY repealing
        Article – Public Safety
        Section 5–119
        Annotated Code of Maryland
        (2011 Replacement Volume and 2012 Supplement)

*BY repealing and reenacting, without amendments,*
        *Article – State Government*
        *Section 10–616(a)*
        *Annotated Code of Maryland*
        *(2009 Replacement Volume and 2012 Supplement)*

*BY adding to*
        *Article – State Government*
        *Section 10–616(v)*
        *Annotated Code of Maryland*
        *(2009 Replacement Volume and 2012 Supplement)*

        SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF
MARYLAND, That the Laws of Maryland read as follows:

**Article – Criminal Law**

*4–102.*

        *(a)     This section does not apply to:*

                *(1)     a law enforcement officer in the regular course of the officer's duty;*

Addend.000020

MARTIN O'MALLEY, Governor                    Ch. 427

*(2)     AN OFF–DUTY LAW ENFORCEMENT OFFICER WHO IS A PARENT, GUARDIAN, OR VISITOR OF A STUDENT ATTENDING A SCHOOL LOCATED ON THE PUBLIC SCHOOL PROPERTY, PROVIDED THAT:*

*(I)     THE OFFICER IS DISPLAYING THE OFFICER'S BADGE OR CREDENTIAL; AND*

*(II)     THE WEAPON CARRIED OR POSSESSED BY THE OFFICER IS CONCEALED;*

*[(2)] (3)     a person hired by a county board of education specifically for the purpose of guarding public school property;*

*[(3)] (4)     a person engaged in organized shooting activity for educational purposes; or*

*[(4)] (5)     a person who, with a written invitation from the school principal, displays or engages in a historical demonstration using a weapon or a replica of a weapon for educational purposes.*

*(b)     A person may not carry or possess a firearm, knife, or deadly weapon of any kind on public school property.*

*(c)     (1)     Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.*

*(2)     A person who is convicted of carrying or possessing a handgun in violation of this section shall be sentenced under Subtitle 2 of this title.*

**4–110.**

*(A)     IN THIS SECTION, "RESTRICTED FIREARM AMMUNITION" MEANS A CARTRIDGE, A SHELL, OR ANY OTHER DEVICE THAT:*

*(1)     CONTAINS EXPLOSIVE OR INCENDIARY MATERIAL DESIGNED AND INTENDED FOR USE IN A FIREARM; AND*

*(2)     HAS A CORE CONSTRUCTED, EXCLUDING TRACES OF OTHER SUBSTANCES, ENTIRELY FROM ONE OR A COMBINATION OF:*

*(I)     TUNGSTEN ALLOYS;*

*(II)     STEEL;*

– 5 –

        **_(III)_**   **_IRON;_**

        **_(IV)_**   **_BRASS;_**

        **_(V)_**   **_BERYLLIUM COPPER;_**

        **_(VI)_**   **_DEPLETED URANIUM; OR_**

        **_(VII)_**   **_AN EQUIVALENT MATERIAL OF SIMILAR DENSITY OR HARDNESS._**

    **_(B)_**   **_A PERSON MAY NOT, DURING AND IN RELATION TO THE COMMISSION OF A CRIME OF VIOLENCE AS DEFINED IN § 14–101 OF THIS ARTICLE, POSSESS OR USE RESTRICTED FIREARM AMMUNITION._**

    **_(C)_**   **_A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 5 YEARS OR A FINE NOT EXCEEDING $5,000 OR BOTH._**

4–203.

    (b)   This section does not prohibit:

        (1)   the wearing, carrying, or transporting of a handgun by a person who **[**is on active assignment engaged in law enforcement,**]** is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment, and is:

        (i)   a law enforcement official of the United States, the State, or a county or city of the State;

        (ii)   a member of the armed forces of the United States or of the National Guard on duty or traveling to or from duty;

        (iii)   a law enforcement official of another state or subdivision of another state temporarily in this State on official business;

        (iv)   a correctional officer or warden of a correctional facility in the State;

        (v)   a sheriff or full–time assistant or deputy sheriff of the State; or

        (vi)   a temporary or part–time sheriff's deputy;

Addend.000022

MARTIN O'MALLEY, Governor                    Ch. 427

(2)    the wearing, carrying, or transporting of a handgun, **IN COMPLIANCE WITH ANY LIMITATIONS IMPOSED UNDER § 5–307 OF THE PUBLIC SAFETY ARTICLE,** by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;

(3)    the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(4)    the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources–sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(5)    the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(6)    the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases;

(7)    the wearing, carrying, or transporting of a handgun by a supervisory employee:

(i)    in the course of employment;

(ii)    within the confines of the business establishment in which the supervisory employee is employed; and

(iii)    when so authorized by the owner or manager of the business establishment;

(8)    the carrying or transporting of a signal pistol or other visual distress signal approved by the United States Coast Guard in a vessel on the waterways of the State or, if the signal pistol or other visual distress signal is unloaded and carried in an enclosed case, in a vehicle; or

– 7 –

(9)      the wearing, carrying, or transporting of a handgun by a person who is carrying a court order requiring the surrender of the handgun, if:

(i)      the handgun is unloaded;

(ii)      the person has notified the law enforcement unit, barracks, or station that the handgun is being transported in accordance with the court order; and

(iii)      the person transports the handgun directly to the law enforcement unit, barracks, or station.

Subtitle 3.  Assault [Pistols] **WEAPONS** and Detachable Magazines.

4–301.

**(A)      IN THIS SUBTITLE THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.**

**(B)      "ASSAULT LONG GUN" MEANS ANY ASSAULT WEAPON LISTED UNDER § 5–101(R)(2) OF THE PUBLIC SAFETY ARTICLE.**

**(C)      [**In this subtitle, "assault**] "ASSAULT** pistol" means any of the following firearms **[**or a copy regardless of the producer or manufacturer**]**:

(1)      AA Arms AP–9 semiautomatic pistol;

(2)      Bushmaster semiautomatic pistol;

(3)      Claridge HI–TEC semiautomatic pistol;

(4)      D Max Industries semiautomatic pistol;

(5)      Encom MK–IV, MP–9, or MP–45 semiautomatic pistol;

(6)      Heckler and Koch semiautomatic SP–89 pistol;

(7)      Holmes MP–83 semiautomatic pistol;

(8)      Ingram MAC 10/11 semiautomatic pistol and variations including the Partisan Avenger and the SWD Cobray;

(9)      Intratec TEC–9/DC–9 semiautomatic pistol in any centerfire variation;

MARTIN O'MALLEY, Governor                    Ch. 427

(10)   P.A.W.S. type semiautomatic pistol;

(11)   Skorpion semiautomatic pistol;

(12)   Spectre double action semiautomatic pistol (Sile, F.I.E., Mitchell);

(13)   UZI semiautomatic pistol;

(14)   Weaver Arms semiautomatic Nighthawk pistol; or

(15)   Wilkinson semiautomatic "Linda" pistol.

**(D)   "ASSAULT WEAPON" MEANS:**

**(1)   AN ASSAULT LONG GUN;**

**(2)   AN ASSAULT PISTOL; OR**

**(3)   A COPYCAT WEAPON.**

**(E)   (1)   "COPYCAT WEAPON" MEANS:**

**(I)   A SEMIAUTOMATIC CENTERFIRE RIFLE THAT CAN ACCEPT A DETACHABLE MAGAZINE AND HAS ANY <u>TWO</u> OF THE FOLLOWING:**

1.   ~~A PISTOL GRIP THAT PROTRUDES CONSPICUOUSLY BENEATH THE ACTION OF THE WEAPON;~~

~~2.~~   ~~A THUMBHOLE STOCK;~~

~~3.~~   A FOLDING ~~OR TELESCOPING~~ STOCK;

~~4.~~ ~~3.~~ *2.* A GRENADE LAUNCHER OR FLARE LAUNCHER; *OR*

~~5.~~ ~~4.~~ *3.* A FLASH SUPPRESSOR; ~~OR~~

~~6.~~ ~~5.~~   ~~A FORWARD PISTOL GRIP;~~

**(II)   A SEMIAUTOMATIC CENTERFIRE RIFLE THAT HAS A FIXED MAGAZINE WITH THE CAPACITY TO ACCEPT MORE THAN 10 ROUNDS;**

**(III)   A SEMIAUTOMATIC CENTERFIRE RIFLE THAT HAS AN OVERALL LENGTH OF LESS THAN ~~30~~ *29* INCHES;**

– 9 –

~~(IV)   A   SEMIAUTOMATIC   PISTOL   THAT   CAN   ACCEPT   A DETACHABLE MAGAZINE AND HAS ANY~~ TWO ~~OF THE FOLLOWING:~~

~~1.     A THREADED BARREL, CAPABLE OF ACCEPTING A FLASH SUPPRESSOR, FORWARD HANDGRIP, OR SILENCER;~~

~~2.     A SECOND HANDGRIP;~~

~~3.     A   SHROUD   THAT   IS   ATTACHED   TO   OR   THAT PARTIALLY  OR  COMPLETELY  ENCIRCLES  THE  BARREL,  EXCEPT  FOR  A  SLIDE THAT  ENCLOSES  THE  BARREL,  AND  THAT  ALLOWS  THE  BEARER  TO  FIRE  THE WEAPON WITHOUT BURNING THE BEARER'S HAND; OR~~

~~4.     THE    CAPACITY    TO    ACCEPT    A    DETACHABLE MAGAZINE OUTSIDE THE PISTOL GRIP;~~

~~(V)~~ *(IV)*     A    SEMIAUTOMATIC    PISTOL    WITH    A    FIXED MAGAZINE THAT CAN ACCEPT MORE THAN **10** ROUNDS;

~~(VI)~~ *(V)*     A SEMIAUTOMATIC SHOTGUN THAT HAS~~:~~

~~1.~~     A FOLDING ~~OR TELESCOPING~~ STOCK; ~~AND~~

~~2.     A    PISTOL    GRIP    THAT    PROTRUDES CONSPICUOUSLY  BENEATH  THE  ACTION  OF  THE  WEAPON,  THUMBHOLE  STOCK, OR VERTICAL HANDGRIP;~~ OR

~~(VII)~~ *(VI)*     A SHOTGUN WITH A REVOLVING CYLINDER.

(2)     "COPYCAT WEAPON" DOES NOT INCLUDE AN ASSAULT LONG GUN OR AN ASSAULT PISTOL.

(F)     "DETACHABLE MAGAZINE" MEANS AN AMMUNITION FEEDING DEVICE THAT CAN BE REMOVED READILY FROM A FIREARM WITHOUT REQUIRING DISASSEMBLY OF THE FIREARM ACTION OR WITHOUT THE USE OF A TOOL, INCLUDING A BULLET OR CARTRIDGE.

(G)     "FLASH SUPPRESSOR" MEANS A DEVICE THAT FUNCTIONS, OR IS INTENDED TO FUNCTION, TO PERCEPTIBLY REDUCE OR REDIRECT MUZZLE FLASH FROM THE SHOOTER'S FIELD OF VISION.

~~(H)     "FORWARD  PISTOL  GRIP"  MEANS  A  GRIP  THAT  ALLOWS  FOR  A PISTOL-STYLE GRASP FORWARD OF THE TRIGGER.~~

MARTIN O'MALLEY, Governor                    Ch. 427

(I) *(H)*      "LICENSED FIREARMS DEALER" MEANS A PERSON WHO HOLDS A DEALER'S LICENSE UNDER TITLE 5, SUBTITLE 1 OF THE PUBLIC SAFETY ARTICLE.

~~(J)      "PISTOL GRIP THAT PROTRUDES CONSPICUOUSLY BENEATH THE ACTION OF THE WEAPON" MEANS A GRIP THAT ALLOWS FOR A PISTOL-STYLE GRASP IN WHICH THE WEB OF THE TRIGGER HAND BETWEEN THE THUMB AND INDEX FINGER CAN BE PLACED BELOW THE TOP OF THE EXPOSED PORTION OF THE TRIGGER WHILE FIRING.~~

~~(K)      "THUMBHOLE STOCK" MEANS A STOCK WITH A HOLE THAT ALLOWS THE THUMB OF THE TRIGGER HAND TO PENETRATE INTO OR THROUGH THE STOCK WHILE FIRING.~~

4–302.

This subtitle does not apply to:

(1)      if acting within the scope of official business, personnel of the United States government or a unit of that government, members of the armed forces of the United States or of the National Guard, ~~*MEMBERS OF THE MARYLAND DEFENSE FORCE,* or~~ law enforcement personnel of the State or a local unit in the State, OR A RAILROAD POLICE OFFICER AUTHORIZED UNDER TITLE 3 OF THE PUBLIC SAFETY ARTICLE OR 49 U.S.C. § 28101;

(2)      a firearm modified to render it permanently inoperative;

(3)      POSSESSION, *IMPORTATION,* MANUFACTURE, RECEIPT FOR MANUFACTURE, SHIPMENT FOR MANUFACTURE, *STORAGE,* purchases, sales, and transport to or by a licensed firearms dealer or manufacturer who is:

(i)      providing or servicing an assault [pistol] WEAPON or detachable magazine for a law enforcement unit or for personnel exempted under item (1) of this section; ~~or~~

(ii)      acting to sell or transfer an assault [pistol] WEAPON or detachable magazine to a licensed firearm dealer in another state *OR TO AN INDIVIDUAL PURCHASER IN ANOTHER STATE THROUGH A LICENSED FIREARMS DEALER*; OR

(III)      ACTING TO RETURN TO A CUSTOMER IN ANOTHER STATE AN ASSAULT WEAPON TRANSFERRED TO THE LICENSED FIREARMS DEALER OR MANUFACTURER UNDER THE TERMS OF A WARRANTY OR FOR REPAIR;

– 11 –

(4)     organizations that are required or authorized by federal law governing their specific business or activity to maintain assault [pistols] **WEAPONS** and applicable ammunition and detachable magazines;

(5)     the receipt of an assault [pistol] **WEAPON** or detachable magazine by inheritance*, AND POSSESSION OF THE INHERITED ASSAULT WEAPON OR DETACHABLE MAGAZINE,* if the decedent lawfully possessed the assault [pistol] **WEAPON** *OR DETACHABLE MAGAZINE AND THE PERSON INHERITING THE ASSAULT WEAPON OR DETACHABLE MAGAZINE IS NOT OTHERWISE DISQUALIFIED FROM POSSESSING A REGULATED FIREARM*; ~~or~~

(6)     the receipt of an assault [pistol] **WEAPON** or detachable magazine by a personal representative of an estate for purposes of exercising the powers and duties of a personal representative of an estate; **OR**

**(7)     POSSESSION BY A PERSON WHO IS RETIRED IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE STATE OR A LOCAL UNIT IN THE STATE AND IS NOT OTHERWISE PROHIBITED FROM RECEIVING AN ASSAULT WEAPON OR DETACHABLE MAGAZINE IF:**

**(I)     THE ASSAULT WEAPON OR DETACHABLE MAGAZINE IS SOLD OR TRANSFERRED TO THE PERSON BY THE LAW ENFORCEMENT AGENCY ON RETIREMENT; OR**

**(II)     THE ASSAULT WEAPON OR DETACHABLE MAGAZINE WAS PURCHASED OR OBTAINED BY THE PERSON FOR OFFICIAL USE WITH THE LAW ENFORCEMENT AGENCY BEFORE RETIREMENT**; ~~OR~~

**(8)     POSSESSION OR TRANSPORT BY AN EMPLOYEE OF AN ARMORED CAR COMPANY IF THE INDIVIDUAL IS ACTING WITHIN THE SCOPE OF EMPLOYMENT AND HAS A PERMIT ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE**; *OR*

**(9)     POSSESSION, RECEIPT, AND TESTING BY, OR SHIPPING TO OR FROM:**

**(I)     AN ISO 17025 ACCREDITED, NATIONAL INSTITUTE OF JUSTICE–APPROVED BALLISTICS TESTING LABORATORY; OR**

**(II)     A FACILITY OR ENTITY THAT MANUFACTURES OR PROVIDES RESEARCH AND DEVELOPMENT TESTING, ANALYSIS, OR ENGINEERING FOR PERSONAL PROTECTIVE EQUIPMENT OR VEHICLE PROTECTION SYSTEMS.**

Addend.000028

MARTIN O'MALLEY, Governor    Ch. 427

4–303.

(a)    Except as provided in subsection (b) of this section, a person may not:

(1)    transport an assault [pistol] **WEAPON** into the State; or

(2)    possess, sell, offer to sell, transfer, purchase, or receive an assault [pistol] **WEAPON**.

(b)    **(1)**    A person who lawfully possessed an assault pistol before June 1, 1994, and who registered the assault pistol with the Secretary of State Police before August 1, 1994, may:

[(1)]    **(I)**    continue to possess **AND TRANSPORT** the assault pistol; or

[(2)]    **(II)**    while carrying a court order requiring the surrender of the assault pistol, transport the assault pistol directly to the law enforcement unit, barracks, or station if the person has notified the law enforcement unit, barracks, or station that the person is transporting the assault pistol in accordance with a court order and the assault pistol is unloaded.

**(2)**    *A LICENSED FIREARMS DEALER MAY CONTINUE TO POSSESS, SELL, OFFER FOR SALE, OR TRANSFER AN ASSAULT LONG GUN OR A COPYCAT WEAPON THAT THE LICENSED FIREARMS DEALER LAWFULLY POSSESSED ON OR BEFORE OCTOBER 1, 2013.*

~~**(3)**~~    ~~A LICENSED FIREARMS DEALER MAY CONTINUE TO POSSESS, SELL, OFFER FOR SALE, OR TRANSFER AN ASSAULT LONG GUN OR A COPYCAT WEAPON THAT THE LICENSED FIREARMS DEALER LAWFULLY POSSESSED ON OR BEFORE OCTOBER 1, 2013.~~

**(3)**    ~~(I)~~    A PERSON WHO LAWFULLY POSSESSED ~~*OR PLACED A VERIFIABLE PURCHASE ORDER FOR,*~~ *HAS A PURCHASE ORDER FOR, OR COMPLETED AN APPLICATION TO PURCHASE* AN ASSAULT LONG GUN OR A COPYCAT WEAPON BEFORE OCTOBER 1, 2013, ~~AND WHO REGISTERS THE ASSAULT LONG GUN OR COPYCAT WEAPON WITH THE SECRETARY OF STATE POLICE BEFORE NOVEMBER 1, 2013~~ JANUARY 1, 2014, MAY:

~~(I)~~    ~~1.~~ *(I)*    ~~CONTINUE TO~~ POSSESS <u>AND TRANSPORT</u> THE ASSAULT LONG GUN OR COPYCAT WEAPON; OR

~~(II)~~    ~~2.~~ *(II)*    WHILE CARRYING A COURT ORDER REQUIRING THE SURRENDER OF THE ASSAULT LONG GUN OR COPYCAT WEAPON,

– 13 –

Ch. 427                        2013 LAWS OF MARYLAND

TRANSPORT THE ASSAULT LONG GUN OR COPYCAT WEAPON DIRECTLY TO THE
LAW ENFORCEMENT UNIT, BARRACKS, OR STATION IF THE PERSON HAS
NOTIFIED THE LAW ENFORCEMENT UNIT, BARRACKS, OR STATION THAT THE
PERSON IS TRANSPORTING THE ASSAULT LONG GUN OR COPYCAT WEAPON IN
ACCORDANCE WITH A COURT ORDER AND THE ASSAULT LONG GUN OR COPYCAT
WEAPON IS UNLOADED.

(II)   A PERSON WHO PURCHASED AN ASSAULT LONG GUN
BEFORE OCTOBER 1, 2013, AND REGISTERED THE ASSAULT LONG GUN WITH
THE SECRETARY OF STATE POLICE IS NOT REQUIRED TO REREGISTER THE
ASSAULT LONG GUN UNDER THIS SUBSECTION.

(3)   (I)   SUBJECT TO PARAGRAPH (4) OF THIS SUBSECTION, A
PERSON WHO LAWFULLY POSSESSED AN ASSAULT LONG GUN OR A COPYCAT
WEAPON BEFORE OCTOBER 1, 2013, AND WHO VOLUNTARILY REGISTERS THE
ASSAULT LONG GUN OR COPYCAT WEAPON ON OR AFTER NOVEMBER 1, 2013
JANUARY 1, 2014, IS NOT SUBJECT TO THE PENALTIES IN § 4-306 OF THIS
SUBTITLE.

(II)   A PERSON WHO VOLUNTARILY REGISTERS AN ASSAULT
LONG GUN OR A COPYCAT WEAPON AS DESCRIBED IN SUBPARAGRAPH (I) OF
THIS PARAGRAPH IS SUBJECT TO A CIVIL PENALTY NOT EXCEEDING $1,000:

1.   BEFORE MAY 1, 2014, A CIVIL PENALTY NOT
EXCEEDING $290 PER REGISTERED FIREARM;

2.   ON OR AFTER MAY 1, 2014 AND BEFORE
NOVEMBER 1, 2015, A CIVIL PENALTY NOT EXCEEDING $580 PER REGISTERED
FIREARM; AND

3.   ON OR AFTER NOVEMBER 1, 2015 AND BEFORE
MAY 1, 2016, A CIVIL PENALTY NOT EXCEEDING $1,000 PER REGISTERED
FIREARM.

(4)   (I)   A PERSON WHO LAWFULLY POSSESSED AN ASSAULT
LONG GUN OR A COPYCAT WEAPON BEFORE OCTOBER 1, 2013, AND WHO
REGISTERS THE ASSAULT LONG GUN OR COPYCAT WEAPON ON OR AFTER
NOVEMBER 1, 2013 JANUARY 1, 2014, ONLY AFTER BEING DISCOVERED IN
POSSESSION OF THE ASSAULT LONG GUN OR COPYCAT WEAPON BY A LAW
ENFORCEMENT OFFICER IS NOT SUBJECT TO THE PENALTIES IN § 4-306 OF THIS
SUBTITLE.

– 14 –

MARTIN O'MALLEY, Governor                     Ch. 427

~~(II)   A PERSON DESCRIBED IN SUBPARAGRAPH (I) OF THIS PARAGRAPH IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 18 MONTHS 1 YEAR FOR EACH INCIDENT IN WHICH THE PERSON IS DISCOVERED WITH UNREGISTERED FIREARMS.~~

*(4)   A PERSON MAY TRANSPORT AN ASSAULT WEAPON TO OR FROM:*

*(I)   AN ISO 17025 ACCREDITED, NATIONAL INSTITUTE OF JUSTICE–APPROVED BALLISTICS TESTING LABORATORY; OR*

*(II)   A FACILITY OR ENTITY THAT MANUFACTURES OR PROVIDES RESEARCH AND DEVELOPMENT TESTING, ANALYSIS, OR ENGINEERING FOR PERSONAL PROTECTIVE EQUIPMENT OR VEHICLE PROTECTION SYSTEMS.*

4–304.

A law enforcement unit may seize as contraband and dispose of according to regulation an assault **[**pistol**]** **WEAPON** transported, sold, transferred, purchased, received, or possessed in violation of this subtitle.

4–305.

(a)   This section does not apply to**:**

*(1)*   a .22 caliber rifle with a tubular magazine***; OR***

*(2)   A LAW ENFORCEMENT OFFICER OR A PERSON WHO RETIRED IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE UNITED STATES, THE STATE, OR ANY LAW ENFORCEMENT AGENCY IN THE STATE*.

