# 14-15408

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

⟫ ⟪

LEONARD FYOCK; SCOTT HOCHSTETLER; WILLIAM DOUGLAS;
DAVID PEARSON; BRAD SEIFERS; ROD SWANSON,

*Plaintiffs-Appellants,*

*v.*

CITY OF SUNNYVALE; THE MAYOR OF SUNNYVALE; ANTHONY SPITALERI,
in his official capacity; THE CHIEF OF THE SUNNYVALE DEPARTMENT
OF PUBLIC SAFETY; FRANK GRGURINA, in his official capacity,

*Defendants-Appellees.*

_____

*Appeal From the United States District Court
for the Northern District of California, San Jose
Case No. 5:13-cv-05807-RMW, Ronald M. Whyte, Senior District Judge*

## *AMICI CURIAE* BRIEF FOR THE CENTER FOR CONSTITUTIONAL JURISPRUDENCE AND GUN OWNERS OF CALIFORNIA IN SUPPORT OF PLAINTIFFS-APPELLANTS AND SUPPORTING REVERSAL

David B. Kopel
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, Colorado 80203
Telephone:   303-279-6536
Facsimile:   303-279-4176

John Parker Sweeney
T. Sky Woodward
BRADLEY ARANT BOULT CUMMINGS, LLP
1615 L Street NW, Suite 1350
Washington, D.C. 20036
Telephone:   202-393-7150
Facsimile:   202-347-1684

*Attorneys for Amici Curiae
The Center for Constitutional Jurisprudence and Gun Owners of California*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *Amicus* the Center for Constitutional Jurisprudence states that it is not a publically held corporation, does not issue stock, and does not have a parent corporation.

Pursuant to Fed. R. App. P. 26.1, *Amicus* Gun Owners of California states that it is not a publically held corporation, does not issue stock, and does not have a parent corporation.

## Table of Contents

CORPORATE DISCLOSURE STATEMENT ........................................ i

INTERESTS OF *AMICI CURIAE* ............................................1

SUMMARY OF ARGUMENT ....................................................3

ARGUMENT ...............................................................3

    I.    MAGAZINES WITH A CAPACITY OF MORE THAN TEN ROUNDS OF AMMUNITION HAVE BEEN MANUFACTURED AND SOLD FOR CENTURIES. ...........................................................3

        A.    Firearms Capable of Firing Multiple Shots Without Reloading Originated over Four Hundred Years Ago. ...............5

        B.    The Nineteenth Century Brought Significant Advances in Multi-shot Technology. ...........................................7

        C.    Manufacturers in the Twentieth Century Continued the Trend of Increasing Ammunition Capacity and Reliability for Civilian Firearms. ...........................................12

    II.    SUNNYVALE'S DRACONIAN RESTRICTION ON MAGAZINE CAPACITY HAS NO HISTORICAL BASIS. ..........................................18

    III.    MAGAZINES WITH A CAPACITY OF MORE THAN TEN ROUNDS ARE COMMONLY POSSESSED FOR LAWFUL PURPOSES. ...............................24

CONCLUSION ............................................................29

## Table of Authorities

## Cases

*A. Uberti and C. v. Leonardo*,
   892 P.2d 1354 (Ariz. 1995) ...................................................................18

*Citizens for a Safer Community v. City of Rochester*,
   627 N.Y.S.2d 193 (N.Y. Sup. 1994) .....................................................18

*Colorado Outfitters Association, et al. v. John W. Hickenlooper*,
   No. 1:13-cv-01300, Dkt. 119 (D. Co. Jan. 31, 2014)...........................25

*Couplin v. State*,
   378 A.2d 197 (Md. App. 1977) .............................................................18

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ..................................................................... 4, 5, 6

*Fyock,et al. v. The City of Sunnyvale, et al.*,
   Case No. C-13-5807, 2014 U.S. Dist. LEXIS 29722 (N.D. Cal. March 5, 2014) 3,
   24, 25

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ............................... 19, 24

*Jackson v. City and County of San Francisco*,
   No. 12-17803 (9th Cir. March 25, 2014) ..............................................20

*Kerr v. Hickenlooper*,
   744 F.3d 1156 (10th Cir. 2014) ...............................................................4

*Kirkland v. District of Columbia*,
   70 F.3d 629 (D.C. Cir. 1995) ...............................................................10

*McDonald v. City of Chicago*,
   130 S. Ct. 3020 (2010) .............................................................................1

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
   No. 13-CV-291S,
   2013 U.S. Dist. LEXIS 182307 (December 31, 2013).........................25

*Peruta v. County of San Diego*,
   742 F.3d 1144 (9th Cir. 2014) ........................................................ 4, 23

*Potter v. United States*
   167 Ct. Cl. 28 (Ct. Cl. 1964) ................................................................14

*Shew v. Malloy*,
  No. 3:13CV739(AVC),
  2014 U.S. Dist. LEXIS 11339 (January 30, 2014)...................................... 24, 25

*Sturm, Ruger & Co. Inc. v. Arcadia Mach. & Tool Inc*.,
  1988 WL 391514 (C.D. Cal. 1988) ....................................................................18

*Turner Broadcasting System, Inc. v. FCC*,
  520 U.S. 180 (1997) ............................................................................................23

*United States v. Fisher*,
  353 F.2d 396 (5th Cir. 1965) ..............................................................................14

*United States v. Olson*,
  1995 WL 746177 (9th Cir. Dec. 15, 1995) .........................................................14

*United States v. Precise Import Corp.*,
  458 F.2d 1376 (Cust. & Pat. App., 1972)............................................................14

## Statutes

Cal. Penal Code § 32310(a) .....................................................................................22

Col. Rev. Stat. § 18-12-302(2)(a) ............................................................................23

Conn. Gen. Stat. § 53-202w(e)(5)............................................................................23

D.C. Code § 7-2501.01(10)(B) (2008) ....................................................................21

Haw. Rev. Stat. § 134-8(c).......................................................................................22

M.C.L. § 750.224 .....................................................................................................20

Mass. Gen. Laws 140 §§ 121, 131...........................................................................23

Md. Code Ann. Crim. L. § 4-305.............................................................................22

N.J. Stat. § 2C:39-1y ...............................................................................................22

N.J. Stat. § 2C:39-3(j)..............................................................................................22

N.Y. Penal L. § 265.00(23).......................................................................................22

Ohio Rev. Code Ann. 2923.11(E).............................................................................23

R.I. Acts 1927, ch. 1052 § 1 ....................................................................................19

## Other Authorities

"M1A," Wikipedia, http://en.wikipedia.org/wiki/ M1A_rifle (year of introduction)
  ...............................................................................................................................16

