Case No. 14-15408

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

LEONARD FYOCK, et al.

*Plaintiffs-Appellants*

v.

CITY OF SUNNYVALE, et al.

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of California
Case No. 13-cv-05807 RMW

---

**BRIEF OF *AMICUS CURIAE* THE NATIONAL SHOOTING SPORTS
FOUNDATION, INC. IN SUPPORT OF APPELLANTS**

---

Robert C. Wright (SBN 51864)
Andrew E. Schouten (SBN 263684)
WRIGHT & L'ESTRANGE
401 West A Street, Suite 2250
San Diego, California 92101
Tel.: (619) 231-4844
Fax: (619) 231-6710

Lawrence G. Keane
General Counsel
THE NATIONAL SHOOTING
SPORTS FOUNDATION, INC.
11 Mile Hill Road
Newtown, CT 06470-2359
(203) 426-1320

Attorneys for *Amicus Curiae*

## RULE 26.1 DISCLOSURE STATEMENT

*Amicus curiae* the National Shooting Sports Foundation, Inc. is a non-profit tax-exempt organization qualified under section 501(c)(6) of the Internal Revenue Code. It has no parent corporation, and no publicly held company owns ten percent or more of it.

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICUS* AND SOURCE OF
     AUTHORITY TO FILE ................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................3

ARGUMENT ..........................................................................................5

I.     THE SECOND AMENDMENT CATEGORICALLY PROTECTS
     "ARMS" IN COMMON USE FOR LAWFUL PURPOSES ........................5

     A.    *Heller* Provides A Categorical Test For The Validity Of
          Prohibitory Firearms Laws...................................................6

     B.    The Categorical Protection For "Arms" Is Absolute; No
          Means/Ends Scrutiny Is Permitted.........................................7

     C.    Absolute, Categorical Protection For "Arms" Is Consistent
          With The Treatment Given To Other "Core" Enumerated
          Rights .............................................................................10

     D.    The Government's Police Power Cannot Override The
          Categorical Protection Of "Arms." .......................................13

II.    THE DISTRICT COURT CORRECTLY FOUND THAT
     MAGAZINES HOLDING MORE THAN TEN ROUNDS OF
     AMMUNITION ARE "ARMS" WITHIN THE SECOND
     AMENDMENT – A DISPOSITIVE FINDING IN THE CASE.................14

     A.    The District Court Found That The Banned Magazines Are In
          Common Use For Lawful Purposes And Are <u>Not</u> "Dangerous
          And Unusual Weapons."......................................................15

     B.    The District Court's Findings Are Supported By The
          Evidentiary Record............................................................16

     C.    The District Court's Findings Are Also Supported By
          Americans' Contemporary Preferences ...............................19

III.   THE DISTRICT COURT ERRED BY APPLYING A BALANCING
       TEST AFTER DETERMINING THAT THE BANNED
       MAGAZINES WERE IN COMMON USE FOR LAWFUL
       PURPOSES ............................................................................................22

       A.    Once The District Court Found That The Banned Magazines
             Were Typically Possessed For Self-Defense, *Heller* Mandated
             Invalidation.........................................................................................22

       B.    The Authorities Relied Upon By The District Court Are Not
             Binding, Correct, Or Dispositive .......................................................24

IV.    THE DISTRICT COURT'S DECISION ILLUSTRATES WHY A
       CATEGORICAL APPROACH TO "ARMS" QUESTIONS IS
       NECESSARY TO PROTECT THE RIGHT .................................................26

       A.    The District Court Effectively Applied Little More Than
             Rational Basis Review, Relieving The Government Of Its Full
             Burden Of Proof..................................................................................27

       B.    The District Court Improperly Accepted Defendants' Post Hoc,
             Litigation-Driven Justifications .........................................................28

       C.    Over Plaintiffs' Objection, The District Court Based Its
             Intermediate Scrutiny Analysis On Unreliable Expert
             Testimony, And Abdicated Its Gatekeeping Role ..............................31

       CONCLUSION............................................................................................33

ii

# TABLE OF AUTHORITIES

## Cases

*Attorney Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009)..................................................................................... 32

*Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) .... 28

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942).................................. 11

*Crawford v. Washington*, 541 U.S. 36 (2004) ............................................ 11

*Davis v. Washington*, 547 U.S. 813 (2006) ................................................. 11

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008)................................ passim

*Dist. of Columbia v. Heller*, No. 07-290, 2008 WL 102223 (D.C. Cir. Jan. 4, 2008)......................................................................................................... 8

*Dist. of Columbia v. Heller,* No. 07-290, 2008 WL 157201 (D.C. Cir. Jan. 11, 2008)..................................................................................................... 8

*Dist. of Columbia v. Heller*, No. 07-290, 2008 WL 336304 (D.C. Cir. Feb. 4, 2008)......................................................................................................... 8

*Edenfield v. Fane*, 507 U.S. 761 (1993) ..................................................... 29

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014)....... 33

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................... 5, 29

*Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389 (9th Cir. 1984)............... 32

*Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001)...................................... 26

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ........... 24, 25

*Kennedy v. Louisiana*, 554 U.S. 407 (2008)................................................. 12

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ......................... 32

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).................... 12

*McCormack v. Hiedeman*, 694 F.3d 1004 (9th Cir. 2012)............... 14, 19, 21

*McDonald v. City of Chicago*, ___U.S. ___, 130 S.Ct. 3020 (2010) .... passim

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) ...................................... 9, 23

*Minneapolis Star and Tribune Co. v. Minnesota Comm'r. of Rev.*, 460 U.S. 575 (1983) ............................................................................................ 10

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ........................................ 22

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ......................................... 11

*Parker v. Dist.of Columbia,* 478 F.3d 370 (D.C. Cir. 2007) ................ passim

*Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014).............. passim

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992) ................................ 11

*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) ....... 32

*Roberts v. Coll. of the Desert*, 870 F.2d 1411 (9th Cir. 1988) .................... 25

*San Francisco Veteran Police Officers Ass'n. v. City & Cnty. of San Francisco*, No. 13-05351, 2014 WL 644395 (N.D. Cal. Feb. 19, 2014).. 25

*Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003) .......................................................................................................... 22

*Talley v. California*, 362 U.S. 60 (1960) ..................................................... 11

*United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005)............................. 26

*United States v. Booker*, 543 U.S. 220 (2005).............................................. 12

*United States v. Chovan*, 735 F.3d 1127 (2013)........................................... 24

*United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945 (2012) ...................... 12

*United States v. Marzzarella*, 595 F. Supp. 2d 596 (W.D. Pa. 2009) .......... 26

*United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803 (2000) ............... 11

*United States v. Virginia*, 518 U.S. 515 (1996)....................................... 29, 30

*United States v. Warren*, 601 F.2d 471 (9th Cir. 1979)................................ 32

*White v. Davis*, 13 Cal. 3d 757 (1975).......................................................... 30

iv

**Statutes**

Fed. R. App. P. 29(a) .................................................................... 2

Fed. R. Evid. 702 .................................................................. 30, 31

Fed. R. Evid. 703 ......................................................................... 31

**Other Authorities**

Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375 (2009) ............................ 7, 9

Brannon Denning & Glenn Reynolds, *Five Takes on District of Columbia v. Heller*, 69 Ohio St. L.J. 671 (2008)........................................................... 14

Robert K. Campbell, <u>The Gun Digest Book of Personal Protection & Home Defense</u> 28 (2009). .................................................................... 20

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150 (1995) ...................................................................... 19

David B. Kopel & Clayton Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms,* 50 Santa Clara L. Rev. 1113 (2010). . 13, 14

Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 Geo. Wash. L.Rev. 703 (2012). ...................................... 26

Eugene Volokh, *Implementing the Right To Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L.Rev. 1443 (2009) .......................................................... 5, 7, 9

**STATEMENT OF INTEREST OF *AMICUS* AND SOURCE OF
AUTHORITY TO FILE**

This brief is submitted by the National Shooting Sports Foundation, Inc. ("the NSSF"), the trade association for the firearms, ammunition, hunting, and shooting sports industry. Formed in 1961, the NSSF is a Connecticut non-profit tax-exempt corporation with a membership of more than 10,000 federally licensed firearms manufacturers, distributors, and retailers; sportsmen's organizations; shooting ranges; gun clubs; publishers; and individual hunters and recreational target shooters. The NSSF provides trusted leadership in addressing industry challenges; advances participation in and understanding of hunting and the shooting sports; reaffirms and strengthens its members' commitment to the safe and responsible use of their products; and promotes a political environment that is supportive of America's traditional hunting heritage and firearms freedoms.

The NSSF's interest in this action derives principally from the fact that the NSSF's federally licensed firearms manufacturer, distributor, and retailer members engage in the lawful commerce in firearms that makes the exercise of Second Amendment rights possible.

Because the Second Amendment's individual right to "keep and bear arms" as articulated by *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) categorically protects from government proscription firearms and firearms

1

components in common use for lawful purposes, including so-called "large-capacity magazines," and the lawful commerce in these products is itself protected by the Second Amendment, the NSSF submits this brief in support of Appellants and urges this Court to reverse the District Court's decision and instruct it on remand to enter an order enjoining the City of Sunnyvale from enforcing Sunnyvale Municipal Code Section 9.44.050 during the pendency of this litigation.

This brief is filed with the consent of the parties to this appeal. *See* Fed. R. App. P. 29(a).[1]

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the *amicus curiae*, or its counsel, made a monetary contribution to its preparation or submission.

2

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

In *Heller*, 554 U.S. at 635, the United States Supreme Court held that the Second Amendment protects a fundamental, individual right to keep and bear arms, which was made applicable to state and local governments in *McDonald v. City of Chicago*, ___ U.S. ___, 130 S.Ct. 3020, 3026, 3036 (2010).

More specifically, *Heller* invalidated a law that banned the possession of handguns, and stands for the larger proposition that government may not ban "Arms" in common use at the time for lawful purposes. Unfortunately, *Heller* has proven difficult for many courts to follow, including the District Court in this matter.

This confusion stems from a misunderstanding of *Heller*'s mode of analysis. Under *Heller,* "Arms" within the Second Amendment's meaning are categorically protected from government proscription, while those outside of the amendment have no constitutional protection.

This categorical approach is similar to the tests used to resolve cases implicating core enumerated rights such as the rights to political speech, confront one's accuser, and a civil jury trial. By embracing this categorical approach for "core" Second Amendment rights, *Heller* rejected the usual

balancing tests employed in constitutional adjudication under the Fourteenth Amendment and for penumbral rights.

Save for certain exceptions, Sunnyvale Municipal Code Section 9.44.050 bans possession of so-called "large-capacity magazines,"[2] detachable firearms magazines with the capacity to hold more than ten rounds of ammunition. The District Court unequivocally and correctly found that the banned magazines are in common use, as 47% of all firearms magazines in the United States have a capacity of over ten rounds, and that firearms equipped with such magazines are typically possessed by tens of millions of law-abiding Americans for self-defense and other lawful purposes. Such findings are clearly supported by the record evidence, along with the NSSF's industry data and market research.

Despite these findings, the District Court failed to strike down Section 9.44.050 under *Heller's* categorical rule. Instead, it applied little more than rational basis scrutiny to uphold Section 9.44.050 on the assumption that it

---

[2] Many of the most popular and predominant pistol and rifle models are designed to use magazines with capacities to hold ten or more rounds. Because they are standard components on these popular firearms, and are universally accepted and common across the country, such magazines should be termed "standard capacity" magazines. The magazines that Sunnyvale has now outlawed are often specially designed to be compatible with these popular firearms. Since they represent a departure from the standard design, the Sunnyvale-compliant magazines are accurately termed "low capacity" magazines.

could prevent gun violence in the same way banning First Amendment protected speech might prevent defamation. This result is plainly contrary to *Heller* and must be reversed.