(b)   A person may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than **[**20**]** **10** rounds of ammunition for a firearm.

4–306.

(a)   ~~A~~ **EXCEPT AS OTHERWISE PROVIDED IN THIS SUBTITLE, A** person who violates this subtitle is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.

(b)   (1)   A person who uses an assault **[**pistol**]** **WEAPON**, or a magazine that has a capacity of more than **[**20**]** **10** rounds of ammunition, in the commission of a

– 15 –

felony or a crime of violence as defined in § 5–101 of the Public Safety Article is guilty of a misdemeanor and on conviction, in addition to any other sentence imposed for the felony or crime of violence, shall be sentenced under this subsection.

    (2)  (i)  For a first violation, the person shall be sentenced to imprisonment for not less than 5 years and not exceeding 20 years.

        (ii)  The court may not impose less than the minimum sentence of 5 years.

        (iii)  The mandatory minimum sentence of 5 years may not be suspended.

        (iv)  Except as otherwise provided in § 4–305 of the Correctional Services Article, the person is not eligible for parole in less than 5 years.

    (3)  (i)  For each subsequent violation, the person shall be sentenced to imprisonment for not less than 10 years and not exceeding 20 years.

        (ii)  The court may not impose less than the minimum sentence of 10 years.

        (iii)  A sentence imposed under this paragraph shall be consecutive to and not concurrent with any other sentence imposed for the felony or crime of violence.

### Article – Health – General

10–632.

   **(G)**  **I**F A HEARING OFFICER ENTERS AN ORDER FOR INVOLUNTARY ~~ADMISSION~~ *COMMITMENT* UNDER PART III OF THIS SUBTITLE AND THE HEARING OFFICER DETERMINES THAT THE INDIVIDUAL CANNOT SAFELY POSSESS A FIREARM BASED ON CREDIBLE EVIDENCE OF DANGEROUSNESS TO OTHERS, THE HEARING OFFICER SHALL ORDER THE INDIVIDUAL WHO IS SUBJECT TO THE INVOLUNTARY ~~ADMISSION~~ *COMMITMENT* TO:

    **(1)**  ~~**(I)**~~  SURRENDER TO LAW ENFORCEMENT AUTHORITIES ANY FIREARMS IN THE INDIVIDUAL'S POSSESSION~~; OR~~

        ~~**(II)**~~  ~~TEMPORARILY CONSIGN ANY FIREARMS IN THE INDIVIDUAL'S POSSESSION TO A LICENSED DEALER FOR STORAGE OR CONSIGNMENT~~; AND

MARTIN O'MALLEY, Governor                                Ch. 427

(2)   REFRAIN FROM POSSESSING A FIREARM UNLESS THE INDIVIDUAL IS GRANTED RELIEF FROM FIREARMS DISQUALIFICATION IN ACCORDANCE WITH § 5–133.3 OF THE PUBLIC SAFETY ARTICLE.

### Article – Natural Resources

10–410.

(g)   (1)   Except as provided in [paragraph (2)] PARAGRAPHS (2) AND (3) of this subsection, a person, other than the owner or occupant, while hunting for any wild bird or mammal may not shoot or discharge any firearm or other deadly weapon within 150 yards, known as the "safety zone," of a dwelling house, residence, church, or other building or camp occupied by human beings, or shoot at any wild bird or mammal while it is within this area, without the specific advance permission of the owner or occupant.

(2)   A PERSON, WHILE HUNTING FOR ANY WILD BIRD OR MAMMAL, MAY NOT SHOOT OR DISCHARGE ANY FIREARM WITHIN 300 YARDS OF A PUBLIC OR NONPUBLIC SCHOOL DURING SCHOOL HOURS OR AT A TIME WHEN A SCHOOL–APPROVED ACTIVITY IS TAKING PLACE.

[(2)] (3)   For archery hunters in Carroll County or Frederick County, the safety zone described in paragraph (1) of this subsection extends for 50 yards from a dwelling house, residence, church, or any other building or camp occupied by human beings.

[(3)] (4)   During any open hunting season, a person, other than the owner or occupant, may not hunt or chase willfully any wild bird or mammal within the safety zone without the specific advance permission of the owner or occupant.

### Article – Public Safety

3–208.

[(a)]   Subject to the authority of the Secretary, the Commission has the following powers and duties:

(1)   to adopt regulations necessary or appropriate to carry out this subtitle; and

(2)   to adopt regulations that establish and enforce standards for prior substance abuse by individuals applying for certification as a police officer.

[(b)   Subject to subsections (c) and (d) of this section, the Commission shall adopt regulations on or before January 1, 2001, for a certified firearms safety training

Ch. 427                      2013 LAWS OF MARYLAND

*course required for an applicant for a regulated firearms purchase, rental, or transfer made on or after January 1, 2002.*

    *(c)    The certified firearms safety training course required under subsection (b) of this section shall:*

        *(1)    be offered by the Commission; or*

        *(2)    contain a handgun safety component and be conducted by an individual or organization certified by:*

            *(i)    the Commission;*

            *(ii)    the Department of Natural Resources;*

            *(iii)    the Department of State Police; or*

            *(iv)    any reputable organization:*

            *1.    that has as one of its objectives the promotion of competency and safety in handling handguns; and*

            *2.    whose course has been determined by the Commission to meet the regulations adopted by the Commission.*

    *(d)    Any course offered by the Commission under subsection (c) of this section:*

        *(1)    shall be offered free of charge or fee;*

        *(2)    may not be more than 2 hours in duration;*

        *(3)    shall be conducted or offered at least once each week in all geographic areas of the State;*

        *(4)    shall be available after regular business hours;*

        *(5)    shall be open to each individual required by law to complete the firearms safety training course, within 2 weeks after request of the individual;*

        *(6)    shall only require attendance throughout the duration of the course in order to complete the course successfully; and*

        *(7)    may not require any skills or knowledge testing in the use of a regulated firearm in order to complete the course successfully.*]

5–101.

Addend.000034

MARTIN O'MALLEY, Governor          Ch. 427

(a)     In this subtitle the following words have the meanings indicated.

(b)     "Antique firearm" has the meaning stated in § 4–201 of the Criminal Law Article.

*__(B–1) (1)     "CONVICTED OF A DISQUALIFYING CRIME" INCLUDES:__*

*__(I)     A CASE IN WHICH A PERSON RECEIVED PROBATION BEFORE JUDGMENT FOR A CRIME OF VIOLENCE; AND__*

*__(II)     A CASE IN WHICH A PERSON RECEIVED PROBATION BEFORE JUDGMENT IN A DOMESTICALLY RELATED CRIME AS DEFINED IN § 6–233 OF THE CRIMINAL PROCEDURE ARTICLE.__*

*__(2)     "CONVICTED OF A DISQUALIFYING CRIME" DOES NOT INCLUDE A CASE IN WHICH A PERSON RECEIVED A PROBATION BEFORE JUDGMENT:__*

*__(I)     FOR ASSAULT IN THE SECOND DEGREE; OR__*

*__(II)     THAT WAS EXPUNGED UNDER TITLE 10, SUBTITLE 1 OF THE CRIMINAL PROCEDURE ARTICLE.__*

(c)     "Crime of violence" means:

(1)     abduction;

(2)     arson in the first degree;

(3)     assault in the first or second degree;

(4)     burglary in the first, second, or third degree;

(5)     carjacking and armed carjacking;

(6)     escape in the first degree;

(7)     kidnapping;

(8)     voluntary manslaughter;

(9)     maiming as previously proscribed under former Article 27, § 386 of the Code;

Addend.000035

     (10)    mayhem as previously proscribed under former Article 27, § 384 of the Code;

     (11)    murder in the first or second degree;

     (12)    rape in the first or second degree;

     (13)    robbery;

     (14)    robbery with a dangerous weapon;

     (15)    sexual offense in the first, second, or third degree;

     (16)    an attempt to commit any of the crimes listed in items (1) through (15) of this subsection; or

     (17)    assault with intent to commit any of the crimes listed in items (1) through (15) of this subsection or a crime punishable by imprisonment for more than 1 year.

     (d)    "Dealer" means a person who is engaged in the business of:

     (1)    selling, renting, or transferring firearms at wholesale or retail; or

     (2)    repairing firearms.

     (e)    "Dealer's license" means a State regulated firearms dealer's license.

     (f)    "Designated law enforcement agency" means a law enforcement agency that the Secretary designates to process applications to purchase regulated firearms for secondary sales.

     (g)    "Disqualifying crime" means:

     (1)    a crime of violence;

     (2)    a violation classified as a felony in the State; or

     (3)    a violation classified as a misdemeanor in the State that carries a statutory penalty of more than 2 years.

     (h)    (1)    "Firearm" means:

          (i)    a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or

MARTIN O'MALLEY, Governor                     Ch. 427

      (ii)    the frame or receiver of such a weapon.

    (2)    "Firearm" includes a starter gun.

  (i)    "Firearm applicant" means a person who makes a firearm application.

  (j)    "Firearm application" means an application to purchase, rent, or transfer a regulated firearm.

  (k)    "Fugitive from justice" means a person who has fled to avoid prosecution or giving testimony in a criminal proceeding.

  (l)    "Habitual drunkard" means a person who has been found guilty of any three crimes under § 21–902(a), (b), or (c) of the Transportation Article, one of which occurred in the past year.

  (m)    "Habitual user" means a person who has been found guilty of two controlled dangerous substance crimes, one of which occurred in the past 5 years.

  (n)    (1)    "Handgun" means a firearm with a barrel less than 16 inches in length.

    (2)    "Handgun" includes signal, starter, and blank pistols.

  **(O)    "HANDGUN QUALIFICATION LICENSE" MEANS A LICENSE ISSUED BY THE SECRETARY THAT AUTHORIZES A PERSON TO PURCHASE, RENT, OR RECEIVE A HANDGUN.**

  [(o)] **(P)**    "Licensee" means a person who holds a dealer's license.

  **(Q)    "QUALIFIED HANDGUN INSTRUCTOR" MEANS A** ~~PERSON CERTIFIED BY THE SECRETARY WHO MEETS THE REQUIREMENTS ESTABLISHED BY THE SECRETARY TO PROVIDE TRAINING IN THE CARE, SAFETY, AND USE OF HANDGUNS~~ *CERTIFIED FIREARMS INSTRUCTOR WHO:*

    *(1)    IS RECOGNIZED BY THE MARYLAND POLICE AND CORRECTIONAL TRAINING COMMISSIONS;*

    *(2)    HAS A QUALIFIED HANDGUN INSTRUCTOR LICENSE ISSUED BY THE SECRETARY; OR*

    *(3)    HAS A CERTIFICATION ISSUED* ~~AND RECOGNIZED BY A NATIONAL ORGANIZATION~~ *BY A NATIONALLY RECOGNIZED FIREARMS ORGANIZATION.*

– 21 –

[(p)] **(R)**     "Regulated firearm" means:

(1)     a handgun; or

(2)     a firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon:

(i)     American Arms Spectre da Semiautomatic carbine;

(ii)     AK–47 in all forms;

(iii)     Algimec AGM–1 type semi–auto;

(iv)     AR 100 type semi–auto;

(v)     AR 180 type semi–auto;

(vi)     Argentine L.S.R. semi–auto;

(vii)     Australian Automatic Arms SAR type semi–auto;

(viii)     Auto–Ordnance Thompson M1 and 1927 semi–automatics;

(ix)     Barrett light .50 cal. semi–auto;

(x)     Beretta AR70 type semi–auto;

(xi)     Bushmaster semi–auto rifle;

(xii)     Calico models M–100 and M–900;

(xiii)     CIS SR 88 type semi–auto;

(xiv)     Claridge HI TEC C–9 carbines;

(xv)     Colt AR–15, CAR–15, and all imitations except Colt AR–15 Sporter H–BAR rifle;

(xvi)     Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K–1, and K–2;

(xvii)     Dragunov Chinese made semi–auto;

(xviii)     Famas semi–auto (.223 caliber);

MARTIN O'MALLEY, Governor                Ch. 427

(xix)    Feather AT–9 semi–auto;

(xx)    FN LAR and FN FAL assault rifle;

(xxi)    FNC semi–auto type carbine;

(xxii)    F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;

(xxiii) Steyr–AUG–SA semi–auto;

(xxiv) Galil models AR and ARM semi–auto;

(xxv)    Heckler and Koch HK–91 A3, HK–93 A2, HK–94 A2 and A3;

(xxvi)    Holmes model 88 shotgun;

(xxvii)    Avtomat Kalashnikov semiautomatic rifle in any format;

(xxviii)    Manchester Arms "Commando" MK–45, MK–9;

(xxix) Mandell TAC–1 semi–auto carbine;

(xxx)    Mossberg model 500 Bullpup assault shotgun;

(xxxi) Sterling Mark 6;

(xxxii)    P.A.W.S. carbine;

(xxxiii)    Ruger mini–14 folding stock model (.223 caliber);

(xxxiv)    SIG 550/551 assault rifle (.223 caliber);

(xxxv)    SKS with detachable magazine;

(xxxvi) AP–74 Commando type semi–auto;

(xxxvii) Springfield    Armory    BM–59,    SAR–48,    G3,    SAR–3,
M–21 sniper rifle, M1A, excluding the M1 Garand;

(xxxviii)    Street sweeper assault type shotgun;

(xxxix)    Striker 12 assault shotgun in all formats;

(xl)    Unique F11 semi–auto type;

(xli)    Daewoo USAS 12 semi–auto shotgun;

Addend.000039

(xlii)   UZI 9mm carbine or rifle;

(xliii)  Valmet M–76 and M–78 semi–auto;

(xliv)  Weaver Arms "Nighthawk" semi–auto carbine; or

(xlv)   Wilkinson Arms 9mm semi–auto "Terry".

[(q)] **(S)**      "Rent" means the temporary transfer for consideration of a regulated firearm that is taken from the property of the owner of the regulated firearm.

[(r)] **(T)**      "Secondary sale" means a sale of a regulated firearm in which neither party to the sale:

(1)      is a licensee;

(2)      is licensed by the federal government as a firearms dealer;

(3)      devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of earning a profit through the repeated purchase and resale of firearms; or

(4)      repairs firearms as a regular course of trade or business.

[(s)] **(U)**      "Secretary" means the Secretary of State Police or the Secretary's designee.

[(t)] **(V)**      "Straw purchase" means a sale of a regulated firearm in which a person uses another, known as the straw purchaser, to:

(1)      complete the application to purchase a regulated firearm;

(2)      take initial possession of the regulated firearm; and

(3)      subsequently transfer the regulated firearm to the person.

5–110.

(a)      The Secretary shall disapprove an application for a dealer's license if:

(1)      the Secretary determines that the applicant supplied false information or made a false statement;

– 24 –

MARTIN O'MALLEY, Governor                    Ch. 427

(2)    the Secretary determines that the application is not properly completed; **[or]**

(3)    the Secretary receives a written notification from the applicant's licensed attending physician that the applicant suffers from a mental disorder and is a danger to the applicant or to another**; OR**

**(4)    THE SECRETARY DETERMINES THAT THE APPLICANT INTENDS THAT A PERSON WHO IS NOT ELIGIBLE TO BE ISSUED A DEALER'S LICENSE OR WHOSE DEALER'S LICENSE HAS BEEN REVOKED OR SUSPENDED:**

**(I)    WILL PARTICIPATE IN THE MANAGEMENT OR OPERATION OF THE BUSINESS FOR WHICH THE LICENSE IS SOUGHT; OR**

**(II)    HOLDS A LEGAL OR EQUITABLE INTEREST IN THE BUSINESS FOR WHICH THE LICENSE IS SOUGHT**.

*(b)    If the Secretary disapproves an application for a dealer's license, the Secretary shall notify the applicant in writing of*:

*(1)    the disapproval* **OF THE APPLICATION; AND**

*(2)*    **THE REASON THE APPLICATION WAS DENIED**.

5–114.

(a)    *(1)*    The Secretary shall suspend a dealer's license if the licensee:

~~(1)~~    *(I)*    is under indictment for a crime of violence; **[or]**

~~(2)~~    *(II)*    is arrested for a violation of this subtitle that prohibits the purchase or possession of a regulated firearm**: OR** .

~~(3)~~ *(2)*    *(I)*    ***THE SECRETARY MAY SUSPEND A DEALER'S LICENSE IF THE LICENSEE* IS NOT IN COMPLIANCE WITH THE RECORD KEEPING AND REPORTING REQUIREMENTS OF § 5–145 OF THIS SUBTITLE**.

***(II)    THE SECRETARY MAY LIFT A SUSPENSION UNDER THIS PARAGRAPH AFTER THE LICENSEE PROVIDES EVIDENCE THAT THE RECORD KEEPING VIOLATION HAS BEEN CORRECTED.***

5–115.

– 25 –

(a)      (1)      A person whose dealer's license is suspended or revoked **OR WHO IS FINED FOR A VIOLATION OF THIS SUBTITLE** and who is aggrieved by the action of the Secretary may request a hearing by writing to the Secretary within 30 days after the Secretary forwards notice to the applicant under § 5–114(c) of this subtitle.

(2)      The Secretary shall grant the hearing within 15 days after receiving the request.

(b)      The hearing shall be held in accordance with Title 10, Subtitle 2 of the State Government Article.

**5–117.1.**

(A)      THIS SECTION DOES NOT APPLY TO:

(1)      A LICENSED FIREARMS MANUFACTURER;

(2)      A LAW ENFORCEMENT OFFICER OR PERSON WHO IS RETIRED IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE UNITED STATES, THE STATE, OR A LOCAL LAW ENFORCEMENT AGENCY OF THE STATE; ~~OR~~

(3)      A MEMBER OR RETIRED MEMBER OF THE ARMED FORCES OF THE UNITED STATES ~~OR,~~ *OR* THE NATIONAL GUARD~~, OR THE MARYLAND DEFENSE FORCE~~; *OR*

*(4)      A PERSON PURCHASING, RENTING, OR RECEIVING AN ANTIQUE, CURIO, OR RELIC FIREARM, AS DEFINED IN FEDERAL LAW OR IN DETERMINATIONS PUBLISHED BY THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES.*

~~(A)~~ (B)      A DEALER OR ANY OTHER PERSON MAY NOT SELL, RENT, OR TRANSFER A ~~REGULATED FIREARM~~ *HANDGUN* TO A PURCHASER, LESSEE, OR TRANSFEREE UNLESS THE PURCHASER, LESSEE, OR TRANSFEREE PRESENTS TO THE DEALER OR OTHER PERSON A VALID ~~REGULATED FIREARM~~ HANDGUN QUALIFICATION LICENSE ISSUED TO THE PURCHASER, LESSEE, OR TRANSFEREE BY THE SECRETARY UNDER THIS SECTION.

~~(B)~~ (C)      A PERSON MAY PURCHASE, RENT, OR RECEIVE A HANDGUN ONLY IF THE PERSON:

(1)      (I)      POSSESSES A VALID HANDGUN QUALIFICATION LICENSE ISSUED TO THE PERSON BY THE SECRETARY IN ACCORDANCE WITH THIS SECTION; ~~AND~~

MARTIN O'MALLEY, Governor                    Ch. 427

(II)    POSSESSES   VALID   CREDENTIALS   FROM   A   LAW ENFORCEMENT   AGENCY   OR   RETIREMENT   CREDENTIALS   FROM   A   LAW ENFORCEMENT AGENCY; ~~OR~~

(III)   IS AN ACTIVE OR RETIRED MEMBER OF THE ARMED FORCES   OF   THE   UNITED   STATES   ~~OR,~~   *OR*   THE   NATIONAL   GUARD~~, OR THE MARYLAND   DEFENSE   FORCE~~   AND   POSSESSES   A   VALID   MILITARY IDENTIFICATION CARD; ~~AND~~ *OR*

(IV)   *IS PURCHASING, RENTING, OR RECEIVING AN ANTIQUE, CURIO,   OR   RELIC   FIREARM,   AS   DEFINED   IN   FEDERAL   LAW   OR   IN DETERMINATIONS   PUBLISHED   BY   THE   BUREAU   OF   ALCOHOL,   TOBACCO, FIREARMS AND EXPLOSIVES; AND*

(2)    IS   NOT   OTHERWISE   PROHIBITED   FROM   PURCHASING   OR POSSESSING A HANDGUN UNDER STATE OR FEDERAL LAW.

~~(C)~~ (D)    SUBJECT TO SUBSECTIONS ~~(E) AND (F)~~ (F) AND (G) OF THIS SECTION, THE SECRETARY SHALL ISSUE A HANDGUN QUALIFICATION LICENSE TO A PERSON WHO THE SECRETARY FINDS:

(1)    ~~(I)~~    IS AT LEAST 21 YEARS OLD; ~~OR~~

~~(II)   IS AT LEAST 18 YEARS OLD IF THE PERSON IS A MEMBER OF   THE   UNITED   STATES   ARMED   FORCES,   THE   NATIONAL   GUARD,   OR   THE MARYLAND DEFENSE FORCE;~~

(2)    IS A RESIDENT OF THE STATE;

(3)    EXCEPT   AS   PROVIDED   IN   SUBSECTION   ~~(D)~~   (E)   OF   THIS SECTION, HAS DEMONSTRATED SATISFACTORY COMPLETION~~,~~ :

~~(I),~~   WITHIN   ~~1 YEAR~~   3 YEARS   PRIOR   TO   THE   SUBMISSION   OF THE APPLICATION, OF A FIREARMS SAFETY TRAINING COURSE APPROVED BY THE SECRETARY THAT INCLUDES:

~~(I)~~    ~~1.~~ *(I)*    A MINIMUM OF ~~8~~ 4 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR;

~~(II)~~    ~~2.~~ *(II)*    CLASSROOM INSTRUCTION ON:

~~1. A.~~ *1.*    STATE FIREARM LAW;

~~2.~~ ~~B.~~ *2.*    HOME FIREARM SAFETY; AND

~~3.~~ ~~C.~~ *3.*    HANDGUN MECHANISMS AND OPERATION; AND

~~(III)~~ ~~(II)~~ *(III)*        ~~WITHIN 10 YEARS PRIOR TO THE SUBMISSION OF THE APPLICATION, OF A FIREARMS SAFETY TRAINING COURSE APPROVED BY THE SECRETARY THAT INCLUDES~~ A FIREARMS ~~QUALIFICATION COMPONENT THAT DEMONSTRATES THE PERSON'S PROFICIENCY AND USE OF THE~~ *ORIENTATION COMPONENT THAT DEMONSTRATES THE PERSON'S SAFE OPERATION AND HANDLING OF A* FIREARM; AND

(4)    BASED ON AN INVESTIGATION, IS NOT PROHIBITED BY FEDERAL OR STATE LAW FROM PURCHASING OR POSSESSING A HANDGUN.