1989 R.I. ALS 542, § 7 .............................................................................................20

2014 STANDARD CATALOG OF FIREARMS
(Jerry Lee ed. 2013).................................................................. passim

Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650...................................20

BILL WEST, SAVAGE AND STEVENS ARMS
11 (1971)..................................................................................14

BROWNELL INDUSTRIES INC. THE GUNSMITH MART NO. 2
1949 (reprinting article from *Hunting & Fishing*, Oct. 1948) ............................13

Clayton E. Cramer & Joseph Olson,
*Pistols, Crime, and Public Safety in Early America*,
44 WILLAMETTE L. REV. 699 (2008) ....................................................6

DWIGHT B. DEMERITT, JR., MAINE MADE GUNS & THEIR MAKERS
(rev. ed.) (Friends of the Maine State Museum, 1997) ........................................11

Gary Kleck & Marc Gertz,
*Armed Resistance to Crime:*
*The Prevalence and Nature of Self-Defense with a Gun*,
86 J. CRIM. L. & CRIMINOLOGY 150 (1995) ........................................................26

Girandoni Air Rifle,
http://en.wikipedia.org/wiki/Girandoni_Air_Rifle.................................................7

GUN DIGEST 1965,
19TH ANNIVERSARY DELUXE EDITION  (John T. Amber ed. 1964) .....................17

GUN DIGEST 1980
(1979).................................................................................. 17, 18

GUN DIGEST 22ND ANNIVERSARY 1968 DELUXE EDITION,
(John T. Amber ed. 1967)..................................................................15

GUN DIGEST 24TH ANNIVERSARY 1970 DELUXE EDITION
(John T. Amber ed. 1969)..................................................................16

H.B. Young, *The CETME—Military to Sporter*, GUNS
(Nov. 1967)..................................................................................15

HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST
(1952)..........................................................................................9

JACK DUNLAP, AMERICAN, BRITISH AND CONTINENTAL PEPPERBOX FIREARMS
(1964)..........................................................................................8

JAY KIMMEL, SAVAGE AND STEVENS ARMS
(5th ed. 1990)................................................................................14

JEAN-NOËL MOURET, PISTOLS AND REVOLVERS
(1993)....................................................................................................12

JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION
(2012)......................................................................................................7

JIM PERKINS, AMERICAN BOYS' RIFLES
(1976)....................................................................................................13

JIM SUPICA, DOUG WICKLUND & PHILIP SCHREIER,
TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM (2013) ................ passim

JOHN PLASTER, THE HISTORY OF SNIPING & SHARPSHOOTING
(2008)......................................................................................................7

JOHN W. BREATHED, JR. & JOSEPH J. SCHROEDER, JR.,
SYSTEM MAUSER, A PICTORIAL HISTORY OF THE MODEL 1896 SELF-LOADING
PISTOL 216-17 (1967) ............................................................................17

LARRY L. RUTH, WAR BABY COMES HOME: THE U.S. CALIBER .30 CARBINE (1993)
.............................................................................................................15

LEWIS WINANT, FIREARMS CURIOSA  (2009)(1st pub. 1954).....................................6

LEWIS WINANT, PEPPERBOX FIREARMS
(2001)(1st pub. 1952) ...............................................................................8

LOUIS A. GARAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST
(1985)....................................................................................................10

Matt Carroll, *Snapshot: Gun Licenses Per 1,000,
2012*, BOSTON GLOBE, Jan. 24, 2013,
http://www.boston.com/yourtown/specials/snapshot/massachusetts_snapshot_gu
n_licenses
2012 .....................................................................................................23

NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS
AND THEIR VALUES
(9th ed. 2007)............................................................................... passim

NORM FLAYDERMAN, THE BOWIE KNIFE
(2004)......................................................................................................7

NSSF, *The Exciting Sport of 3-Gun Shooting*,
http://www.nssf.org/events/featurette/2012/0712.cfm............................................25

PATRICK SWEENEY, GUN DIGEST BOOK OF THE AR-15
(2005)....................................................................................................15

Pub.L. 103-322,
    Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000 ........................................21

R.L. WILSON, THE WINCHESTER: AN AMERICAN LEGEND
    (1991)........................................................................................................ 9, 10

ROY MARCOT, REMINGTON, AMERICA'S OLDEST GUN MAKER
    (1998)................................................................................................................13

STOEGER SHOOTER'S BIBLE TREASURY REPRODUCTION OF 1936 CATALOG
    (1960)................................................................................................................13

*Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun
    Markets and Gun Violence,*
    *1994-2003* (2004) ........................................................................... 21, 22

Vivian Chu, Cong. Res. Svc., *DC Gun Laws and Proposed Amendments*
    (2011)................................................................................................................21

WINANT, FIREARMS CURIOSA
    (24 shot pepperbox) .................................................................... 8, 11, 12

# INTERESTS OF *AMICI CURIAE*[1]

*Amicus* the Center for Constitutional Jurisprudence (the "Center") was established in 1999 as the public interest law arm of The Claremont Institute, a public policy think tank devoted to restoring the principles of the American founding to their rightful and preeminent authority in our national life, including the proposition that the Second Amendment protects the right of a free people to armed self defense. The Center advances this mission by representing clients or appearing as *amicus curiae* in cases of constitutional significance, including *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).

*Amicus* Gun Owners of California ("GOC"), is a California non-profit corporation that was organized in 1974. It has an office in Sacramento. GOC is a leading voice in California, supporting the right to self defense and to keep and bear arms guaranteed by the Second Amendment to the United States Constitution. It monitors government activities at the national, state and local levels that may affect the rights of the American public to choose to own firearms.

All parties have consented to the filing of this brief.

---

[1] *Amici* make the following disclosures pursuant to Fed. R. App. P. 29(c)(5): Legal fees associated with the preparation of this amicus brief are being paid by Gun Owners of California and the National Rifle Association. No person or other *amicus* contributed money towards the preparation of this brief. No party or party's counsel contributed money towards the preparation of this brief. No party or party's counsel authored any portion of this brief.

*Amici* seek to advise this Court that, while the District Court correctly identified that the history of detachable magazines with a capacity of greater than ten rounds was critical to its determination of the case, it fatally misapprehended the history of such magazines. An understanding of the history of multi-shot guns will be valuable to this Court's review.

## SUMMARY OF ARGUMENT

Magazines with a capacity of more than ten rounds have been common in the United States for the last 150 years, predating the ratification of the Fourteenth Amendment. These magazines have long been produced by iconic manufacturers such as Winchester, Browning, Colt, and many others. Such magazines were not so common when the Second Amendment was being ratified, but they had been invented over 200 years previously, and guns with such magazines represented the state of the art at the time. In American history, magazine prohibition has been a rarity. Sunnyvale's prohibition of magazines of more than ten rounds has no support in American legal history. Even compared to the magazine limitations that exist today in some states, the Sunnyvale ordinance is extreme.