## ARGUMENT

## I.  THE SECOND AMENDMENT CATEGORICALLY PROTECTS "ARMS" IN COMMON USE FOR LAWFUL PURPOSES.

*Heller* struck down the District of Columbia's handgun ban because "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 130 S. Ct. at 3044. *Heller* therefore stands for the proposition that "broadly prohibitory laws restricting the core Second Amendment right – like the handgun bans at issue in those cases, which prohibited handgun possession even in the home – are categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011); *see* Eugene Volokh, *Implementing the Right To Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L.Rev. 1443, 1462 (2009) (*Heller* adopted "a rule of *per se* invalidation" for "Arms" questions).

### A. *Heller* Provides A Categorical Test For The Validity Of Prohibitory Firearms Laws.

*Heller* explicitly instructs which firearms are "Arms" entitled to constitutional protection. Based on its reading of history, tradition, and existing precedent, the *Heller* majority concluded that constitutionally protected "Arms" were those weapons, including firearms, "'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 581, 624. In contrast, Second Amendment protection does not extend to "dangerous and unusual" firearms "not typically possessed by law-abiding citizens for lawful purposes," such as sophisticated military-grade arms. *Id.* at 625, 629.

Applying this analytical framework,[3] *Heller* holds that handguns are categorically protected "Arms," based on the finding that handguns were "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *Id.* at 628 (quoting *Parker v. Dist. of Columbia.,* 478 F.3d 370, 400 (D.C. Cir. 2007)). Since "the American people have considered the handgun to be the quintessential self-defense weapon," it was beyond question that handguns are protected "Arms." *Id.* at 629. Because it "amount[ed] to a prohibition of an entire class of 'arms' that is

---

[3] In *dicta*, *Heller* articulated four exceptions from Second Amendment coverage, none of which apply here. *Heller*, 554 U.S. at 627-28.

overwhelmingly chosen by American society for" lawful self-defense, the

District of Columbia's handgun ban failed "constitutional muster" under

"any of the standards of scrutiny that [the Supreme Court] [has] applied to

enumerated constitutional rights." *Id.* at 628-629.

### B. The Categorical Protection For "Arms" Is Absolute; No Means/Ends Scrutiny Is Permitted.

*Heller* "endorsed a categorical test under which some types of 'Arms'

. . . are protected absolutely from bans and some types of 'Arms' . . . are

excluded entirely from constitutional coverage." Joseph Blocher,

*Categoricalism and Balancing in First and Second Amendment Analysis*, 84

N.Y.U. L. Rev. 375, 380 (2009). Thus, *Heller's* recognition of the "right to

keep and bear weapons that are roughly as dangerous as civilian firearms

will definitionally exclude the extraordinarily dangerous weapons. And

while [the core right] will indeed protect ordinarily dangerous guns, this

ordinary danger is precisely what the right to bear arms expressly

contemplates." Volokh, *supra*, at 1464.

In articulating this test, the *Heller* court expressly considered and

rejected means/end scrutiny for "Arms" questions. On review to the

Supreme Court, none of the parties advocated in favor of the District of

Columbia Circuit's categorical approach. *See Parker*, 478 F.3d at 397, 400

("Once it is determined – as we have done – that handguns are 'Arms'

referred to in the Second Amendment, it is not open to the District to ban them.")

Instead, the District argued that the handgun ban should be reviewed under a "reasonableness" standard. Petitioner's Br., *Dist. of Columbia v. Heller*, No. 07-290, 2008 WL 102223, at \*44-46 (D.C. Cir. Jan. 4, 2008). The United States, appearing as an *amicus* on behalf of the District, argued for intermediate scrutiny and against *Parker's* "categorical approach." USA Amicus Br., *Dist. of Columbia v. Heller,* No. 07-290, 2008 WL 157201, at \*8-9, 23-24 (D.C. Cir. Jan. 11, 2008). Mr. Heller argued for strict scrutiny. Respondent's Br., *Dist. of Columbia v. Heller*, No. 07-290, 2008 WL 336304, at 54-58 (D.C. Cir. Feb. 4, 2008).

The *Heller* Court disagreed with the parties' proposed balancing tests, and adopted the "common use" categorical test instead. *See id*, 554 U.S. at 629. It also rejected Justice Breyer's "interest-balancing inquiry," under which a court examines whether a challenged law's burdens on the constitutional right are "out of proportion" to the law's "salutary effects upon other important governmental interests," while giving deference to the legislature's policy judgments. *Id.* at 689-690 (Breyer, J. dissenting).

Thus, the debate in *Heller* was not over the appropriate level of means/end scrutiny, but rather, whether to adopt the "majority's categorical

8

absolutism" or the dissenters' interest-balancing approach. Blocher, *supra*, at 379. By adopting a categorical, outcome-determinative approach, *Heller* foreclosed future judges from using balancing tests to recalibrate the Second Amendment and uphold bans on firearms in common use. *Id.* at 381-382; *see Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (courts are bound by Supreme Court holdings and their "mode of analysis").

*Heller* explained that a categorical approach was warranted because the "very enumeration of [a constitutional] right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634. Indeed, a "constitutional guarantee subject to future judges assessments of its usefulness is no constitutional guarantee at all." *Id.* Thus, courts may not apply a balancing approach to questions implicating the core Second Amendment right – which includes the categorical protection for firearms in "common use" – without violating *Heller.* Blocher*, supra,* at 405 (*Heller* "neither requires nor permits any balancing beyond that accomplished by the Framers themselves"); Volokh, *supra,* at 1443 (*Heller* foreclosed means/ends scrutiny of the core Second Amendment right), *id.* at 1461–73 (absent better social science, means/end scrutiny will always turn

9

on legislators' and judges' unprovable intuitions concerning gun violence, a result contrary to *Heller*).

### C. Absolute, Categorical Protection For "Arms" Is Consistent With The Treatment Given To Other "Core" Enumerated Rights.

Categorical treatment is appropriate for "Arms" questions because the Framers already conducted their own balancing tests in adopting the Bill of Rights, deciding in the Second Amendment that "the right of the people to keep and bear Arms, shall not be infringed." *Heller,* 554 U.S. at 635. Indeed, no other "core" enumerated right is subject to balancing. *Id.* at 634-35; *McDonald*, 130 S. Ct. at 3044 (core Second Amendment right is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.")

In the First Amendment context, the Supreme Court applies a *per se* categorical analysis when the government prohibits certain types of "core" speech. *Minneapolis Star and Tribune Co. v. Minnesota Comm'r. of Rev.*, 460 U.S. 575, 583-84 n.6 (1983). ("[W]e ordinarily simply apply those general principles, requiring the government to justify any burdens on First Amendment rights by showing that they are necessary to achieve a legitimate overriding governmental interest. . . . But when we do have

evidence that a particular law would have offended the Framers, we have not hesitated to invalidate it on that ground alone.")

Thus, for example, the First Amendment categorically protects viewpoints, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382, 391 (1992) (cross-burning), anonymous pamphleteering, *Talley v. California*, 362 U.S. 60, 64 (1960), and non-malicious reporting on public officials, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964), but categorically excludes "fighting words" from protection, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). Unlike ancillary speech issues, it is immaterial whether any given law bans or merely burdens "core" speech. *United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803, 812 (2000).

The same is true of "core" Confrontation Clause statements. *Cf., Crawford v. Washington*, 541 U.S. 36, 61 (2004) (absent opportunity to cross-examine declarant, testimonial hearsay is admissible only if witness is unavailable and was previously deposed), with *Davis v. Washington*, 547 U.S. 813, 826-827 (2006) (Confrontation Clause does not protect against admission of nontestimonial hearsay). Indeed, the *Crawford* rule is premised on the notion that categorical tests are more protective of enumerated rights than balancing tests. *Id.*, 541 U.S. at 67-68 ("By

11

replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design.")

Even where courts must gauge the validity of evolving, contemporary norms and procedures against Bill of Rights guarantees, categorical analyses, not means/ends scrutiny, are employed. *See, e.g., Kennedy v. Louisiana*, 554 U.S. 407, 418 (2008) (cruel and unusual punishment); *United States v. Booker*, 543 U.S. 220, 249-50 (2005) (criminal jury trial right); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376 (1996) (civil jury trial right); *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945, 953 (2012) (while guarantee against unreasonable searches may expand, Fourth Amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted.")

Similarly, the protection afforded weapons in "common use" for lawful purposes is absolute and extends to all such weapons within the protected category. *Heller*, 554 U.S. at 629 ("it is no answer to say" that a handgun ban is valid so long as "other firearms" are allowed); *Parker*, 478 F.3d at 400 (argument that bans on "one type of firearm" are valid if residents have access to other firearm types is "frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted.")

### D.    The Government's Police Power Cannot Override The Categorical Protection Of "Arms."

Finally, *Heller* makes clear that federal, state, and local police power cannot be used to enact firearms prohibitions or regulations that infringe on the core Second Amendment right.  *See* David B. Kopel & Clayton Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms,* 50 Santa Clara L. Rev. 1113, 1114 (2010).

Justice Breyer urged in dissent that the handgun ban was within the District's police power and was supported by the District of Columbia's City Council's predictive judgment and appropriate findings.  *Heller*, 554 U.S. at 704-705 (Breyer, J. dissenting).  After summarizing the contested social science considered by the City Council, Justice Breyer concluded that the "studies and counterstudies ... could leave a judge uncertain about the proper policy conclusion" and "legislators, not judges, have primary responsibility for drawing policy conclusions from empirical fact."  *Id.* at 693-705.

While taking the District's public safety claims seriously, the *Heller* Court responded that the enumeration of the core right limits the scope of the District's police power.  The Constitution left "a variety of tools" for addressing gun violence, but "*the enshrinement of constitutional rights necessarily takes certain policy choices off the table*.  These include the

13

absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 636 (emphasis added).

Thus, *Heller* instructs that invocations of police power cannot save a prohibition on "Arms" – even if other "Arms" are not prohibited – because such public policy decisions are displaced by the Second Amendment. Kopel & Clayton Cramer, *supra*, at 1120-21; Brannon Denning & Glenn Reynolds, *Five Takes on District of Columbia v. Heller*, 69 Ohio St. L.J. 671, 674 & n.17 (2008) ("That the Court was unwilling to defer to elected officials relying on contested empirical studies about gun control and gun crime, strongly suggested that the majority considered categorical bans on common weapons used for self-defense to be presumptively unconstitutional.")

## II. THE DISTRICT COURT CORRECTLY FOUND THAT MAGAZINES HOLDING MORE THAN TEN ROUNDS OF AMMUNITION ARE "ARMS" WITHIN THE SECOND AMENDMENT – A DISPOSITIVE FINDING IN THE CASE.

In reviewing an order granting or denying a preliminary injunction, the District Court's findings are reviewed for clear error, "and may be reversed only if 'illogical, implausible, or without support in inferences that may be drawn from the facts in the record'." *McCormack v. Hiedeman*, 694 F.3d 1004, 1018 (9th Cir. 2012).

14

**A.    The District Court Found That The Banned Magazines Are In Common Use For Lawful Purposes And Are <u>Not</u> "Dangerous And Unusual Weapons."**

The District Court found that standard magazines holding over ten rounds are "Arms" in common use for lawful purposes and are <u>not</u> "dangerous and unusual weapons," relying on Plaintiffs' evidence, which Defendants were unable to refute (ER 7-9).

First, it found that firearms designed and equipped with the banned magazines are typically possessed for self-defense purposes. Such firearms are marketed to, and purchased by, consumers for self-defense (ER 6, 431-549, 623). Expert opinion established that firearms equipped with such magazines "are highly effective for in-home self-defense" (ER 6, 431-549, 638-639). And, the most popular and predominant models of handguns (the "quintessential" self-defense firearm) in America today have the capacity to accept more than ten rounds (ER 6, 429-465, 481-493, 495-549, 623).