~~(D)~~ (E)    AN APPLICANT FOR A HANDGUN QUALIFICATION LICENSE IS NOT REQUIRED TO COMPLETE A FIREARMS SAFETY TRAINING COURSE UNDER SUBSECTION ~~(C)~~ (D) OF THIS SECTION IF THE APPLICANT:

(1)    ~~IS A LAW ENFORCEMENT OFFICER OF THE UNITED STATES, THE STATE, OR ANY LOCAL LAW ENFORCEMENT AGENCY IN THE STATE;~~

(2)    ~~IS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES OR THE NATIONAL GUARD; OR~~

(3)    ~~HAS COMPLETED A CERTIFIED FIREARMS TRAINING COURSE APPROVED BY THE SECRETARY;~~ ~~OR~~

*(2)    HAS COMPLETED A COURSE OF INSTRUCTION IN COMPETENCY AND SAFETY IN THE HANDLING OF FIREARMS PRESCRIBED BY THE DEPARTMENT OF NATURAL RESOURCES UNDER § 10–301.1 OF THE NATURAL RESOURCES ARTICLE;*

~~(2)~~ *(3)*    IS ~~CURRENTLY A CERTIFIED FIREARMS INSTRUCTOR WHO:~~

(I)    ~~IS RECOGNIZED BY THE MARYLAND POLICE AND CORRECTIONAL TRAINING COMMISSIONS;~~

(II)    ~~HAS A QUALIFIED HANDGUN INSTRUCTOR LICENSE ISSUED BY THE SECRETARY; OR~~

(III)    ~~HAS A CERTIFICATION ISSUED AND RECOGNIZED BY A NATIONAL ORGANIZATION~~ *A QUALIFIED HANDGUN INSTRUCTOR*; ~~OR~~

MARTIN O'MALLEY, Governor                    Ch. 427

~~(3)~~ *(4)*        IS AN HONORABLY DISCHARGED MEMBER OF THE ARMED FORCES OF THE UNITED STATES OR THE NATIONAL GUARD; ~~OR~~

~~(4)~~ *(5)*        IS AN EMPLOYEE OF AN ARMORED CAR COMPANY AND HAS A PERMIT ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE *; OR*

*(6)        LAWFULLY OWNS A REGULATED FIREARM.*

~~(E)~~ (F)        (1)        IN THIS SUBSECTION, "CENTRAL REPOSITORY" MEANS THE CRIMINAL JUSTICE INFORMATION SYSTEM CENTRAL REPOSITORY OF THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES.

(2)        ~~IN ORDER TO OBTAIN A HANDGUN QUALIFICATION LICENSE, AN APPLICANT SHALL APPLY TO THE CENTRAL REPOSITORY FOR A NATIONAL AND STATE CRIMINAL HISTORY RECORDS CHECK~~ THE SECRETARY SHALL APPLY TO THE CENTRAL REPOSITORY FOR A STATE AND NATIONAL CRIMINAL HISTORY RECORDS CHECK FOR EACH APPLICANT FOR A HANDGUN QUALIFICATION LICENSE.

(3)        AS PART OF THE APPLICATION FOR A CRIMINAL HISTORY RECORDS CHECK, THE ~~APPLICANT~~ SECRETARY SHALL SUBMIT TO THE CENTRAL REPOSITORY:

(I)        ~~TWO COMPLETE SETS~~ A COMPLETE SET OF THE APPLICANT'S LEGIBLE FINGERPRINTS TAKEN IN A FORMAT APPROVED BY THE DIRECTOR OF THE CENTRAL REPOSITORY AND THE DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION;

(II)        THE FEE AUTHORIZED UNDER § 10–221(B)(7) OF THE CRIMINAL PROCEDURE ARTICLE FOR ACCESS TO MARYLAND CRIMINAL HISTORY RECORDS; AND

(III)        THE MANDATORY PROCESSING FEE REQUIRED BY THE FEDERAL BUREAU OF INVESTIGATION FOR A NATIONAL CRIMINAL HISTORY RECORDS CHECK.

(4)        THE CENTRAL REPOSITORY SHALL PROVIDE A RECEIPT TO THE APPLICANT FOR THE FEES PAID IN ACCORDANCE WITH PARAGRAPH (3)(II) AND (III) OF THIS SUBSECTION.

(5)        IN ACCORDANCE WITH §§ 10–201 THROUGH 10–234 OF THE CRIMINAL PROCEDURE ARTICLE, THE CENTRAL REPOSITORY SHALL FORWARD

Addend.000045

TO THE APPLICANT AND THE SECRETARY A PRINTED STATEMENT OF THE APPLICANT'S CRIMINAL HISTORY INFORMATION.

(6) INFORMATION OBTAINED FROM THE CENTRAL REPOSITORY UNDER THIS SECTION:

(I) IS CONFIDENTIAL AND MAY NOT BE DISSEMINATED; AND

(II) SHALL BE USED ONLY FOR THE LICENSING PURPOSE AUTHORIZED BY THIS SECTION.

(7) IF CRIMINAL HISTORY RECORD INFORMATION IS REPORTED TO THE CENTRAL REPOSITORY AFTER THE DATE OF THE INITIAL CRIMINAL HISTORY RECORDS CHECK, THE CENTRAL REPOSITORY SHALL PROVIDE TO THE DEPARTMENT OF STATE POLICE LICENSING DIVISION A REVISED PRINTED STATEMENT OF THE APPLICANT'S OR LICENSEE'S STATE CRIMINAL HISTORY RECORD.

(F) (G) AN APPLICANT FOR A HANDGUN QUALIFICATION LICENSE SHALL SUBMIT TO THE SECRETARY:

(1) AN APPLICATION IN THE MANNER AND FORMAT DESIGNATED BY THE SECRETARY;

(2) A NONREFUNDABLE APPLICATION FEE OF $100 TO COVER THE COSTS TO ADMINISTER THE PROGRAM OF UP TO $50 $25 $50;

(3) (I) PROOF OF SATISFACTORY COMPLETION OF:

1. A FIREARMS SAFETY TRAINING COURSE APPROVED BY THE SECRETARY; OR

2. A COURSE OF INSTRUCTION IN COMPETENCY AND SAFETY IN THE HANDLING OF FIREARMS PRESCRIBED BY THE DEPARTMENT OF NATURAL RESOURCES UNDER § 10–301.1 OF THE NATURAL RESOURCES ARTICLE; OR

(II) A VALID FIREARMS INSTRUCTOR CERTIFICATION;

(4) ANY OTHER IDENTIFYING INFORMATION OR DOCUMENTATION REQUIRED BY THE SECRETARY; AND

MARTIN O'MALLEY, Governor                    Ch. 427

**(5)**    A STATEMENT MADE BY THE APPLICANT UNDER THE PENALTY OF PERJURY THAT THE APPLICANT IS NOT PROHIBITED UNDER FEDERAL OR STATE LAW FROM POSSESSING A HANDGUN.

~~(G)~~ (H)    *(1)*    WITHIN 30 DAYS AFTER RECEIVING A PROPERLY COMPLETED APPLICATION, THE SECRETARY SHALL ISSUE TO THE APPLICANT:

~~(1)~~ *(I)*    A HANDGUN QUALIFICATION LICENSE IF THE APPLICANT IS APPROVED; OR

~~(2)~~ *(II)*    A WRITTEN DENIAL OF THE APPLICATION THAT CONTAINS*:*

~~(I)~~ *1.*    *THE REASON THE APPLICATION WAS DENIED; AND*

~~(II)~~ *2.*    A STATEMENT OF THE APPLICANT'S APPEAL RIGHTS UNDER SUBSECTION ~~(J)~~ (L) OF THIS SECTION.

*(2)* *(I)*    *AN INDIVIDUAL WHOSE FINGERPRINTS HAVE BEEN SUBMITTED TO THE CENTRAL REPOSITORY, AND WHOSE APPLICATION HAS BEEN DENIED, MAY REQUEST THAT THE RECORD OF THE FINGERPRINTS BE EXPUNGED BY OBLITERATION.*

*(II)*    *PROCEEDINGS TO EXPUNGE A RECORD UNDER THIS PARAGRAPH SHALL BE CONDUCTED IN ACCORDANCE WITH § 10–105 OF THE CRIMINAL PROCEDURE ARTICLE.*

*(III)*    *ON RECEIPT OF AN ORDER TO EXPUNGE A FINGERPRINT RECORD, THE CENTRAL REPOSITORY SHALL EXPUNGE BY OBLITERATION THE FINGERPRINTS SUBMITTED AS PART OF THE APPLICATION PROCESS.*

*(IV)*    *AN INDIVIDUAL MAY NOT BE CHARGED A FEE FOR THE EXPUNGEMENT OF A FINGERPRINT RECORD IN ACCORDANCE WITH THIS PARAGRAPH.*

~~(H)~~ (I)    ~~(1)~~    A HANDGUN QUALIFICATION LICENSE ISSUED UNDER THIS SECTION EXPIRES ~~5~~ 10 YEARS FROM THE DATE OF ISSUANCE.

~~(2)~~ (J)    ~~(1)~~    THE HANDGUN QUALIFICATION LICENSE MAY BE RENEWED FOR SUCCESSIVE PERIODS OF ~~5~~ 10 YEARS EACH IF, AT THE TIME OF AN APPLICATION FOR RENEWAL, THE APPLICANT ~~POSSESSES THE QUALIFICATIONS FOR THE ISSUANCE OF THE HANDGUN QUALIFICATION~~

– 31 –

~~LICENSE AND PAYS THE FEES REQUIRED IN SUBSECTIONS (E)(3) AND (F)(2) OF THIS SECTION:~~

(I)    POSSESSES THE QUALIFICATIONS FOR THE ISSUANCE OF THE HANDGUN QUALIFICATION LICENSE; AND

(II)    SUBMITS A NONREFUNDABLE APPLICATION FEE TO COVER THE COSTS TO ADMINISTER THE PROGRAM UP TO $20.

(2)    AN APPLICANT RENEWING A HANDGUN QUALIFICATION LICENSE UNDER THIS SUBSECTION IS NOT REQUIRED TO:

(I)    COMPLETE THE FIREARMS SAFETY TRAINING COURSE REQUIRED IN SUBSECTION (D)(3) OF THIS SECTION; OR

(II)    SUBMIT TO A STATE AND NATIONAL CRIMINAL HISTORY RECORDS CHECK AS REQUIRED IN SUBSECTION (F) OF THIS SECTION.

~~(I)~~ (K)    (1)    THE SECRETARY MAY REVOKE A HANDGUN QUALIFICATION LICENSE ISSUED OR RENEWED UNDER THIS SECTION ON A FINDING THAT THE LICENSEE NO LONGER SATISFIES THE QUALIFICATIONS SET FORTH IN SUBSECTION ~~(C)~~ (D) OF THIS SECTION.

(2)    A PERSON HOLDING A HANDGUN QUALIFICATION LICENSE THAT HAS BEEN REVOKED BY THE SECRETARY SHALL RETURN THE LICENSE TO THE SECRETARY WITHIN 5 DAYS AFTER RECEIPT OF THE NOTICE OF REVOCATION.

~~(J)~~ (L)    (1)    A PERSON WHOSE ORIGINAL OR RENEWAL APPLICATION FOR A HANDGUN QUALIFICATION LICENSE IS DENIED OR WHOSE HANDGUN QUALIFICATION LICENSE IS REVOKED, MAY SUBMIT A WRITTEN REQUEST TO THE SECRETARY FOR A HEARING WITHIN 30 DAYS AFTER THE DATE THE WRITTEN NOTICE OF THE DENIAL OR REVOCATION WAS SENT TO THE AGGRIEVED PERSON.

(2)    A HEARING UNDER THIS SECTION SHALL BE GRANTED BY THE SECRETARY WITHIN 15 DAYS AFTER THE REQUEST.

(3)    A HEARING AND ANY SUBSEQUENT PROCEEDINGS OF JUDICIAL REVIEW UNDER THIS SECTION SHALL BE CONDUCTED IN ACCORDANCE WITH TITLE 10, SUBTITLE 2 OF THE STATE GOVERNMENT ARTICLE.

MARTIN O'MALLEY, Governor                    Ch. 427

(4)    A HEARING UNDER THIS SECTION SHALL BE HELD IN THE COUNTY OF THE LEGAL RESIDENCE OF THE AGGRIEVED PERSON.

(M)    (1)    IF AN ORIGINAL OR RENEWAL HANDGUN QUALIFICATION LICENSE IS LOST OR STOLEN, A PERSON MAY SUBMIT A WRITTEN REQUEST TO THE SECRETARY FOR A REPLACEMENT LICENSE.

(2)    UNLESS THE APPLICANT IS OTHERWISE DISQUALIFIED, THE SECRETARY SHALL ISSUE A REPLACEMENT HANDGUN QUALIFICATION LICENSE ON RECEIPT OF A WRITTEN REQUEST AND A NONREFUNDABLE FEE TO COVER THE COST OF REPLACEMENT UP TO $20.

(N)    THE SECRETARY MAY ADOPT REGULATIONS TO CARRY OUT THE PROVISIONS OF THIS SECTION.

5–118.

(b)    A firearm application shall contain:

(2)    the date and time that the firearm applicant delivered the completed firearm application to the prospective seller or transferor; [and]

(3)    a statement by the firearm applicant under the penalty of perjury that the firearm applicant:

(i)    ~~1.~~    is at least 21 years old; ~~OR~~

~~2.    IS AT LEAST 18 YEARS OLD IF THE FIREARM APPLICANT IS A MEMBER OF THE UNITED STATES ARMED FORCES, THE NATIONAL GUARD, OR THE MARYLAND DEFENSE FORCE;~~

(ii)    has never been convicted of a disqualifying crime;

(iii)    has never been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years;

(iv)    is not a fugitive from justice;

(v)    is not a habitual drunkard;

(vi)    is not addicted to a controlled dangerous substance or is not a habitual user;

(VII)    DOES NOT SUFFER FROM A MENTAL DISORDER AS DEFINED IN § 10–101(F)(2) OF THE HEALTH – GENERAL ARTICLE AND HAVE A

Ch. 427                    2013 LAWS OF MARYLAND

HISTORY OF VIOLENT BEHAVIOR AGAINST ~~THEMSELVES~~ *THE FIREARM APPLICANT* OR ANOTHER~~, UNLESS THE PERSON HAS A PHYSICIAN'S CERTIFICATE THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER~~;

      ~~(vii)~~ **(VIII)**   has never ~~spent more than 30 consecutive days in a medical institution for treatment of a mental disorder, unless a physician's certificate issued within 30 days before the date of application is attached to the application, certifying that the firearm applicant is capable of possessing a regulated firearm without undue danger to the firearm applicant or to another~~;

      ~~(viii)   is not a respondent against whom a current non ex parte civil protective order has been entered under § 4–506 of the Family Law Article~~ BEEN FOUND INCOMPETENT TO STAND TRIAL UNDER § 3–106 OF THE CRIMINAL PROCEDURE ARTICLE;

      (IX)   HAS   NEVER   BEEN   FOUND   NOT   CRIMINALLY RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

      (X)   ~~HAS NEVER BEEN~~ ~~BEFORE OCTOBER 1, 2013, WAS~~ *HAS* NEVER *BEEN* VOLUNTARILY ADMITTED FOR MORE THAN 30 CONSECUTIVE DAYS TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

      (XI)   HAS NEVER BEEN INVOLUNTARILY COMMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

      ~~(XII)   HAS NEVER BEEN ADMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE AS THE RESULT OF AN EMERGENCY EVALUATION UNDER § 10–622 OF THE HEALTH – GENERAL ARTICLE OR, IF THE PERSON HAS BEEN ADMITTED TO A FACILITY, POSSESSES A CERTIFICATE FROM THE FACILITY THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER~~;

      ~~(XIII)~~ *(XII)*   IS NOT UNDER THE PROTECTION OF A GUARDIAN APPOINTED BY A COURT UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND TRUSTS ARTICLE , *EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY*;

      ~~(XIII)~~ ~~(XIV)~~ *(XIII)*   IS NOT A RESPONDENT AGAINST WHOM:

         1.   A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE; OR

– 34 –

MARTIN O'MALLEY, Governor                     Ch. 427

**2.     AN ORDER FOR PROTECTION, AS DEFINED IN §
4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF
ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT**; AND

(ix) ~~(XIV)~~ ~~(XV)~~ *(XIV)*     if under the age of 30 years at the time of
application, has not been adjudicated delinquent by a juvenile court for an act that
would be a disqualifying crime if committed by an adult**[**; and

(x)     subject to § 5–119 of this subtitle, has completed a certified
firearms safety training course that the Police Training Commission conducts without
charge or that meets the standards that the Police Training Commission establishes
under § 3–207 of this article**]; AND**

**(4)     A COPY OF THE APPLICANT'S HANDGUN QUALIFICATION
LICENSE**.

**[**5–119.

A firearm applicant is not required to complete a certified firearms training
course required under §§ 5–118 and 5–134 of this subtitle if the firearm applicant:

(1)     has already completed a certified firearms training course required
under §§ 5–118 and 5–134 of this subtitle;

(2)     is a law enforcement officer of the State or any local law
enforcement agency in the State;

(3)     is a member, retired member, or honorably discharged member of
the armed forces of the United States or the National Guard;

(4)     is a member of an organization that is required by federal law
governing its specific business or activity to maintain handguns and applicable
ammunition; or

(5)     holds a permit to carry a handgun under Subtitle 3 of this title.**]**

5–120.

(a)     (1)     On receipt of a firearm application, a licensee or designated law
enforcement agency shall promptly forward one copy of it to the Secretary by**[**:

(i)     certified mail;

(ii)     facsimile machine; or

(iii)**]**   electronic means approved by the Secretary.

(2)    The copy of the firearm application forwarded to the Secretary shall contain the name, address, and signature of the prospective seller, lessor, or transferor.

(b)    (1)    The prospective seller, lessor, or transferor shall keep one copy of the firearm application for not less than 3 years.

(2)    The firearm applicant is entitled to **[**the remaining**]** <u>A</u> copy of the firearm application.

(c)    **[**(1)    Except as provided in paragraph (2) of this subsection, the**]** **THE** licensee or designated law enforcement agency shall forward the $10 application fee with the firearm application to the Secretary.

**[**(2)    A licensee or designated law enforcement agency that uses a facsimile machine to forward the firearm application to the Secretary shall:

(i)    be billed $10 for each firearm application forwarded to the Secretary during the month; and

(ii)    pay the total application fee by the fifteenth day of the following month.**]**

5–133.

(a)    This section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm.

(b)    **[**A**]** **SUBJECT TO § 5–133.3 OF THIS SUBTITLE, A** person may not possess a regulated firearm if the person:

(1)    has been convicted of a disqualifying crime;

(2)    has been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years;

(3)    is a fugitive from justice;

(4)    is a habitual drunkard;

(5)    is addicted to a controlled dangerous substance or is a habitual user;

MARTIN O'MALLEY, Governor                    Ch. 427

~~(6)~~    ~~[suffers from a mental disorder as defined in § 10–101(f)(2) of the Health – General Article and has a history of violent behavior against the person or another, unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another, unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another];~~

*(6)*    *SUFFERS FROM A MENTAL DISORDER AS DEFINED IN § 10–101(F)(2) OF THE HEALTH – GENERAL ARTICLE AND HAS A HISTORY OF VIOLENT BEHAVIOR AGAINST THE PERSON OR ANOTHER;*

**(7)**    HAS BEEN FOUND INCOMPETENT TO STAND TRIAL UNDER § 3–106 OF THE CRIMINAL PROCEDURE ARTICLE;

~~(7)~~ **(8)**    HAS BEEN FOUND NOT CRIMINALLY RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

[(7)] ~~(8)~~ **(9)**    has been [~~confined~~ **VOLUNTARILY ADMITTED** for more than 30 consecutive days to] **A PATIENT IN** a facility as defined in § 10–101 of the Health – General Article **BEFORE OCTOBER 1, 2013**[, unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another] ~~AND:~~**;**

~~(I)~~ **(10)**    ~~HAS BEEN A VOLUNTARY OR AN INVOLUNTARY PATIENT FOR 30 CONSECUTIVE DAYS OR MORE; OR~~

~~(II)~~    ~~HAS BEEN DETERMINED BY A COURT TO BE UNABLE TO SAFELY POSSESS A FIREARM BASED ON CREDIBLE EVIDENCE OF DANGEROUSNESS TO OTHERS INVOLUNTARILY COMMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;~~

~~(9)~~ **(11)**    ~~HAS BEEN ADMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE AS THE RESULT OF AN EMERGENCY EVALUATION UNDER § 10–622 OF THE HEALTH – GENERAL ARTICLE, UNLESS THE PERSON HAS A CERTIFICATE FROM THE FACILITY THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER;~~

*(10)*    *HAS BEEN INVOLUNTARILY COMMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;*

~~(12)~~ *(11)*    IS UNDER THE PROTECTION OF A GUARDIAN APPOINTED BY A COURT UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND TRUSTS

– 37 –

ARTICLE , *EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY*;

[(8)] (10) (12) (13) *(12)*    except as provided in subsection (e) of this section, is a respondent against whom [a current non ex parte civil protective order has been entered under § 4–506 of the Family Law Article; or]:

(I)    A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE; OR

(II)    AN ORDER FOR PROTECTION, AS DEFINED IN § 4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; OR

[(9)] (11) (13) (14) *(13)*    if under the age of 30 years at the time of possession, has been adjudicated delinquent by a juvenile court for an act that would be a disqualifying crime if committed by an adult.

(c)    (1)    A person may not possess a regulated firearm if the person was previously convicted of:

(i)    a crime of violence;

(ii)    a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–612, § 5–613, or § 5–614 of the Criminal Law Article; or

(iii)    an offense under the laws of another state or the United States that would constitute one of the crimes listed in item (i) or (ii) of this paragraph if committed in this State.

(2)    (i)    Subject to paragraph (3) of this subsection, a person who violates this subsection is guilty of a felony and on conviction is subject to imprisonment for not less than 5 years and not exceeding 15 years.

(ii)    The court may not suspend any part of the mandatory minimum sentence of 5 years.

(iii)    Except as otherwise provided in § 4–305 of the Correctional Services Article, the person is not eligible for parole during the mandatory minimum sentence.

(3)    At the time of the commission of the offense, if a period of more than 5 years has elapsed since the person completed serving the sentence for the most recent conviction under paragraph (1)(i) or (ii) of this subsection, including all imprisonment, mandatory supervision, probation, and parole:

MARTIN O'MALLEY, Governor          Ch. 427

(i)     the imposition of the mandatory minimum sentence is within the discretion of the court; and

(ii)     the mandatory minimum sentence may not be imposed unless the State's Attorney notifies the person in writing at least 30 days before trial of the State's intention to seek the mandatory minimum sentence.

(4)     Each violation of this subsection is a separate crime.

(d)     (1)     Except as provided in paragraph (2) of this subsection, a person who is under the age of 21 years may not possess a regulated firearm.

(2)     Unless a person is otherwise prohibited from possessing a regulated firearm, this subsection does not apply to:

(i)     the temporary transfer or possession of a regulated firearm if the person is:

1.     under the supervision of another who is at least 21 years old and who is not prohibited by State or federal law from possessing a firearm; and

2.     acting with the permission of the parent or legal guardian of the transferee or person in possession;

(ii)     the transfer by inheritance of title, and not of possession, of a regulated firearm;

(iii)     a member of the armed forces of the United States or the National Guard *while performing official duties* ~~while performing official duties~~;

(iv)     the temporary transfer or possession of a regulated firearm if the person is:

1.     participating in marksmanship training of a recognized organization; and

2.     under the supervision of a qualified instructor;

(v)     a person who is required to possess a regulated firearm for employment and who holds a permit under Subtitle 3 of this title; or

(vi)     the possession of a firearm for self–defense or the defense of others against a trespasser into the residence of the person in possession or into a residence in which the person in possession is an invited guest.