## ARGUMENT

### I.   MAGAZINES WITH A CAPACITY OF MORE THAN TEN ROUNDS HAVE BEEN MANUFACTURED AND SOLD FOR CENTURIES.

The District Court correctly noted that the history of magazines with a capacity greater than ten rounds is an important issue in determining whether such magazines can be banned. *Fyock, et al. v. The City of Sunnyvale, et al.*, Case No. C-13-5807, 2014 U.S. Dist. LEXIS 29722 at *10 (N.D. Cal. March 5, 2014). The District Court explicitly noted the importance of the history of magazines and of magazine prohibition. The history of regulations is an issue of central concern when considering challenges under the Second Amendment. *See District of*

3

*Columbia v. Heller*, 554 U.S. 570, 595 (2008) (using "text and history" to interpret Second Amendment); *id.* at 588-89 (same); *id.* at 623-24 (*United States v. Miller* was flawed by its "scant discussion of the history of the Second Amendment"); *id.* at 629 ("Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."); *see also Peruta v. County of San Diego*, 742 F.3d 1144, 1150 (9th Cir. 2014) ("[W]e must consult 'both text and history.'"); *Kerr v. Hickenlooper*, 744 F.3d 1156, 1178 (10th Cir. 2014) (Second Amendment analysis includes history, and "the rarity of state enactments in determining whether they are constitutionally permissible").

The District Court erred when it asserted that "magazines didn't even exist when the Second Amendment was ratified." *Id.* The District Court appears to have erroneously assumed that magazines themselves (as well as magazines of more than ten rounds) are a relatively recent technological advancement; that assumption was plain error. Like many consumer products, magazines today are better-made and even more common than ever, but they are hardly novelties of recent vintage.

Magazines of more than ten rounds are older than the United States. Box magazines pre-date the Civil War. In terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified. Handgun magazines of more than ten rounds would become popular in the 1930s.

4

### A. Firearms Capable of Firing Multiple Shots Without Reloading Originated over Four Hundred Years Ago.

When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm. The Second Amendment, of course, guarantees the right to a *functional* firearm. *See Heller*, 554 U.S. at 576, 628, 630, 635 (right to an "operable" firearm). As the Court explained, D.C. could not require that lawfully-possessed guns be kept in an inoperable status in the home, because doing so affects their utility with respect to "the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

When the defender is reloading, the defender is especially vulnerable to attack. When ammunition is low but not exhausted (e.g., two or three rounds remaining), that may be insufficient to deter or control the threat, especially if the threat is posed by more than one criminal. Accordingly, from the outset of firearms manufacturing, one constant goal has been to design firearms able to fire more rounds without reloading.

To this end, manufacturers have experimented with various designs of firearms and magazines for centuries. While not all of these experiments were successful, in terms of mass sales, they indicated where firearms development was headed. The first experiments to gain widespread commercial success in the United States came around the middle of the nineteenth century.

5

As with First Amendment technology (such as televisions or websites), the Second Amendment is not limited to the technology that existed in 1791. The *Heller* Court properly described such an asserted limit as "bordering on the frivolous."[2] But even if *Heller* had created such a rule, magazines of more than ten rounds are older than the Second Amendment.

The first known firearm that was able to fire more than ten rounds without reloading was a 16-shooter created around 1580, using "superposed" loads (each round stacked on top of the other).[3] Multishot guns continued to develop in the next two centuries, with such guns first issued to the British army in 1658.[4] One of the more successful of the early designs was the "Puckle Gun," patented in 1718. It used pre-loaded cylinders of eleven charges and fired a separate charge with each pull of the trigger, much like a modern revolver.[5]

At the time that the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a 20- or 22-shot magazine

---

[2]  *Heller*, 554 U.S. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

[3]  LEWIS WINANT, FIREARMS CURIOSA 168-70 (2009) (1st pub. 1954).

[4]  Clayton E. Cramer & Joseph Olson, *Pistols, Crime, and Public Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716-18 (2008).

[5]  *Id.* at 716-17.

capacity. Merriweather Lewis carried one on the Lewis & Clark expedition. At the time, air guns were ballistically equal to powder guns, firing large bullets at a velocity similar to powder guns. The .46 and .49 caliber Girandoni rifles had been invented around 1779 for use in European armies, and were employed by elite units. One shot could penetrate a one-inch wood plank, or take down an elk.[6]

## B.      The Nineteenth Century Brought Significant Advances in Multi-shot Technology.

Firearm technology progressed rapidly in the 1800s. Manufacturers were constantly attempting to produce reliable firearms with greater ammunition capacities for consumers. One notable step came in 1821 with the introduction of the Jennings multi-shot flintlock rifle, which, borrowing the superposed projectile design from centuries before, could fire 12 shots before reloading.[7] Around the same time, pistol technology also advanced to permit more than ten shots being fired without reloading. "Pepperbox" pistols began to be produced in the 1830s.

---

[6]      JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 91-103 (2012) ; JOHN PLASTER, THE HISTORY OF SNIPING & SHARPSHOOTING 69-70 (2008); Girandoni Air Rifle, http://en.wikipedia.org/wiki/Girandoni_Air_Rifle; JIM SUPICA, DOUG WICKLUND & PHILIP SCHREIER, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

[7]      NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 683 (9th ed. 2007). According to James S. Hutchins, Historian Emeritus at the National Museum of American History, Smithsonian Institution, Mr. Flayderman is a "revered expert in antique American arms and a vast range of other Americana for half a century." James S. Hutchins, *Foreword*, in NORM FLAYDERMAN, THE BOWIE KNIFE 7 (2004).

These pistols had multiple barrels that would fire sequentially. While the most common configurations were five or six shots, some models had 12 independently-firing barrels, and there were even models with 18 or 24. Pepperboxes were commercially successful, and it took a number of years for Samuel Colt's revolvers (also invented in the 1830s) to surpass them in the marketplace.[8]

The 1830s through the 1850s saw a number of different firearm designs intended to increase ammunition capacity. In 1838, the Bennet & Haviland Rifle was produced; it was a rifle version of the pepperbox, with 12 individual chambers that were manually rotated after each shot. This would bring a new chamber, pre-loaded with powder and shot, into the breach, ready to be fired.[9] Alexander Hall and Colonel Parry W. Porter each created rifles with capacities greater than ten in the 1850s, though they were limited in production. Hall's design had a 15-shot rotating cylinder (similar to a revolver), while Porter's design used a 38-shot canister magazine.[10]

The great breakthrough, however, began with a collaboration of Daniel Wesson (of "Smith & Wesson") and Oliver Winchester. They produced the first

---

[8]    LEWIS WINANT, PEPPERBOX FIREARMS (2001) (1st pub. 1952); SUPICA, TREASURES at 33, 250 (Marietta 18-shot model); JACK DUNLAP, AMERICAN, BRITISH AND CONTINENTAL PEPPERBOX FIREARMS 148-49, 167 (1964) (three European 18-shot models, and one 24 shot model); WINANT, FIREARMS CURIOSA at 250 (24-shot pepperbox).