Second, the District Court found that the banned magazines were commonly used and possessed by millions of Americans. According to James Curcuruto, NSSF's Director of Industry Research and Analysis, 47% of all magazines owned in America have a capacity of over ten rounds, which, according to conservative estimates, number in the "tens-of-millions." (ER 7, 617-618). Stephen Helsley, a law enforcement expert,

15

testified that individuals own "millions" of the prohibited magazines, and that sales of semi-automatic pistols (many of which are standardly equipped with the banned magazines) have grown substantially at revolvers' expense (which do not use the banned magazines) (ER 7, 625). And, while product offerings do not necessarily correlate to market share, industry reference publications indicated that one-third of semi-automatic pistols and two-thirds of rifles are regularly sold with standard magazines over ten rounds (ER 7, 431-493).

Third, the District Court found that, while the banned magazines were not firearms themselves, they were "integral components to vast categories of gun," and thus, "Arms" (ER 8-9).

Defendants did not controvert Plaintiffs' evidentiary showing, relying instead on erroneous legal arguments (ER 7-9).

## B.     The District Court's Findings Are Supported By The Evidentiary Record.

The District Court's factual findings and inferences were amply supported by the remainder of Plaintiffs' record evidence. The banned magazines are standard equipment for many pistols and rifles purchased by Americans for both self-defense and sporting purposes (ER 429-549, 623). According to U.S. Government records, the vast majority of handguns manufactured in America are pistols, not revolvers, and the most popular

16

handgun models typically have capacities ranging from eleven to twenty rounds (ER 431-465, 481-549, 623, 625).

Plaintiffs demonstrated that Americans' firearms preferences typically follow police officers' preferences. Beginning in the 1970s, police departments transitioned to pistols equipped with magazines with ten or more rounds from revolvers. Ordinary Americans followed suit, sharing the common-sense assessment that, in the event of a violent confrontation, such magazines "increase[d] his or her chances of staying alive." For example, Glock brand pistols, many of which come equipped standard with 17-round magazines, are popular with both law enforcement and everyday Americans (ER 77-80, 596-597, 600-601, 604-605, 608-609, 612-613, 624-625, 631).

According to Massad Ayoob, Plaintiffs' self-defense expert, pistols equipped with the banned magazines are better suited for self-defense than revolvers. In defending against aggressive offenders, a large volume of fire may be necessary, and ordinary citizens' ability to defend themselves would be impaired if they were forced to carry or keep multiple firearms at hand or to reload their firearms (ER 630-640). Such difficulties are multiplied for the disabled (ER 640). Moreover, Mr. Ayoob's non-litigation research demonstrates that consumers and police officers prefer modern pistols with a capacity over ten rounds because they come in a multiple of models with

17

customizable features that make them very accurate, reliable, and easy to handle (ER 77-80).

Americans' common-sense preferences are supported by social science. Plaintiffs' expert Dr. Gary Kleck[4] testified that Americans are forced to use firearms defensively as many as 2.5 million times a year, more than the annual number of firearms-related crimes. Moreover, crime victims who use firearms defensively are "less likely to be injured or lose property than victims who do not," and more effective at preventing "serious injury" than any other self-defense strategy. And, studies conducted on the now-lapsed federal magazine ban found there had been "no discernable reduction in the lethality or injuriousness of gun violence" (ER 561-564).

Plaintiffs also submitted evidence showing that magazines, with capacities greater than ten rounds, have been integral elements of firearms, dating back to Leonardo Da Vinci, and that Merriweather Lewis and William Clark utilized firearms with such magazines during their expedition (ER 623).

Finally, Plaintiffs demonstrated that six states ban magazines with a capacity of more than ten rounds. Two states ban magazines with a capacity

---

[4] Notably, *Heller's* finding that handguns are the "quintessential self-defense weapon" is predicated on Dr. Kleck's research on defensive firearm usage. *See Parker*, 478 F.3d at 400.

of 15 rounds or more. The remaining 42 states do not place any restrictions on magazine capacity (ER 93-94; AOB Addenda 2-85).

The District Court's findings are amply supported in the record. *McCormack*, 694 F.3d at 1018.

### C. The District Court's Findings Are Also Supported By Americans' Contemporary Preferences.

In recent times, self-defense is the concern that most motivates Americans in firearms purchases. An October 28, 2013 Gallup survey found that personal safety and protection (60%) was the single most important reason why Americans own firearms (Ex. 1). In a 2010 survey conducted by the NSSF, firearms purchasers cited "home protection" (40%) and "personal protection" (36%) as the top-ranking factors that prompted their most recent firearm purchase (Ex. 2). A 2013 NSSF survey found that the top-ranking factors driving first-time gun purchases are home defense (87.3%) and self-defense (76.5%) (Ex. 3).

In finding that Americans prefer handguns for self-defense purposes, *Heller*, 554 U.S. at 629, relied on Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 185 (1995), which determined that 40.1% of all defensive gun uses involved semi-automatic pistols, with

revolvers accounting for 38.5% of such uses.[5]  *See Parker*, 478 F.3d at 400.

Consumer buying guides counsel prospective purchasers to consider their likely self-defense needs before selecting any particular handgun. For example, one buying guide instructs that if the purchaser works on a ranch, and may be required to shoot aggressive wildlife, a large-caliber revolver would be ideal.  When faced with a mass shooter or multiple assailants, a semi-automatic pistol equipped with a standard magazine over ten rounds may prove to be the best option.  A compact revolver would be easier to handle to ward off a sexual assault. Robert K. Campbell, The Gun Digest Book of Personal Protection & Home Defense, at 28-30 (2009).  (*See also* ER 77-80).

The wide and varied product offerings in the marketplace demonstrate that there is no one-size-fits-all approach to self-defense.  But, Americans have come to prefer semiautomatic pistols.  Excluding imports,[6] the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") figures show that

---

[5] Dr. Kleck's study is from 1995.  The defensive gun use percentage of pistols (40.1) versus revolvers (38.5) has shifted more towards pistols over time as the market has shifted.

[6] Unfortunately, the ATF does not differentiate between revolvers and pistols on imported handguns.  Handguns account for the vast majority of firearms imported into the United States (Ex. 4), including some of the most popular brands of pistols with standard magazines over ten rounds, such as Glock, Sig Sauer, and others.

from 1990-2012, domestic manufacturing of semiautomatic pistols (32,429,452) outpaced revolvers (10,021,159) by a ratio of 3:1 (Ex. 4). In contrast, the ATF reported that in 1973, more revolvers were manufactured than pistols by a 3:1 ratio (Ex. 5).

While exact numbers are unknown, the vast majority of those pistols have standard magazines over ten rounds. NSSF's research shows that from 1990-2012 consumers possessed 60,000,000 pistol magazines holding ten rounds or less and 40,000,000 pistol magazines holding 11 rounds or more (ER 620). Given that domestic manufacturing of the latter magazines was illegal for ten of those 22 years, and many manufacturers switched to producing and marketing pistols with the former magazines, the only inference that can be drawn from the evidence is that most American handgun owners have chosen pistols equipped with standard magazines over ten rounds. Indeed, during the ten-year federal ban on magazines holding more than ten rounds (1994 to 2004), such used magazines became highly sought after in the marketplace.

Because they are supported by the record and consistent with Americans' contemporary preferences, the District Court's findings must be upheld on appeal. *McCormack*, 694 F.3d at 1018.

21

### III. THE DISTRICT COURT ERRED BY APPLYING A BALANCING TEST AFTER DETERMINING THAT THE BANNED MAGAZINES WERE IN COMMON USE FOR LAWFUL PURPOSES.

Where, as here, the District Court makes an error of law as to the litigation's underlying legal principles, it abuses its discretion, and its order granting or denying an injunction must be reversed. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).

### A. Once The District Court Found That The Banned Magazines Were Typically Possessed For Self-Defense, *Heller* Mandated Invalidation.

As noted, *Heller's* "Arms" test is categorical – bans on protected "Arms" are invalid, while bans on unprotected "Arms" are valid. *Heller*, 554 U.S. at 629. The *Heller* categorical test is rooted in and derived from the explicit text the Framers used in the Second Amendment that "the right to keep and bear Arms, shall not be infringed." Once it determined that Section 9.44.050 banned magazines typically possessed by law-abiding persons for lawful purposes, the District Court was required to invalidate the law without any further analysis. *Id.*; *see also Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1175 (9th Cir. 2014) (following *Heller* no balancing test applied after finding prohibition on "Arms" usage); *Moore v. Madigan*, 702 F.3d 933, 941-42 (7th Cir. 2012) (same).

22

Instead, the District Court chose to apply intermediate scrutiny and upheld the law. It reasoned that while Section 9.44.050 burdened the "core" Second Amendment right, the burden is "light" because it only bans a "less-preferred subset of magazines." (ER 35).

This was plain error. First, and as discussed above, *Heller* rejected the application of balancing tests and adopted a categorical approach to resolving "Arms" questions. *Id.*, 554 U.S. at 628-629. The District Court, like this Court, is "bound not only by" *Heller's* holding, but also by its categorical "mode of analysis." *Miller*, 335 F.3d at 900 (en banc) (Ninth Circuit courts are "bound not only by the holdings of [Supreme Court] decisions but also by their 'mode of analysis.'")

Second, the degree of infringement is irrelevant under *Heller*. Bans on categorically protected "Arms" cannot be justified on the grounds that they permit reasonable alternatives within or without the type or class of firearms subject to the ban. *Heller*, 554 U.S. at 629; *Parker*, 478 F.3d at 400. Indeed, the Second Amendment displaces Defendants' authority under their police power to dictate their preferences for magazine types; such "policy choices [are] off the table." *Heller*, 554 U.S. at 636.

**B.     The Authorities Relied Upon By The District Court Are Not Binding, Correct, Or Dispositive.**

Despite *Heller*, the District Court relied on non-controlling authorities which applied intermediate scrutiny to large-capacity magazine bans and Second Amendment issues, generally (ER 12).

Yet, all of these non-controlling authorities suffer from the same flaw as the District Court's decision: they failed to apply *Heller's* categorical analysis. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."), cited with approval by *Peruta,* 742 F.3d at 1168.[7]

Moreover, *Heller II* is inapposite.  *Heller II* did not consider handgun magazines, and found that while standard magazines over ten rounds were in "common use" for *rifles*, it "was not certain" that such rifle magazines "are commonly used or are useful specifically for self-defense or hunting."  *See Heller II*, at 1260-61.  Yet the District Court here found that the banned

---

[7] While the Ninth Circuit has cited *Heller II* with approval before, it has been for the opinion's analysis of registration and licensing regulations, not the magazine issue.  *See, e.g., United States v. Chovan*, 735 F.3d 1127, 1138 (2013).

magazines are in "common use" for pistols and rifles and "typically possessed" for self-defense, and recognized that *Heller* does not require more (ER 6-7). Whatever persuasive authority *Heller II* may have, it is factually distinguishable, and the District Court erred by following it instead of *Heller*. *See, e.g.*, *Roberts v. Coll. of the Desert*, 870 F.2d 1411, 1416 (9th Cir. 1988) (out of circuit authority is inapposite where Supreme Court decision on point).

The District Court also relied upon the particularly troubling decision in *San Francisco Veteran Police Officers Ass'n. v. City & Cnty. of San Francisco* ("*SFVPOA*"), No. 13-05351, 2014 WL 644395 (N.D. Cal. Feb. 19, 2014). First, that court mistakenly believed that it was not bound to follow *Heller*'s categorical "Arms" analysis because "our appellate courts" had not yet had occasion to apply it. *Id.* at *4; see *Miller*, 335 F.3d at 900 (lower courts must follow Supreme Court's mode of analysis). Second, *SFVPOA* interpreted *Heller* to hold that only complete bans on handguns trigger categorical invalidation. *Id.* at *4. This is not the law. *Heller*, 554 U.S. at 629; *Parker*, 478 F.3d at 400.