Addend.000055

(e)    This section does not apply to a respondent transporting a regulated firearm if the respondent is carrying a civil protective order requiring the surrender of the regulated firearm and:

(1)    the regulated firearm is unloaded;

(2)    the respondent has notified the law enforcement unit, barracks, or station that the regulated firearm is being transported in accordance with the civil protective order; and

(3)    the respondent transports the regulated firearm directly to the law enforcement unit, barracks, or station.

**5–133.1.**

(A)    IN THIS SECTION, "AMMUNITION" MEANS A CARTRIDGE, SHELL, OR ANY OTHER DEVICE CONTAINING EXPLOSIVE OR INCENDIARY MATERIAL DESIGNED AND INTENDED FOR USE IN A FIREARM.

(B)    A PERSON MAY NOT POSSESS AMMUNITION IF THE PERSON IS PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133 (B) OR (C) OF THIS SUBTITLE.

(C)    A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 1 YEAR OR A FINE NOT EXCEEDING $1000 OR BOTH.

**5–133.2.**

(A)    (1)    IN THIS SECTION THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.

(2)    "FACILITY" HAS THE MEANING STATED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE.

(3)    "NICS INDEX" MEANS THE FEDERAL BUREAU OF INVESTIGATION'S NATIONAL INSTANT CRIMINAL BACKGROUND CHECK SYSTEM.

(B)    (1)    A COURT SHALL PROMPTLY REPORT INFORMATION REQUIRED IN PARAGRAPH (2) OF THIS SUBSECTION THROUGH A SECURE DATA PORTAL APPROVED BY THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES IF A COURT:

MARTIN O'MALLEY, Governor                    Ch. 427

(I)    DETERMINES THAT A PERSON IS NOT CRIMINALLY RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

(II)    FINDS THAT A PERSON IS INCOMPETENT TO STAND TRIAL UNDER § 3–106 OF THE CRIMINAL PROCEDURE ARTICLE; OR

(III)    FINDS UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND TRUST ARTICLE THAT A PERSON SHOULD BE UNDER THE PROTECTION OF A GUARDIAN, *EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY*.

(2)    ON A FINDING OR DETERMINATION UNDER PARAGRAPH (1) OF THIS SUBSECTION, THE FOLLOWING INFORMATION SHALL BE REPORTED TO THE NICS INDEX:

(I)    THE NAME AND IDENTIFYING INFORMATION OF THE PERSON; AND

(II)    THE DATE OF THE DETERMINATION OR FINDING.

(C)    (1)    A FACILITY SHALL REPORT INFORMATION REQUIRED IN PARAGRAPH (2) OF THIS SUBSECTION REGARDING A PERSON ADMITTED TO THE FACILITY UNDER § 10–609 OF THE HEALTH – GENERAL ARTICLE OR COMMITTED TO THE FACILITY UNDER TITLE 10, SUBTITLE 6, PART III OF THE HEALTH – GENERAL ARTICLE TO THE NICS INDEX THROUGH A SECURE DATA PORTAL APPROVED BY THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, IF:

(I)    THE PERSON HAS BEEN ADMITTED ~~OR COMMITTED~~ TO A FACILITY FOR 30 CONSECUTIVE DAYS OR MORE; OR

(II)    ~~IN THE CASE OF AN INVOLUNTARY ADMISSION TO A FACILITY, A COURT MAKES A DETERMINATION THAT THE PERSON CANNOT SAFELY POSSESS A FIREARM BASED ON CREDIBLE EVIDENCE OF DANGEROUSNESS TO OTHERS~~ THE PERSON HAS BEEN INVOLUNTARILY COMMITTED TO A FACILITY.

(2)    ON ADMISSION TO A FACILITY THE FOLLOWING INFORMATION SHALL BE REPORTED TO THE NICS INDEX:

(I)    THE NAME AND IDENTIFYING INFORMATION OF THE PERSON ADMITTED OR COMMITTED;

– 41 –

          **(II)     THE DATE THE PERSON WAS ADMITTED OR COMMITTED TO THE FACILITY; AND**

          **(III)     THE NAME OF THE FACILITY TO WHICH THE PERSON WAS ADMITTED OR COMMITTED.**

~~**5–133.3.**~~

    ~~**(A)     IN THIS SECTION, "HEALTH DEPARTMENT" MEANS THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE.**~~

    ~~**(B)     A PERSON SUBJECT TO A REGULATED FIREARMS DISQUALIFICATION UNDER § 5–133(B)(6), (7), (8), OR (9) (9), (10), OR (11) (11), OR (12) OF THIS SUBTITLE OR A RIFLE OR SHOTGUN DISQUALIFICATION UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11) (11), OR (12) OF THIS TITLE MAY BE AUTHORIZED TO POSSESS A FIREARM IF:**~~

          ~~**(1)     THE PERSON IS NOT SUBJECT TO ANOTHER FIREARMS RESTRICTION UNDER STATE OR FEDERAL LAW; AND**~~

          ~~**(2)     THE HEALTH DEPARTMENT, IN ACCORDANCE WITH THIS SECTION, DETERMINES THAT THE PERSON MAY POSSESS A FIREARM.**~~

    ~~**(C)     A PERSON WHO SEEKS RELIEF FROM A FIREARMS DISQUALIFICATION SHALL FILE AN APPLICATION WITH THE HEALTH DEPARTMENT IN THE FORM AND MANNER SET BY THE HEALTH DEPARTMENT.**~~

    ~~**(D)     (1)     AN APPLICANT SHALL PROVIDE COMPLETE AND ACCURATE DATA ON ALL INFORMATION REQUIRED IN AN APPLICATION UNDER THIS SECTION.**~~

          ~~**(2)     THE APPLICANT SHALL INCLUDE THE FOLLOWING INFORMATION IN THE APPLICATION:**~~

          ~~**(I)     THE REASON WHY THE APPLICANT IS PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133(B)(6), (7), (8), OR (9) (9), (10), OR (11) (11), OR (12) OF THIS SUBTITLE OR A RIFLE OR SHOTGUN UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11) (11), OR (12) OF THIS TITLE AND WHY THE APPLICANT SHOULD BE RELIEVED FROM THAT PROHIBITION;**~~

          ~~**(II)     A CERTIFICATE ON A FORM APPROVED BY THE HEALTH DEPARTMENT AND SIGNED BY AN INDIVIDUAL LICENSED IN THE STATE AS A PHYSICIAN WHO IS BOARD-CERTIFIED IN PSYCHIATRY OR AS A PSYCHOLOGIST**~~

MARTIN O'MALLEY, Governor                    Ch. 427

~~AND LISTED IN THE NATIONAL REGISTER OF HEALTH SERVICE PROVIDERS IN PSYCHOLOGY THAT PROVIDES:~~

~~1.    THAT THE CERTIFICATE WAS ISSUED WITHIN 30 DAYS OF THE DATE OF THE FILING OF THE PETITION;~~

~~2.    THAT THE APPLICANT HAS BEEN EVALUATED AND THE SIGNATORY REASONABLY BELIEVES THAT THE APPLICANT IS COMPETENT TO UNDERSTAND AND COMPLY WITH THE RULES, REGULATIONS, AND LAW GOVERNING FIREARM OWNERSHIP AND POSSESSION AND THE RISKS AND RESPONSIBILITIES INHERENT TO FIREARM OWNERSHIP;~~

~~3.    THAT THERE IS NO REASON TO BELIEVE THAT THE PERSON WILL BECOME INCOMPETENT IN THE FORESEEABLE FUTURE;~~

~~4.    AN OPINION AS TO WHETHER THE APPLICANT WILL BE LIKELY TO ACT IN A MANNER THAT IS DANGEROUS TO SELF OR PUBLIC SAFETY; AND~~

~~5.    AN OPINION ON WHETHER GRANTING A FIREARM HANDGUN QUALIFICATION LICENSE UNDER § 5–117 § 5–117.1 OF THIS SUBTITLE OR AUTHORIZING A PERSON TO POSSESS A RIFLE OR SHOTGUN WOULD BE CONTRARY TO THE PUBLIC INTEREST;~~

~~(III)    A SIGNED AUTHORIZATION, ON A FORM APPROVED BY THE HEALTH DEPARTMENT ALLOWING THE HEALTH DEPARTMENT TO ACCESS ALL RELEVANT HEALTH CARE, MENTAL HEALTH, DISABILITY, GUARDIANSHIP, AND CRIMINAL JUSTICE RECORDS, INCLUDING COURT ORDERED OR REQUIRED MENTAL HEALTH RECORDS, OF THE APPLICANT FOR USE WITH THE DISQUALIFICATION AND HEARING PROCESS;~~

~~(IV)    THREE STATEMENTS ON A FORM DESIGNATED BY THE HEALTH DEPARTMENT ATTESTING TO THE APPLICANT'S REPUTATION AND CHARACTER RELEVANT TO FIREARM OWNERSHIP OR POSSESSION; AND~~

~~(V)    ANY OTHER INFORMATION REQUIRED BY THE HEALTH DEPARTMENT.~~

~~(3)    (I)    AT LEAST TWO OF THE STATEMENTS REQUIRED UNDER PARAGRAPH (2)(IV) OF THIS SUBSECTION SHALL BE PROVIDED BY AN INDIVIDUAL WHO IS NOT RELATED TO THE APPLICANT.~~

~~(II)    STATEMENTS PROVIDED UNDER PARAGRAPH (2)(IV) OF THIS SUBSECTION MUST BE SIGNED AND DATED WITHIN 30 DAYS OF~~

~~SUBMISSION TO THE HEALTH DEPARTMENT AND PROVIDE CONTACT INFORMATION FOR EACH INDIVIDUAL PROVIDING A STATEMENT.~~

~~(4)    IF THE APPLICANT IS PROHIBITED FROM FIREARM OWNERSHIP UNDER § 5–133(B)(9) § 5–133(B)(11) § 5–133(B)(12) OF THIS SUBTITLE OR § 5–205(B)(11) § 5–205(B)(12) OF THIS TITLE, THE FOLLOWING ADDITIONAL INFORMATION SHALL BE INCLUDED IN AN APPLICATION FOR RELIEF FROM THE PROHIBITION:~~

~~(I)    A COPY OF ALL PLEADINGS, AFFIDAVITS, AND CERTIFICATES SUBMITTED INTO EVIDENCE AT THE GUARDIANSHIP PROCEEDING; AND~~

~~(II)    ALL ORDERS ISSUED BY THE COURT RELATING TO THE GUARDIANSHIP, INCLUDING, IF APPLICABLE, AN ORDER INDICATING THAT THE GUARDIANSHIP IS NO LONGER IN EFFECT.~~

~~(5)    IF THE APPLICANT IS PROHIBITED FROM FIREARM OWNERSHIP UNDER § 5–133(B)(6), (7), OR (8) (8), (9), OR (10) (10), OR (11) OF THIS SUBTITLE OR § 5–205(B)(6), (7), (8), (9), OR (10) (10), OR (11) OF THIS TITLE, THE CERTIFICATE REQUIRED UNDER PARAGRAPH (2)(II) OF THIS SUBSECTION SHALL ALSO INCLUDE:~~

~~(I)    AN OPINION AS TO WHETHER THE APPLICANT HAS SYMPTOMS OF A MENTAL DISORDER OR DEVELOPMENTAL DISABILITY THAT CAUSES THE APPLICANT TO BE A DANGER TO SELF OR OTHERS;~~

~~(II)    IF THE APPLICANT HAS NO SYMPTOMS THAT CAUSE THE APPLICANT TO BE A DANGER, HOW MANY MONTHS THE APPLICANT HAS NOT HAD SYMPTOMS OF A MENTAL DISORDER OR DEVELOPMENTAL DISABILITY THAT CAUSED THE APPLICANT TO BE A DANGER TO SELF OR OTHERS;~~

~~(III)    THE TIME PERIOD THE APPLICANT HAS BEEN COMPLIANT WITH TREATMENT RECOMMENDATIONS FOR THE INDIVIDUAL'S MENTAL ILLNESS;~~

~~(IV)    THE NAME, ADDRESS, AND TELEPHONE NUMBER OF ALL MENTAL HEALTH PROVIDERS OR SERVICE PROVIDERS SEEN WITHIN THE LAST 12 MONTHS;~~

~~(V)    IF THE APPLICANT WAS FOUND NOT GUILTY BY REASON OF INSANITY OR NOT CRIMINALLY RESPONSIBLE, A STATEMENT ATTESTING TO~~

– 44 –

~~WHETHER THE APPLICANT IS ON CONDITIONAL RELEASE UNDER § 3–114 OF THE CRIMINAL PROCEDURE ARTICLE; AND~~

~~(VI)   IF THE APPLICANT WAS FOUND NOT COMPETENT TO STAND TRIAL AND DANGEROUS, A WRITTEN STATEMENT REGARDING THE STATUS OF THE RELATED CRIMINAL CHARGE.~~

~~(E)   THE HEALTH DEPARTMENT MAY NOT APPROVE AN APPLICATION UNDER THIS SECTION IF A DETERMINATION IS MADE THAT:~~

~~(1)   THE APPLICANT SUPPLIED FALSE INFORMATION OR MADE A FALSE STATEMENT;~~

~~(2)   THE APPLICATION IS NOT PROPERLY COMPLETED; OR~~

~~(3)   ON REVIEW OF THE APPLICATION AND SUPPORTING DOCUMENTATION AND ANY OTHER INFORMATION RELATING TO THE APPLICATION REQUESTED BY THE HEALTH DEPARTMENT, THE APPLICANT HAS NOT SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT THE APPLICANT WILL BE UNLIKELY TO ACT IN A MANNER DANGEROUS TO SELF OR PUBLIC SAFETY AND THAT GRANTING A PERMIT TO POSSESS A REGULATED FIREARM OR AUTHORIZING THE POSSESSION OF A RIFLE OR SHOTGUN WOULD NOT BE CONTRARY TO THE PUBLIC INTEREST.~~

~~(F)   (1)   IF THE HEALTH DEPARTMENT DETERMINES THAT THE APPLICATION SHALL BE APPROVED ON REVIEW UNDER SUBSECTION (E)(3) OF THIS SECTION, THE HEALTH DEPARTMENT SHALL PROVIDE THE APPLICANT WITH A CERTIFICATE AFFIRMING THE APPLICANT'S MENTAL COMPETENCE TO POSSESS A REGULATED FIREARM.~~

~~(2)   A CERTIFICATE UNDER THIS SUBSECTION SHALL BE PRESENTED TO THE DEPARTMENT OF STATE POLICE AS EVIDENCE OF THE APPLICANT'S ELIGIBILITY TO POSSESS A REGULATED FIREARM.~~

~~(G)   AN APPLICANT WHO IS AGGRIEVED BY THE ACTION OF THE HEALTH DEPARTMENT MAY REQUEST A HEARING BY WRITING TO THE SECRETARY OF HEALTH AND MENTAL HYGIENE WITHIN 30 DAYS AFTER THE HEALTH DEPARTMENT MAILS THE DECISION TO THE APPLICANT.~~

~~(H)   THE HEARING SHALL BE HELD IN ACCORDANCE WITH TITLE 10, SUBTITLE 2 OF THE STATE GOVERNMENT ARTICLE WITHIN 60 DAYS AFTER THE HEALTH DEPARTMENT RECEIVES THE REQUEST.~~

Addend.000061

(I)    IF THE APPLICANT REQUESTS A HEARING, THE ADMINISTRATIVE LAW JUDGE SHALL CONDUCT A HEARING AT WHICH THE APPLICANT MAY TESTIFY AND PROVIDE OTHER EVIDENCE.

(J)    AT A HEARING, THE APPLICANT IS REQUIRED TO PROVIDE EVIDENCE THAT:

(1)    THE APPLICANT DOES NOT HAVE SYMPTOMS OF A MENTAL DISORDER THAT WOULD CAUSE THE APPLICANT TO BE A DANGER TO SELF OR OTHERS AND HAS NOT HAD SYMPTOMS OF A MENTAL DISORDER FOR AT LEAST 6 MONTHS;

(2)    THE APPLICANT DOES NOT HAVE A MENTAL DISORDER OR MENTAL HEALTH CONDITION THAT PREVENTS THE APPLICANT FROM UNDERSTANDING THE RULES, REGULATIONS, AND LAWS GOVERNING FIREARM OWNERSHIP AND POSSESSION, OR THE RESPONSIBILITIES AND RISKS INVOLVED IN FIREARM OWNERSHIP AND POSSESSION;

(3)    THE APPLICANT IS NOT LIKELY TO ACT IN A MANNER DANGEROUS TO PUBLIC SAFETY;

(4)    GRANTING RELIEF WOULD NOT BE CONTRARY TO PUBLIC INTEREST; AND

(5)    THE APPLICANT IS NOT OTHERWISE PROHIBITED FROM OWNING OR POSSESSING A FIREARM.

(K)    AT A HEARING UNDER THIS SECTION, THE HEALTH DEPARTMENT IS A PARTY AND SHALL PROVIDE EVIDENCE REGARDING:

(1)    THE CIRCUMSTANCES UNDER WHICH THE FIREARMS PROHIBITION WAS IMPOSED UNDER STATE OR FEDERAL LAW; AND

(2)    THE APPLICANT'S RECORD, INCLUDING THE APPLICANT'S MENTAL HEALTH AND CRIMINAL HISTORY RECORDS.

(L)    IF THE ADMINISTRATIVE LAW JUDGE FINDS THAT THE APPLICANT HAS MET, BY CLEAR AND CONVINCING EVIDENCE, THE STANDARDS OF SUBSECTION (J) OF THIS SECTION THE ADMINISTRATIVE LAW JUDGE SHALL:

(1)    ISSUE A WRITTEN DETERMINATION THAT THE APPLICANT IS RELIEVED FROM THE FIREARMS DISQUALIFICATION IMPOSED BY 18 U.S.C. § 922(D)(4) AND (G)(4) AND § 5–133(B)(6), (7), (8), OR (9) (9), (10), OR (11) (11),

MARTIN O'MALLEY, Governor                    Ch. 427

~~OR (12) OF THIS SUBTITLE OR § 5–205(B)(6), (7), (8), (9), (10), OR (11)~~ (11), OR (12) OF THIS TITLE; AND

~~(2)     PROVIDE TO THE NICS INDEX, THROUGH A SECURE DATA PORTAL APPROVED BY THE DEPARTMENT OF STATE POLICE PUBLIC SAFETY AND CORRECTIONAL SERVICES:~~

~~(I)     THE NAME AND IDENTIFYING INFORMATION OF THE APPLICANT; AND~~

~~(II)    THE DATE OF THE DETERMINATION.~~

~~(M)     AN APPLICANT OR THE HEALTH DEPARTMENT MAY SEEK JUDICIAL REVIEW OF A DETERMINATION OF THE ADMINISTRATIVE LAW JUDGE ON AN APPLICATION UNDER THIS SECTION FOR RELIEF FROM A FIREARMS PROHIBITION IN ACCORDANCE WITH §§ 10–222 AND 10–223 OF THE STATE GOVERNMENT ARTICLE.~~

~~(N)     AFTER A DETERMINATION ON THE MERITS OF A HEARING REQUESTED UNDER THIS SECTION, AN APPLICANT MAY NOT REQUEST A SUBSEQUENT HEARING WITHIN 1 YEAR AFTER THE COMPLETION OF THE HEARING PROCESS AND ANY JUDICIAL REVIEW OF THE ADMINISTRATIVE DECISION.~~

~~(O)     THE HEALTH DEPARTMENT SHALL ENTER INTO A MEMORANDUM OF UNDERSTANDING WITH THE DEPARTMENT OF STATE POLICE TO ASSIST IN CLINICAL CONSULTATION AND IMPLEMENTATION OF THIS SECTION.~~

*5–133.3.*

*(A)     IN THIS SECTION, "HEALTH DEPARTMENT" MEANS THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE.*

*(B)     A PERSON SUBJECT TO A REGULATED FIREARMS DISQUALIFICATION UNDER § 5–133(B)(6), (7), (8), (9), (10), OR (11) OF THIS SUBTITLE, A RIFLE OR SHOTGUN DISQUALIFICATION UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11) OF THIS TITLE, OR PROHIBITED FROM THE SHIPMENT, TRANSPORTATION, POSSESSION, OR RECEIPT OF A FIREARM BY 18 U.S.C. §§ 922(D)(4) OR (G)(4) AS A RESULT OF AN ADJUDICATION OR COMMITMENT THAT OCCURRED IN THE STATE MAY BE AUTHORIZED TO POSSESS A FIREARM IF:*

*(1)     THE PERSON IS NOT SUBJECT TO ANOTHER FIREARMS RESTRICTION UNDER STATE OR FEDERAL LAW; AND*

Addend.000063

*(2)     THE HEALTH DEPARTMENT, IN ACCORDANCE WITH THIS SECTION, DETERMINES THAT THE PERSON MAY POSSESS A FIREARM.*

*(C)     A PERSON WHO SEEKS RELIEF FROM A FIREARMS DISQUALIFICATION SHALL FILE AN APPLICATION WITH THE HEALTH DEPARTMENT IN THE FORM AND MANNER SET BY THE HEALTH DEPARTMENT.*

*(D)     AN APPLICATION FOR RELIEF FROM A FIREARMS DISQUALIFICATION SHALL INCLUDE:*

*(1)     A COMPLETE AND ACCURATE STATEMENT EXPLAINING THE REASON WHY THE APPLICANT IS PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133(B)(6), (7), (8), (9), (10), OR (11) OF THIS SUBTITLE OR A RIFLE OR SHOTGUN UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11) OF THIS TITLE, OR IS PROHIBITED FROM THE SHIPMENT, TRANSPORTATION, POSSESSION, OR RECEIPT OF A FIREARM BY 18 U.S.C. §§ 922(D)(4) OR (G)(4) AS A RESULT OF AN ADJUDICATION OR COMMITMENT THAT OCCURRED IN THE STATE;*

*(2)     A STATEMENT WHY THE APPLICANT SHOULD BE RELIEVED FROM THE PROHIBITION DESCRIBED IN ITEM (1) OF THIS SUBSECTION;*

*(3)     IF THE APPLICANT IS SUBJECT TO A PROHIBITION DESCRIBED IN ITEM (1) OF THIS SUBSECTION, A CERTIFICATE ISSUED WITHIN 30 DAYS OF THE SUBMISSION OF THE APPLICATION ON A FORM APPROVED BY THE HEALTH DEPARTMENT AND SIGNED BY AN INDIVIDUAL LICENSED IN THE STATE AS A PHYSICIAN WHO IS BOARD CERTIFIED IN PSYCHIATRY OR AS A PSYCHOLOGIST STATING:*

*(I)     THE LENGTH OF TIME THAT THE APPLICANT HAS NOT HAD SYMPTOMS THAT CAUSE THE APPLICANT TO BE A DANGER TO THE APPLICANT OR OTHERS, OR, IF THE DISQUALIFICATION RELATES TO AN INTELLECTUAL DISABILITY, THE LENGTH OF TIME THAT THE APPLICANT HAS NOT ENGAGED IN BEHAVIORS THAT CAUSE THE APPLICANT TO BE A DANGER TO THE APPLICANT OR OTHERS;*