[9]    FLAYDERMAN at 711.

[10]    FLAYDERMAN at 713, 716.

8

metallic cartridge—containing the gunpowder, primer, and ammunition in a metallic case, just like modern ammunition. And they invented a firearms mechanism that was well-suited to the new metallic cartridge: the lever action. Their company, the Volcanic Repeating Arms Company, introduced the lever action rifle in 1855. This rifle had up to a 30-round tubular magazine under the barrel that was operated by manipulating a lever on the bottom of the stock. The lever-action allowed a shooter to quickly expel spent cartridges and ready the firearm for additional shots.[11] An 1859 advertisement bragged that the guns could be loaded and fire 30 shots in less than a minute.[12] In 1862, the Volcanic evolved into the 15-round Henry lever action rifle.[13]

The Henry rifle further evolved into the Winchester repeating rifle, and the market for these firearms greatly expanded with the first gun produced under the Winchester name. The Winchester touted the Model 1866 for defense against "sudden attack, either from robbers or Indians."[14] According to advertising, the M1866 "can be fired thirty times a minute,"[15] or with 17 in the magazine and one

---

[11]     HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 13, 25 (1952); FLAYDERMAN at 304-06 (about 1,250 made).

[12]     WILLIAMSON at 25.

[13]     FLAYDERMAN at 304-06.

[14]     R.L. WILSON, THE WINCHESTER: AN AMERICAN LEGEND 11, 32 (1991).

[15]     WILLIAMSON at 49.

9

in the chamber, "eighteen charges, which can be fired in nine seconds."[16] The gun was a particularly big seller in the American West.[17] There were over 170,000 Model 1866s produced.[18]

Next came the Winchester M1873, "The gun that won the West." The Winchester M1873 and then the M1892 were lever actions holding 12 to 17 rounds in tubular magazines. There were over 720,000 copies of the Winchester 1873 produced, from 1873 to 1919.[19] Over a million of the M1892 were produced from 1892-1941.[20] Reproductions of all of the above Winchesters are produced today by the Italian company Uberti, which specializes in high-quality reproductions of Western firearms.[21] Another iconic rifle of the latter 19th century was the pump action Colt Lightning rifle, with a 15-round capacity.[22]

---

[16]    LOUIS A. GARAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 128-29 (1985). The Winchester Model 1866 was produced until 1898. FLAYDERMAN at 306.

[17]    WILSON at 34.

[18]    FLAYDERMAN at 306.

[19]    FLAYDERMAN at 307-09. The Model 1873 was Pa Cartwright's gun on the 1959-1973 television series *Bonanza*. SUPICA, TREASURES at 108.

[20]    FLAYDERMAN at 307-12. The Model 1892 was John Wayne's gun in many movies. SUPICA, TREASURES at 109.

[21]    2014 STANDARD CATALOG OF FIREARMS, at 1237, 1240-41 (Jerry Lee ed. 2013). This annually-published guide was relied on by *Kirkland v. District of Columbia*, 70 F.3d 629, 635 n.3 (D.C. Cir. 1995) (citing the 1995 5th edition).

[22]    The Uberti is a modern replica of the Colt Lightning, medium frame model, of which 89,000 were produced between 1887 and 1904. The original Colt held up to 15 rounds, in calibers of .32-20, .38-40, and .44-40. FLAYDERMAN at 122-23.

Manufactured in Maine, the Evans Repeating Rifle came on the market in 1873. The innovative rotary helical magazine in the buttstock held 34 rounds.[23] It was commercially successful for a while, although not at Winchester's or Colt's levels. Over 12,000 copies were produced.[24]

Meanwhile, the first handgun to use a detachable box magazine was the ten-round Jarre harmonica pistol, patented in 1862.[25] Pin-fire revolvers with capacities of up to 20 or 21 entered the market in the 1850s; they were produced for the next half century, but were significantly more popular in Europe than in America.[26] For revolvers with other firing mechanisms, there were some models with more than 17 rounds.[27] The 20-round Josselyn belt-fed chain pistol introduced in 1866, and

---

[23]   DWIGHT B. DEMERITT, JR., MAINE MADE GUNS & THEIR MAKERS 294-95 (rev. ed.) (Friends of the Maine State Museum, 1997). A later iteration of the rifle held 25 or 28 rounds in the buttstock. *Id.* at 331; FLAYDERMAN at 694. The American Society of Arms Collectors endorses the Demeritt book as "the definitive work for historians and collectors" of Maine guns. DEMERITT at vi.

[24]   FLAYDERMAN at 694; DEMERITT at 332.

[25]   WINANT, FIREARMS CURIOSA at 244-45; SUPICA, TREASURES at 33. The magazine stuck out horizontally from the side of the firing chamber, making the handgun difficult to carry in a holster, which perhaps explains why the gun never had mass success.

[26]   WINANT, FIREARMS CURIOSA at 60-61, 63, 67-71 (16-, 18-, and 20-shot European revolvers are on pages 67-71); SUPICA, TREASURES, at 48-49 (21-shot Belgian).

[27]   WINANT, FIREARMS CURIOSA 62, 64-65 (.22 cal.; 18 shots from one cylinder); 207-08 (Enouy "Ferris Wheel" revolver; 42 shots from 7 cylinders). *Cf. id.* at 250 (Beals prototype 24-shot revolver).

various other chain pistols had even greater capacity.[28] Chain pistols did not win much market share, perhaps because the large dangling chain was such an impediment to carrying the gun.

The late nineteenth century also saw the introduction of the semi-automatic pistol. Even at this early stage of development, companies were selling firearms and magazines with a capacity of more than ten rounds. For example, Mauser sold the C96 semiautomatic pistol beginning in 1896. This firearm was very successful in both the civilian and military markets. It had a fixed magazine of six, ten, or twenty rounds.[29] The Luger semi-automatic pistol was introduced a few years later, in 1899, and also was very popular. Magazines designed and sold for this pistol contained either 7, 8, or 32 rounds.[30]

### C. Manufacturers in the Twentieth Century Continued the Trend of Increasing Ammunition Capacity and Reliability for Civilian Firearms.

The twentieth century saw improvements on the designs pioneered in the 1800s, and expanding popularity for firearms with more than ten rounds.