Third, the *SFVPOA* court chose not to apply *Heller* based on its view that individuals simply do not need more than ten rounds to defend

25

themselves. *Id.* at \*4. Courts, however, are not free to recalibrate the Second

Amendment or its underlying policies. *Heller*, 554 U.S. at 634-635.

 The District Court also cited *United States v. Marzzarella*, 595 F.

Supp. 2d 596, 604 (W.D. Pa. 2009) for the proposition that *Heller* implicitly

approved intermediate scrutiny because it was willing to presume the

validity of certain types of firearms regulations (ER 12). But, *Marzzarella*

based this proposition on Justice Breyer's dissent.[8] *See id.* at 604 (citing

*Heller, 554 U.S.* at 688 (Breyer, J., dissenting)). A dissent is not binding

precedent, *United States v. Ameline*, 409 F.3d 1073, 1083 n.5 (9th Cir.

2005), and the District Court had to follow *Heller* even if it disagreed, *Hart

v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001).

## IV. THE DISTRICT COURT'S DECISION ILLUSTRATES WHY A CATEGORICAL APPROACH TO "ARMS" QUESTIONS IS NECESSARY TO PROTECT THE RIGHT.

 In applying intermediate scrutiny, the District Court understood

*Heller* and *McDonald* to mean that it could not second-guess the

---

[8] The District Court also found it persuasive that other courts tend to apply intermediate, as opposed to strict, scrutiny (ER 12). Even gun control advocates recognize that the lower courts have largely disregarded *Heller's* categorical approach in favor of highly deferential intermediate scrutiny consistent with Justice Breyer's interest balancing approach, which "gives them the comfort of applying familiar formulas and enables them to show due respect for the right to keep and bear arms while rarely ever actually using it to strike down a law." *See* Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 Geo. Wash. L.Rev. 703, 706-707, 744-763 (2012).

Legislature's or the People's policy decisions (ER 13). This is incorrect; *Heller* and *McDonald* stand for the proposition that enumeration "takes out of the hands of government" the ability to decide the scope of the core Second Amendment right, "whether or not *future legislatures* or (yes) even *future judges* think that scope too broad." *Heller*, 554 U.S. at 634-35 (emphasis added). *Heller* does not require judges to make empirical policy judgments precisely because enumeration denies them the power to recalibrate the core Second Amendment right on a case-by-case basis. *McDonald*, 130 S.Ct. at 3050.

Indeed, the District Court's opinion illustrates precisely why the scope of core, enumerated rights cannot turn on imperfect judicial balancing.

> ### A. The District Court Effectively Applied Little More Than Rational Basis Review, Relieving The Government Of Its Full Burden Of Proof.

The District Court articulated intermediate scrutiny as "requir[ing] (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." (ER 12-13).

This is wrong. The "fit" prong of intermediate scrutiny requires that the government prove that the challenged statute does not burden the right "substantially more ... than is necessary to further' [the government's

legitimate] interests." *Peruta*, 742 F.3d at 1177. No deference is owed or appropriate in resolving the "fit" prong. *Id.*

Nevertheless, because it believed that it could not question Defendants' policy judgments, the District Court concluded that its analysis "must concentrate more on the relationship between the challenged ordinance and public safety than on the exact effect the law may have." (ER 12-13). Yet, by focusing on the relationship between the law and Defendants' stated interest and ignoring Section 9.44.050's efficacy or burden on the right, the District Court effectively applied *rational basis* scrutiny. *See Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989) (while rational basis review is satisfied "if the law could be thought to further a legitimate governmental goal, without reference to whether it does so at inordinate cost," intermediate scrutiny "require[s] the government goal to be substantial, and the cost to be carefully calculated.").

**B. The District Court Improperly Accepted Defendants' Post Hoc, Litigation-Driven Justifications.**

The District Court found in favor of Defendants because the evidence they submitted purported to show that Section 9.44.050 "*may* reduce the threat of gun violence." (ER 13-14; emphasis added). It relied heavily on the expert opinion of Professor Koper, who opined that Section 9.44.050 "*has the potential*" to reduce gun violence by reducing, among other things,

28

the total number of gun crimes committed with the banned magazines, the number of shots fired, the number of gunshot victims, and wounds per gunshot victim. Based on statistics showing that such magazines are used in 31% to 41% of police homicides, and in 75% of firearms used in mass shootings, Koper testified that Section 9.44.050 would necessarily reduce crime by reducing the availability of such magazines to criminals. Thus, while Defendants were unable to show that Section 9.44.050 would reduce violent crime rates or the total number of gun crimes, the District Court accepted Koper's testimony, concluding that the law "*may still* reduce gun crime by restricting the banned magazines' availability." (ER 14; emphasis added).

Koper's speculative testimony that Section 9.44.050 may reduce gun violence does not satisfy intermediate scrutiny. *Ezell*, 651 F.3d at 708-09; *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (intermediate scrutiny "is not satisfied by mere speculation or conjecture.")

Moreover, intermediate scrutiny requires that the government's justification "be genuine, not hypothesized or invented *post hoc* in response to litigation" or rely on broad generalizations. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Both prongs of the intermediate scrutiny test must be supported by actual, reliable evidence. *Ezell, 651 F.3d at 708-710.* While

Defendants argued that Section 9.44.050 was supported by its interest in reducing gun violence, the legislative history shows that the Sunnyvale City Council and Sunnyvale voters specifically adopted Measure C to reduce mass shootings[9] (ER 219-221; Ex. 6).

Defendants did not submit any expert evidence supporting Section 9.44.050's efficacy in preventing mass shootings. They could not: Koper admitted in another case that he could not offer an opinion to a reasonable degree of scientific certainty[10] that a magazine ban would reduce mass shootings or the number of mass shooting victims (ER 100-110).

In addition, Koper previously testified that his own research would not permit him to opine to a reasonable degree of scientific certainty that handguns with magazines over ten rounds produce more deaths than revolvers (ER 103-105). Thus, Koper's testimony that Section 9.44.050 "may" reduce gun crime was not only speculative, but it amounted to a broad generalization invented entirely for *this* litigation, which could not support the law's real underlying reasons. *Virginia*, 518 U.S. at 533.

---

[9] Ballot arguments and pamphlets are cognizable legislative history in California. *See White v. Davis*, 13 Cal. 3d 757, 775 n.11 (1975).

[10] Plaintiffs submitted this deposition testimony in support of their objection to Professor Koper's testimony as unreliable under Fed. R. Evid. 702-703. *See* Plaintiffs' Objections to Evidence at 45-1, *Fyock, et al. v. The City of Sunnyvale, et al.*, No. 13-05807 (N.D. Cal. Feb. 10, 2014).

In sum, the District Court upheld Section 9.44.050 based on the unsupported belief that the law *would* reduce gun crime simply because it *could* restrict criminal's access to the banned magazines (ER 14). Such unvarnished speculation comes nowhere near to satisfying intermediate scrutiny. A correct analysis would have found Defendants' evidence wanting because Section 9.44.050 precludes law-abiding citizens' exercise of their constitutional rights without any demonstrable effect on the reduction of mass shootings. *See Peruta*, 742 F.3d at 1177.

Furthermore, it is incontrovertible that since the expiration of the federal assault weapons ban in 2004, the number of "Arms" with standard magazines over ten rounds has increased and become more common, if not ubiquitous, while national crime rates continue to decline (Ex. 7).

**C. Over Plaintiffs' Objection, The District Court Based Its Intermediate Scrutiny Analysis On Unreliable Expert Testimony, And Abdicated Its Gatekeeping Role.**

As noted, Plaintiffs objected to Koper's testimony as unreliable under Fed. R. Evid. 702-703. *See* Plaintiffs' Objections to Evidence at 45-1, *Fyock, et al. v. The City of Sunnyvale, et al.*, No. 13-05807 (N.D. Cal. Feb. 10, 2014). The District Court overruled these objections, believing that it can rely on "inadmissible evidence, including hearsay evidence" to resolve a preliminary injunction motion (ER 16).

This ruling was erroneous and prejudicial. *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) holds that a district court may give hearsay affidavits "some weight, when to do so serves the purpose of preventing irreparable harm" to plaintiffs. Similarly, *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) holds that a court may consider uncontroverted, hearsay affidavits supporting a preliminary injunction where it would be too difficult for the plaintiffs to obtain testimony from persons competent to testify at trial. *Flynt* and *Marcos* do not make Defendants' unreliable expert testimony admissible to disprove Plaintiffs' likelihood of success on the merits. *See Attorney Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) (Rules 702-703 apply to preliminary injunctions).

The District Court also overruled Plaintiffs' evidentiary objections as violating the Northern District's local rules on page limits (ER 15). However, local rules may not be "inconsistent with the federal rules," *United States v. Warren*, 601 F.2d 471, 473 (9th Cir. 1979), and Rules 702-703 obligate the District Court to act as a "gatekeeper" in deciding whether Professor Koper's testimony was reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). The District Court abused its discretion by abdicating its gatekeeper role in reliance on the local rules.

*See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014).

## CONCLUSION

For the reasons stated here and in Appellants' opening brief, the District Court's decision should be reversed and remanded, with instructions to enter an order preliminarily enjoining Appellees from enforcing Section 9.44.050, which violates the Second Amendment of the U.S. Constitution.

Respectfully submitted,

WRIGHT & L'ESTRANGE

Dated: May 23, 2014                    By: s/ Robert C. Wright
                                           Robert C. Wright
                                        Attorneys for Amicus Curiae

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Form 8.  Certificate of Compliance with Rule 32(a)

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

I certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☒ This brief contains 6,687 words, excluding the parts of the brief exempted by Fed. R. App. P .32(a)(7)(B)(iii).

    ☐ This brief uses a mono-spaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

    ☐ This brief has been prepared in a mono-spaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated:  May 23, 2014              *s/  Robert C. Wright*
                                  Robert C. Wright

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I hereby certify that on May 23, 2014, I electronically filed the foregoing Brief Of *Amicus Curiae* The National Shooting Sports Foundation, Inc. In Support Of Appellants with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: May 23, 2014              *s/ Robert C. Wright*
                                 Robert C. Wright

*Fyock, et al. v. City of Sunnyvale, et al.*

### Case No. 14-15408

### <u>EXHIBIT INDEX</u>

1.  Art Swift, Gallup, Inc., Personal Safety Top Reason Americans Own Guns Today (Oct. 28, 2013),  http://www.gallup.com/poll/165605/personal-safety-top-reason-americans-own-guns-today.aspx?version=print
…………………………………………...………………………..**PAGE 1**

2.  Press Release, National Shooting Sports Foundation, Inc., NSSF/Harris Poll: Target Shooting, Home Defense Top-ranked (Mar. 31, 2010), http://www.nssf.org/newsroom/releases/2010/033110.cfm?print=x
……………………………………………………………………….**PAGE 4**

3.  Press Release, National Shooting Sports Foundation, Inc., NSSF Study: First-time Gun Buyers (June 24, 2013), http://www.nssf.org/newsroom/releases/2013/062413_FirstTimeBuyers.cfm?print=x
……………………………………………………………………….**PAGE 6**

4.  Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Dept. of Justice, Firearms Commerce in the United States  Annual Statistical Update (2014), http://www.atf.gov/sites/default/files/assets/statistics/CommerceReport/firearms_commerce_annual_statistical_report_2014.pdf
……………………………………………………………………….**PAGE 8**

5.  Bureau of Alcohol, Tobacco and Firearms, Project Identification: A Study of Handguns Used in Crime (1976)
…………………………………………………………………...**PAGE 15**

6.  City of Sunnyvale Ballot Arguments on Measure C
…………………………………………………………………...**PAGE 20**

7.  Statistics on National Crime Rates
…………………………………………………………………...**PAGE 29**

**EXHIBIT 1**

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 45 of 80

October 28, 2013

# Personal Safety Top Reason Americans Own Guns Today

Second Amendment rights, job with police or military are lower on list

by Art Swift

WASHINGTON, D.C. -- President Barack Obama has made strengthening gun control one of his top priorities this year, focusing on expanding background checks and a partial assault weapons ban. Gallup finds that those who already own firearms mention personal safety/protection most frequently as a reason for ownership (60%), followed by hunting, at 36%.