*(II)     THE LENGTH OF TIME THAT THE APPLICANT HAS BEEN COMPLIANT WITH THE TREATMENT PLAN FOR THE APPLICANT'S MENTAL ILLNESS, OR, IF THE DISQUALIFICATION RELATES TO AN INTELLECTUAL DISABILITY, THE LENGTH OF TIME THAT THE APPLICANT HAS BEEN COMPLIANT WITH ANY BEHAVIOR PLAN OR BEHAVIOR MANAGEMENT PLAN;*

MARTIN O'MALLEY, Governor                    Ch. 427

*(III)   AN OPINION AS TO WHETHER THE APPLICANT, BECAUSE OF MENTAL ILLNESS, WOULD BE A DANGER TO THE APPLICANT IF ALLOWED TO POSSESS A FIREARM AND A STATEMENT OF REASONS FOR THE OPINION; AND*

*(IV)   AN OPINION AS TO WHETHER THE APPLICANT, BECAUSE OF MENTAL ILLNESS, WOULD BE A DANGER TO ANOTHER PERSON OR POSES A RISK TO PUBLIC SAFETY IF ALLOWED TO POSSESS A FIREARM;*

*(4)   IF THE APPLICANT IS PROHIBITED FROM POSSESSING A FIREARM UNDER § 5–133(B)(11) OF THIS SUBTITLE OR § 5–205(B)(11) OF THIS TITLE:*

*(I)   A COPY OF ALL PLEADINGS, AFFIDAVITS, AND CERTIFICATES SUBMITTED INTO EVIDENCE AT THE GUARDIANSHIP PROCEEDING; AND*

*(II)   ALL ORDERS ISSUED BY THE COURT RELATING TO THE GUARDIANSHIP, INCLUDING, IF APPLICABLE, AN ORDER INDICATING THAT THE GUARDIANSHIP IS NO LONGER IN EFFECT;*

*(5)   A SIGNED AUTHORIZATION, ON A FORM APPROVED BY THE HEALTH DEPARTMENT, ALLOWING THE HEALTH DEPARTMENT TO ACCESS ANY RELEVANT HEALTH CARE, MENTAL HEALTH, DISABILITY, GUARDIANSHIP, AND CRIMINAL JUSTICE RECORDS, INCLUDING COURT ORDERED OR REQUIRED MENTAL HEALTH RECORDS, OF THE APPLICANT FOR USE IN DETERMINING WHETHER THE APPLICANT SHOULD BE RELIEVED FROM A FIREARMS DISQUALIFICATION;*

*(6)   THREE STATEMENTS SIGNED AND DATED WITHIN 30 DAYS OF SUBMISSION TO THE HEALTH DEPARTMENT ON A FORM DESIGNATED BY THE HEALTH DEPARTMENT ATTESTING TO THE APPLICANT'S REPUTATION AND CHARACTER RELEVANT TO FIREARM OWNERSHIP OR POSSESSION INCLUDING:*

*(I)   AT LEAST TWO STATEMENTS PROVIDED BY AN INDIVIDUAL WHO IS NOT RELATED TO THE APPLICANT; AND*

*(II)   CONTACT INFORMATION FOR EACH INDIVIDUAL PROVIDING A STATEMENT; AND*

*(7)   ANY OTHER INFORMATION REQUIRED BY THE HEALTH DEPARTMENT.*

*(E)   THE HEALTH DEPARTMENT MAY NOT APPROVE AN APPLICATION UNDER THIS SECTION IF A DETERMINATION IS MADE THAT:*

Addend.000065

(1)     THE     APPLICANT     SUPPLIED     INCOMPLETE     OR     FALSE
INFORMATION OR MADE A FALSE STATEMENT;

(2)     THE APPLICATION IS NOT PROPERLY COMPLETED; OR

(3)     ON     REVIEW     OF     THE     APPLICATION     AND     SUPPORTING
DOCUMENTATION AND ANY OTHER INFORMATION RELATING TO THE
APPLICATION REQUESTED BY THE HEALTH DEPARTMENT, INCLUDING ANY
CRIMINAL HISTORY RECORDS AND MENTAL HEALTH RECORDS OF THE
APPLICANT, THE APPLICANT HAS NOT SHOWN BY A PREPONDERANCE OF THE
EVIDENCE THAT THE APPLICANT WILL BE UNLIKELY TO ACT IN A MANNER
DANGEROUS TO THE APPLICANT OR TO PUBLIC SAFETY AND THAT GRANTING A
LICENSE TO POSSESS A REGULATED FIREARM OR AUTHORIZING THE
POSSESSION OF A RIFLE OR SHOTGUN WOULD NOT BE CONTRARY TO THE PUBLIC
INTEREST.

(F)     (1)     IF THE HEALTH DEPARTMENT DETERMINES THAT THE
APPLICATION SHALL BE APPROVED, THE HEALTH DEPARTMENT SHALL PROVIDE
THE APPLICANT WITH A CERTIFICATE AFFIRMING THE APPLICANT'S MENTAL
COMPETENCE TO POSSESS A FIREARM.

(2)     A CERTIFICATE PROVIDED UNDER PARAGRAPH (1) OF THIS
SUBSECTION OR A WRITTEN STATEMENT THAT THE INDIVIDUAL IS NOT
MENTALLY COMPETENT TO POSSESS A FIREARM SHALL BE PROVIDED TO THE
APPLICANT WITHIN 60 DAYS FROM THE HEALTH DEPARTMENT'S RECEIPT OF A
COMPLETED APPLICATION, WHICH INCLUDES ANY RECORDS NECESSARY TO
REVIEW AN APPLICATION.

(3)     A CERTIFICATE ISSUED UNDER PARAGRAPH (1) OF THIS
SUBSECTION SHALL BE PRESENTED TO THE DEPARTMENT OF STATE POLICE AS
EVIDENCE OF THE APPLICANT'S ELIGIBILITY TO POSSESS A FIREARM.

(G)     (1)     AN APPLICANT WHO IS AGGRIEVED BY THE ACTION OF THE
HEALTH DEPARTMENT UNDER SUBSECTION (E) OF THIS SECTION MAY REQUEST
A HEARING IN WRITING TO THE SECRETARY OF HEALTH AND MENTAL HYGIENE
WITHIN 30 DAYS AFTER THE HEALTH DEPARTMENT MAILS NOTICE OF THE
DECISION TO THE APPLICANT.

(2)     (I)     THE HEARING REQUESTED UNDER PARAGRAPH (1) OF
THIS SUBSECTION SHALL BE HELD IN ACCORDANCE WITH TITLE 10, SUBTITLE 2
OF THE STATE GOVERNMENT ARTICLE WITHIN 60 DAYS AFTER THE HEALTH
DEPARTMENT RECEIVES THE REQUEST.

MARTIN O'MALLEY, Governor                    Ch. 427

*(II)   AT THE HEARING, THE INFORMATION DESCRIBED IN SUBSECTIONS (D) AND (E) OF THIS SECTION SHALL BE CONSIDERED AND USED TO DETERMINE WHETHER THE APPLICANT, IF ALLOWED TO POSSESS A FIREARM, WOULD NOT BE LIKELY TO ACT IN A MANNER DANGEROUS TO THE PUBLIC SAFETY AND WHETHER GRANTING THE RELIEF WOULD NOT BE CONTRARY TO THE PUBLIC INTEREST.*

*(3)   (I)   JUDICIAL REVIEW OF THE DETERMINATION ON AN APPLICATION UNDER THIS SECTION FOR RELIEF FROM A FIREARMS PROHIBITION MAY BE SOUGHT IN ACCORDANCE WITH §§ 10–222 AND 10–223 OF THE STATE GOVERNMENT ARTICLE.*

*(II)   NOTWITHSTANDING THE PROVISIONS OF § 10–222 OF THE STATE GOVERNMENT ARTICLE, THE CIRCUIT COURT MAY GIVE DEFERENCE TO THE FINAL DECISION OF THE HEALTH DEPARTMENT AND MAY IN ITS DISCRETION RECEIVE ADDITIONAL EVIDENCE THAT IT DETERMINES TO BE NECESSARY TO CONDUCT AN ADEQUATE REVIEW.*

*(H)   THE BOARD OF REVIEW OF THE HEALTH DEPARTMENT DOES NOT HAVE JURISDICTION TO REVIEW A FINAL DECISION OF THE HEALTH DEPARTMENT UNDER THIS SECTION.*

*(I)   AFTER A DETERMINATION ON THE MERITS OF A HEARING REQUESTED UNDER THIS SECTION, AN APPLICANT MAY NOT REQUEST A SUBSEQUENT HEARING WITHIN 1 YEAR AFTER THE COMPLETION OF THE HEARING PROCESS AND ANY JUDICIAL REVIEW OF THE ADMINISTRATIVE DECISION.*

*(J)   THE SECRETARY OF HEALTH AND MENTAL HYGIENE MAY ADOPT REGULATIONS ESTABLISHING FEES TO COVER THE ADMINISTRATIVE COSTS ASSOCIATED WITH THE IMPLEMENTATION OF THIS SECTION.*

*(K)   AN INDIVIDUAL LICENSED IN THE STATE AS A PHYSICIAN WHO IS BOARD CERTIFIED IN PSYCHIATRY, OR A PSYCHOLOGIST WHO, IN GOOD FAITH AND WITH REASONABLE GROUNDS, ACTS IN COMPLIANCE WITH THIS SECTION, MAY NOT BE HELD CIVILLY OR CRIMINALLY LIABLE FOR ACTIONS AUTHORIZED BY THIS SECTION.*

**5–143.**

(A)   (1)   A PERSON WHO MOVES INTO THE STATE WITH THE INTENT OF BECOMING A RESIDENT SHALL REGISTER ALL REGULATED FIREARMS WITH THE SECRETARY WITHIN ~~30~~ *90* DAYS AFTER ESTABLISHING RESIDENCY.

(2)   THE SECRETARY SHALL PREPARE AND, ON REQUEST OF AN APPLICANT, PROVIDE AN APPLICATION FORM FOR REGISTRATION UNDER THIS SECTION.

(B)   AN APPLICATION FOR REGISTRATION UNDER THIS SECTION SHALL CONTAIN:

(1)   THE MAKE, MODEL, MANUFACTURER'S SERIAL NUMBER, CALIBER, TYPE, BARREL LENGTH, FINISH, AND COUNTRY OF ORIGIN OF ~~THE~~ *EACH* REGULATED FIREARM; AND

(2)   THE FIREARM APPLICANT'S NAME, ADDRESS, SOCIAL SECURITY NUMBER, PLACE AND DATE OF BIRTH, HEIGHT, WEIGHT, RACE, EYE AND HAIR COLOR, SIGNATURE, DRIVER'S OR PHOTOGRAPHIC IDENTIFICATION SOUNDEX NUMBER, AND OCCUPATION.

(C)   ~~EACH~~ *AN* APPLICATION FOR REGISTRATION FILED WITH THE SECRETARY OF STATE POLICE SHALL BE ACCOMPANIED BY A NONREFUNDABLE *TOTAL* REGISTRATION FEE OF $15, *REGARDLESS OF THE NUMBER OF FIREARMS REGISTERED*.

(D)   REGISTRATION DATA PROVIDED UNDER THIS SECTION IS NOT OPEN TO PUBLIC INSPECTION.

**[**5–143.**] 5–144.**

(a)   Except as otherwise provided in this subtitle, a dealer or other person may not:

(1)   knowingly participate in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated firearm in violation of this subtitle; or

(2)   knowingly violate § 5–142 of this subtitle.

(b)   A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

(c)   Each violation of this section is a separate crime.

**5–145.**

MARTIN O'MALLEY, Governor                    Ch. 427

(A)   (1)   A LICENSED DEALER SHALL KEEP RECORDS OF ALL RECEIPTS, SALES, AND OTHER DISPOSITIONS OF FIREARMS AFFECTED IN CONNECTION WITH THE LICENSED DEALER'S BUSINESS.

(2)   THE SECRETARY SHALL ADOPT REGULATIONS SPECIFYING:

(I)   SUBJECT TO PARAGRAPH (3) OF THIS SUBSECTION, THE INFORMATION THAT THE RECORDS SHALL CONTAIN;

(II)   THE TIME PERIOD FOR WHICH THE RECORDS ARE TO BE KEPT; AND

(III)   THE FORM IN WHICH THE RECORDS ARE TO BE KEPT.

(3)   THE RECORDS SHALL INCLUDE:

(I)   THE NAME AND ADDRESS OF EACH PERSON FROM WHOM THE DEALER ACQUIRES A FIREARM AND TO WHOM THE DEALER SELLS OR OTHERWISE DISPOSES OF A FIREARM;

(II)   A PRECISE DESCRIPTION, INCLUDING MAKE, MODEL, CALIBER, AND SERIAL NUMBER OF EACH FIREARM ACQUIRED, SOLD, OR OTHERWISE DISPOSED OF; AND

(III)   THE DATE OF EACH ACQUISITION, SALE, OR OTHER DISPOSITION.

(4)   ~~THE SECRETARY MAY PROVIDE THAT RECORDS~~ *RECORDS* MAINTAINED UNDER 18 U.S.C. § 923(G)(1)(A) MAY BE USED TO SATISFY THE REQUIREMENTS OF THIS SECTION, *IF THE SECRETARY IS GRANTED ACCESS TO THOSE RECORDS.*

(B)   (1)   WHEN REQUIRED BY A LETTER ISSUED BY THE SECRETARY, A LICENSEE SHALL SUBMIT TO THE SECRETARY THE INFORMATION REQUIRED TO BE KEPT UNDER SUBSECTION (A) OF THIS SECTION FOR THE TIME PERIODS SPECIFIED BY THE SECRETARY.

(2)   THE SECRETARY SHALL DETERMINE THE FORM AND METHOD BY WHICH THE RECORDS SHALL BE MAINTAINED.

(C)   WHEN A FIREARMS BUSINESS IS DISCONTINUED AND SUCCEEDED BY A NEW LICENSEE, THE RECORDS REQUIRED TO BE KEPT UNDER THIS SECTION SHALL REFLECT THE BUSINESS DISCONTINUANCE AND SUCCESSION AND SHALL BE DELIVERED TO THE SUCCESSOR LICENSEE.

Addend.000069

(D)    (1)    A LICENSEE SHALL RESPOND WITHIN 48 HOURS AFTER RECEIPT OF A REQUEST FROM THE SECRETARY FOR INFORMATION CONTAINED IN THE RECORDS REQUIRED TO BE KEPT UNDER THIS SECTION WHEN THE INFORMATION IS REQUESTED IN CONNECTION WITH A BONA FIDE CRIMINAL INVESTIGATION.

(2)    THE INFORMATION REQUESTED UNDER THIS SUBSECTION SHALL BE PROVIDED ORALLY OR IN WRITING, AS REQUIRED BY THE SECRETARY.

(3)    THE SECRETARY MAY IMPLEMENT A SYSTEM BY WHICH A LICENSEE CAN POSITIVELY ESTABLISH THAT A PERSON REQUESTING INFORMATION BY TELEPHONE IS AUTHORIZED BY THE SECRETARY TO REQUEST THE INFORMATION.

(E)    THE SECRETARY MAY MAKE AVAILABLE TO A FEDERAL, STATE, OR LOCAL LAW ENFORCEMENT AGENCY ANY INFORMATION THAT THE SECRETARY OBTAINS UNDER THIS SECTION RELATING TO THE IDENTITIES OF PERSONS WHO HAVE UNLAWFULLY PURCHASED OR RECEIVED FIREARMS.

(F)    THE SECRETARY:

(1)    SHALL INSPECT THE INVENTORY AND RECORDS OF A LICENSED DEALER AT LEAST ONCE EVERY 2 YEARS; AND

(2)    MAY INSPECT THE INVENTORY AND RECORDS AT ANY TIME DURING THE NORMAL BUSINESS HOURS OF THE LICENSED DEALER'S BUSINESS.

(G)    (1)    A PERSON WHO VIOLATES THIS SECTION IS SUBJECT TO A CIVIL PENALTY NOT EXCEEDING $1,000 IMPOSED BY THE SECRETARY.

(2)    FOR A SECOND OR SUBSEQUENT OFFENSE, A PERSON WHO KNOWINGLY VIOLATES THIS SECTION IS GUILTY OF A MISDEMEANOR AND IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 3 YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.

(3)    *THE PENALTIES PROVIDED IN THIS SUBSECTION ARE NOT INTENDED TO APPLY TO INCONSEQUENTIAL OR INADVERTENT ERRORS.*

*5–146.*

– 54 –

MARTIN O'MALLEY, Governor                    Ch. 427

*(A)    A DEALER OR ANY OTHER PERSON WHO SELLS OR TRANSFERS A REGULATED FIREARM SHALL NOTIFY THE PURCHASER OR RECIPIENT OF THE REGULATED FIREARM AT THE TIME OF PURCHASE OR TRANSFER THAT THE PURCHASER OR RECIPIENT IS REQUIRED TO REPORT A LOST OR STOLEN REGULATED FIREARM TO THE LOCAL LAW ENFORCEMENT AGENCY AS REQUIRED UNDER SUBSECTION (B) OF THIS SECTION.*

*(B)    IF A REGULATED FIREARM IS LOST OR STOLEN, THE OWNER OF THE REGULATED FIREARM SHALL REPORT THE LOSS OR THEFT TO THE LOCAL LAW ENFORCEMENT AGENCY WITHIN 72 HOURS AFTER THE OWNER FIRST DISCOVERS THE LOSS OR THEFT.*

*(C)    ON RECEIPT OF A REPORT OF A LOST OR STOLEN REGULATED FIREARM, A LOCAL LAW ENFORCEMENT AGENCY SHALL REPORT TO THE SECRETARY AND ENTER INTO THE NATIONAL CRIME INFORMATION CENTER (NCIC) DATABASE, TO THE EXTENT KNOWN, THE CALIBER, MAKE, MODEL, MANUFACTURER, AND SERIAL NUMBER OF THE REGULATED FIREARM AND ANY OTHER DISTINGUISHING NUMBER OR IDENTIFICATION MARK ON THE REGULATED FIREARM.*

*(D)    (1)    A KNOWING AND WILLFUL FIRST–TIME VIOLATION OF THIS SECTION IS A CIVIL OFFENSE PUNISHABLE BY A FINE NOT EXCEEDING $500.*

*(2)    A PERSON WHO KNOWINGLY AND WILLFULLY VIOLATES THIS SECTION FOR A SECOND OR SUBSEQUENT TIME IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 90 DAYS OR A FINE NOT EXCEEDING $500 OR BOTH.*

*(E)    THE IMPOSITION OF A CIVIL OR CRIMINAL PENALTY UNDER THIS SECTION DOES NOT PRECLUDE THE PURSUIT OF ANY OTHER CIVIL REMEDY OR CRIMINAL PROSECUTION AUTHORIZED BY LAW.*

5–205.

(A)    THIS SUBTITLE DOES NOT APPLY TO A RIFLE OR SHOTGUN THAT IS AN ANTIQUE FIREARM AS DEFINED IN § 4–201 OF THE CRIMINAL LAW ARTICLE.

(B)    A PERSON MAY NOT POSSESS A RIFLE OR SHOTGUN IF THE PERSON:

(1)    HAS BEEN CONVICTED OF A DISQUALIFYING CRIME AS DEFINED IN § 5–101 OF THIS TITLE;

(2)    HAS BEEN CONVICTED OF A VIOLATION CLASSIFIED AS A CRIME UNDER COMMON LAW AND RECEIVED A TERM OF IMPRISONMENT OF MORE THAN 2 YEARS;

(3)    IS A FUGITIVE FROM JUSTICE;

(4)    IS A HABITUAL DRUNKARD AS DEFINED IN § 5–101 OF THIS TITLE;

(5)    IS ADDICTED TO A CONTROLLED DANGEROUS SUBSTANCE OR IS A HABITUAL USER AS DEFINED IN § 5–101 OF THIS TITLE;

(6)    SUFFERS FROM A MENTAL DISORDER AS DEFINED IN § 10–101(F)(2) OF THE HEALTH – GENERAL ARTICLE AND HAS A HISTORY OF VIOLENT BEHAVIOR AGAINST THE PERSON OR ANOTHER, ~~UNLESS THE PERSON HAS A PHYSICIAN'S CERTIFICATE THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER~~;

(7)    HAS BEEN FOUND INCOMPETENT TO STAND TRIAL UNDER § 3–106 OF THE CRIMINAL PROCEDURE ARTICLE;

(8)    HAS BEEN FOUND NOT CRIMINALLY RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

(9)    ~~HAS BEEN BEFORE OCTOBER 1, 2013, WAS~~ *HAS BEEN* VOLUNTARILY ADMITTED FOR MORE THAN 30 CONSECUTIVE DAYS TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

~~(10)    HAS BEEN ADMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE AS THE RESULT OF AN EMERGENCY EVALUATION UNDER § 10–622 OF THE HEALTH – GENERAL ARTICLE, UNLESS THE PERSON HAS A CERTIFICATE FROM THE FACILITY THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER;~~

~~(10)~~ ~~(11)~~ *(10)*    HAS BEEN INVOLUNTARILY COMMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

~~(11)~~ ~~(12)~~ *(11)*    IS UNDER THE PROTECTION OF A GUARDIAN APPOINTED BY A COURT UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND TRUSTS ARTICLE, *EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY*;

(6) (12) (13) *(12)* EXCEPT AS PROVIDED IN SUBSECTION (C) OF THIS SECTION, IS A RESPONDENT AGAINST WHOM:

(I)     A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE; OR

(II)    AN ORDER FOR PROTECTION, AS DEFINED IN § 4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; OR

(7) (13) (14) *(13)* IF UNDER THE AGE OF 30 YEARS AT THE TIME OF POSSESSION, HAS BEEN ADJUDICATED DELINQUENT BY A JUVENILE COURT FOR AN ACT THAT WOULD BE A DISQUALIFYING CRIME IF COMMITTED BY AN ADULT.

[(a)] (C)   ~~Unless the person possesses a physician's certificate that the person is capable of possessing a rifle or shotgun without undue danger to the person or to another, a person may not possess a rifle or shotgun if the person:~~

(1)   ~~suffers from a mental disorder as defined in § 10–101(f)(2) of the Health – General Article and has a history of violent behavior against the person or another; or~~

(2)   ~~has been confined for more than 30 consecutive days in a facility as defined in § 10–101 of the Health – General Article.~~

(D) (C)     THIS SECTION DOES NOT APPLY TO A PERSON TRANSPORTING A RIFLE OR SHOTGUN IF THE PERSON IS CARRYING A CIVIL PROTECTIVE ORDER REQUIRING THE SURRENDER OF THE RIFLE OR SHOTGUN AND:

(1)     THE RIFLE OR SHOTGUN IS UNLOADED;

(2)     THE PERSON HAS NOTIFIED THE LAW ENFORCEMENT UNIT, BARRACKS, OR STATION THAT THE RIFLE OR SHOTGUN IS BEING TRANSPORTED IN ACCORDANCE WITH THE CIVIL PROTECTIVE ORDER; AND

(3)     THE PERSON TRANSPORTS THE RIFLE OR SHOTGUN DIRECTLY TO THE LAW ENFORCEMENT UNIT, BARRACKS, OR STATION.