---

[28]   WINANT, FIREARMS CURIOSA at 204-08 (Guycot 25-shot chain pistol and 100- shot chain rifle).

[29]   2014 STANDARD CATALOG OF FIREARMS at 708-09. The 20-round version was the "Cone Hammer." *Id.*

[30]   JEAN-NOËL MOURET, PISTOLS AND REVOLVERS 126-27 (1993); SUPICA, TREASURES at 86.

Since the late 1890s, the Savage Repeating Arms Company has been one of the classic American firearms manufacturers. In 1911, the company introduced their bolt action Model 1911, a 20-shot repeater with a tubular magazine in .22 Short. The rifle was popular for boys, and for shooting galleries.[31]

By the 1930s, the classic American manufacturers were producing many tubular magazine rifles in .22 caliber. These firearms are classic rifles for "plinking" (casual target shooting), especially popular for young people. Based on firearms catalogues from 1936-1971, there are over 20 such firearms models from major American manufacturers with magazines of 16-30 rounds in one or more of the calibers.[32]

---

[31]    JIM PERKINS, AMERICAN BOYS' RIFLES 1890-1945, at 191-92 (1976). Similarly, the Remington Model 12B Gallery Special was introduced in 1910, with an optional extended magazine that held 25 .22 short. ROY MARCOT, REMINGTON, AMERICA'S OLDEST GUN MAKER 149 (1998).

[32]    *Shooter's Bible 1936*: Remington Model 34 bolt action, Remington Model 121 slide action, Remington Model 341 bolt action, Stevens No. 71 slide action, Savage Model 5 bolt action, Stevens Model 76 semi auto, Stevens-Springfield Model 86 bolt action, Winchester Model 62 slide action, Winchester Model 61 slide action. STOEGER SHOOTER'S BIBLE TREASURY REPRODUCTION OF 1936 CATALOG 108-09, 112, 123, 124, 126, 127, 140 (1960).

Some additional models appearing in a 1948 hunting magazine: Stevens Model 87 bolt action, Remington 550 semi-auto, Mossberg Model 46B bolt action, Mossberg Model 46M bolt action, Winchester Model 74 semi-automatic, Marlin 39 A lever action, Marlin Model 81 DL bolt action. BROWNELL INDUSTRIES INC. THE GUNSMITH MART NO. 2 1949-1950, at 212, 214, 216, 218, 221 (reprinting article from *Hunting & Fishing*, Oct. 1948).

In 1927, the Auto Ordinance Company introduced their semi-automatic rifle that used 30-round magazines.[33] These rifles are still in production today.

The M-1 carbine was invented for the citizen solider of World War II. The M-1 carbine has been a popular rifle for civilians in America for decades. The United States government's Civilian Marksmanship Program, a program created by Congress, put nearly a quarter-million of these guns into the hands of law-abiding American citizens, starting in 1963, at steeply-discounted prices. Partly using surplus government parts, the Plainfield Machine Company, Iver Johnson, and more than a dozen other companies cumulatively manufactured over 200,000

---

The 1959 annual edition of the *Shooter's Bible* adds the semiautomatic Savage Model 6 to the above list. THE "SHOOTER'S BIBLE" NO. 50, 1959, at 103 (1959). *See id.* at 80, 87, 91, 101 for some of the models previously mentioned.

Histories of Savage and Stevens firearms includes the following not listed above: Stevens No. 66 bolt action, Stevens Model 46 bolt action, Model 1914 slide action, Savage Model 29 slide action, Savage Model 29 G slide action. JAY KIMMEL, SAVAGE AND STEVENS ARMS 49, 53, 79, 102, 165, 167-68, 177 (5th ed. 1990); BILL WEST, SAVAGE AND STEVENS ARMS 11-12, 13-8, 14-44, 15-10, 16-10 (1971) (page numbering recommences in each chapter). Savage purchased Stevens in 1920.

For use of *The Shooter's Bible* by the courts, *see United States v. Olson*, 1995 WL 746177 at *1 (9th Cir. Dec. 15, 1995) (book was properly used as a source for ATF agent's expert opinion); *United States v. Precise Import Corp.*, 458 F.2d 1376, 1377 (Cust. & Pat. App., 1972) (record reflects district court's admission of pages from the 1967 edition as an exhibit); *United States v. Fisher*, 353 F.2d 396, 399 (5th Cir. 1965) (Gewin, J., dissenting) (noting that experts had relied on the book); *Potter v. United States* 167 Ct. Cl. 28, 80 n.1 (Ct. Cl. 1964) (citing the book for the history of Gabilondo firearms).

[33]     2014 STANDARD CATALOG at 84.

14

for the civilian market, starting in the late 1950s. The standard magazines are 15 and 30 rounds.[34]

The most popular rifle in American history is the AR-15 platform, a semi-automatic rifle with standard magazines of 20 or 30 rounds.[35] The AR-15 was brought to the market in 1963, with a then-standard magazine of 20; the 30-round standard magazine was developed a few years later.[36] By 1969 there was also the

---

[34]    LARRY L. RUTH, WAR BABY COMES HOME: THE U.S. CALIBER .30 CARBINE (1993); BRUCE N. CANFIELD, COMPLETE GUIDE TO THE M1 GARAND AND THE M1 CARBINE 163, 165, 167, 206-08, 279 (2d ed. 2010); Civilian Marksmanship Program, Carbine Sales, http://www.thecmp.org/Sales/carbine.htm M1 Carbines Incorporated website, http://www.m1carbinesinc.com/ (on company-specific pages, the largest producers were Plainfield's 112,000 from 1962-78; and Iver Johnson's 96,700 from 1978-92). The U.S. government sold 240,000 of its own surplus in 1963 into the Civilian Marksmanship Program. Thereafter, the program (then known as "DCM"—Director of Civilian Marksmanship), sold M1s to Americans from the supply of WWII M1 carbines that had been exported to allied nations, and subsequently returned to the U.S. when the allied nation switched to a newer type of rifle. As of 2014, the CMP's supply of carbines for sale has been exhausted. *See* Civilian Marksmanship Program, Carbine Sales, http://www.thecmp.org/Sales/carbine.htm.

[35]    The "AR" stands for "Armalite Rifle." ArmaLite, http://en.wikipedia.org/wiki/ArmaLite.

[36]    PATRICK SWEENEY, GUN DIGEST BOOK OF THE AR-15 104 (2005). About this time, the Cetme-Sport semi-auto rifle with optional 20-round detachable box mag magazine came on the market. GUN DIGEST 22ND ANNIVERSARY 1968 DELUXE EDITION, at 335 (John T. Amber ed. 1967); H.B. Young, *The CETME—Military to Sporter*, GUNS (Nov. 1967): 26-27, 57-58.