### Reasons Americans Own Guns

There are many reasons why some people choose to own guns and others do not. What are some of the reasons why you own a gun? [Open ended]

|  | Oct 3-6, 2013 % |
|---|---|
| Personal safety/Protection | 60 |
| Hunting | 36 |
| Recreation/Sport | 13 |
| Target shooting | 8 |
| Second Amendment right | 5 |
| Like guns/Wanted one/Enjoy using | 5 |
| Antique/Family heirloom/Passed down | 5 |
| Have always owned/Raised with guns/Family tradition | 4 |
| Related to line of work -- police, military | 3 |
| Animal/Pest control/Euthanize sick animals, pets | 1 |
| Collect guns/Hobby | 1 |
| Other | 1 |
| No reason in particular | 3 |

Note: Percentages total more than 100% due to multiple responses

GALLUP'

GALLUP ANALYTICS: Sign up to learn how you can access Gallup's global database >

Americans who say they personally own a gun were asked this open-ended question in Gallup's Oct. 3-6 annual Crime poll. These 309 gun owners were allowed to provide up to three reasons they own guns.

EXHIBIT 1
Page 1

After personal safety and hunting, general mentions of recreation or sport are third (13%) among the reasons gun owners chose to own a firearm, with 8% citing target shooting.

Only 5% of American gun owners cite "Second Amendment rights," despite its frequent use as an argument against gun control. Three percent say they own a gun related to their line of work in the police or military. Collecting guns as a hobby and euthanizing sick animals or pest control had few mentions.

Gallup asked gun owners in 2000 and 2005 whether they owned a gun for each of three explicit reasons: for protection, for target shooting, or for hunting. The responses then were mostly similar to those found today, particularly if recreation is combined with hunting. While not strictly comparable, the 2000 and 2005 surveys show that the desire to own a gun for protection is not a new phenomenon resulting from recent U.S. mass shootings.

## Implications

Personal protection is the top reason Americans own a gun, as was true in 2000 and 2005. This, rather than views on the Second Amendment, may explain why moving toward greater gun control, as Obama and many Democrats have sought to do, is so difficult. Those who own firearms for protection may feel that their own personal safety is a vital need on which they do not wish to compromise.

The Trend Line: Top Five Reasons Americans Own ...



0:00 / 2:29

Survey Methods

Results for this Gallup poll are based on telephone interviews conducted Oct. 3-6, 2013, on the Gallup Daily tracking survey, with a random sample of 309 gun owners, aged 18 and older, living in all 50 U.S. states and the District of Columbia.

For results based on the total sample of national adults, one can say with 95% confidence that the margin of sampling error is ±7 percentage points.

Interviews are conducted with respondents on landline telephones and cellular phones, with interviews conducted in Spanish for respondents who are primarily Spanish-speaking. Each sample of national adults includes a minimum

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 46 of 80

EXHIBIT l
Page 2

quota of 50% cellphone respondents and 50% landline respondents, with additional minimum quotas by region. Landline and cell telephone numbers are selected using random-digit-dial methods. Landline respondents are chosen at random within each household on the basis of which member had the most recent birthday.

Samples are weighted to correct for unequal selection probability, nonresponse, and double coverage of landline and cell users in the two sampling frames. They are also weighted to match the national demographics of gender, age, race, Hispanic ethnicity, education, region, population density, and phone status (cellphone only/landline only/both, and cellphone mostly). Demographic weighting targets are based on the March 2012 Current Population Survey figures for the aged 18 and older U.S. population. Phone status targets are based on the July-December 2011 National Health Interview Survey. Population density targets are based on the 2010 census. All reported margins of sampling error include the computed design effects for weighting.

In addition to sampling error, question wording and practical difficulties in conducting surveys can introduce error or bias into the findings of public opinion polls.

<u>View methodology, full question results, and trend data</u>.

For more details on Gallup's polling methodology, visit **www.gallup.com**.


<u>Back to Top</u>

Copyright © 2014 Gallup, Inc. All rights reserved.
Gallup, Inc. maintains several registered and unregistered trademarks that include but may not be limited to: A8, Accountability Index, Business Impact Analysis, BE10, CE11, CE11 Accelerator, Clifton StrengthsExplorer, Clifton StrengthsFinder, Customer Engagement Index, Customer Engagement Management, Dr. Gallup Portrait, Employee Engagement Index, Enetrix, Engagement Creation Index, Follow This Path, Gallup, Gallup Brain, Gallup Business Journal, GBJ, Gallup Consulting, Gallup-Healthways Well-Being Index, Gallup Management Journal, GMJ, Gallup Panel, Gallup Press, Gallup Tuesday Briefing, Gallup University, Gallup World News, HumanSigma, HumanSigma Accelerator, ICE11, I10, L3, ME25, NurseInsight, NurseStrengths, Patient Quality System, Performance Optimization, Power of 2, PrincipalInsight, Q12, Q12 Accelerator, Q12 Advantage, Selection Research, Inc., SE25, SF34, SRI, Soul of the City, Strengths Spotlight, Strengths-Based Selling, StatShot, StrengthsCoach, StrengthsExplorer, StrengthsFinder, StrengthsInsight, StrengthsQuest, SupportInsight, TX(R+E+R)=P3, TeacherInsight, The Gallup Path, The Gallup Poll, The Gallup School, VantagePoint, Varsity Management, Wellbeing Finder, Achiever, Activator, Adaptability, Analytical, Arranger, Belief, Command, Communication, Competition, Connectedness, Consistency, Context, Deliberative, Developer, Discipline, Empathy, Fairness, Focus, Futuristic, Harmony, Ideation, Includer, Individualization, Input, Intellection, Learner, Maximizer, Positivity, Relator, Responsibility, Restorative, Self-Assurance, Significance, Strategic, and Woo. All other trademarks are the property of their respective owners. These materials are provided for noncommercial, personal use only. Reproduction prohibited without the express permission of Gallup, Inc.

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 47 of 80



EXHIBIT 1
Page 3

**EXHIBIT 2**



NATIONAL SHOOTING SPORTS FOUNDATION, INC.

11 Mile Hill Road ▪ Newtown, CT 06470-2359 ▪ Tel (203) 426-1320 ▪ Fax (203) 426-1087

**www.nssf.org**

## PRESS RELEASE

To: ALL MEDIA
*For immediate release*

For more information contact:

**Bill Brassard**
203-426-1320

March 31, 2010

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 49 of 80

# NSSF/Harris Poll: Target Shooting,
# Home Defense Top-ranked

NEWTOWN, Conn.— A new National Shooting Sports Foundation poll conducted by Harris Interactive found that more Americans are target shooting now than six months ago, and that "home and personal defense" were the main reasons Americans recently purchased firearms.

The poll also showed that 43 percent of respondents, which equates to nearly 98 million people, expressed some level of interest in participating in the shooting sports or hunting.

"Last year was a banner year for lawful firearm sales, and the results of this poll suggest the desires for personal security and recreation were drivers of most of those purchases," said Steve Sanetti, president of the National Shooting Sports Foundation, trade association for the firearms industry. "The poll also reaffirms something we've known for a long time— that many millions of Americans want to try target shooting or hunting and are just waiting for an invitation from an experienced shooter to go to the range or afield. So, firearms owners, what are you waiting for? Make that invitation and share the enjoyment of recreational shooting or hunting with someone eager to go."

The online survey was conducted March 16-18 by Harris Interactive, which performs periodic surveys for NSSF on shooting and hunting participation. The questions were asked of general population adults 18 and over.

Findings from the NSSF/Harris poll include:

- Some 18.4 million Americans "currently participate" in handgun target shooting and 14.8 million in rifle target shooting, an increase from the 16.8 million and 13.9 million, respectively, from an NSSF poll conducted by Harris Interactive last September.

- Participation in the shotgun sports of "skeet/trap" and "sporting clays" was 4.2 million in each of those categories.

- In response to a question about why Americans made their most recent firearm purchase, 40 percent of respondents said "home protection" followed by 36 percent citing "personal protection." Target shooting (30 percent) and hunting (28 percent) came next.

- The main barrier to people going target shooting more often? "Cost of ammunition" was cited by 50 percent of the respondents, followed by "not enough free time" (43 percent).

- The survey highlighted the power of a personal invitation to motivate an individual to go target shooting or hunting. Some 45 percent of respondents said an "invitation from friend or family" would most encourage them to participate, ranking this personal interaction far ahead of all forms of advertising.

- Once invited by a friend or family member, respondents said they would want to . . .
  - Shoot a handgun at the range (77 percent)
  - Shoot a rifle at the range (69 percent)



EXHIBIT 2
Page 4

- Go plinking (55 percent)
- Fire shotguns at clay targets (54 percent)
- Take a self-protection class (54 percent)
- Go hunting for various game species, which was cited by an average of 25 percent of respondents.

To learn more about the shooting sports and firearm safety, visit nssf.org.

Click here to view complete survey data.

-30-

**About NSSF**

*The National Shooting Sports Foundation is the trade association for the firearms industry. Its mission is to promote, protect and preserve hunting and the shooting sports. Formed in 1961, NSSF has a membership of more than 5,500 manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations and publishers. For more information, log on to www.nssf.org.*

PROMOTE          PROTECT          PRESERVE

EXHIBIT 2
Page 5

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 50 of 80

**EXHIBIT 3**



# NATIONAL SHOOTING SPORTS FOUNDATION, INC.

11 Mile Hill Road ∙ Newtown, CT 06470-2359 ∙ Tel (203) 426-1320 ∙ Fax (203) 426-1087

nssf.org

## PRESS RELEASE

To: ALL MEDIA
*For immediate release*

June 24, 2013

For more information contact:

**Bill Brassard Jr.**
203-426-1320

## NSSF® Study: First-time Gun Buyers

EXHIBIT 3
Page 6



*Log in to view the report*

NEWTOWN, Conn. -- A study commissioned by the National Shooting Sports Foundation® reveals that first-time gun buyers are largely active in one or more shooting activities and that women are motivated to purchase their first firearm predominately for personal defense.

NSSF is the trade association for the firearms, ammunition, hunting and shooting sports industry.

The study, "NSSF Report: First-Time Gun Buyer," was done to help determine the motivations for the first firearm purchase and how these firearms are being used. The online research was conducted in March -- April 2013 and involved consumers aged 22 to 65 who bought their first firearm during 2012. InfoManiacs Inc., conducted the research.

Key findings include . . .

- The majority of first-time buyers (60.3 percent) tend to be active, using their gun once per month or more, with one in five reporting usage of once a week or more.
- Target shooting is by far the most popular shooting activity among first-time gun owners, with 84.3 percent of respondents saying they used their firearms for this purpose, followed by hunting (37.7 percent) and plinking (27.4 percent). Practical pistol shooting (17.3 percent) and clay-target shooting (14.6 percent) were shooting sports also enjoyed by first-time buyers.
- First-time gun owners who have participated in hunting (53.2 percent), practical pistol shooting (46.3 percent), clay-target sports (44.0 percent) and gun collecting (42.4 percent) said they want to increase their participation in these activities.

The top-ranking factors driving first-time gun purchases are home defense (87.3 percent), self-defense (76.5 percent) and the desire to share shooting activities with family and friends (73.2 percent). Women, in particular, are highly focused on personal defense and self-sufficiency.

Older first-time buyers--the 55 to 65 age group--indicated concern that firearms may no longer be available to them was one of many reasons for their purchase.