[(b)] (E) (D) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.

(E)     A PERSON WHO IS DISQUALIFIED FROM OWNING A RIFLE OR SHOTGUN UNDER SUBSECTION (B)(6), (7), (8), (9), (10), OR (11) OF THIS

**SECTION MAY SEEK RELIEF FROM THE DISQUALIFICATION IN ACCORDANCE WITH § 5–133.3 OF THIS TITLE.**

5–206.

(a)      A person may not possess a rifle or shotgun if the person was previously convicted of:

(1)      a crime of violence **AS DEFINED IN § 5–101 OF THIS TITLE**;

(2)      a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–612, § 5–613, or § 5–614 of the Criminal Law Article; or

(3)      an offense under the laws of another state or the United States that would constitute one of the crimes listed in item (1) or (2) of this subsection if committed in this State.

(b)      A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 15 years.

(c)      Each violation of this subsection is a separate crime.

5–301.

(a)      In this subtitle the following words have the meanings indicated.

(b)      "Board" means the Handgun Permit Review Board.

(c)      "Handgun" has the meaning stated in § 4–201 of the Criminal Law Article.

(d)      "Permit" means a permit issued by the Secretary to carry, wear, or transport a handgun.

**(E)      "QUALIFIED HANDGUN INSTRUCTOR" HAS THE MEANING STATED IN § 5–101 OF THIS TITLE.**

**[**(e)**] (F)**      "Secretary" means the Secretary of State Police or the Secretary's designee.

5–306.

(a)      Subject to subsection **[**(b)**] (C)** of this section, the Secretary shall issue a permit within a reasonable time to a person who the Secretary finds:

MARTIN O'MALLEY, Governor                         Ch. 427

(1)      is an adult;

(2)      (i)      has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed; or

(ii)      if convicted of a crime described in item (i) of this item, has been pardoned or has been granted relief under 18 U.S.C. § 925(c);

(3)      has not been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance;

(4)      is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction; [and]

**(5)      EXCEPT AS PROVIDED IN SUBSECTION (B) OF THIS SECTION, HAS SUCCESSFULLY COMPLETED PRIOR TO APPLICATION AND EACH RENEWAL, A FIREARMS TRAINING COURSE APPROVED BY THE SECRETARY THAT INCLUDES:**

**(I)      1.      FOR AN INITIAL APPLICATION, A MINIMUM OF 16 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR; OR**

**2.      FOR A RENEWAL APPLICATION, 8 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR;**

**(II)      CLASSROOM INSTRUCTION ON:**

**1.      STATE FIREARM LAW;**

**2.      HOME FIREARM SAFETY; AND**

**3.      HANDGUN MECHANISMS AND OPERATION; AND**

**(III)      A FIREARMS QUALIFICATION COMPONENT THAT DEMONSTRATES THE APPLICANT'S PROFICIENCY AND USE OF THE FIREARM; AND**

[(5)] **(6)**      based on an investigation:

(i)      has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another; and

– 59 –

(ii)    has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger.

**(B)    AN APPLICANT FOR A PERMIT IS NOT REQUIRED TO COMPLETE A CERTIFIED FIREARMS TRAINING COURSE UNDER SUBSECTION (A) OF THIS SECTION IF THE APPLICANT:**

**(1)    IS A LAW ENFORCEMENT OFFICER OR A PERSON WHO IS RETIRED IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE UNITED STATES, THE STATE, OR ANY LOCAL LAW ENFORCEMENT AGENCY IN THE STATE;**

**(2)    IS A MEMBER OR, RETIRED MEMBER, OR HONORABLY DISCHARGED MEMBER OF THE ARMED FORCES OF THE UNITED STATES OR THE NATIONAL GUARD; OR;**

**(3)    IS CURRENTLY A CERTIFIED FIREARMS INSTRUCTOR WHO:**

**(I)    IS RECOGNIZED BY THE MARYLAND POLICE AND CORRECTIONAL TRAINING COMMISSIONS;**

**(II)    HAS A QUALIFIED HANDGUN INSTRUCTOR LICENSE ISSUED BY THE SECRETARY; OR**

**(III)    HAS A CERTIFICATION ISSUED AND RECOGNIZED BY A NATIONAL ORGANIZATION *A QUALIFIED HANDGUN INSTRUCTOR*; OR**

**(3) (4)    HAS COMPLETED A FIREARMS TRAINING COURSE APPROVED BY THE SECRETARY.**

[(b)] **(C)**    An applicant under the age of 30 years is qualified only if the Secretary finds that the applicant has not been:

(1)    committed to a detention, training, or correctional institution for juveniles for longer than 1 year after an adjudication of delinquency by a juvenile court; or

(2)    adjudicated delinquent by a juvenile court for:

(i)    an act that would be a crime of violence if committed by an adult;

MARTIN O'MALLEY, Governor                    Ch. 427

(ii)    an act that would be a felony in this State if committed by an adult; or

(iii)    an act that would be a misdemeanor in this State that carries a statutory penalty of more than 2 years if committed by an adult.

**(D)    THE SECRETARY MAY ISSUE A HANDGUN QUALIFICATION LICENSE, WITHOUT AN ADDITIONAL APPLICATION OR FEE, TO A PERSON WHO:**

**(1)    MEETS THE REQUIREMENTS FOR ISSUANCE OF A PERMIT UNDER THIS SECTION; AND**

**(2)    DOES NOT HAVE A HANDGUN QUALIFICATION LICENSE ISSUED UNDER § 5–117.1 OF THIS TITLE.**

*Article – State Government*

*10–616.*

*(a)    Unless otherwise provided by law, a custodian shall deny inspection of a public record, as provided in this section.*

*(V)    (1)    EXCEPT AS PROVIDED IN PARAGRAPHS (2) AND (3) OF THIS SUBSECTION, A CUSTODIAN SHALL DENY INSPECTION OF ALL RECORDS OF A PERSON AUTHORIZED TO:*

*(I)    SELL, PURCHASE, RENT, OR TRANSFER A REGULATED FIREARM UNDER TITLE 5, SUBTITLE 1 OF THE PUBLIC SAFETY ARTICLE; OR*

*(II)    CARRY, WEAR, OR TRANSPORT A HANDGUN UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE.*

*(2)    A CUSTODIAN SHALL ALLOW INSPECTION OF FIREARM OR HANDGUN RECORDS BY:*

*(I)    THE INDIVIDUAL NAMED IN THE RECORD; OR*

*(II)    THE ATTORNEY OF RECORD OF THE INDIVIDUAL NAMED IN THE RECORD.*

*(3)    THE PROVISIONS OF THIS SUBSECTION MAY NOT BE CONSTRUED TO PROHIBIT THE DEPARTMENT OF STATE POLICE OR THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES FROM ACCESSING FIREARM OR HANDGUN RECORDS IN THE PERFORMANCE OF THAT DEPARTMENT'S OFFICIAL DUTY.*

– 61 –

*SECTION 2. AND BE IT FURTHER ENACTED, That, on or before October 1, 2013:*

*(a)     The Department of State Police shall investigate illegal transfers, possession, and transport of firearms within the State, including the number and types of firearms seized by the Department of State Police and the best information available as to the source of the seized firearms.*

*(b)     On or before December 31, 2015, the Department of State Police shall report its findings to the Governor and, in accordance with § 2–1246 of the State Government Article, the General Assembly.*

SECTION ~~2.~~ *3.* AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2013. *Section 2 of this Act shall remain effective for a period of 3 years and, at the end of September 30, 2016, with no further action required by the General Assembly, Section 2 of this Act shall be abrogated and of no further force and effect.*

**Approved by the Governor, May 16, 2013.**

Addend.000078

New Jersey Statutes Annotated
Title 2C. The New Jersey Code of Criminal Justice (Refs & Annos)
Subtitle 2. Definition of Specific Offenses
Part 5. Offenses Against Public Order, Health and Decency
Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

N.J.S.A. 2C:39-1

2C:39-1. Definitions

Effective: December 23, 2002
Currentness

The following definitions apply to this chapter and to chapter 58:

a. "Antique firearm" means any rifle or shotgun and "antique cannon" means a destructive device defined in paragraph (3) of subsection c. of this section, if the rifle, shotgun or destructive device, as the case may be, is incapable of being fired or discharged, or which does not fire fixed ammunition, regardless of date of manufacture, or was manufactured before 1898 for which cartridge ammunition is not commercially available, and is possessed as a curiosity or ornament or for its historical significance or value.

b. "Deface" means to remove, deface, cover, alter or destroy the name of the maker, model designation, manufacturer's serial number or any other distinguishing identification mark or number on any firearm.

c. "Destructive device" means any device, instrument or object designed to explode or produce uncontrolled combustion, including (1) any explosive or incendiary bomb, mine or grenade; (2) any rocket having a propellant charge of more than four ounces or any missile having an explosive or incendiary charge of more than one-quarter of an ounce; (3) any weapon capable of firing a projectile of a caliber greater than 60 caliber, except a shotgun or shotgun ammunition generally recognized as suitable for sporting purposes; (4) any Molotov cocktail or other device consisting of a breakable container containing flammable liquid and having a wick or similar device capable of being ignited. The term does not include any device manufactured for the purpose of illumination, distress signaling, line- throwing, safety or similar purposes.

x. "Semi-automatic" means a firearm which fires a single projectile for each single pull of the trigger and is self-reloading or automatically chambers a round, cartridge, or bullet.

y. "Large capacity ammunition magazine" means a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm.

z. "Pistol grip" means a well-defined handle, similar to that found on a handgun, that protrudes conspicuously beneath the action of the weapon, and which permits the shotgun to be held and fired with one hand.

aa. "Antique handgun" means a handgun manufactured before 1898, or a replica thereof, which is recognized as being historical in nature or of historical significance and either (1) utilizes a match, friction, flint, or percussion ignition, or which utilizes a pin-fire cartridge in which the pin is part of the cartridge or (2) does not fire fixed ammunition or for which cartridge ammunition is not commercially available.

bb. "Trigger lock" means a commercially available device approved by the Superintendent of State Police which is operated with a key or combination lock that prevents a firearm from being discharged while the device is attached to the firearm. It may include, but need not be limited to, devices that obstruct the barrel or cylinder of the firearm, as well as devices that immobilize the trigger.

cc. "Trigger locking device" means a device that, if installed on a firearm and secured by means of a key or mechanically, electronically or electromechanically operated combination lock, prevents the firearm from being discharged without first deactivating or removing the device by means of a key or mechanically, electronically or electromechanically operated combination lock.

dd. "Personalized handgun" means a handgun which incorporates within its design, and as part of its original manufacture, technology which automatically limits its operational use and which cannot be readily deactivated, so that it may only be fired by an authorized or recognized user. The technology limiting the handgun's operational use may include, but not be limited to: radio frequency tagging, touch memory, remote control, fingerprint, magnetic encoding and other automatic user identification systems utilizing biometric, mechanical or electronic systems. No

New Jersey Statutes Annotated
   Title 2C. The New Jersey Code of Criminal Justice (Refs & Annos)
      Subtitle 2. Definition of Specific Offenses
         Part 5. Offenses Against Public Order, Health and Decency
            Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime
            (Refs & Annos)

N.J.S.A. 2C:39-3

2C:39-3. Prohibited weapons and devices

Effective: September 3, 2003
Currentness

**a. Destructive devices.** Any person who knowingly has in his possession any destructive device is guilty of a crime of the third degree.

**b. Sawed-off shotguns.** Any person who knowingly has in his possession any sawed-off shotgun is guilty of a crime of the third degree.

**c. Silencers.** Any person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree.

**d. Defaced firearms.** Any person who knowingly has in his possession any firearm which has been defaced, except an antique firearm or an antique handgun, is guilty of a crime of the fourth degree.

**e. Certain weapons.** Any person who knowingly has in his possession any gravity knife, switchblade knife, dagger, dirk, stiletto, billy, blackjack, metal knuckle, sandclub, slingshot, cestus or similar leather band studded with metal filings or razor blades imbedded in wood, ballistic knife, without any explainable lawful purpose, is guilty of a crime of the fourth degree.

**f. Dum-dum or body armor penetrating bullets.** (1) Any person, other than a law enforcement officer or persons engaged in activities pursuant to subsection f. of N.J.S.2C:39-6, who knowingly has in his possession any hollow nose or dum-dum bullet, or (2) any person, other than a collector of firearms or ammunition as curios or relics as defined in Title 18, United States Code, section

(3) Nothing in paragraph (2) of subsection f. or in subsection j. shall be construed to prevent any licensed retail or wholesale firearms dealer from possessing that ammunition or large capacity ammunition magazine at its licensed premises for sale or disposition to another licensed dealer, the Armed Forces of the United States or the National Guard, or to a law enforcement agency, provided that the seller maintains a record of any sale or disposition to a law enforcement agency. The record shall include the name of the purchasing agency, together with written authorization of the chief of police or highest ranking official of the agency, the name and rank of the purchasing law enforcement officer, if applicable, and the date, time and amount of ammunition sold or otherwise disposed. A copy of this record shall be forwarded by the seller to the Superintendent of the Division of State Police within 48 hours of the sale or disposition.

(4) Nothing in subsection a. of this section shall be construed to apply to antique cannons as exempted in subsection d. of N.J.S.2C:39-6.

(5) Nothing in subsection c. of this section shall be construed to apply to any person who is specifically identified in a special deer management permit issued by the Division of Fish and Wildlife to utilize a firearm silencer as part of an alternative deer control method implemented in accordance with a special deer management permit issued pursuant to section 4 of P.L.2000, c. 46 (C.23:4-42.6), while the person is in the actual performance of the permitted alternative deer control method and while going to and from the place where the permitted alternative deer control method is being utilized. This exception shall not, however, otherwise apply to any person to authorize the purchase or possession of a firearm silencer.

**h. Stun guns.** Any person who knowingly has in his possession any stun gun is guilty of a crime of the fourth degree.

**i.** Nothing in subsection e. of this section shall be construed to prevent any guard in the employ of a private security company, who is licensed to carry a firearm, from the possession of a nightstick when in the actual performance of his official duties, provided that he has satisfactorily completed a training course approved by the Police Training Commission in the use of a nightstick.

**j.** Any person who knowingly has in his possession a large capacity ammunition magazine is guilty of a crime of the fourth degree unless the person has registered an assault firearm pursuant to section 11 of P.L.1990, c. 32 (C.2C:58-12) and the magazine is maintained and used

S T A T E   O F   N E W   Y O R K
_____

S. 2230                                                    A. 2388

2013-2014 Regular Sessions

S E N A T E - A S S E M B L Y

January 14, 2013
_____

IN SENATE -- Introduced by Sens. KLEIN, SMITH -- (at request of the
   Governor) -- read twice and ordered printed, and when printed to be
   committed to the Committee on Rules

IN ASSEMBLY -- Introduced by M. of A. SILVER, LENTOL, ORTIZ, MORELLE,
   FARRELL, WEINSTEIN, CAMARA, HOOPER, O'DONNELL, TITONE, PAULIN, MOYA,
   GLICK, WRIGHT, SCHIMEL, GOTTFRIED, ROSENTHAL, KAVANAGH, STECK, WEPRIN
   -- Multi-Sponsored by -- M. of A. ABINANTI, BOYLAND, BRENNAN,
   BROOK-KRASNY, BUCHWALD, CASTRO, COLTON, DINOWITZ, ENGLEBRIGHT, ESPI-
   NAL, FAHY, JACOBS, JAFFEE, KELLNER, KIM, LAVINE, LIFTON, MARKEY,
   MAYER, MILLMAN, MOSLEY, OTIS, ROSA, ROZIC -- (at request of the Gover-
   nor) -- read once and referred to the Committee on Codes

AN ACT to amend the criminal procedure law, the correction law, the
   family court act, the executive law, the general business law, the
   judiciary law, the mental hygiene law, the penal law and the surro-
   gate's court procedure act, in relation to suspension and revocation
   of firearms licenses; private sale or disposal of firearms, rifles or
   shotguns and establishing a minimum age to possess a firearm; to amend
   the family court act, the domestic relations law and the criminal
   procedure law, in relation to providing for the mandatory suspension
   or revocation of the firearms license of a person against whom an
   order of protection or a temporary order of protection has been issued
   under certain circumstances, or upon violation of any such order; to
   amend the penal law, in relation to community guns and the criminal
   sale of a firearm and in relation to the definitions of aggravated and
   first degree murder; to amend chapter 408 of the laws of 1999 consti-
   tuting Kendra's Law, in relation to extending the expiration thereof;
   and to amend the education law, in relation to the New York state
   school safety improvement teams; and in relation to building aid for
   metal detectors and safety devices

   THE PEOPLE OF THE STATE OF NEW YORK, REPRESENTED IN SENATE AND ASSEM-
BLY, DO ENACT AS FOLLOWS:

   EXPLANATION--Matter in ITALICS (underscored) is new; matter in brackets
                    [ ] is old law to be omitted.
                                                         LBD12007-03-3
S. 2230                        2                           A. 2388

1     Section 1. Section 330.20 of the criminal procedure law is amended by
2   adding a new subdivision 2-a to read as follows:
3     2-A. FIREARM, RIFLE OR SHOTGUN SURRENDER ORDER. UPON ENTRY OF A
4   VERDICT OF NOT RESPONSIBLE BY REASON OF MENTAL DISEASE OR DEFECT, OR

Addend.000083

50   SUCH WEAPON IS AN ASSAULT WEAPON;
51     (V) ANY WEAPON VALIDLY REGISTERED PURSUANT TO SUBDIVISION SIXTEEN-A OF
52   SECTION 400.00 OF THIS CHAPTER. SUCH WEAPONS SHALL BE SUBJECT TO THE
53   PROVISIONS OF PARAGRAPH (H) OF THIS SUBDIVISION;
54     (VI) ANY FIREARM, RIFLE, OR SHOTGUN THAT WAS MANUFACTURED AT LEAST
55   FIFTY YEARS PRIOR TO THE CURRENT DATE, BUT NOT INCLUDING REPLICAS THERE-

S. 2230                         20                         A. 2388

1   OF THAT IS VALIDLY REGISTERED PURSUANT TO SUBDIVISION SIXTEEN-A OF
2   SECTION 400.00 OF THIS CHAPTER;
3     (H) ANY WEAPON DEFINED IN PARAGRAPH (E) OR (F) OF THIS SUBDIVISION AND
4   ANY LARGE CAPACITY AMMUNITION FEEDING DEVICE THAT WAS LEGALLY POSSESSED
5   BY AN INDIVIDUAL PRIOR TO THE ENACTMENT OF THE CHAPTER OF THE LAWS OF
6   TWO THOUSAND THIRTEEN WHICH ADDED THIS PARAGRAPH, MAY ONLY BE SOLD TO,
7   EXCHANGED WITH OR DISPOSED OF TO A PURCHASER AUTHORIZED TO POSSESS SUCH
8   WEAPONS OR TO AN INDIVIDUAL OR ENTITY OUTSIDE OF THE STATE PROVIDED THAT
9   ANY SUCH TRANSFER TO AN INDIVIDUAL OR ENTITY OUTSIDE OF THE STATE MUST
10   BE REPORTED TO THE ENTITY WHEREIN THE WEAPON IS REGISTERED WITHIN SEVEN-
11   TY-TWO HOURS OF SUCH TRANSFER. AN INDIVIDUAL WHO TRANSFERS ANY SUCH
12   WEAPON OR LARGE CAPACITY AMMUNITION DEVICE TO AN INDIVIDUAL INSIDE NEW
13   YORK STATE OR WITHOUT COMPLYING WITH THE PROVISIONS OF THIS PARAGRAPH
14   SHALL BE GUILTY OF A CLASS A MISDEMEANOR UNLESS SUCH LARGE CAPACITY
15   AMMUNITION FEEDING DEVICE, THE POSSESSION OF WHICH IS MADE ILLEGAL BY
16   THE CHAPTER OF THE LAWS OF TWO THOUSAND THIRTEEN WHICH ADDED THIS PARA-
17   GRAPH, IS TRANSFERRED WITHIN ONE YEAR OF THE EFFECTIVE DATE OF THE CHAP-
18   TER OF THE LAWS OF TWO THOUSAND THIRTEEN WHICH ADDED THIS PARAGRAPH.
19     S 38. Subdivision 23 of section 265.00 of the penal law, as added by
20   chapter 189 of the laws of 2000, is amended to read as follows:
21     23. "Large capacity ammunition feeding device" means a magazine, belt,
22   drum, feed strip, or similar device, [manufactured after September thir-
23   teenth, nineteen hundred ninety-four,] that (A) has a capacity of, or
24   that can be readily restored or converted to accept, more than ten
25   rounds of ammunition, OR (B) CONTAINS MORE THAN SEVEN ROUNDS OF AMMUNI-
26   TION, OR (C) IS OBTAINED AFTER THE EFFECTIVE DATE OF THE CHAPTER OF THE
27   LAWS OF TWO THOUSAND THIRTEEN WHICH AMENDED THIS SUBDIVISION AND HAS A
28   CAPACITY OF, OR THAT CAN BE READILY RESTORED OR CONVERTED TO ACCEPT,
29   MORE THAN SEVEN ROUNDS OF AMMUNITION; provided, however, that such term
30   does not include an attached tubular device designed to accept, and
31   capable of operating only with, .22 caliber rimfire ammunition OR A
32   FEEDING DEVICE THAT IS A CURIO OR RELIC. A FEEDING DEVICE THAT IS A
33   CURIO OR RELIC IS DEFINED AS A DEVICE THAT (I) WAS MANUFACTURED AT LEAST
34   FIFTY YEARS PRIOR TO THE CURRENT DATE, (II) IS ONLY CAPABLE OF BEING
35   USED EXCLUSIVELY IN A FIREARM, RIFLE, OR SHOTGUN THAT WAS MANUFACTURED
36   AT LEAST FIFTY YEARS PRIOR TO THE CURRENT DATE, BUT NOT INCLUDING REPLI-
37   CAS THEREOF, (III) IS POSSESSED BY AN INDIVIDUAL WHO IS NOT PROHIBITED
38   BY STATE OR FEDERAL LAW FROM POSSESSING A FIREARM AND (IV) IS REGISTERED
39   WITH THE DIVISION OF STATE POLICE PURSUANT TO SUBDIVISION SIXTEEN-A OF
40   SECTION 400.00 OF THIS CHAPTER, EXCEPT SUCH FEEDING DEVICES TRANSFERRED
41   INTO THE STATE MAY BE REGISTERED AT ANY TIME, PROVIDED THEY ARE REGIS-
42   TERED WITHIN THIRTY DAYS OF THEIR TRANSFER INTO THE STATE. NOTWITH-
43   STANDING PARAGRAPH (H) OF SUBDIVISION TWENTY-TWO OF THIS SECTION, SUCH
44   FEEDING DEVICES MAY BE TRANSFERRED PROVIDED THAT SUCH TRANSFER SHALL BE
45   SUBJECT TO THE PROVISIONS OF SECTION 400.03 OF THIS CHAPTER INCLUDING
46   THE CHECK REQUIRED TO BE CONDUCTED PURSUANT TO SUCH SECTION.
47     S 39. Section 265.00 of the penal law is amended by adding a new
48   subdivision 24 to read as follows:
49     24. "SELLER OF AMMUNITION" MEANS ANY PERSON, FIRM, PARTNERSHIP,