Armalite-180 (20-round optional magazine), the J&R 68 carbine (30 rounds), and the Eagle Apache carbine (30 rounds).[37]

Springfield Armory brought out the M1A semi-automatic rifle in 1974, with a 20-round detachable box magazine.[38] The next year, the Ruger Mini-14 was introduced, with manufacturer-supplied standard 5-, 10-, or 20-round detachable magazines.[39] Both the M1A and the Mini-14 are very popular to this day.[40]

By 1979, all of the above guns faced competition in the American market from high quality European imports such as the Belgian FN-FAL Competition rifle (optional 20-round magazine), the German Heckler & Koch HK-91 and HK-93

---

[37]   GUN DIGEST 24TH ANNIVERSARY 1970 DELUXE EDITION 294 (John T. Amber ed. 1969).

[38]   2014 STANDARD CATALOG at 1102; "M1A," Wikipedia, http://en.wikipedia.org/wiki/ M1A_rifle (year of introduction).

[39]   2104 STANDARD CATALOG at 1173.

[40]   Another gun introduced in 1975 also used magazines larger than 15. The Bingham company (from Norcross, Georgia) brought out the PPS 50 and AK-22, .22 caliber rifles with detachable magazines of 50 or 29 rounds. 2014 STANDARD CATALOG at 164. The PPS-50 is currently manufactured by Mitchell's Mausers. http://www.mauser.org/pps-50-22/. That the gun is still in production four decades later is impressive, but the PPS-50 never became an all-American favorite as did the M1, AR-15, M1A and the Mini-14.

16

rifles (20 rounds), the Swiss SIG AMT rifle (20 rounds), and the Finnish Valmet M-71S rifle (30 rounds).[41]

Citizen firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. In 1935, Browning introduced the Hi-Power pistol. This handgun was sold with a 13-round detachable and is still in production.[42]

In Europe more so than in America, Browning faced competition from the Spanish Gabilondo 20-round "Plus Ultra," introduced in 1925.[43] Spain's Arostegui, Eulogio brought out the Azul—a semi-automatic with standard magazines of 10, 20 and 30—in 1935.[44]

Browning's first notable American competition came with the 1964 introduction of the Plainfield Machine Company's "Enforcer," a pistol version of the M1 carbine (discussed above), with a 30-round magazine.[45]

---

[41]    GUN DIGEST 1980, at 319-21 (1979). Also on the market were the Commando Arms carbine (5, 15, 30 or 90 rounds), and the Wilkinson Terry carbine (31 rounds). *Id.* at 319, 322.

[42]    2014 STANDARD CATALOG at 182-83, 432-33.

[43]    *Id*. at 464-66 (manufactured 1925-33).

[44]    *Id*. at 72-73 (manufactured 1935-40); JOHN W. BREATHED, JR. & JOSEPH J. SCHROEDER, JR., SYSTEM MAUSER, A PICTORIAL HISTORY OF THE MODEL 1896 SELF-LOADING PISTOL 216-17 (1967).

[45]    GUN DIGEST 1965, 19TH ANNIVERSARY DELUXE EDITION 229 (John T. Amber ed. 1964).

The Beretta model 92, a 9mm pistol with a 16-round magazine, which entered the market in 1976, was a tremendous commercial success.[46] In various configurations (currently the Beretta 92F), the Beretta is one of the most popular of all modern handguns.[47] Browning introduced another popular handgun in 1977, the 14-round BDA (Browning Double Action).[48] Also coming on the market at this time were European handguns such as Austria's L.E.S. P-18 (18 rounds), and Germany's Heckler & Koch VP 70Z (also 18).[49]

## II. SUNNYVALE'S DRACONIAN RESTRICTION ON MAGAZINE CAPACITY HAS NO HISTORICAL BASIS.

At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity. This was not because all guns were single-shot. As detailed above, multi-shot guns predate the Second Amendment by about 200

---

[46]     2014 STANDARD CATALOG at 121.

[47]     *Id*. at 121-26. In 1985 the M9 version of this pistol became the standard U.S. military issue sidearm.

[48]     *Id*. at 184.

[49]     GUN DIGEST 34TH ANNIVERSARY 1980 DELUXE EDITION, at 297-98 (Ken Warner ed., 1979). L.E.S. was the American partner of Austria's Steyr. The following courts have relied on one of the annual issues of *Gun Digest*: *A. Uberti and C. v. Leonardo*, 892 P.2d 1354, 1364 (Ariz. 1995) (when certain guns were available for sale to Arizona residents); *Citizens for a Safer Community v. City of Rochester*, 627 N.Y.S.2d 193, 203 n.5 (N.Y. Sup. 1994); *Sturm, Ruger & Co. v. Arcadia Mach. & Tool Inc*., 1988 WL 391514 at *2 (C.D. Cal. 1988) (influence of a particular model on Ruger's recognition by consumers); *Couplin v. State*, 378 A.2d 197 205 n.2 (Md. App. 1977) (examples of a particular type of gun).

years, and Lewis & Clark carried a powerful 22-round gun on their famous expedition.

Law prohibiting magazines are *not* "longstanding and thereby deserving of a presumption of validity." *Heller v. District of Columbia*, 670 F.3d 1244, 1260 n. * (D.C. Cir. 2011) ("*Heller II*").[50] The first laws that actually restricted magazine capacity were enacted during the Prohibition Era, nearly a century and a half after the Second Amendment was adopted.

In 1927, Michigan prohibited the *sale* of "machine gun[s] or firearm[s] which can be fired more than sixteen times without reloading . . . ." 1927 Mich. Laws 887, 888. Rhode Island enacted a similar law. *See* R.I. Acts 1927, ch. 1052 § 1 (12-shot limitation). Notably, these were sales-only limits, not the criminalization

---

[50]    The *Heller II* Court was correct about history, but was not rigorous in its application of modern doctrine. In upholding the D.C. magazine ban, the divided panel relied heavily on an analogy to the First Amendment's "alternative channels of communication" doctrine. The D.C. Circuit panel majority failed to consider that "alternative channels" is a doctrine for public speech, especially on public property, which allows leafleting to be limited on public property; it is not a doctrine allowing the criminalization of the possession of leaflets within one's own home.

More fundamentally, the alternative channels doctrine mandates a serious inquiry into the adequacy of those alternative channels, and strong evidence that the alternative channels are (at least) nearly as effective as whatever channel is being restricted. However, the *Heller II* majority merely cited to the opinion of the D.C. police chief, and to the legislative testimony of a gun prohibition lobbyist, as evidence that self-defense with other firearms and smaller magazines would be just as effective. *Heller II*, 670 F.3d at 1259. It was clearly erroneous for the D.C. Circuit to treat such highly-contested assertions as conclusive at the summary judgment stage.

of mere possession. The two statutes applied only to firearms, and not simply to a magazine which was not even inserted in a firearm. These statutes did not go so far as Sunnyvale's more-than-ten-round ban on mere possession. *Cf. Jackson v. City & County of San Francisco*, No. 12-17803 (9th Cir. March 25, 2014) (upholding local ban on sales while emphasizing that it is not a ban on possession).