Most first-time buyers purchased their guns through local gun shops (43.6 percent) and mass retailers such as Walmart and Cabela's (33.6 percent). First-time gun buyers spent an average of $515 for their first gun and nearly as much for accessories ($504). Nearly a quarter of first-time buyers bought at least one more firearm within the first year after their first purchase spending more, on average, on the later purchase.

This report is exclusive to NSSF members and can accessed by logging in at www.nssf.org/members and selecting NSSF Industry Research. For additional information pertaining to NSSF industry research please visit www.nssf.org/research or contact NSSF Director Industry Research and Analysis Jim Curcuruto at jcucuruto@nssf.org.

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 52 of 80

**About NSSF®**

*The National Shooting Sports Foundation® is the trade association for the firearms industry. Its mission is to promote, protect and preserve hunting and the shooting sports. Formed in 1961, NSSF has a membership of more than 8,000 manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations and publishers. For more information, log on to www.nssf.org.*

PROMOTE     PROTECT     PRESERVE

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 53 of 80

EXHIBIT 3
Page 7

**EXHIBIT 4**

Case: 14-15408, 05/22/2014, ID: 9107818, DktEntry: 25, Page 55 of 80

# Firearms Commerce

## in the

## United States

### Annual Statistical Update

### 2014

**United States Department of Justice**

**Bureau of Alcohol, Tobacco, Firearms and Explosives**

EXHIBIT 4
Page 8

# Exhibit 1. Firearms Manufactured (1986-2012)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 662,973 | 761,414 | 970,507 | 641,482 | 4,558 | 3,040,934 |
| 1987 | 964,561 | 722,512 | 1,007,661 | 857,949 | 6,980 | 3,559,663 |
| 1988 | 1,101,011 | 754,744 | 1,144,707 | 928,070 | 35,345 | 3,963,877 |
| 1989 | 1,404,753 | 628,573 | 1,407,400 | 935,541 | 42,126 | 4,418,393 |
| 1990 | 1,371,427 | 470,495 | 1,211,664 | 848,948 | 57,434 | 3,959,968 |
| 1991 | 1,378,252 | 456,966 | 883,482 | 828,426 | 15,980 | 3,563,106 |
| 1992 | 1,669,537 | 469,413 | 1,001,833 | 1,018,204 | 16,849 | 4,175,836 |
| 1993 | 2,093,362 | 562,292 | 1,173,694 | 1,144,940 | 81,349 | 5,055,637 |
| 1994 | 2,004,298 | 586,450 | 1,316,607 | 1,254,926 | 10,936 | 5,173,217 |
| 1995 | 1,195,284 | 527,664 | 1,411,120 | 1,173,645 | 8,629 | 4,316,342 |
| 1996 | 987,528 | 498,944 | 1,424,315 | 925,732 | 17,920 | 3,854,439 |
| 1997 | 1,036,077 | 370,428 | 1,251,341 | 915,978 | 19,680 | 3,593,504 |
| 1998 | 960,365 | 324,390 | 1,535,690 | 868,639 | 24,506 | 3,713,590 |
| 1999 | 995,446 | 335,784 | 1,569,685 | 1,106,995 | 39,837 | 4,047,747 |
| 2000 | 962,901 | 318,960 | 1,583,042 | 898,442 | 30,196 | 3,793,541 |
| 2001 | 626,836 | 320,143 | 1,284,554 | 679,813 | 21,309 | 2,932,655 |
| 2002 | 741,514 | 347,070 | 1,515,286 | 741,325 | 21,700 | 3,366,895 |
| 2003 | 811,660 | 309,364 | 1,430,324 | 726,078 | 30,978 | 3,308,404 |
| 2004 | 728,511 | 294,099 | 1,325,138 | 731,769 | 19,508 | 3,099,025 |
| 2005 | 803,425 | 274,205 | 1,431,372 | 709,313 | 23,179 | 3,241,494 |
| 2006 | 1,021,260 | 385,069 | 1,496,505 | 714,618 | 35,872 | 3,653,324 |
| 2007 | 1,219,664 | 391,334 | 1,610,923 | 645,231 | 55,461 | 3,922,613 |
| 2008 | 1,609,381 | 431,753 | 1,734,536 | 630,710 | 92,564 | 4,498,944 |
| 2009 | 1,868,258 | 547,195 | 2,248,851 | 752,699 | 138,815 | 5,555,818 |
| 2010 | 2,258,450 | 558,927 | 1,830,556 | 743,378 | 67,929 | 5,459,240 |
| 2011 | 2,598,133 | 572,857 | 2,318,088 | 862,401 | 190,407 | 6,541,886 |
| 2012 | 3,487,883 | 667,357 | 3,168,206 | 949,010 | 306,154 | 8,578,610 |

Source: ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1]Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies. The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act. For example, calendar year 2012 data was due to ATF by April 1, 2013, but not published until January 2014.



EXHIBIT 4
Page 9

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 57 of 80



Exhibit 1a. Firearms Manufactured (1986-2012)

2

EXHIBIT 4
Page 10

# Exhibit 2. Firearms Manufacturers' Exports (1986 - 2012)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 16,511 | 104,571 | 37,224 | 58,943 | 199 | 217,448 |
| 1987 | 24,941 | 134,611 | 42,161 | 76,337 | 9,995 | 288,045 |
| 1988 | 32,570 | 99,289 | 53,896 | 68,699 | 2,728 | 257,182 |
| 1989 | 41,970 | 76,494 | 73,247 | 67,559 | 2,012 | 261,282 |
| 1990 | 73,398 | 106,820 | 71,834 | 104,250 | 5,323 | 361,625 |
| 1991 | 79,275 | 110,058 | 91,067 | 117,801 | 2,964 | 401,165 |
| 1992 | 76,824 | 113,178 | 90,015 | 119,127 | 4,647 | 403,791 |
| 1993 | 59,234 | 91,460 | 94,272 | 171,475 | 14,763 | 431,204 |
| 1994 | 93,959 | 78,935 | 81,835 | 146,524 | 3,220 | 404,473 |
| 1995 | 97,969 | 131,634 | 90,834 | 101,301 | 2,483 | 424,221 |
| 1996 | 64,126 | 90,068 | 74,557 | 97,191 | 6,055 | 331,997 |
| 1997 | 44,182 | 63,656 | 76,626 | 86,263 | 4,354 | 275,081 |
| 1998 | 29,537 | 15,788 | 65,807 | 89,699 | 2,513 | 203,344 |
| 1999 | 34,663 | 48,616 | 65,669 | 67,342 | 4,028 | 220,318 |
| 2000 | 28,636 | 48,130 | 49,642 | 35,087 | 11,132 | 172,627 |
| 2001 | 32,151 | 32,662 | 50,685 | 46,174 | 10,939 | 172,611 |
| 2002 | 22,555 | 34,187 | 60,644 | 31,897 | 1,473 | 150,756 |
| 2003 | 16,340 | 26,524 | 62,522 | 29,537 | 6,989 | 141,912 |
| 2004 | 14,959 | 24,122 | 62,403 | 31,025 | 7,411 | 139,920 |
| 2005 | 19,196 | 29,271 | 92,098 | 46,129 | 7,988 | 194,682 |
| 2006 | 144,779 | 28,120 | 102,829 | 57,771 | 34,022 | 367,521 |
| 2007 | 45,053 | 34,662 | 80,594 | 26,949 | 17,524 | 204,782 |
| 2008 | 54,030 | 28,205 | 104,544 | 41,186 | 523 | 228,488 |
| 2009 | 56,402 | 32,377 | 61,072 | 36,455 | 8,438 | 194,744 |
| 2010 | 80,041 | 25,286 | 76,518 | 43,361 | 16,771 | 241,977 |
| 2011 | 121,035 | 23,221 | 79,256 | 54,878 | 18,498 | 296,888 |
| 2012 | 128,313 | 19,643 | 81,355 | 42,858 | 15,385 | 287,554 |

Source: ATFs' Annual Firearms Manufacturing and Exportation Report (AFMER).

[1]Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 58 of 80



EXHIBIT 4
Page 11

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 59 of 80



Exhibit 2a. Firearms Manufacturers' Exports (1986 - 2012)

4

EXHIBIT 4
Page 12

## Exhibit 3. Firearms Imports (1986 - 2013)

| Calendar Year | Shotguns | Rifles | Handguns | Total |
|---|---|---|---|---|
| 1986 | 201,000 | 269,000 | 231,000 | 701,000 |
| 1987 | 307,620 | 413,780 | 342,113 | 1,063,513 |
| 1988 | 372,008 | 282,640 | 621,620 | 1,276,268 |
| 1989 | 274,497 | 293,152 | 440,132 | 1,007,781 |
| 1990 | 191,787 | 203,505 | 448,517 | 843,809 |
| 1991 | 116,141 | 311,285 | 293,231 | 720,657 |
| 1992 | 441,933 | 1,423,189 | 981,588 | 2,846,710 |
| 1993 | 246,114 | 1,592,522 | 1,204,685 | 3,043,321 |
| 1994 | 117,866 | 847,868 | 915,168 | 1,880,902 |
| 1995 | 136,126 | 261,185 | 706,093 | 1,103,404 |
| 1996 | 128,456 | 262,568 | 490,554 | 881,578 |
| 1997 | 106,296 | 358,937 | 474,182 | 939,415 |
| 1998 | 219,387 | 248,742 | 531,681 | 999,810 |
| 1999 | 385,556 | 198,191 | 308,052 | 891,799 |
| 2000 | 331,985 | 298,894 | 465,903 | 1,096,782 |
| 2001 | 428,330 | 227,608 | 710,958 | 1,366,896 |
| 2002 | 379,755 | 507,637 | 741,845 | 1,629,237 |
| 2003 | 407,402 | 428,837 | 630,263 | 1,466,502 |
| 2004 | 507,050 | 564,953 | 838,856 | 1,910,859 |
| 2005 | 546,403 | 682,100 | 878,172 | 2,106,675 |
| 2006 | 606,820 | 659,393 | 1,166,309 | 2,432,522 |
| 2007 | 725,752 | 631,781 | 1,386,460 | 2,743,993 |
| 2008 | 535,960 | 602,364 | 1,468,062 | 2,606,386 |
| 2009 | 558,679 | 864,010 | 2,184,417 | 3,607,106 |
| 2010 | 509,913 | 547,449 | 1,782,585 | 2,839,947 |
| 2011 | 529,056 | 998,072 | 1,725,276 | 3,252,404 |
| 2012 | 973,465 | 1,243,924 | 2,627,201 | 4,844,590 |
| 2013 | 936,235 | 1,507,776 | 3,095,528 | 5,539,539 |

Source: ATF and United States International Trade Commission.

Statistics prior to 1992 are for fiscal years; 1992 is a transition year with five quarters.

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 60 of 80

EXHIBIT 4
Page 13

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 61 of 80



Exhibit 3a. Firearms Imports (1986 - 2013)

EXHIBIT 4
Page 14

**EXHIBIT 5**

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 63 of 80



# PROJECT IDENTIFICATION

## A Study of Handguns used in Crime



**Bureau of Alcohol, Tobacco and Firearms**

EXHIBIT 6
Page 15

**In these cities**

| | | | |
|---|---|---|---|
| New York | Dallas | Miami/Dade County | Boston |
| Detroit | Denver | Minneapolis/St. Paul | Louisville |
| New Orleans | Kansas City | Philadelphia | Charlotte |
| Atlanta | Oakland | Seattle | Los Angeles |

ATF P 3310.1 (5/76)

KF
3941
P76
1976

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 64 of 80

# PROJECT IDENTIFICATION





91125

JUN 1976
RECEIVED
MARVIN KRATTER
LAW LIBRARY

1

# A Message From the Director

Project Identification was begun in 1973 by the Bureau of Alcohol, Tobacco and Firearms as a cooperative study with selected police departments to determine the types of guns being used in crimes, and their sources. The project was conducted in 16 diverse cities—New York, Atlanta, Detroit, New Orleans, Dallas, Denver, Kansas City, Philadelphia, Oakland, Miami/Dade County, Florida, Minneapolis/St. Paul, Seattle, Boston, Charlotte, Louisville and Los Angeles.