Addend.000084

S T A T E   O F   N E W   Y O R K

_____

S. 2230                                                        A. 2388

2013-2014 Regular Sessions

S E N A T E - A S S E M B L Y

January 14, 2013

_____

IN SENATE -- Introduced by Sens. KLEIN, SMITH -- (at request of the
  Governor) -- read twice and ordered printed, and when printed to be
  committed to the Committee on Rules

IN ASSEMBLY -- Introduced by M. of A. SILVER, LENTOL, ORTIZ, MORELLE,
  FARRELL, WEINSTEIN, CAMARA, HOOPER, O'DONNELL, TITONE, PAULIN, MOYA,
  GLICK, WRIGHT, SCHIMEL, GOTTFRIED, ROSENTHAL, KAVANAGH, STECK, WEPRIN
  -- Multi-Sponsored by -- M. of A. ABINANTI, BOYLAND, BRENNAN,
  BROOK-KRASNY, BUCHWALD, CASTRO, COLTON, DINOWITZ, ENGLEBRIGHT, ESPI-
  NAL, FAHY, JACOBS, JAFFEE, KELLNER, KIM, LAVINE, LIFTON, MARKEY,
  MAYER, MILLMAN, MOSLEY, OTIS, ROSA, ROZIC -- (at request of the Gover-
  nor) -- read once and referred to the Committee on Codes

AN ACT to amend the criminal procedure law, the correction law, the
  family court act, the executive law, the general business law, the
  judiciary law, the mental hygiene law, the penal law and the surro-
  gate's court procedure act, in relation to suspension and revocation
  of firearms licenses; private sale or disposal of firearms, rifles or
  shotguns and establishing a minimum age to possess a firearm; to amend
  the family court act, the domestic relations law and the criminal
  procedure law, in relation to providing for the mandatory suspension
  or revocation of the firearms license of a person against whom an
  order of protection or a temporary order of protection has been issued
  under certain circumstances, or upon violation of any such order; to
  amend the penal law, in relation to community guns and the criminal
  sale of a firearm and in relation to the definitions of aggravated and
  first degree murder; to amend chapter 408 of the laws of 1999 consti-
  tuting Kendra's Law, in relation to extending the expiration thereof;
  and to amend the education law, in relation to the New York state
  school safety improvement teams; and in relation to building aid for
  metal detectors and safety devices

  THE PEOPLE OF THE STATE OF NEW YORK, REPRESENTED IN SENATE AND ASSEM-
BLY, DO ENACT AS FOLLOWS:

  EXPLANATION--Matter in ITALICS (underscored) is new; matter in brackets
                        [ ] is old law to be omitted.
                                                        LBD12007-03-3
S. 2230                          2                            A. 2388

1    Section 1. Section 330.20 of the criminal procedure law is amended by
2  adding a new subdivision 2-a to read as follows:
3    2-A. FIREARM, RIFLE OR SHOTGUN SURRENDER ORDER. UPON ENTRY OF A
4  VERDICT OF NOT RESPONSIBLE BY REASON OF MENTAL DISEASE OR DEFECT, OR

Addend.000085

50  RATION OR COMPANY WHO ENGAGES IN THE BUSINESS OF PURCHASING, SELLING  OR
51  KEEPING AMMUNITION.
52    S 40. Section 265.01 of the penal law, as added by chapter 1041 of the
53  laws  of  1974,  subdivision  1 as amended by chapter 257 of the laws of
54  2008, subdivision 2 as amended by chapter  220  of  the  laws  of  1988,
55  subdivision 3 as amended by chapter 199 of the laws of 2006, subdivision
56  4  as amended by chapter 357 of the laws of 2011, subdivision 7 as added
   S. 2230                          21                          A. 2388

1  by chapter 807 of the laws of 1981, and subdivision 8 as added by  chap-
2  ter 646 of the laws of 1986, is amended to read as follows:
3  S 265.01 Criminal possession of a weapon in the fourth degree.
4    A  person  is  guilty of criminal possession of a weapon in the fourth
5  degree when:
6    (1) He or she possesses any firearm, electronic dart  gun,  electronic
7  stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal
8  knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles,
9  metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type sling-
10 shot or slungshot, shirken or "Kung Fu star"; or
11   (2)  He possesses any dagger, dangerous knife, dirk, razor, stiletto,
12 imitation pistol, or any other dangerous or deadly instrument or  weapon
13 with intent to use the same unlawfully against another; or
14   (3) [He or she knowingly has in his or her possession a rifle, shotgun
15 or  firearm  in  or  upon  a building or grounds, used for educational
16 purposes, of any school, college or  university,  except  the  forestry
17 lands, wherever located, owned and maintained by the State University of
18 New York college of environmental science and forestry, or upon a school
19 bus as defined in section one hundred forty-two of the vehicle and traf-
20 fic  law, without the written authorization of such educational institu-
21 tion]; or
22   (4) He possesses a rifle,  shotgun,  antique  firearm,  black  powder
23 rifle, black powder shotgun, or any muzzle-loading firearm, and has been
24 convicted of a felony or serious offense; or
25   (5)  He  possesses any dangerous or deadly weapon and is not a citizen
26 of the United States; or
27   (6) He is a person who has been certified not suitable  to  possess  a
28 rifle  or  shotgun, as defined in subdivision sixteen of section 265.00,
29 and refuses to yield possession of such rifle or shotgun upon the demand
30 of a police officer. Whenever a person  is  certified  not  suitable  to
31 possess  a  rifle or shotgun, a member of the police department to which
32 such certification is made, or of  the  state  police,  shall  forthwith
33 seize  any rifle or shotgun possessed by such person. A rifle or shotgun
34 seized as herein provided shall not be destroyed, but shall be delivered
35 to the headquarters of such police  department,  or  state  police,  and
36 there retained until the aforesaid certificate has been rescinded by the
37 director  or  physician in charge, or other disposition of such rifle or
38 shotgun has been ordered or authorized by a court of competent jurisdic-
39 tion.
40   (7) He knowingly possesses a bullet containing an explosive  substance
41 designed to detonate upon impact.
42   (8) He possesses any armor piercing ammunition with intent to use the
43 same unlawfully against another.
44   Criminal possession of a weapon in the fourth  degree  is  a  class  A
45 misdemeanor.
46   S  41.  The  penal  law is amended by adding a new section 265.01-a to
47 read as follows:
48 S 265.01-A. CRIMINAL POSSESSION OF A WEAPON ON SCHOOL GROUNDS.

```
49      A PERSON IS GUILTY OF CRIMINAL POSSESSION OF A WEAPON ON SCHOOL
50  GROUNDS WHEN HE OR SHE KNOWINGLY HAS IN HIS OR HER POSSESSION A RIFLE,
51  SHOTGUN, OR FIREARM IN OR UPON A BUILDING OR GROUNDS, USED FOR EDUCA-
52  TIONAL PURPOSES, OF ANY SCHOOL, COLLEGE, OR UNIVERSITY, EXCEPT THE
53  FORESTRY LANDS, WHEREVER LOCATED, OWNED AND MAINTAINED BY THE STATE
54  UNIVERSITY OF NEW YORK COLLEGE OF ENVIRONMENTAL SCIENCE AND FORESTRY, OR
55  UPON A SCHOOL BUS AS DEFINED IN SECTION ONE HUNDRED FORTY-TWO OF THE
    S. 2230                      22                            A. 2388

 1  VEHICLE AND TRAFFIC LAW, WITHOUT THE WRITTEN AUTHORIZATION OF SUCH
 2  EDUCATIONAL INSTITUTION.
 3    CRIMINAL POSSESSION OF A WEAPON ON SCHOOL GROUNDS IS A CLASS E FELONY.
 4    S 41-a.  The penal law is amended by adding a new section 265.01-b to
 5  read as follows:
 6  S 265.01-B CRIMINAL POSSESSION OF A FIREARM.
 7    A PERSON IS GUILTY OF CRIMINAL POSSESSION OF A FIREARM WHEN HE OR SHE:
 8  (1) POSSESSES ANY FIREARM OR; (2) LAWFULLY POSSESSES A FIREARM PRIOR TO
 9  THE EFFECTIVE DATE OF THE CHAPTER OF THE LAWS OF TWO THOUSAND THIRTEEN
10  WHICH ADDED THIS SECTION SUBJECT TO THE REGISTRATION REQUIREMENTS OF
11  SUBDIVISION SIXTEEN-A OF SECTION 400.00 OF THIS CHAPTER AND KNOWINGLY
12  FAILS TO REGISTER SUCH FIREARM PURSUANT TO SUCH SUBDIVISION.
13    CRIMINAL POSSESSION OF A FIREARM IS A CLASS E FELONY.
14    S 41-b. Subdivision 8 of section 265.02 of the penal law, as amended
15  by chapter 764 of the laws of 2005, is amended and two new subdivisions
16  9 and 10 are added to read as follows:
17    (8) Such person possesses a large capacity ammunition feeding device.
18  FOR PURPOSES OF THIS SUBDIVISION, A LARGE CAPACITY AMMUNITION FEEDING
19  DEVICE SHALL NOT INCLUDE AN AMMUNITION FEEDING DEVICE LAWFULLY POSSESSED
20  BY SUCH PERSON BEFORE THE EFFECTIVE DATE OF THE CHAPTER OF THE LAWS OF
21  TWO THOUSAND THIRTEEN WHICH AMENDED THIS SUBDIVISION, THAT HAS A CAPACI-
22  TY OF, OR THAT CAN BE READILY RESTORED OR CONVERTED TO ACCEPT MORE THAN
23  SEVEN BUT LESS THAN ELEVEN ROUNDS OF AMMUNITION, OR THAT WAS MANUFAC-
24  TURED BEFORE SEPTEMBER THIRTEENTH, NINETEEN HUNDRED NINETY-FOUR, THAT
25  HAS A CAPACITY OF, OR THAT CAN BE READILY RESTORED OR CONVERTED TO
26  ACCEPT, MORE THAN TEN ROUNDS OF AMMUNITION; OR
27    (9) SUCH PERSON POSSESSES AN UNLOADED FIREARM AND ALSO COMMITS A DRUG
28  TRAFFICKING FELONY AS DEFINED IN SUBDIVISION TWENTY-ONE OF SECTION 10.00
29  OF THIS CHAPTER AS PART OF THE SAME CRIMINAL TRANSACTION; OR
30    (10) SUCH PERSON POSSESSES AN UNLOADED FIREARM AND ALSO COMMITS ANY
31  VIOLENT FELONY OFFENSE AS DEFINED IN SUBDIVISION ONE OF SECTION 70.02 OF
32  THIS CHAPTER AS PART OF THE SAME CRIMINAL TRANSACTION.
33    S 42.  Subdivision 2 of section 265.09 of the penal law, as added by
34  chapter 650 of the laws of 1996, is amended to read as follows:
35    (2) Sentencing. Notwithstanding any other provision of law to the
36  contrary, when a person is convicted of criminal use of a firearm in the
37  first degree as defined in subdivision one of this section, the court
38  shall impose an additional consecutive sentence of five years to the
39  [minimum term of an indeterminate] sentence imposed on the underlying
40  class B violent felony offense where the person convicted of such crime
41  displays a loaded weapon from which a shot, readily capable of producing
42  death or other serious injury may be discharged, in furtherance of the
43  commission of such crime, provided, however, that such additional
44  sentence shall not be imposed if the court, having regard to the nature
45  and circumstances of the crime and to the history and character of the
46  defendant, finds on the record that such additional consecutive sentence
47  would be unduly harsh and that not imposing such sentence would be
48  consistent with the public safety and would not deprecate the serious-
```

AMENDED IN COMMITTEE
10/10/13

FILE NO. 130585

ORDINANCE NO. 249-13

[Police Code - Large Capacity Magazines; Sales of Firearms and Ammunition; Reporting Lost or Stolen Firearms; Shooting Ranges]

**Ordinance amending the Police Code to ban the possession of large capacity magazines for firearm ammunition; require that dealers advise persons purchasing a firearm of local firearms laws; establish a rebuttable presumption that the owner who has not reported the theft or loss of a firearm as required by law remains in possession of the firearm; _modify certain requirements for ammunition sales_ ~~require local dealers to report all ammunition sales to the Chief of Police~~; and, prohibit the operator of a shooting range from allowing minors to enter the premises.**

NOTE:     **Unchanged Code text and uncodified text** are in plain Arial font.
          **Additions to Codes** are in _single-underline italics Times New Roman font_.
          **Deletions to Codes** are in ~~strikethrough italics Times New Roman font~~.
          **Board amendment additions** are in <u>double-underlined Arial font</u>.
          **Board amendment deletions** are in ~~strikethrough Arial font~~.
          Asterisks (*   *   *   *) indicate the omission of unchanged Code subsections or parts of tables. Do NOT delete this NOTE: area.

Be it ordained by the People of the City and County of San Francisco:

Section 1.  The San Francisco Police Code is hereby amended by adding Section <u>619</u> ~~618~~, to read as follows:

_SEC. <u>619</u> ~~618~~.  PROHIBITION AGAINST POSSESSION OF LARGE CAPACITY MAGAZINES_

  _(a)  Findings._

    _(1)  In 2007, 3,231 people died from firearm-related injuries in California, and 4,491 other people were treated for non-fatal gunshot wounds._

    _(2)  The ability of an automatic or semiautomatic firearm to fire multiple bullets without reloading is directly related to the capacity of the firearm's feeding device or "magazine."  Inside the_

Supervisors Cohen, Chiu, Campos, Yee, Mar, Breed
**BOARD OF SUPERVISORS**

Addend.000088

1   *magazine, a spring forces the cartridges into position to be fed into the chamber by operation of the*

2   *firearm's action.*

3          *(3)  Magazines with a capacity of more than 10 rounds of ammunition are generally*

4   *considered to be "large capacity" magazines, although the statutory definitions vary.  In some cases,*

5   *large capacity magazines can hold up to 100 rounds of ammunition.  Other types of firearms, in*

6   *contrast, are generally capable of holding far less ammunition; for example, revolvers typically hold*

7   *six rounds of ammunition in a rotating cylinder.*

8          *(4)  Although detachable large capacity magazines are typically associated with*

9   *machine guns or semiautomatic assault weapons, such devices are available for any semiautomatic*

10  *firearm that accepts a detachable magazine, including semiautomatic handguns.*

11         *(5)  The ability of large capacity magazines to hold numerous rounds of ammunition*

12  *significantly increases the lethality of the automatic and semiautomatic firearms using them.*

13         *(6)  Large capacity magazines were used in a number of recent high-profile shootings,*

14  *including:*

15         *The shooting on the campus of Virginia Tech on April 16, 2007, where 32 people were*

16  *killed and many others wounded,*

17         *The shooting in a gym in Pittsburgh on August 4, 2009, where three people were killed*

18  *and nine others injured,*

19         *The shooting on November 5, 2009 at Fort Hood, Texas, where 13 people were killed*

20  *and 34 more were wounded,*

21         *The shooting on January 8, 2011, at Tucson, Arizona, where 6 people were killed and 13*

22  *people were injured, including a member of the United States House of Representatives, and*

23         *The shootings on December 14, 2012, at Newtown, Connecticut, where 27 people (not*

24  *including the shooter) were killed.*

25

Supervisors Cohen, Chiu, Campos, Yee, Mar, Breed
**BOARD OF SUPERVISORS**

Page 2
10/10/2013

Addend.000089

1         *(7) Large capacity magazines have also been used against San Francisco police*

2 *officers, including a recent incident at India Basin Shoreline Park, where undercover police officers*

3 *were targeted with semiautomatic pistols containing 30-round magazines. Prohibiting large capacity*

4 *magazines serves police safety by requiring perpetrators to pause to reload their firearms more*

5 *frequently, giving police officers greater opportunity to apprehend them.*

6         *(8) Large capacity magazine bans reduce the capacity, and thus the potential lethality,*

7 *of any firearm that can accept a large capacity magazine.*

8         *(9) Large capacity magazines are not necessary for individuals to vindicate their right*

9 *to self-defense. Only in an extraordinarily rare circumstance would a person using a firearm in self-*

10 *defense ever be required to use a large capacity magazine to defend himself or herself effectively. This*

11 *is particularly true in an urban center like San Francisco, where law enforcement can and does*

12 *respond quickly to threats and incidents. Conversely, the dangers of large capacity magazines are*

13 *heightened in dense urban areas like San Francisco.*

14         *(10) In 1994, in recognition of the dangers posed by these devices, Congress adopted a*

15 *law prohibiting the transfer and possession of large capacity magazines as part of the federal assault*

16 *weapon ban. That law was filled with loopholes, however.*

17         *(11) The federal law was enacted with a sunset clause, providing for its expiration after*

18 *ten years. Despite overwhelming public support for the law, Congress allowed the federal ban to*

19 *expire on September 13, 2004.*

20         *(12) Research commissioned by the U.S. Department of Justice to analyze the effect of*

21 *the 1994 federal ban on assault weapons and large capacity magazines found that attacks with*

22 *semiautomatics including assault weapons and other semiautomatics equipped with large capacity*

23 *magazines result in more shots fired, more persons hit, and more wounds inflicted per victim than do*

24 *attacks with other firearms.*

25

Supervisors Cohen, Chiu, Campos, Yee, Mar, Breed
**BOARD OF SUPERVISORS**
Addend.000090

1          (13)  Since January 1, 2000, California Penal Code §§ 32310 et seq., have, with limited

2  exceptions, prohibited the manufacture, importation into the state, keeping for sale, offering or

3  exposing for sale, giving, or lending of large capacity magazines. California law does not, however,

4  prohibit the possession of these magazines, and this gap in the law threatens public safety.

5         (b)  **Definition.**  "Large capacity magazine" means any detachable ammunition feeding device

6  with the capacity to accept more than 10 rounds, but shall not be construed to include any of the

7  following:

8              (1)  A feeding device that has been permanently altered so that it cannot accommodate

9  more than 10 rounds;

10            (2)  A .22 caliber tube ammunition feeding device; or

11            (3)  A tubular magazine that is contained in a lever-action firearm.

12       (c)  **Prohibition on Possession of Large Capacity Magazines.**

13            (1)  No person, corporation, or other entity in the City may possess a large capacity

14  magazine, whether assembled or disassembled.

15            (2)  Any person who, prior to the effective date of this chapter, was legally in possession

16  of a large capacity magazine shall have 90 days from such effective date to do any of the following

17  without being subject to prosecution:

18                 (A)  Remove the large capacity magazine from the City;

19                 (B)  Surrender the large capacity magazine to the Police Department for

20  destruction; or

21                 (C)  Sell or transfer the large capacity magazine lawfully in accordance with

22  Penal Code § 12020.

23       (d)  **Exceptions.**  Subsection (c) shall not apply to the following:

24

25

Supervisors Cohen, Chiu, Campos, Yee, Mar, Breed
**BOARD OF SUPERVISORS**

Addend.000091

1          (1)  *Any government officer, agent, or employee, member of the armed forces of the*

2    *United States, or peace officer, to the extent that such person is otherwise authorized to possess a large*

3    *capacity magazine in connection with his or her official duties;*

4          (2)  *A person licensed pursuant to Penal Code §§ 26700 to 26915, inclusive;*

5          (3)  *A gunsmith for the purposes of maintenance, repair or modification of the large*

6    *capacity magazine;*

7          (4)  *Any entity that operates an armored vehicle business pursuant to the laws of the*

8    *state, and an authorized employee of such entity, while in the course and scope of his or her*

9    *employment for purposes that pertain to the entity's armored vehicle business;*

10         (5)  *Any person, corporation or other entity that manufactures the large capacity*

11   *magazine for a person mentioned in subsection (a) or for export pursuant to applicable federal*

12   *regulations;*

13         (6)  *Any person using the large capacity magazine solely as a prop for a motion picture,*

14   *television, or video production, or entertainment event;*

15         (7)  *Any holder of a special weapons permit issued pursuant to Penal Code § 33300,*

16   *32650, 32700, 31000, or 18900;*

17         (8)  *Any person issued a permit pursuant to Penal Code § 32315 by the California*

18   *Department of Justice upon a showing of good cause for the possession, transportation, or sale of large*

19   *capacity magazines between a person licensed pursuant to Penal Code §§ 26700 to 26915 and an out-*

20   *of-state client, when those activities are in accordance with the terms and conditions of that permit;*

21         (9)  *Any federal, state or local historical society, museum, or institutional collection*

22   *which is open to the public, provided that the large capacity magazine is properly housed, secured from*

23   *unauthorized handling, and unloaded;*

24         (10)  *Any person who finds the large capacity magazine, if the person is not prohibited*

25   *from possessing firearms or ammunition pursuant to federal or state law, and the person possesses the*

1   large capacity magazine no longer than is necessary to deliver or transport the same to a law

2   enforcement agency for that agency's disposition according to law;

3        (11)  A forensic laboratory or any authorized agent or employee thereof in the course

4   and scope of his or her authorized activities;

5        (12)  Any person in the business of selling or transferring large capacity magazines in

6   accordance with Penal Code § 12020, who is in possession of a large capacity magazine solely for the

7   purpose of doing so; or

8        (13)  Any person lawfully in possession of a firearm that the person obtained prior to

9   January 1, 2000 if no magazine that holds 10 or less rounds of ammunition is compatible with that

10  firearm and the person possesses the large capacity magazine solely for use with that firearm.

11       (e)  **Penalty.**  Any person violating this chapter is guilty of a misdemeanor.

12       (f)  **Severability.**  If any subsection, sentence, clause, phrase, or word of this Section be for any

13  reason declared unconstitutional or invalid or ineffective by any court of competent jurisdiction, such

14  decision shall not affect the validity or the effectiveness of the remaining portions of this Section or any

15  part thereof.  The Board of Supervisors hereby declares that it would have adopted this Section

16  notwithstanding the unconstitutionality, invalidity, or ineffectiveness of any one or more of its

17  subsections, sentences, clauses, phrases, or words.

18       (g)  **No duplication of state law.**  In the event that the State of California enacts legislation

19  prohibiting possession of large capacity magazines, this Section 618 shall have no force or effect to the

20  extent that it duplicates any such state law.

21

22       Section 2.  The San Francisco Police Code is hereby amended by amending

23  Section 613.10, to read as follows:

24  **SEC. 613.10.  LICENSE—CONDITIONS.**

25       * * * *

Supervisors Cohen, Chiu, Campos, Yee, Mar, Breed
**BOARD OF SUPERVISORS**

1    *(n)  At or prior to the time of delivering a firearm, licensees shall provide the person buying,*

2    *leasing, or receiving the loan of the firearm with a copy of a notice, to be prepared by the Chief of*

3    *Police, advising the reader of local firearms laws, including safe gun storage requirements and the*

4    *requirement to report a lost or stolen firearm.  The notice may also include summary information on*

5    *relevant State firearms laws, including the requirement that the sale, loan or other transfer of a firearm*

6    *to a non-licensed person be completed through a licensed firearms dealer.*

7

8            Section 3.  The San Francisco Police Code is hereby amended by amending

9    Section 616, to read as follows:

10   **SEC. 616.  REPORTING THE LOSS OR THEFT OF FIREARMS.**

11           (a)  Any person that owns or is otherwise in possession of a firearm shall report the

12   theft or loss of such firearm to the San Francisco Police Department within 48 hours of

13   becoming aware of the theft or loss whenever

14                   (1)  the owner resides in San Francisco, or

15                   (2)  the theft or loss of the firearm occurs in San Francisco.