In the following decades, the Michigan and Rhode Island statutes were modified to increase the limits, and then were completely repealed. *See* M.C.L. § 750.224 (currently prohibiting, as machine guns, only a "firearm that shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger"); *see also* 1989 R.I. ALS 542, § 7 (same).

In 1932, Congress passed a D.C. law prohibiting the possession of a firearm that "shoots, is designed to shoot or can be readily converted to shoot . . . semi-automatically, more than 12 shots without reloading."[51] In contrast, when Congress enacted the National Firearms Act of 1934 to impose stringent regulations on machine guns, it chose to impose no restrictions on magazines. Act of June 26, 1934, ch. 757, 48 Stat. 1236. When D.C. achieved home rule in 1975, the Council did not choose to repeal the law, but instead promptly enacted the bans on handguns and on self-defense with any gun in the home, which were later ruled unconstitutional by the Supreme Court in *Heller*. "Firearms Control Regulations

---

[51]    Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652.

Act of 1975," Law 1-85, Bill no. 1-164, 23 D.C.R. 2464. The D.C. government interpreted the law so that it outlawed all magazines and all semi-automatic handguns. (In contrast to the state approach, discussed above.)[52] D.C. stands alone in its historical restriction of magazines.

The only widespread restriction on magazine capacity came in 1994 when Congress enacted a ban on new magazines holding more than ten rounds. The law was in effect until 2004, at which point Congress allowed it to sunset. Pub. L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000. The effects of this law were studied extensively by Dr. Christopher Koper, who reported on the law's efficacy in 2004. He stated "the ban has not yet reduced the use of [such magazines] in crime . . ." Christopher Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* at 2 (2004). Dr. Koper was even more critical of the notion that laws restricting certain firearms and limiting magazine capacity could reduce criminal activity: "[b]ecause offenders can substitute non-banned guns and small magazines for banned [guns

---

[52] *See* Vivian Chu, Cong. Res. Svc., *DC Gun Laws and Proposed Amendments* (2011) ("Prior to Heller, the DC Code's definition of 'machine gun' included 'any firearm, which shoots, is designed to shoot or can be readily converted to shoot ... semiautomatically, more than 12 shots without manual reloading.' [citing DC Code § 7-2501.01(10)(B) (2008)]. By virtue of this broad definition, any semiautomatic weapon that could shoot more than 12 shots without manual reloading, whether pistol, rifle, or shotgun, was deemed a 'machine gun, and prohibited from being registered. It appears under the District's old definition, registration of a pistol was largely limited to revolvers.").

and magazines], there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns." *Id.* at 81. Dr. Koper noted also that state-level firearm bans have not had an impact on crime. *Id.* at 81, n. 95.

Despite the ineffectiveness of the federal law on criminal events using banned magazines, a few states have recently enacted restrictions on magazines. Even compared to those few states, the Sunnyvale ban is extreme.

Only two states, Hawaii and New York, ban completely the possession of all magazines over a certain capacity, and Hawaii's law applies only to handguns. Haw. Rev. Stat. § 134-8(c); N.Y. Penal L. § 265.00(23) (enacted 2013). California, notably, does not prohibit the possession of magazines with a capacity greater than ten, even though the manufacturing, importing, selling, buying, and lending of such magazines is prohibited. Cal. Penal Code § 32310(a). Maryland prohibits sales, but does not ban possession or importation. Md. Code Ann. Crim. L. § 4-305.

New Jersey's 15-round limit is only for magazines for semi-automatic firearms, not for other types of firearms, and it has exemptions for certain competitive shooters. N.J. Stat. § 2C:39-1y.[53] Ohio's statute simply forbids

---

[53]    New Jersey prohibits the possession of magazines over a certain capacity unless the possessor also lawfully possesses an "assault weapon" and uses the banned magazine in connection with a sanctioned competitive shooting match. N.J. Stat. § 2C:39-3(j).

actually inserting a magazine of more than 31 rounds into a firearm. Ohio Rev. Code Ann. 2923.11(E) (also exempting .22 caliber).

Highly controversial enactments last year in Colorado (15 rounds)[54] and Connecticut (ten)[55] allowed current owners to retain possession—unlike Sunnyvale.

Most importantly, Massachusetts shows the ready availability of a "less restrictive alternative." That is, the law does "not burden the right substantially more . . . than is necessary to further the government's legitimate interests." *Peruta v. County of San Diego*, 742 F.3d 1144, 1177 (9th Cir. 2014) (*quoting Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 214 (1997) (internal quotation marks and brackets omitted). Besides allowing for complete grandfathering, Massachusetts also allows for new acquisitions if the citizen has a "Class A" firearms license—which most of Massachusetts gun owners do.[56]

---

[54] Col. Rev. Stat. § 18-12-302(2)(a) (permitting a person to maintain possession of a banned magazine if he or she possessed it on the effective date of the law).

[55] Conn. Gen. Stat. § 53-202w(e)(5) (permitting a person to maintain possession of a banned magazine if he or she possessed it prior to the effective date of the law and declared it to the government).

[56] Mass. Gen. Laws 140 §§ 121, 131 (grandfathering for all lawful owners; acquisition of magazines manufactured before Sept. 1994 by anyone with a Class A license); Matt Carroll, *Snapshot: Gun Licenses Per 1,000, 2012*, Boston Globe, Jan. 24, 2013,

### III. MAGAZINES WITH A CAPACITY OF MORE THAN TEN ROUNDS ARE COMMONLY POSSESSED FOR LAWFUL PURPOSES.

The District Court correctly determined that "magazines having a capacity to accept more than ten rounds are in common use, and therefore are not dangerous and unusual." *Fyock,* 2014 U.S. Dist LEXIS 29722 at *13. The court was correct to reject Sunnyvale's arguments that these magazines could be prohibited because they are not commonly possessed in Sunnyvale itself because the correct test is whether these magazines are commonly possessed by law-abiding, responsible citizens across the nation. *Id.* at 15-16. The *Heller* Court required no proof that handguns were common within the District of Columbia.