As the nation's firearms expert, ATF has sought to learn as much as possible concerning the use of guns in crime. With such knowledge, we seek to stem the flow of firearms into the hands of criminals or would be criminals.

This study was not concerned with the question of gun control, but was concentrated solely on the collection of data which would serve to increase our knowledge of the criminal misuse of firearms.

The Bureau is indebted to the police departments of the 16 cities involved for their complete cooperation.

*Rex D. Davis*

Rex D. Davis
Director, Bureau of
Alcohol, Tobacco and Firearms

EXHIBIT 5
Page 16

DEPOSITORY ITEM

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 65 of 80

# PROJECT IDENTIFICATION

**A Study of Crime Handguns**

## HIGHLIGHTS

 Seventy-one percent, or 7,538, of the handguns submitted for tracing, had a barrel length of 3 inches or less. Sixty-one percent, or 6,476, had a caliber of .32 or less. Since both of these factors relate to the size of the weapon, these figures indicate that concealability is an overriding factor in selecting a handgun for use in crime.

2

 Pawnshops supplied a disproportionate number of inexpensive, easily concealed handguns used in street crimes.

 The percentage of crime handguns purchased interstate was directly proportionate to the degree of local handgun control.

 Six percent of the handguns submitted for tracing were reported stolen. However, it is likely that the true figure is much higher due to a reluctance to report the theft of firearms. (NOTE: Further studies are being made in this area.)

 The breakdown of these crime handguns was 76 percent revolvers and 24 percent semi-automatic pistols. This may indicate a predilection for simply operated, mechanically understandable handguns for use in crimes.

 Forty-five percent, or 3,486, of the weapons successfully traced had a value of less than $50 *and* a barrel length of 3 inches or less *and* a caliber of .32 or less.

   These highlights are preliminary conclusions. Because of the considerable statistical data collected by the Bureau, further analysis should reveal more information concerning the use of handguns in crime. Individuals and organizations are encouraged to conduct independent studies of the published data. With such a wealth of Project I material yet to be reviewed, perhaps more far reaching trends and conclusions may be discovered.

EXHIBIT 5
Page 17

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 66 of 80

# PROJECT IDENTIFICATION

**A Study of Crime Handguns**

## BACKGROUND

During the early part of 1970, an ATF agent in New York City purchased on the streets a small handgun of the caliber and size from which the term "Saturday Night Special" was derived. He paid more than $100 for the gun. A trace of the gun disclosed that originally it had been sold by a retail outlet in South Carolina. Investigation revealed that several licensed dealers in South Carolina were working in collusion with North Carolina and New York City residents to transfer handguns illegally from one state to another. It was estimated that approximately 40,000 small, inexpensive handguns were involved in these illegal transactions. As a result of the investigation, ATF brought charges against 17 persons. All of the dealers involved were convicted and put out of the retail gun business.

Following this, ATF proceeded with plans to study the scope of illegal handguns in several major cities to learn how criminals were acquiring guns and what could be done about it. Thus Project Identification was begun in Detroit, Atlanta and New Orleans. The police department in each city was asked to provide ATF with a list of all firearms seized by the department during the 6 months from July, 1973, to December, 1973. ATF then traced the handguns. No long guns were traced.

Of the total number of serial numbers or descriptions received from the police departments, some of the guns were "untraceable" because records on these guns did not exist or were not available. The rest then were traced from manufacturer or importer to the first retail outlet in the state of the originating project city.

In August, 1973, New York Mayor John V. Lindsay asked that Project Identification (I) include the City of New York because of the problem the police department was experiencing with handguns, in spite of existing strict laws in both New York City and the State of New York. His request was granted.

Project I objectives were to identify the sources of handguns used in street crimes, and to develop intelligence for ATF and police departments regarding illegal firearms dealers, firearms theft rings and other suppliers of handguns to criminals.

In processing voluminous identification data, it became apparent that in addition to the original objectives of determining street gun sources, considerable statistical data relating to types of guns used in street crimes was being channeled through ATF. As a result, in December, 1973, a

3

EXHIBIT 5
Page 18

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 67 of 80

### TYPE

| | | |
|---|---|---|
| Revolvers | - | 76% |
| Semi-automatic pistols | - | 24% |



*Revolver*

*Pistol*

This three to one ratio, indicating that the revolver is the more heavily favored weapon by the criminal element, is directly proportional to the type of handguns manufactured in the United States. During the first 10 months of 1975, approximately 1.5 million revolvers were produced as compared to approximately 500,000 semi-automatic pistols; a ratio of three to one.

Another factor to be considered concerning "type" of weapon is that most individuals, exclusive of the law enforcement community and gun enthusiasts, do not fully understand the mechanical workings of the various types of weapons. When an individual acquires a handgun, whether for self-protection or to rob a gas station, his concern may be to obtain a weapon that will be simple to operate.

### BARREL LENGTH

| | | |
|---|---|---|
| Barrel 3" or less | - | 71% |
| Barrel over 3" | - | 29% |

Barrel length of a handgun relates directly to concealability and as such it is probably the single most significant factor in the entire project. Its significance stands alone and is not dependent upon any other factor.

Even though complete statistics are not available for the specific reasons that police acquired each handgun in all studies, a review of individual trace forms indicate that many of these weapons were used in street crimes or they were related to "carrying concealed weapon" charges. If a weapon is

10

EXHIBIT 5
Page 19

**EXHIBIT 6**

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 69 of 80

Arguments in support or opposition of the proposed laws are the opinions of the authors.

## Argument In Favor of Measure _C_

*[Pursuant to §9282: Maximum 300 words]*

Many of us in Sunnyvale are concerned about the risks to our families from stolen, improperly secured, or large-capacity weapons in private hands. Multiple levels of government have been slow to act on these concerns. Accordingly, Sunnyvale Citizens for Sensible Gun Measures (www.SV4SGM.org) was formed to do whatever was possible at the local level to increase our safety. This Measure includes four regulations that have been successfully implemented in other cities.

1. Report Firearm Loss or Theft within 48 Hours

This requirement attacks gun trafficking by alerting law enforcement to missing weapons, while helping gun owners recover their missing property.

2. Lock Up Firearms

Easy access to guns in the home kills children and increases suicides. This measure requires firearms in the home to be disabled with a safety device or in a locked container if not in the owner's immediate possession.

3. Prohibit Possession of Large-Capacity Magazines

California already prohibits the manufacture, sale and purchase of ammunition magazines holding more than ten rounds, due to their role in many mass shootings. This ordinance prohibits their possession as well. It allows 90 days for disposal by sale or donation.

4. Log Ammunition Sales

Whoever sells ammunition in Sunnyvale must keep and maintain records of sales, which Public Safety may view upon request. Persons prohibited from having guns will either be deterred from purchasing ammunition, or their illegal gun use will be detected.

We cannot solve the gun violence problem by ourselves. But we can all make our city safer and prevent gun-related tragedies in Sunnyvale without compromising anyone's individual rights. We urge you to vote YES on Measure _C_ .



EXHIBIT _C_
Page _10_

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 70 of 80

The undersigned proponent(s) or author(s) of the (primary/~~rebuttal~~) argument (in favor of / ~~against~~) Ballot Measure _C_ at the General Municipal Election for the City of Sunnyvale to be held on November 5, 2013 hereby state that this argument is true and correct to the best of ~~(his/her~~/their) knowledge and belief.

Signed:

| | | Residence Address | Official Use Only |
|---|---|---|---|
| 1 | Print Name _Anthony Spitaleri_ <br> Signature _Anthony Spitaleri_ <br> Organization / Title: _Mayor of Sunnyvale_ <br> Date _7/24/13_ | _545 S. Frances St Sunnyvale CA 94086_ | |
| 2 | Print Name _Jim Davis_ <br> Signature _Jim Davis_ <br> Organization / Title: _Councilmember / Retired Public Safety Officers_ <br> Date _7/24/13_ | _424 Southwood Ave. Sunnyvale, Ca 94086_ | |
| 3 | Print Name _Carol L. Weiss_ <br> Signature _Carol L. Weiss_ <br> Organization / Title: _Co-founder - Sunnyvale Citizens for Sensible Gun Measures_ <br> Date _7/24/2013_ | _778 Steuben Drive Sunnyvale, CA 94087_ | |
| 4 | Print Name _Donald P. Veith Jr._ <br> Signature _Donald P. Veith Jr._ | _955 Iris Ave. Sunnyvale CA 94086_ | |

EXHIBIT 6
Page 21

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 71 of 80

| Co-chair, Santa Clara Co., Brady Campaign | |
|---|---|
| Organization / Title: to Prevent Gun Violence | |
| Date 7/29/13 | |

| 5 | Print Name Kulvinder Singh Gitt | Residence Address 201 W. California Ave. # 1022 Sunnyvale, CA 94086 |
|---|---|---|
| | Signature _Kuhi S Gir_ | |
| | Organization / Title: Small Business Owner | |
| | Date 29 July 2013 | |



RECEIVED
JUL 29 2013
CITY CLERK'S OFFICE
CITY OF SUNNYVALE

EXHIBIT 6
Page 22

Arguments in support or opposition of the proposed laws are the opinions of the authors.

## Rebuttal To Argument Against Measure C

*[Pursuant to §9285: Maximum 250 words]*

Newtown, Connecticut had a low crime rate. So did Santa Monica. So did Sunnyvale, but that didn't stop Richard Farley from fatally shooting 7 and wounding 4 more here at ESL in 1988.

We do have an urgent public safety problem. There are many guns out there, even in Sunnyvale. We must act to prevent another mass shooting, suicides, injuries, and accidental deaths.

The opposition's argument makes statements that just aren't true. The truth is:

- Existing state law does not preempt or duplicate this measure.
- City Council voted 6-1 to let you decide on this measure.
- Councilmember Davis never said this measure wouldn't work. He voted to put it on the ballot and signed the argument for it.
- This measure will work. Large-capacity gun magazine bans have been shown to reduce their availability and use. Studies show that safe storage measures significantly reduce youth suicide and other firearm deaths among children. Since Sacramento required ammunition sales logs, Sacramento police have seized hundreds of guns from felons, gang members, and sex offenders.

The opponents threaten "unknown costs." This measure will give our police tools to fight crime at little cost to our city. The opponents bluster about lawsuits against Sunnyvale. No city has successfully been sued over these regulations.

We can make Sunnyvale safer for all our families. Vote YES on Measure C on November 5.


EXHIBIT 6
Page 23

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 72 of 80

The undersigned proponent(s) or author(s) of the (primary/rebuttal) argument (in favor of / against) Ballot Measure _C_ at the General Municipal Election for the City of Sunnyvale to be held on November 5, 2013 hereby state that this argument is true and correct to the best of (his/her/their) knowledge and belief.