16           (b)  The failure of an owner or person in possession of a firearm to report the theft or

17   loss of the firearms within 48 hours of when the owner or person in possession becomes

18   aware or should have become aware of the theft or loss shall be punishable in accordance

19   with Section 613.19.

20           *(c)  The failure of an owner or person in possession of a firearm to report the theft or loss of the*

21   *firearms in a timely manner shall create a rebuttable presumption that the owner or person remains in*

22   *possession of the firearm.*

23

24   /   /   /

25   /   /   /

Supervisors Cohen, Chiu, Campos, Yee, Mar, Breed
**BOARD OF SUPERVISORS**

10/10/2013

Addend.000094

1    Section 4.  The San Francisco Police Code is hereby amended by amending

2    Section 615, to read as follows:

3    **SEC. 615. RECORDS OF AMMUNITION SALES.**

4        (a) **Definitions.**

5            (1) "Firearm ammunition," as used in this Section, shall include any ammunition

6    for use in any pistol or revolver, or semiautomatic rifle or assault weapon, but shall not include

7    ammunition for shotguns that contains shot that is No. 4 or smaller.

8            (2) "Semiautomatic rifle," as used in this Section, shall mean any repeating rifle

9    which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and

10   chamber the next round, and which requires a separate pull of the trigger to fire each

11   cartridge.

12           (3) "Assault weapon," as used in this Section, shall mean any of the weapons

13   designated in California Penal Code Section 12276 or 12276.1.

14           (4) "Vendor," as used in this Section, shall mean any person located in the City

15   and County of San Francisco who is engaged in the sale of firearm ammunition, including any

16   retail firearms dealer.

17           (5) "Remote Vendor," as used in this Section, shall mean any person engaged

18   in the sale of firearm ammunition, including any retail firearms dealer, who is located outside

19   the City and County of San Francisco but delivers or causes to be delivered firearm

20   ammunition to an address within the City and County of San Francisco.

21       (b) No Vendor shall sell or otherwise transfer ownership of any firearm ammunition

22   without at the time of purchase recording the following information on a form to be prescribed

23   by the Chief of Police:

24           (1) the name of the Vendor (including the name of the specific individual)

25   transferring ownership to the transferee;

(2) the place where the transfer occurred;

(3) the date and time of the transfer;

(4) the name, address and date of birth of the transferee;

(5) the transferee's driver's license number, or other identification number, and the state in which it was issued;

(6) the brand, type and amount of ammunition transferred; and

(7) the transferee's signature *and thumbprint*.

~~Within 24 hours of the commencement of the transaction, regardless of when the firearm ammunition is delivered, the Vendor shall report the transaction to the Chief of Police by electronic mail at _____ or by such other means specified by the Chief of Police. The report shall contain the same information required above.~~

(c)      ~~*(1) The records required by this Section shall be maintained on the premises of the vendor for a period of not less than two years from the date of the recorded transfer. Said records shall be subject to inspection at any time during normal business hours.*~~

~~*(2) Any vendor or remote vendor*~~ *Any* Vendor or *Remote Vendor* who sells or otherwise transfers ownership of five hundred (500) or more rounds of any firearm ammunition to a transferee in a single transaction, where the transaction occurs within the City and County of San Francisco or the firearm ammunition is ordered for delivery to an address within the City and County of San Francisco, shall be subject to the reporting requirement of this subsection *(c)* ~~*(c)(2)*~~. Within 24 hours of the commencement of the transaction, regardless of when the firearm ammunition is delivered, the Vendor or ~~Vendor or~~ Remote Vendor shall report the transaction to the Chief of Police by electronic mail at _____ or by such other means specified by the Chief of Police. The report shall contain the same information required under subsection (b). In determining the number of rounds sold or otherwise transferred for purposes of complying with this subsection *(c)* ~~*(c)(2)*~~,

1    the <u>Vendor or</u> <u>*Remote Vendor*</u> ~~vendor or remote vendor~~ shall include any combination of types,

2    brands or calibers sold or transferred to the transferee.

3            (d)  No Vendor shall knowingly make a false entry in, or fail to make a required entry in,

4    ~~or fail to maintain in the required manner~~ records prepared in accordance with <u>*subsection (b)*</u>

5    ~~subsections (b) and (c)(1)~~.  ~~No vendor shall refuse to permit a Police Department employee to examine~~

6    ~~any record prepared in accordance with this Section during any inspection conducted pursuant to this~~

7    ~~Section.~~  No Vendor or Remote Vendor shall fail to submit the report required under

8    <u>subsection (c)</u> ~~subsections (b) or (c)~~ <u>*in a timely manner*</u> ~~subsection (c)(2)~~, or knowingly include

9    false information in such report.  <u>*A Vendor must maintain the records required under subsection (b)*</u>

10   <u>*on the premises for a period of not less than two years from the date of the recorded transfer.  Said*</u>

11   <u>*records shall be subject to inspection by the Police Department at any time during normal business*</u>

12   <u>*hours.*</u>

13           (e)  **Penalties.**

14                   (1)  **First Conviction.**  Any person violating any provision of this Section shall

15   be guilty of an infraction.  Upon conviction of the infraction, the violator shall be punished by a

16   fine of not less than $50 nor more than $100.

17                   (2)  **Subsequent Convictions.**  In any accusatory pleading charging a violation

18   of this Section, if the defendant has been previously convicted of a violation of this Section,

19   each such previous violation and conviction shall be charged in the accusatory pleading.  Any

20   person violating any provision of this Section a second time within a 90-day period shall be

21   guilty of a misdemeanor and shall be punished by a fine of not less than $300 and not more

22   than $400 for each provision violated, or by imprisonment in the County Jail for a period of not

23   more than six months, or by both such fine and imprisonment.  Any person violating any

24   provision of this Section, a third time, and each subsequent time, within a 30-day period shall

25   be guilty of a misdemeanor and shall be punished by a fine of not less than $400 and not

1 | more than $500 for each provision violated, or by imprisonment in the County Jail for a period
2 | of not more than six months, or by both such fine and imprisonment.

3 | (f) **Severability.** If any subsection, sentence, clause, phrase, or word of this Section
4 | be for any reason declared unconstitutional or invalid or ineffective by any court of competent
5 | jurisdiction, such decision shall not affect the validity or the effectiveness of the remaining
6 | portions of this Section or any part thereof. The Board of Supervisors hereby declares that it
7 | would have adopted this Section notwithstanding the unconstitutionality, invalidity, or
8 | ineffectiveness of any one or more of its subsections, sentences, clauses, phrases, or words.
9 |

10 | Section 5. The San Francisco Police Code is hereby amended by amending
11 | Section 1040, to read as follows:

12 | **SEC. 1040. FIREARMS REGULATED_; _MINORS PROHIBITED_.**

13 | _(a)_ It shall be unlawful for any person, firm, corporation, club or association,
14 | maintaining or conducting any shooting gallery or range to use or permit to be used or
15 | discharged therein any firearms of greater than 22 caliber, unless the cartridges used in such
16 | firearms be loaded with reduced charges.

17 | _(b) It shall be unlawful for any person, firm, corporation, club or association, maintaining or_
18 | _conducting any shooting gallery or range to permit any person under the age of 18 to enter the_
19 | _premises that are the subject of the permit unless accompanied by a parent or guardian._
20 |

21 | Section 6. Effective Date. This ordinance shall become effective 30 days after
22 | enactment. Enactment occurs when the Mayor signs the ordinance, the Mayor returns the
23 | ordinance unsigned or does not sign the ordinance within ten days of receiving it, or the Board
24 | of Supervisors overrides the Mayor's veto of the ordinance.
25 |

Supervisors Cohen, Chiu, Campos, Yee, Mar, Breed
**BOARD OF SUPERVISORS**

Addend.000098

1    Section 7. Scope of Ordinance. In enacting this ordinance, the Board of Supervisors

2    intends to amend only those words, phrases, paragraphs, subsections, sections, articles,

3    numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal

4    Code that are explicitly shown in this ordinance as additions, deletions, Board amendment

5    additions, and Board amendment deletions in accordance with the "Note" that appears under

6    the official title of the ordinance.

7

8

9

10    APPROVED AS TO FORM:
      DENNIS J. HERRERA, City Attorney
11

12    By: _____
13           THOMAS J. OWEN
             Deputy City Attorney
14

15

16    n:\legana\as2013\1300396\00878805.doc

17

18

19

20

21

22

23

24

25



**City and County of San Francisco**

**Tails**

**Ordinance**

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102-4689

---

**File Number:** 130585        **Date Passed:** October 29, 2013

Ordinance amending the Police Code to ban the possession of large capacity magazines for firearm ammunition; require that dealers advise persons purchasing a firearm of local firearms laws; establish a rebuttable presumption that the owner who has not reported the theft or loss of a firearm as required by law remains in possession of the firearm; modify certain requirements for ammunition sales; and prohibit the operator of a shooting range from allowing minors to enter the premises.

October 10, 2013 Neighborhood Services and Safety Committee - AMENDED, AN AMENDMENT OF THE WHOLE BEARING NEW TITLE

October 10, 2013 Neighborhood Services and Safety Committee - RECOMMENDED AS AMENDED

October 22, 2013 Board of Supervisors - PASSED ON FIRST READING
     Ayes: 9 - Avalos, Breed, Campos, Chiu, Cohen, Farrell, Mar, Tang and Yee
     Excused: 2 - Kim and Wiener

October 29, 2013 Board of Supervisors - FINALLY PASSED
     Ayes: 11 - Avalos, Breed, Campos, Chiu, Cohen, Farrell, Kim, Mar, Tang, Wiener and Yee

File No. 130585

**I hereby certify that the foregoing Ordinance was FINALLY PASSED on 10/29/2013 by the Board of Supervisors of the City and County of San Francisco.**

**Angela Calvillo**
**Clerk of the Board**

_____
Mayor

_____ 11/8/13
Date Approved

---

Addend.000100

Sunnyvale Municipal Code

Up        Previous        Next        Main                    Search        Print        No Frames

Title 1. GENERAL PROVISIONS
Chapter 1.04. GENERAL PENALTY

## 1.04.010. Violation—Misdemeanor or infraction.

(a)    It is unlawful for any person to violate any provision or fail to comply with any requirement of this code or any requirements or conditions validly imposed upon such person under the authority of this code. Any person violating any of the provisions of this code, failing to comply with any of the mandatory requirements of this code, or failing to comply with any requirements or conditions validly imposed under authority of this code is guilty of a misdemeanor unless such action or inaction shall be designated and declared to be an infraction. Each person is guilty of a separate offense for each and every day during any portion of which any violation of any provision of this code or any requirement or condition validly imposed upon such person under authority of this code is committed, continued or permitted by such person and shall be punishable accordingly.

(b)    Violations of the following provisions are infractions:

(1)    Title 5: Chapters 5.16, 5.24, 5.26, 5.28, 5.32, and 5.38;

(2)    Title 6: Entire title except Sections 6.08.100 through 6.08.130 and Section 6.16.060;

(3)    Title 8;

(4)    Title 9: Chapter 9.24, except Section 9.24.180; Chapters 9.26, 9.28, 9.42, 9.52, 9.54, 9.60, 9.62, 9.64, 9.66, and 9.84;

(5)    Title 10: Chapters 10.08 through 10.60, with the exception of sections set forth in subsection (c) herein;

(6)    Title 13: Chapter 13.16;

(7)    Title 16, except Chapters 16.52, 16.53 and 16.54;

(8)    Title 18: Section 18.20.080;

(9)    Title 19: Entire title except Chapters 19.67 and 19.69.

(c)    Violations of the following sections shall not be deemed infractions, but rather shall be subject to civil penalties in accordance with a schedule of penalties established by the city, and procedures as set forth in Vehicle Code Section 40203.5 and following, or as the same shall be later amended: Sections 9.24.180, 10.16.020, 10.16.040, 10.16.050, 10.16.060, 10.16.080, 10.16.090, 10.16.110, 10.16.120, 10.16.140, 10.16.150, 10.16.160, 10.16.170, 10.24.010, 10.24.015, 10.24.020, 10.24.030, 10.36.040(b), 10.36.050, 10.36.060, 10.36.065, 10.36.070, and 10.36.090.

(d)    Notwithstanding the above, a violation shall be deemed an infraction if it is deemed an infraction by any other provision of this code; if a citation is issued specifying that the violation is an infraction; if the city attorney files a complaint in the Superior Court specifying that the offense is an infraction; or if the city attorney makes a motion to reduce a misdemeanor charge to an infraction prior to trial on the matter. (Ord. 2998-13 § 1; Ord. 2976-12 § 3; Ord. 2478-94 § 2; Ord. 2477-94 § 3; Ord. 2438-93 § 1; Ord. 2422-92 § 1).

Sunnyvale Municipal Code

Up       Previous       Next       Main              Search       Print       No Frames

Title 9. PUBLIC PEACE, SAFETY OR WELFARE
  Chapter 9.44. FIREARMS

## 9.44.050. Possession of large-capacity ammunition magazines prohibited.

(a)    No person may possess a large-capacity magazine in the city of Sunnyvale whether assembled or disassembled. For purposes of this section, "large-capacity magazine" means any detachable ammunition feeding device with the capacity to accept more than ten (10) rounds, but shall not be construed to include any of the following:

(1)    A feeding device that has been permanently altered so that it cannot accommodate more than ten (10) rounds; or

(2)    A .22 caliber tubular ammunition feeding device; or

(3)    A tubular magazine that is contained in a lever-action firearm.

(b)    Any person who, prior to the effective date of this section, was legally in possession of a large-capacity magazine shall have ninety (90) days from such effective date to do either of the following without being subject to prosecution:

(1)    Remove the large-capacity magazine from the city of Sunnyvale; or

(2)    Surrender the large-capacity magazine to the Sunnyvale Department of Public Safety for destruction; or

(3)    Lawfully sell or transfer the large-capacity magazine in accordance with Penal Code Section 12020.

(c)    This section shall not apply to the following:

(1)    Any federal, state, county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties;

(2)    Any government officer, agent, or employee, member of the armed forces of the United States, or peace officer, to the extent that such person is otherwise authorized to possess a large-capacity magazine and does so while acting within the course and scope of his or her duties;

(3)    A forensic laboratory or any authorized agent or employee thereof in the course and scope of his or her duties;

(4)    Any entity that operates an armored vehicle business pursuant to the laws of the state, and an authorized employee of such entity, while in the course and scope of his or her employment for purposes that pertain to the entity's armored vehicle business;

(5)    Any person who has been issued a license or permit by the California Department of Justice pursuant to Penal Code Sections 18900, 26500-26915, 31000, 32315, 32650, 32700-32720, or 33300, when the posses-

sion of a large-capacity magazine is in accordance with that license or permit;

(6)    A licensed gunsmith for purposes of maintenance, repair or modification of the large-capacity magazine;        (7)        Any person who finds a large-capacity magazine, if the person is not prohibited from possessing firearms or ammunition pursuant to federal or state law, and the per- son possesses the large-capacity magazine no longer than is reasonably necessary to deliver or transport the same to a law enforcement agency;

(8)    Any person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds fewer than 10 rounds of ammunition is compatible with the firearm and the person possesses the large-capacity magazine solely for use with that firearm.

(9)    Any retired peace officer holding a valid, current Carry Concealed Weapons (CCW) permit issued

pursuant to California Penal Code. (Ord. 3027-13 § 1).

## PROPOSED ORDINANCE TO AMEND
## THE CITY OF SUNNYVALE MUNICIPAL CODE
## ESTABLISHING GUN SAFETY REGULATIONS

The City Council of the City of Sunnyvale, on its own motion, submits to the electors the following proposed ordinance to amend the Municipal Code of the City of Sunnyvale. The City Council has called a Special Municipal Election to be held on Tuesday, November 5, 2013, for the purpose of voting on the proposed amendments.

The proposed ordinance to amend the Municipal Code of the City of Sunnyvale follows the statement of the measure; it is set out in full.

### CITY OF SUNNYVALE MEASURE  _C_

Shall the City of Sunnyvale adopt a gun safety ordinance to require: 1) reporting to police, within 48 hours, known loss or theft of a firearm; 2) storing firearms in residences in a locked container or disabling them with a trigger lock when not in the owner's immediate possession; 3) prohibiting the possession of ammunition magazines capable of holding more than 10 rounds, with certain exceptions; and 4) logging and tracking of ammunition sales within the City of Sunnyvale?

Yes        _____
No         _____

If Measure  _C_  carries, an ordinance amending the Municipal Code of the City of Sunnyvale shall be adopted, adding new Sections 9.44.030, 9.44.040, 9.44.050, 9.44.060 to Chapter 9.44, entitled "Firearms," which reads as follows:

AN ORDINANCE AMENDING CHAPTER 9.44 (FIREARMS) OF THE SUNNYVALE
MUNICIPAL CODE TO ADD GUN SAFETY MEASURES

WHEREAS, the People of the City of Sunnyvale find that the violence and harm caused by and resulting from both the intentional and accidental misuse of guns constitutes a clear and present danger to the populace, and find that sensible gun safety measures provide some relief from that danger and are of benefit to the entire community; and

WHEREAS, the People of the City of Sunnyvale find that laws that provide for safe storage of guns in homes, that require a gun owner to report a stolen or lost gun, that prohibit the possession of ammunition magazines capable of holding more than ten rounds unless circumstances warrant such possession, and that require record-keeping relating to the sale of ammunition constitute sensible gun safety regulations because they are not unduly burdensome for gun owners, they aid law enforcement officers in their duties, and they offer some protection to all members of the community.

NOW THEREFORE, THE PEOPLE OF THE CITY OF SUNNYVALE DO ORDAIN AS FOLLOWS:

1

SECTION 1. SMC§§9.44.030, 9.44.040, 9.44.050, 9.44.060. ADDED.

Sunnyvale Municipal Code Title IX (Public Peace, Safety or Welfare), Chapter 9.44 (Firearms), is amended to add four new Sections to read as follows:

### 9.44.030.    Duty to report theft or loss of firearms.

Any person who owns or possesses a firearm (as defined in Penal Code Section 16520 or as amended) shall report the theft or loss of the firearm to the Sunnyvale Department of Public Safety within forty-eight (48) hours of the time he or she knew or reasonably should have known that the firearm had been stolen or lost, whenever: (1) the person resides in the City of Sunnyvale; or (2) the theft or loss of the firearm occurs in the City of Sunnyvale.

### 9.44.040.    Safe storage of firearms.

Except when carried on his or her person, or in his or her immediate control and possession, no person shall keep a firearm (as defined in Penal Code Section 16520 or as amended) in any residence owned or controlled by that person unless the firearm is stored in a locked container, or the firearm is disabled with a trigger lock that is listed on the California Department of Justice's list of approved firearms safety devices.

### 9.44.050.    Possession of large-capacity ammunition magazines prohibited.

(a) No person may possess a large-capacity magazine in the City of Sunnyvale whether assembled or disassembled. For purposes of this section, "large-capacity magazine" means any detachable ammunition feeding device with the capacity to accept more than ten (10) rounds, but shall not be construed to include any of the following:

(1) A feeding device that has been permanently altered so that it cannot accommodate more than ten (10) rounds; or
(2) A .22 caliber tubular ammunition feeding device; or
(3) A tubular magazine that is contained in a lever-action firearm.

(b) Any person who, prior to the effective date of this section, was legally in possession of a large-capacity magazine shall have ninety (90) days from such effective date to do either of the following without being subject to prosecution:

(1) Remove the large-capacity magazine from the City of Sunnyvale; or
(2) Surrender the large-capacity magazine to the Sunnyvale Department of Public Safety for destruction; or
(3) Lawfully sell or transfer the large-capacity magazine in accordance with Penal Code Section 12020.

(c) This section shall not apply to the following:

2

(1) Any federal, state, county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties;

(2) Any government officer, agent, or employee, member of the armed forces of the United States, or peace officer, to the extent that such person is otherwise authorized to possess a large-capacity magazine and does so while acting within the course and scope of his or her duties;

(3) A forensic laboratory or any authorized agent or employee thereof in the course and scope or his or her duties;

(4) Any entity that operates an armored vehicle business pursuant to the laws of the state, and an authorized employee of such entity, while in the course and scope of his or her employment for purposes that pertain to the entity's armored vehicle business;

(5) Any person who has been issued a license or permit by the California Department of Justice pursuant to Penal Code Sections 18900, 26500-26915, 31000, 32315, 32650, 32700-32720, or 33300, when the possession of a large capacity magazine is in accordance with that license or permit;

(6) A licensed gunsmith for purposes of maintenance, repair or modification of the large capacity magazine;

(7) Any person who finds a large capacity magazine, if the person is not prohibited from possessing firearms or ammunition pursuant to federal or state law, and the person possesses the large capacity magazine no longer than is reasonably necessary to deliver or transport the same to a law enforcement agency;

(8) Any person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds fewer than 10 rounds of ammunition is compatible with the firearm and the person possesses the large capacity magazine solely for use with that firearm.

(9) Any retired peace officer holding a valid, current Carry Concealed Weapons (CCW) permit issued pursuant to the California Penal Code.

**9.44.060.      Ammunition Sales.**

(a) It is unlawful for any person to engage in the business of selling, leasing, or otherwise transferring firearm ammunition within the City of Sunnyvale except in compliance with this code.

(b) Definitions:

(1) "Ammunition" means any cartridge or encasement containing a bullet or projectile, propellant, or explosive charge, and a primer which is used in the operation of a firearm.

(2) "Ammunition vendor" means any person engaged in the business of selling, leasing, or otherwise transferring firearm ammunition.

(3) "Person" means a natural person, association, partnership, firm, corporation, or other entity.

(c) Every ammunition vendor shall maintain an ammunition sales log which records all ammunition sales made by the vendor. The transferee shall provide, and the ammunition vendor shall record on the ammunition sales log, at the time of sale, all of the following information for each sale of firearms ammunition:

(1) The name, address, and date of birth of the transferee;

(2) The date of the sale;

3

(3)  The transferee's driver's license number, state identification card number, passport number, or other valid government-issued photographic identification;

(4)  The brand, type, and quantity of firearms ammunition transferred;

(5)  The identity of the person transferring the firearms ammunition on behalf of the ammunition vendor;

(6)  The transferee's signature and right thumbprint.

(d)  The ammunition sales log shall be recorded on a form approved by the Director of Public Safety. All ammunition sales logs shall be kept at the location of the firearms ammunition sale for a period of not less than two years from the date of the sale. Ammunition sales logs shall be open to reasonable inspection by peace officers at all times the ammunition vendor is regularly open for business.

(e)  No person shall knowingly provide false, inaccurate, or incomplete information to an ammunition vendor for the purpose of purchasing firearms ammunition. No ammunition vendor shall knowingly make a false, inaccurate, or incomplete entry in any ammunition sales log, nor shall any ammunition vendor refuse any reasonable inspection of an ammunition sales log subject to inspection.

SECTION 2.  SEVERABILITY.

If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason held by a court of competent jurisdiction to be invalid, such a decision shall not affect the validity of the remaining portions of this Ordinance.  The People of the City of Sunnyvale hereby declare that they would have passed this Ordinance and each section or subsection, sentence, clause and phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared invalid.