The District Court's determination that "whatever the actual number of such magazines in United States' consumers hands is, it is in the tens of millions, even under the most conservative estimates," *id.* at 13-14, is in harmony with the other courts that have dealt with the question of magazine commonality. *Accord Heller II*, 670 F.3d at 1261 ("[F]ully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more [of] such magazines were imported into the United States between 1995 and 2000."); *Shew v. Malloy*, No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339 at *26 (January 30, 2014) ("[M]illions of Americans

---

http://www.boston.com/yourtown/specials/snapshot/massachusetts_snapshot_gun_licenses_2012 (prevalence of Class A licenses).

commonly possess firearms that have magazines which hold more than ten cartridges.").

Undermining Sunnyvale's arguments that such magazines are not commonly possessed and are dangerous and unusual, two government defendants involved in litigation over this issue *conceded* that they are in common use nationally. *See N.Y. State Rifle & Pistol Ass'n v. Cuomo*, No. 13-CV-291S, 2013 U.S. Dist. LEXIS 182307 at *37 (W.D. N.Y. Dec. 31, 2013) (conceding that magazines with a capacity greater than ten are in common use); *Colorado Outfitters Association, et al. v. John W. Hickenlooper*, No. 1:13-cv-01300, Dkt. 119 (D. Colo. Jan. 31, 2014) (The parties stipulated: "Although the total number is not known, the number of lawfully owned semi-automatic firearms that utilize a detachable box magazine with a capacity greater than 15 rounds is in the tens of millions.").

Magazines capable of holding more than ten rounds are commonly used for lawful purposes, including self-defense.[57] *Fyock*, 2014 U.S. Dist. LEXIS 29722 at *12 (noting the plaintiffs' evidence illustrated the utility of these magazines for self-defense); *see also Shew*, 2014 U.S. Dist. LEXIS 11339 at *26-27; *N.Y. State Rifle & Pistol Ass'n*, 2013 U.S. Dist. LEXIS 182307 at *37-38; *Colorado*

---

[57]     Indeed, some competitive shooting events *require* magazines with a capacity greater than ten to compete. *See The Exciting Sport of 3-Gun Shooting*, NSSF, http://www.nssf.org/events/featurette/2012/0712.cfm (stating that most competitors choose .223 caliber rifles with 30-round magazines but any rifle that "will handle larger magazines" will be permitted).

*Outfitters Association*, Dkt. 119 (stipulation that "Semi-automatic firearms equipped with detachable box magazines with a capacity greater than 15 rounds are used for multiple lawful purposes, including recreational target shooting, competition shooting, collecting, hunting, and are kept for home defense and defense outside the home.").

The utility of magazines holding more than ten rounds for self-defense is illustrated most clearly when considering an individual who, because of age or disability, cannot quickly change magazines. For example, an individual with a significant injury to one arm or hand can be an extremely proficient marksman with a pistol, but will not be able to change magazines quickly, or even without assistance. Limiting magazine capacity to ten rounds artificially limits this person's ability to defend himself.

The District Court measured the utility of the banned magazines by demanding a count of how often more than ten shots were fired in self-defense. This methodology is erroneous—akin to assessing the utility of handguns solely by counting the number of justifiable homicides in which handguns are used. In the most common self-defense situations, *no* shots are fired.[58] The crime is terminated not by incapacitating the attacker, but by simple deterrence.

---

[58] *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 173

The same point is true about magazine capacity. Not all shots hit an attacker. Of those that do, few are immediately incapacitating, unless they strike the heart or the central nervous system. Yet when the defender has sufficient reserve capacity, even multiple attackers may decide to desist from an attack. That is why American law enforcement officers ubiquitously carry handguns with more than ten rounds of ammunition, and often more than 15. It is also why their rifles typically have 20 or 30 round magazines, not ten.

The District Court's methodology was flatly contrary to *Heller*. The *Heller* Court repeatedly emphasized how often law-abiding American citizens choose to *possess or use* handguns for self-defense. 554 U.S. at 616 ("an individual right to use arms for self-defense"), 625 ("typically possessed by law-abiding citizens for lawful purposes"), 625 n.25 (criticizing on other grounds a case which described a ban on gun possession by convicted criminals as "legislative restrictions on the use of firearms"); 627 (approvingly quoting *U.S. v. Miller*: "arms supplied by themselves and of the kind in common use at the time"); 628-29 (quoting with approval the opinion below, "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family"); 629 (listing reasons why Americans prefer to possess handguns: "handguns are the most popular weapon chosen by

---

(1995) ("Only 24% of the gun defenders in the present study reported firing the gun, and only 8% report wounding an adversary.").

Americans for self-defense in the home, and a complete prohibition of their use is invalid"); *id.* (requirement that firearms in the home must be inoperable "makes it impossible for citizens to use them for the core lawful purpose of self-defense"); 635 (Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home").

Significantly, the Court did not address whether citizens actually *shoot* handguns for self-defense. When a citizen keeps a firearm that is ready for self-defense, or lawfully bears the firearm at home or in public, the citizen is using the firearm. Law enforcement officers very rarely *shoot* their duty arms, except during target practice, but they *use* their guns every day. They use their firearms by possessing them in a manner so that they can be fired in the unlikely event of an emergency. Indeed, by using firearms as an available deterrent, law enforcement officers reduce the need to fire their guns. The same is true for ordinary citizens. People use the firearms that they possess or display in many ways for self-defense, and most of these uses do not involve pulling a trigger against a violent attacker. What mattered to the *Heller* Court was the *choice* of the American people about what guns to own. Accordingly, and by definition, handgun prohibition was unconstitutional. The same is true for the choice of magazines.

The Sunnyvale ordinance literally outlaws magazines that were invented before the Second Amendment. The Appellants' assertions about the evils of

magazines above ten rounds and the people who own them are belied by a very long history of the common ownership of such magazines by American citizens. Whether judged by American history and tradition, or by comparison to the handful of states in 2014 that restrict magazines, the Sunnyvale ordinance is an eccentric and repressive outlier.

## CONCLUSION

For the foregoing reasons, this Court should declare that the Sunnyvale ordinance violates the Second and Fourteenth Amendments to the United States Constitution and enjoin its enforcement.

/s/ John Parker Sweeney
John Parker Sweeney
T. Sky Woodward
James W. Porter, III
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW
Suite 1350
Washington, DC 20036
Phone: 202-393-7150
Fax: 202-347-1684
jsweeney@babc.com

*and*

/s/ David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: 303-279-6536
Fax: 303-279-4176
david@i2i.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 28(e)(2)(a) because this brief contains less than 6,656 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated: May 23, 2014

/s/ John Parker Sweeney
Of Counsel

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 23rd day of May, 2014, this brief of *Amici Curiae* Center for Constitutional Jurisprudence and Gun Owners of California was served, via electronic delivery to all parties' counsel via CM/ECF system which will forward copies to Counsel of Record.

/s/ John Parker Sweeney
Of Counsel