Signed:

| | | | Official Use Only |
|---|---|---|---|
| 1 | Print Name_OTTO LEE_ <br> Signature _Otto C. Lee_ <br> Organization / Title: _Former Sunnyvale Mayor_ <br> Date _August 7, 2013_ | Residence Address <br> 813 Cadis Court <br> Sunnyvale CA <br> 94086 | |
| 2 | Print Name _Karen Pandula_ <br> Signature _Karen Pandula_ <br> Organization / Title: _member of Moms Demand Action_ <br> Date _August 8, 2013_ | Residence Address <br> 1035 Katrine Ct. <br> Sunnyvale, CA <br> 94087 | |
| 3 | Print Name _Rev. Genavieve Heywood and the Congregational Community Church, UCC_ <br> Signature _Rev Genavieve Heywood_ <br> Organization / Title: _Pastor Congregational Community Church, UCC_ <br> Date _8/11/13_ | Residence Address <br> 1141 Reed Ave <br> Unit A <br> Sunnyvale, CA <br> 94086 | |
| 4 | Print Name _Margaret Okuzumi_ <br> Signature _Margaret Okuzumi_ <br> Organization / Title: _Member, Sunnyvale Citizens for Sensible Gun Measures_ <br> Date _8/11/13_ | Residence Address <br> 749 Winstead Ter <br> Sunnyvale CA 94087 | |

EXHIBIT 6
Page 24

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 74 of 80

| | | Residence Address | |
|---|---|---|---|
| 5 | Print Name _Benjamin H Picard_<br>Signature _Ben Picard_<br>Organization / Title: _Sunnyvale Educator_<br>Date _8/12/13_ | _559 W Remington Drive_<br>_Sunnyvale CA 94087_ | |



R E C E I V E D

AUG 12 2013

CITY CLERK'S OFFICE
CITY OF SUNNYVALE

EXHIBIT 6
Page 25

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 75 of 80

**AUTHORIZATION FOR ANOTHER PERSON OR PERSONS TO PREPARE, SUBMIT OR SIGN THE REBUTTAL ARGUMENT**

The following author or majority of ___5___ authors of the Argument
    ☒ In Favor of    ☐ Against

Measure ____ authorize(s) the following person(s) to prepare, submit or sign the Rebuttal to the Argument
    ☐ In Favor of    ☒ Against

Measure ____ for the City of Sunnyvale Election to be held on November 5, 2013.

Signature(s) of the author or majority of the authors of the Argument
    ☒ In Favor of    ☐ Against    Measure ____ are required:

| Carol L. Weiss | _(signature)_ | 7/26/2013 |
| Name (Print) | Signature | Date |
| Jim Davis | _(signature)_ | 7/26/2013 |
| Name (Print) | Signature | Date |
| Anthony Spitaleri | _(signature)_ | 7/29/2013 |
| Name (Print) | Signature | Date |

The following authors are authorized to prepare, submit or sign the Rebuttal to the Argument
    ☐ In Favor of    ☒ Against    Measure _C_

Signed:

|   |   | Residence Address | Official Use Only |
|---|---|---|---|
| 1 | Print Name Otto Lee<br>Signature _____<br>Organization / Title: _____<br>Date _____ | | |
| 2 | Print Name Karen Pandula<br>Signature _____<br>Organization / Title: _____<br>Date _____ | Residence Address | |
| 3 | Print Name Rev. Genevieve Heywood<br>Signature _____<br>Organization / Title: _____<br>Date _____ | Residence Address | |

EXHIBIT 6
Page 26

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 76 of 80

| | | | |
|---|---|---|---|
| 4 | Print Name Margaret Okuzumi<br><br>Signature _____<br>Organization / Title: _____<br>Date _____ | Residence Address | |
| 5 | Print Name Benjamin H. Picard<br><br>Signature _____<br>Organization / Title: _____<br>Date _____ | Residence Address | |

Attach this form to the Form of Statement of Authors Form submitted with the Argument
□ In Favor of          □ Against          Measure ____

EXHIBIT 6
Page 27



# Yes on C

### GUN SAFETY FOR SUNNYVALE

May 20, 2014

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 77 of 80

home

Measure C

Report stolen firearms

Lock your guns

No high-capacity magazines

Keep records of ammunition sales

state bills

gun safety links

contact

### *3. No person may own or possess ammunition magazines that have the capacity to hold more than 10 rounds of ammunition.*

The reason for banning high-capacity magazines has everything to do with mass shootings: in Newtown Adam Lanza had 30-round magazines and shot off more than 150 rounds in five minutes.(1) A handful of children got away while he was changing magazines. In Aurora, the shooter had a 100-round drum for his rifle and shot 70 people in 90 seconds.(2) In Tucson, the shooter was taken down when a sixty one year-old woman disrupted him in the act of changing magazines so that he could be tackled.(3) Magazine capacity is not an issue in hunting or target shooting. It matters in situations where people are shooting at people, in a military firefight, or a gun battle between gangs or between criminals and police, or most glaringly when a disturbed individual is trying to kill as many people as he can before he commits suicide or the police do it for him. If a defender fires shots during a home invasion, most likely it will be 2 rounds.(4)

In California we have already decided that any gun owner's wish to be able to shoot more than ten bullets without pausing is outweighed by the need to limit the capability of disturbed individuals to kill many people very quickly.

It is already against the law in California to manufacture or sell magazines with a greater-than-ten-round capacity.(5) The next logical step is to phase out the possession of these magazines designed for shooting and killing people.

*References:*

1 http://www.courant.com/news/opinion/editorials/hc-ed-gun-bill-in-newtown-memory-20130403,0,3618090.story
2 http://articles.washingtonpost.com/2012-07-20/world/35488879_1_assault-rifle-police-chief-dan-oates-movietheater
3 http://abcnews.go.com/Politics/patricia-maisch-describes-stopping-gunmanreloading/story?id=12577933#.UcEvm5yC1fw

4 http://thinkinggunfighter.blogspot.com/2012/03/self-defense-findings.html
5 California Penal Code §12020(c)(25)



EXHIBIT 6
Page 28

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 78 of 80

EXHIBIT 7

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

## SPECIAL REPORT

MAY 2013

NCJ 241730

# Firearm Violence, 1993-2011

Michael Planty, Ph.D., and Jennifer L. Truman, Ph.D., *BJS Statisticians*

Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 79 of 80

I n 2011, a total of 478,400 fatal and nonfatal violent crimes were committed with a firearm (table 1). Homicides made up about 2% of all firearm-related crimes. There were 11,101 firearm homicides in 2011, down by 39% from a high of 18,253 in 1993 (figure 1). The majority of the decline in firearm-related homicides occurred between 1993 and 1998. Since 1999, the number of firearm homicides increased from 10,828 to 12,791 in 2006 before declining to 11,101 in 2011.

Nonfatal firearm-related violent victimizations against persons age 12 or older declined 70%, from 1.5 million in 1993 to 456,500 in 2004 (figure 2). The number then fluctuated between about 400,000 to 600,000 through 2011.[1] While the number of firearm crimes declined over time, the percentage of all violence that involved a firearm did not change substantively, fluctuating between 6% and 9% over the same period. In 1993, 9% of all violence was committed with a firearm, compared to 8% in 2011.

---

[1]Many percentages and counts presented in this report are based on nonfatal firearm victimizations. Since firearm homicides accounted for about 2% of all firearm victimizations, when firearm homicides are included in the total firearm estimates, the findings do not change significantly.



**FIGURE 1**
**Firearm homicides, 1993–2011**

Note: Excludes homicides due to legal intervention and operations of war. See appendix table 1 for numbers and rates.
*Preliminary estimates retrieved from Hoyert DL, Xu JQ. (2012) Deaths: Preliminary data for 2011. *National Vital Statistics Reports*, 61(6).
Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS), 1993–2010. Retrieved March 2013 from www.cdc.gov/ncipc/wisqars.

## HIGHLIGHTS

- Firearm-related homicides declined 39%, from 18,253 in 1993 to 11,101 in 2011.

- Nonfatal firearm crimes declined 69%, from 1.5 million victimizations in 1993 to 467,300 victimizations in 2011.

- For both fatal and nonfatal firearm victimizations, the majority of the decline occurred during the 10-year period from 1993 to 2002.

- Firearm violence accounted for about 70% of all homicides and less than 10% of all nonfatal violent crime from 1993 to 2011.

- About 70% to 80% of firearm homicides and 90% of nonfatal firearm victimizations were committed with a handgun from 1993 to 2011.

- From 1993 to 2010, males, blacks, and persons ages 18 to 24 had the highest rates of firearm homicide.

- In 2007-11, about 23% of victims of nonfatal firearm crime were injured.

- About 61% of nonfatal firearm violence was reported to the police in 2007-11.

- In 2007-11, less than 1% of victims in all nonfatal violent crimes reported using a firearm to defend themselves during the incident.

- In 2004, among state prison inmates who possessed a gun at the time of offense, less than 2% bought their firearm at a flea market or gun show and 40% obtained their firearm from an illegal source.

EXHIBIT 7
Page 29



Case: 14-15408, 05/23/2014, ID: 9107818, DktEntry: 25, Page 80 of 80



*THE* **FBI** *FEDERAL BUREAU OF INVESTIGATION*

*Uniform Crime Reports*

Home • About Us • CJIS • UCR • Crime in the U.S. • 2013 • Preliminary Semiannual Uniform Crime Report, January-June 2013

U.S. DEPARTMENT OF JUSTICE • FEDERAL BUREAU OF INVESTIGATION • CRIMINAL JUSTICE INFORMATION SERVICES DIVISIO

**CRIME** *JANUARY-JUNE* PRELIMINARY SEMIANNUAL UNIFORM CRIME REPORT **in the United States 2013**

Report Home    Contact Us    Data Quality Guidelines    Download Printable Files    UCR

## Preliminary Semiannual Uniform Crime Report, January-June 2013

Preliminary figures indicate that, as a whole, law enforcement agencies throughout the nation reported a decrease of 5.4 percent in the number of violent crimes brought to their attention for the first 6 months of 2013 when compared with figures reported for the same time in 2012. The violent crime category includes murder, forcible rape, robbery, and aggravated assault. The number of property crimes in the United States from January to June of 2013 decreased 5.4 percent when compared with data for the same time period in 2012. Property crimes include burglary, larceny-theft, and motor vehicle theft. Arson is also a property crime, but data for arson are not included in property crime totals. Figures for 2013 indicate that arson decreased 15.6 percent when compared to 2012 figures from the same time period.

The data presented in Tables 1 and 2 indicate the percent change in offenses known to law enforcement for the first 6 months of 2013 compared to those for the first half of 2012 by population group and region, respectively. Table 3 reflects the percent change in offenses reported within the nation for consecutive years (each year compared to the prior year). Table 4 presents the number of offenses known to law enforcement for agencies with resident populations of 100,000 or more that provided 6 months of complete data for 2013. In addition, Table 4 presents 6 months of 2012 data, where available, as a point of comparison. All data in this *Report* are preliminary.

**PLEASE NOTE**

In 2013, the FBI UCR Program initiated collection of data under a new definition for forcible rape within the Summary Based Reporting System. The term "forcible" was removed, and the definition changed to "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." Only data compatible with the historical definition of forcible rape were published in Tables 1-3. However, all rape data—whether submitted under the historical definition or the new definition by agencies 100,000 and more in population—are presented in Table 4; agencies that reported under the new definition are referenced with a footnote.

Figures used in this *Report* were submitted voluntarily by law enforcement agencies throughout the country. Individuals using these tabulations are cautioned against drawing conclusions by making direct comparisons between cities. Comparisons lead to simplistic and/or incomplete analyses that often create misleading perceptions adversely affecting communities and their residents. Valid assessments are possible only with careful study and analysis of the range of unique conditions affecting each local law enforcement jurisdiction. It is important to remember that crime is a social problem and, therefore, a concern of the entire community. The efforts of law enforcement are limited to factors within its control. The data user is, therefore, cautioned against comparing statistical data of individual agencies. Further information on this topic can be obtained in the annual UCR report *Crime in the United States, 2012.*

Data users can obtain assistance by sending e-mails to cjis_comm@leo.gov.

*Report* issued by James B. Comey, Director, Federal Bureau of Investigation, United States Department of Justice, Washington, D.C. 20535

Advisory: Criminal Justice Information Systems Committee, International Association of Chiefs of Police; Criminal Justice Information Services Committee, National Sheriffs' Association; Criminal Justice Information Services Advisory Policy Board

**Resources**

**Table 1**
Percent Change by Population Group
**Table 2**
Percent Change by Region
**Table 3**
Percent Change for Consecutive Years
**Table 4**
Offenses Reported to Law Enforcement, by State by City 100,000 and over in population
**Download Spreadsheets**

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. government, U.S. Department of Justice

EXHIBIT 7
Page 30