**No. 14-15408**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
————————

LEONARD FYOCK, *et al*,
*Plaintiffs-Appellants,*
v.
CITY OF SUNNYVALE, *et al*,
*Defendants-Appellees.*
————————

**On Appeal from the United States District Court
For the Northern District of California
Case No. CV-13-05807-RMW**
————————

**BRIEF OF *AMICI CURIAE* INTERNATIONAL LAW ENFORCEMENT
TRAINERS AND EDUCATORS ASSOCIATION, CALIFORNIA RESERVE
PEACE OFFICERS ASSOCIATION, LAW ENFORCEMENT LEGAL
DEFENSE FUND, LAW ENFORCEMENT ACTION NETWORK, CRPA
FOUNDATION, LAW ENFORCEMENT ALLIANCE OF AMERICA, INC.,
SAN FRANCISCO VETERAN POLICE OFFICERS' ASSOCIATION,
CALIFORNIA COUNTY SHERIFFS BOSENKO, CHRISTIANSON,
D'AGOSTINI, DOWNEY, DURFOR, GROWDON, HENCRAFT, L. JONES,
S. JONES, LOPEY, MCMAHON, MELE, MIMS, PARKER, POINDEXTER,
WILSON AND YOUNGBLOOD, AND DISTRICT ATTORNEY EGAN IN
SUPPORT OF APPELLANTS AND IN SUPPORT OF REVERSAL**

Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com
*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

The International Law Enforcement Trainers and Educators Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

The California Reserve Peace Officers Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

The Law Enforcement Legal Defense Fund is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

The Law Enforcement Action Network is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

The CRPA Foundation is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

The Law Enforcement Alliance of America, Inc. is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

i

The San Francisco Veteran Police Officers' Association is a nonprofit organization which has no parent corporation. It issues no stock and therefore no publicly held company owns 10% or more of its stock.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES .......................................................................v

INTEREST OF *AMICI CURIAE* ...............................................................1

STATEMENT PURSUANT TO RULE 29(c) ...................................................5

ARGUMENT ......................................................................................5

  I.  SUNNYVALE BANS MAGAZINES THAT ARE IN
    COMMON USE BY LAW ENFORCEMENT OFFICERS
    AND LAW ABIDING CITIZENS FOR LAWFUL PURPOSES,
    THEREBY INFRINGING THEIR SECOND AMENDMENT RIGHTS. ............5

  II.    SUNNYVALE'S BAN DENIES BOTH TO ORDINARY
    CITIZENS AND TO OFF DUTY PEACE OFFICERS THE
    RIGHT TO ARMS PROTECTED BY THE SECOND AMENDMENT..............8

    A.    The ban seriously infringes the constitutional rights
    of ordinary citizens, which law enforcement officers have
    sworn to uphold..................................................................8

    B.    The ordinance by its terms does not exempt off duty
    police or other law enforcement officers from the ban on
    possessing ordinary magazines. .............................................9

  III.    BANNING MAGAZINES OVER TEN ROUNDS
    WILL NOT REDUCE CRIME OR PROTECT OFFICERS. .............................16

  IV.    THE DISTRICT COURT'S OPINION ILLOGICALLY
    CONCLUDES THAT MAGAZINES OVER TEN ROUNDS
    ARE USEFUL FOR CRIMINAL PURPOSES BUT ARE NOT
    USEFUL FOR LEGITIMATE SELF-DEFENSE BY CITIZENS
    AND OFF DUTY OFFICERS. ...................................................24

iii

CONCLUSION ........................................................................................................31

CERTIFICATE OF COMPLIANCE.........................................................................32

CERTIFICATE OF SERVICE ..................................................................................33

iv

# TABLE OF AUTHORITIES

## CASES                                                         Page

*Cooke v. Hickenlooper*, Civil Action No. 13-CV-1300
 (D. Colo)(Doc. No. 136) .......................................................................5, 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................5, 6

*New York State Rifle and Pistol Association v. Cuomo*, 1:13-cv-00291
(W.D.N.Y) (Doc. No. 47-1) ........................................................................19

*Nojay v. Cuomo*, 14-36-CV(L) (2d. Cir.) (Doc. No. 93) .........................19

*Peruta v. Cnty. Of San Diego*, 10-56971, 2014 WL 555862,
at *18 (9th Cir. Feb. 13, 2014) .....................................................................6

## CONSTITUTIONS, STATUTES, AND ORDINANCES

U.S. CONST. Amend II...................................................................... *passim*

18 U.S.C § 926A (2013) ..............................................................................14

CAL. CONST. art. XX, § 3 ...............................................................................8

CAL. GOV'T CODE § 1031(d) (2014).............................................................16

NY SAFE Act, enacted by S2230-2013 and amended by S2607D-2013 ..............18

SUNNYVALE, CAL., MUN. CODE § 1.04.020(a) (2014) ...............................15

SUNNYVALE, CAL., MUN. CODE § 9.44.050(2014)...............................7, 13

SUNNYVALE, CAL., MUN. CODE § 9.44.50(c)(1)(2014) ............................9

v

SUNNYVALE, CAL., MUN. CODE § 9.44.50(c)(2)(2014) ....................................9, 13

## OTHER AUTHORITIES

California Commission on Peace Officer Standards
and Training, *Background Investigation Manual:
Guidelines for the Investigator* 5-41(2013) ............................................................16

City of Sunnyvale Public Safety Department, *Department
General Orders Manual* § 4.14.01(B) (Dec. 2011) ..................................................11

City of Sunnyvale Public Safety Department, *Department
General Orders Manual* §4.14.01(C) (Dec. 2011) ..................................................11

City of Sunnyvale Public Safety Department, *Department
General Orders Manual* §4.14.01(D) (Dec. 2011)...................................................11

City of Sunnyvale Public Safety Department, *Department
General Orders Manual* §4.14.01(E)(1) (Dec. 2011)...............................................11

Christopher Koper *et al., An Updated Assessment of the Federal
Assault Weapons Ban: Impacts on Gun Markets and
Gun Violence, 1994-2003* (2004).....................................................20, 21, 22, 23, 24

PoliceOne, *Gun Policy & Law Enforcement Survey* (2013)....................................17

Sean Webby & Lisa Fernandez, *How Cupertino homicide
suspect Shareef Allman eluded huge manhunt for 22 hours*,
SAN JOSE MERCURY-NEWS, Oct. 6, 2011..................................................................28

Michael Winter, *Calif. quarry killer died from self-inflicted
gunshot,* USA TODAY, Oct. 11, 2011.......................................................................28

## INTEREST OF *AMICI CURIAE*

### International Law Enforcement Educators and Trainers Association

The International Law Enforcement Educators and Trainers Association ("ILEETA"), is a professional association of 4,000 persons committed to the reduction of law enforcement risk and to saving lives of police officers and the general citizenry through the provision of training enhancements for criminal justice practitioners. ILEETA has joined this brief because unconstitutional firearms restrictions not only disadvantage law-abiding citizens whose lawful self-defense deters crime, but also disadvantage police officers who may be tasked with interpreting and enforcing such provisions and may be subject to such provisions in an off duty capacity.

### California Reserve Police Officers Association

The California Reserve Peace Officers Association was founded in 1974 for the purpose of raising the professional, educational and employment standards of California reserve peace officers. CRPOA members dedicate their time to community service by working as part-time employees with law enforcement agencies both on a compensated and non-compensated basis. These officers work with full-time regular officers to provide law enforcement services at the city, county, district, and State levels, including uniformed patrol, investigations, undercover and vice operations, and search and rescue. Approximately 600 law enforcement agencies currently employ

1

more than 5,000 reserve law enforcement officers in California. CRPOA has a number of members who reside in Sunnyvale, and other members travel to that city.

## Law Enforcement Legal Defense Fund

The Law Enforcement Legal Defense Fund ("LELDF") is a 501(c)(3) non-profit organization, headquartered in Alexandria, Virginia, that provides legal assistance to law enforcement officers. LELDF has aided nearly one hundred officers, many of whom have been acquitted, mostly in cases where officers have faced legal action for otherwise authorized and legal activity in the line of duty. While LELDF supports measures that will further legitimate public safety interests and protection of law enforcement officers, it does not support provisions that are ill-conceived, violate the Constitution, and may subject police officers to undue legal risk or uncertainty.

## Law Enforcement Action Network

The Law Enforcement Action Network ("LEAN") is a sister organization of LELDF, headquartered in Alexandria, Virginia, which has applied for 501(c)(4) status. LEAN promotes policies that protect law enforcement officers' personal and professional safety. LEAN seeks to provide insight to the Court about the negative ground level impact the challenged provisions will have on police officers and others who may be affected by the challenged provisions.

2

## CRPA Foundation

The CRPA Foundation is a non-profit entity classified under section 501(c)(3) of the Internal Revenue Code, with headquarters in Fullerton, California. The CRPA Foundation seeks, among other goals, to raise awareness about unconstitutional laws, defend and expand the legal recognition of the rights protected by the Second Amendment, educate the general public about firearms, and support law enforcement.

## Law Enforcement Alliance of America, Inc.

The Law Enforcement Alliance of America, Inc. (LEAA) is a non-profit, non-partisan advocacy and public education organization founded in 1992 and made up of thousands of law enforcement professionals, crime victims, and concerned citizens. Many of LEAA's members reside and/or work in California. LEAA represents its members' interests by assisting law enforcement professionals, seeking criminal justice reforms that target violent criminals not law-abiding citizens, and explaining from a law enforcement perspective why firearms regulation is not effective in controlling crime. LEAA has been an *amicus curiae* in other California cases, and on the prevailing side in two United States Supreme Court cases.

## San Francisco Veteran Police Officers' Association

The San Francisco Veteran Police Officers' Association ("SFVPOA") is a nonprofit organization that represents the interests of veteran police officers in the City

3

and County of San Francisco, including the exercise of their members' rights to keep and bear arms under the Second Amendment. The SFVPOA is engaged in ongoing litigation against the City and County of San Francisco due to a ban on magazines over ten rounds enacted by San Francisco, and thus its members have an interest in the outcome of the instant case.

### Individual Amici

The following individual *Amici* are elected County Sheriffs in California: Sheriffs Tom Bosenko (Shasta), Adam Christianson (Stanislaus), John D'Agostini (El Dorado), Michael Downey (Humboldt), Steven Durfor (Yuba), Dean Growdon (Lassen), David Hencraft (Tehema), Larry Jones (Glenn), Scott R. Jones (Sacramento), Jon E. Lopey (Siskiyou), John McMahon (San Bernardino), James Mele (Tuolumne), Margaret Mims (Fresno), J. Paul Parker (Sutter), Mike Poindexter (Modoc), Dean Wilson (Del Norte), and Donny Youngblood (Kern). Elizabeth Egan is District Attorney for Fresno County. All of these individuals have distinguished records of practical experience in public service, often extending for decades, in the fields of law enforcement and public safety. Sheriff Christianson is also President of the California State Sheriffs' Association. Their interest in this lawsuit is protecting the constitutional rights of their constituents and California residents generally, promoting wise and efficient strategies in combating crime, and helping to ensure that law abiding

4

citizens and law enforcement officers are not subject to risk of prosecution in Sunnyvale or other jurisdictions under ordinances that serve no effective law enforcement purpose.

## STATEMENT PURSUANT TO RULE 29(c)

No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than *Amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

## ARGUMENT

**I. SUNNYVALE BANS MAGAZINES THAT ARE IN COMMON USE BY LAW ENFORCEMENT OFFICERS AND LAW ABIDING CITIZENS FOR LAWFUL PURPOSES, THEREBY INFRINGING THEIR SECOND AMENDMENT RIGHTS.**

Amici will not repeat the arguments made by plaintiffs-appellants in this case, but rather will present the unique perspective of law enforcement officers and organizations. For that perspective to be appreciated, however, some fundamental facts regarding the prevalence and role of magazines capable of holding more than ten rounds for lawful defense must initially be noted. For both off duty peace officers and private citizens, such magazines will most often be possessed in the home, "where the need for defense of self, family, and property is most acute." *See* District Court

opinion at ER000005-ER000006 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008)). The District Court properly observed that "the right also applies outside the home." *Peruta v. Cnty. of San Diego*, 10-56971, 2014 WL 555862, at *18 (9th Cir. Feb. 13, 2014). This case involves the right to possess magazines of over ten rounds capacity both inside and outside the home, thereby implicating the full scope of the Second Amendment for both ordinary citizens and off duty law enforcement personnel.

The District Court correctly observed that *Heller* protects fireams in "common use" that are "typically possessed by law-abiding citizens for lawful purposes…." ER000007. It found that "magazines having a capacity to accept more than ten rounds are in common use, and are therefore not dangerous and unusual." *Id.* Only firearms or components that are "dangerous and unusual" may be banned. *Heller,* 554 U.S. at 627.

Far from being "unusual" or not "typically possessed for lawful purposes," the evidence showed that "magazines having a capacity to accept more than ten rounds make up approximately 47 percent of all magazines owned…." ER000007. Furthermore, "approximately one-third of the semi-automatic handgun models and two-thirds of the semi-automatic, centerfire rifles" listed in a standard reference work are "typically sold with magazines having a capacity to accept more than ten rounds."

6

*Id.* Even under the most conservative estimates, the number of such magazines in consumers' hands is in the tens of millions. *Id.* Such magazines are preferred for law enforcement use, off duty use, and defensive use by private citizens. *See* especially Part IV, below. They are "arms" within the meaning of the Second Amendment, and "integral components to vast categories of guns." ER000008, ER000009. If they were not considered arms, "any jurisdiction could effectively ban all weapons simply by forbidding magazines and ammunition." *Id.*

Despite these findings, the District Court engaged in a fundamental error, concluding that SUNNYVALE, CAL., MUN. CODE § 9.44.050 could be justified under a watered down "intermediate scrutiny" test because the burden on Second Amendment rights was allegedly "light" and "hardly crucial" to exercising the right to bear arms. ER000011. For the reasons stated below, *Amici* respectfully suggest that limiting the functioning of a firearm possessed to defend one's life, below the capacity for which it was designed and purchased, is far from a "light" burden. If a citizen or off duty peace officer is killed or wounded because of an artificial limit imposed on his ability to defend himself or others, that is among the heaviest burdens known to the law. Yet the Sunnyvale ordinance does just that, without any corresponding public safety benefit.

7

## II. SUNNYVALE'S BAN DENIES BOTH TO ORDINARY CITIZENS AND TO OFF DUTY PEACE OFFICERS THE RIGHT TO ARMS PROTECTED BY THE SECOND AMENDMENT.

### A. The ban seriously infringes the constitutional rights of ordinary citizens, which law enforcement officers have sworn to uphold.

Law enforcement officers and law-abiding citizens share important common interests. Both are interested in preserving public order, preventing crime, and ensuring the safety of peace officers. Sheriffs and other peace officers in the State of California take an oath in which they solemnly swear or affirm that they will "support and defend the Constitution of the United States and the Constitution of the State of California" and "will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California...." CAL. CONST. art. XX, § 3. Thus, they are honor-bound not just to enforce state and local laws, but also to protect the constitutional rights of citizens. That includes the Second Amendment rights of those citizens. Of course, law enforcement officers also have Second Amendment rights. The Sunnyvale magazine ban infringes the Second Amendment rights of both citizens and officers.

**B.     The ordinance by its terms does not exempt off duty police or other law enforcement officers from the ban on possessing ordinary magazines.**

As noted by the District Court, Sunnyvale's ban contains several exceptions, all of which are "narrow." ER000009. Although two of these exceptions address law enforcement personnel or agencies, those exceptions are narrow indeed, and will subject off duty officers to the magazine ban.

Subsection 9.44.50(c)(1) exempts from the magazine ban "Any federal, state, county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties…." That exception obviously applies only to agencies themselves, and does not create an exception for individual law enforcement officers.

Subsection 9.44.50(c)(2) exempts "Any government officer, agent, or employee, member of the armed forces of the United States, or peace officer, to the extent that such person is *otherwise authorized* to possess a large-capacity magazine and *does so while acting within the course and scope of his or her duties*…." It is unclear, at best, what "otherwise authorized" means. Authorized specifically by one's agency to possess "large capacity" magazines? It would be the rare instance in which agency authorization to possess or carry firearms would mention magazine size. Authorization to possess a duty handgun which ordinarily comes equipped with a magazine greater

9

than ten rounds presumably would not suffice, since ten round magazines are now often available for such handguns. Must the authorization be in writing, or by a formal department rule, or is verbal permission enough? The ordinance does not say. Authorized by law? Again, most laws relating to carrying of firearms by government, peace officers, or members of the military do not authorize or even address the size of the magazine. This nebulous "authorization" requirement of the ordinance must be met in every instance for the exception to apply. Consequently, the exception generally will *not* apply.

More importantly, the exception only applies when the officer or employee is "authorized" to possess a "large capacity" magazine, and is *also* "acting within the course and scope of his or her duties." In other words, the officer must be "on duty" for the exception to apply.

Sunnyvale draws a clear distinction between on duty and off duty for purposes of carrying of firearms by their own officers. Officers are not considered to be always "on duty." For example, the regulations of the Public Safety Department of the City of Sunnyvale state: "An Officer shall not carry any firearm *while on-duty*, nor any concealable firearm *while off duty*" unless the firearm has been examined and approved

by appropriate department officials.[1]  City of Sunnyvale Public Safety Department, *Department General Orders Manual* § 4.14.01(B) (Dec. 2011) (emphasis added).[2] Section 4.14.01(C) states that most officers "shall carry a Uniform Service Handgun or approved substitute firearm, *while on-duty*…." (emphasis added).  Similarly, § 4.14.01(D) provides that "Officers may carry an approved back-up firearm *while on-duty*" provided certain conditions are met (emphasis added). Section 4.14.01(E)(1) states that "The carrying of firearm [sic] *while off-duty* is not required but is permitted." (emphasis added).  The distinction for Sunnyvale officers between carrying (and thus possessing) a firearm and its magazines while on duty as opposed to while off duty is thus clear.

Accordingly, for Sunnyvale police officers themselves, there are times when he or she is "off duty" and thus not "acting within the course and scope of his or her duties."  During off duty hours, Sunnyvale officers may not possess, and thus may not carry, magazines with more than ten rounds.  When off duty, Sunnyvale officers are prohibited by the ordinance from defending themselves, their families, and others by

---

[1]   Sunnyvale does not address mere possession of firearms when off duty.

[2]   Available online at http://www.calgunsfoundation.org/wp-content/uploads/2013/12/cgf_sunnyvale-firearms-prar-response.pdf   These official government documents were furnished by the City of Sunnyvale in December of 2013 in response to a public records request ("Sunnyvale Public Records Production").  *See* http://www.calgunsfoundation.org/2013/12/hypocrisy-sunnyvales-measure-c-cgf-

using standard magazines as capable as they use when on duty. Just as with ordinary citizens, they are arbitrarily limited by the ordinance in using otherwise lawful firearms to their designed capacity to defend themselves and their families against criminal attack. This prohibition will apply directly to members of the CRPOA (an *amicus* party) who reside in Sunnyvale.

The problem is even more acute for law enforcement officers from other jurisdictions and agencies who may be temporarily present in Sunnyvale, for law enforcement business or otherwise. There are hundreds of jurisdictions and agencies in California that employ peace officers, and thousands of law enforcement agencies in the United States. Their policies undoubtedly differ widely in terms of what is considered to be "on duty" and "off duty." These divergent policies will also control as to whether the officer is "otherwise authorized" to possess a large capacity magazine. Such policies are highly unlikely to specifically address magazine size. As a consequence the ordinance will be a nightmare to enforce in situations involving officers from other cities, counties, states, and agencies.

The ordinance will further be a "trap for the unwary." Law enforcement officers from other jurisdictions might well assume that they are allowed to possess their duty handguns, including the standard magazines greater than ten rounds for those

focuses-sunshine-city-firearms-policies/

12

handguns, but could find themselves prosecuted for violating this outlier ordinance enacted in Sunnyvale, which criminalizes possession of magazines recognized almost everywhere else as ordinary and lawful.

Defendants take the position that the entirety of Section 9.44.050 "does not apply to law enforcement personnel." Decl. of Frank Grgurina ¶ 6 (ER000384-ER000388). Chief Grgurina asserts that the exception applies to "possession of [large capacity magazines] while on or off duty." *Id.* He claims that the exception applies "equally" to "off-duty officers from other jurisdictions." *Id.*

The problem is that the ordinance does not say that. Chief Grgurina bases these statements on a one-page "Interoffice Memorandum" from the City Attorney's Office. *Id.,* Ex. A. This interoffice memo contains no legal reasoning, but only conclusions. The key conclusion is that "individuals listed in Section 9.44.050(c)(2), who are authorized as part of their duties to possess and use large-capacity magazines, are exempt under 9.44.050(c)(2) at all times, *both while on and off duty*." This conclusion does nothing to clear up the "authorization" requirement for officers residing in Sunnyvale, and especially for officers from other jurisdictions. But more importantly, it directly contradicts the language of the ordinance which states that the exception only applies to officers "acting within the course and scope of his or her duties." It strains credulity to believe that an off duty officer, spending a quiet evening watching

13

television or eating dinner at home, is "acting within the course and scope of his or her duties." If he or she is not acting within the course and scope while relaxing at home, the ordinance plainly makes it a crime for him or her to possess a magazine that can hold more than ten rounds, whether for a duty gun or privately owned gun. An interoffice memorandum cannot change or contradict the language of the law itself.

Thus, the ordinance puts law enforcement officers, both local officers and those temporarily present in Sunnyvale, at risk of unwitting violation of the law. If they follow the law as written, it deprives them of the right to defend themselves and their home and families using a full capacity magazine. It also creates a needless enforcement morass.

In addition, the ordinance is a trap for the unwary for ordinary citizens. Magazines of over ten rounds capacity are possessed in the tens of millions, according to evidence credited by the District Court. ER000007. Citizens bringing a handgun or rifle with a standard capacity magazine into or through Sunnyvale, for perfectly lawful purposes such as recreation or hunting, are unlikely to be aware of this highly unusual law and may easily run afoul of it unintentionally.[3] Similarly, persons moving to Sunnyvale from elsewhere in California or from other states are unlikely to know that

---

[3] Federal law may provide protection in certain instances (*see* 18 U.S.C § 926A (2013)) but that protection, if any, is highly dependent on particular circumstances being met.

this extraordinarily uncommon law exists, and may bring a standard magazine holding over ten rounds with them, never suspecting that they may be subject to a hefty fine and imprisonment for such an inoffensive object.[4] Arresting and prosecuting such individuals is not in the interest of law enforcement. Not only is it unjust to the citizen, and a violation of their Second Amendment rights, it is a waste of valuable law enforcement resources, which could be better spent on preventing and solving crimes that involve violence or other socially harmful behavior.

For law enforcement personnel, the absence of any clear exception from the magazine ban could result in consequences far greater than the penalties provided by the Municipal Code. A conviction could be career-ending for law enforcement officers. The requirements for service as a peace officer in California are strict. Candidates must undergo an extremely thorough background check, in which criminal history checks are run, and those checks may be run again even after initial appointment. The official manual for these background checks provides that misdemeanor convictions may be disqualifying:

> Misdemeanor convictions are not, in and of themselves, automatically disqualifying either for peace officers or for public safety dispatchers.

---

[4] Violation of the magazine ban is punishable by a fine of "not more than one thousand dollars or imprisonment in the county jail for not more than six months, or by both such fine and imprisonment…." SUNNYVALE, CAL., MUN. CODE § 1.04.020(a) (2014).

However, any conviction should be carefully examined with regard to its relevance to the candidate's suitability for appointment….

California Commission on Peace Officer Standards and Training, *Background Investigation Manual: Guidelines for the Investigator* 5-41(2013) (available at http://lib.post.ca.gov/Publications/bi.pdf ). CAL. GOV'T CODE §1031(d) (2014) requires that a peace officer "[b]e of good moral character." The Manual includes the following as "indicators" of lack of such character: "Conviction(s) of any criminal offense classified as a misdemeanor under California Law, especially as an adult," and "Conviction of any offense classified as a misdemeanor under California Law while employed as a peace officer…." *Manual* at 2-5. Such a conviction could end an otherwise successful law enforcement career.

## III.   BANNING MAGAZINES OVER TEN ROUNDS WILL NOT REDUCE CRIME OR PROTECT OFFICERS.

The District Court relied on the findings portion of the ordinance, which stated in part that "the People of Sunnyvale…find that sensible gun safety measures provide some relief from [dangers of gun violence].…" ER000013 (citing Spitaleri Decl. Ex. A at 1). One of the reasons why the ordinance is ostensibly a "sensible" safety measure is that "laws that prohibit the possession of ammunition magazines capable of holding more than ten rounds…constitute sensible gun safety regulations because…they aid

16

law enforcement officers in their duties….."  Spitaleri Decl. Ex. A at 1 (ER000219-ER000222).

Prohibition of standard magazines capable of holding more than ten rounds does not "aid law enforcement in their duties."  The trial court credited "opinions of Sunnyvale public officials, indicating that the Sunnyvale ordinance is substantially related to the compelling government interest in public safety." ER000015.  Those opinions—which can only be described as outliers, since almost no municipalities have similar laws—are directly opposed to the overwhelming opinion of experienced law enforcement personnel as revealed in a recent, large scale, national survey.

The national law enforcement organization PoliceOne conducted its Gun Policy & Law Enforcement survey between March 4 and March 13, 2013, receiving 15,595 responses from verified police professionals across all ranks and department sizes.[5] Respondents were asked, "Do you think a federal ban on manufacture and sale of ammunition magazines that hold more than ten rounds would reduce violent crime?" PoliceOne Survey, Question 6.  The results were overwhelming: 95.7% (14,013) of

---

[5]  PoliceOne, *Gun Policy & Law Enforcement Survey* (2013) (reported at http://ddq74coujkv1i.cloudfront.net/p1_gunsurveysummary_2013.pdf  ("PoliceOne Survey"). A description of the study is at http://www.policeone.com/police/products/press-releases/6188461-policeone-com-releases-survey-of-15-000-law-enforcement-professionals-about-u-s-gun-control-policies/.

17

the respondents said "no," only 2.7% (391) said "yes," and 1.6% (238) were unsure. This extraordinary consensus by police professionals that such bans will not reduce violent crime is in stark contrast to the opinions of Sunnyvale officials referenced by the Court.

Where magazine bans have recently been imposed in a small number of other states, sometimes after little or no debate, the reaction of rank and file law enforcement officers, as well as elected law enforcement officials, has been heavily negative, chiefly on grounds that such bans are ineffective in reducing crime. After no debate at all, the New York state legislature in 2013 imposed a ten round magazine limit on civilians, though not on law enforcement. *See* NY SAFE Act, enacted by S2230-2013 and amended by S2607D-2013. (The Act also banned certain so-called "assault weapons"). The Albany Police Officers Union wrote an open letter to the Governor and key legislators stating that it "condemns and opposes" the new law, that the law "violates fundamental constitutional rights," and that it "will not deter criminals or mentally ill individuals from plotting and carrying out bloodshed and violence."[6] They forcefully urged that the Act "will not improve public safety. Criminals and the mentally ill will not abide by it…." *Id.*

---

[6] Available at http://www.nysrpa.org/files/SAFE/AlbanyPoliceUnionLetter.pdf

18

The New York State Sheriffs' Association and a number of individual sheriffs not only opposed the Act publicly, they submitted a brief in opposition to the Act in federal district court and on appeal. *New York State Rifle and Pistol Association v. Cuomo*, 1:13-cv-00291 (W.D.N.Y) (Doc. No. 47-1); *Nojay v. Cuomo*, 14-36-CV(L) (2d. Cir.) (Doc. No. 93).

In Colorado, a ban on magazines over fifteen rounds was also passed in 2013. Fifty-five out of sixty-two elected sheriffs initially joined as plaintiffs in a lawsuit to have the ban declared unconstitutional. *Cooke v. Hickenlooper*, Civil Action No. 13-CV-1300-MSK-MJW (D. Colo). As noted by a brief in that case, speculations about what a local magazine ban might accomplish "are outweighed by the evidence of what a national ban ***did accomplish***, which was nothing." *Id.,* Plaintiffs' Trial Brief at 52 (Doc. No. 136) (emphasis in original).[7]

In short, the Sunnyvale public officials' view of the effectiveness of a magazine ban in reducing crime is directly at odds with the opinions of broad spectrum of experienced law enforcement personnel across the country.

---

[7] The New York State Troopers Police Benevolent Association stated in a public release that "our membership holds widely shared concerns" regarding the new law. "Additionally, we believe that actual enforcement of these new regulations will significantly increase the hazards of an already dangerous job." http://www.syracuse.com/ news/index.ssf/2013/04/nys_troopers_have_widely_share.html

19

The District Court relied on a declaration submitted by Professor Christopher Koper, which the Court characterized as showing that the ordinance "*may*" reduce gun violence:

> Professor Koper opines in his declaration that the Sunnyvale law "has the *potential* to (1) reduce the number of crimes committed with [large capacity magazines]; (2) reduce the number of shots fired in gun crimes; (3) reduce the number of gunshot victims in such crimes; (4) reduce the number of wounds per gunshot victim; (5) reduce the lethality of gunshot injuries when they do occur; and (6) reduce the substantial societal costs that flow from shootings." Koper Decl. ¶ 57. (emphasis added).

ER000014. Whatever Professor Koper thinks the "potential" of such a ban might be, his actual data do not show that the ten year national ban produced such a result. Professor Koper was the lead investigator in the study entitled *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004) ("*Updated Assessment*") (ER000242-ER355). He and his co-investigators were handpicked by the Justice Department headed by Attorney General Janet Reno during the Clinton administration, the very administration that pushed for and succeeded in passing the federal ban. Nevertheless, Professor Koper and his co-authors concluded that *ten years* after the ban on magazines was imposed, "the ban has not yet reduced the use of [large capacity magazines] in crime…." *Updated Assessment* at 2 (ER000249). They also opined that:

20

> Should it be renewed, the ban's effects on gun violence are likely to be *small at best* and *perhaps too small for reliable measurement*. [Assault weapons] were rarely used in gun crimes even before the ban. LCMs [magazines capable of holding more than ten rounds] are involved in a more substantial share of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability of offenders to fire more than ten shots (the current magazine capacity limit) without reloading.

*Id.* at 3 (ER000250) (emphasis added). Recall that Professor Koper is here discussing a *nationwide* ban on sales of magazines over ten rounds, as well as a *nationwide* ban on so-called "assault weapons." Yet according to his report, the effects of continuing the ban would be "small at best" and "perhaps too small for reliable measurement." Because there are already tens of millions of magazines over ten rounds, the effects on crime (if any) of Sunnyvale's ban would be even less significant--if it possible to be less significant than "not reducing" their use in crime, and being "too small for reliable measurement." As a purported justification for infringement on Second Amendment rights, Professor Koper's research on magazine bans is not just a slender reed, but a will-o-the-wisp.

Koper asserts that it "appears" that "guns with LCMs have been used disproportionately in murders of police." Specifically, the available data, from prior to the federal ban, indicates that LCMs are used in somewhere between 31% to 41% of gun murders of police." Koper Decl. ¶ 18 (ER000229). However, the percentage cited by Koper indicates that such magazines may be involved in *fewer* homicides of police.

Given the prevalence of magazines with a capacity over ten rounds (47 percent of all magazines, according to data cited by the District Court at ER000007) a 31% to 41% figure, even if accurate, does not indicate that such magazines are disproportionately used for police shootings, but rather reflects their general prevalence in the pool of all magazines.[8]   In addition, the federal ban on magazines over ten rounds (1994-2004), and the subsequent California ban on sales of such magazines (enacted in 2000), have extended continuously from 1994 to the present day.  Reliance on pre-1994 data to justify a ban on possession in Sunnydale in the year 2014 is inapt, to say the least.

Koper says that in mass shootings including those where magazine capacity could not be determined, "exactly half of the cases (31 of 62) are known to have involved an LCM."  Koper Decl.  ¶ 14 (ER000228).  But that is exactly what one would expect, given the court's own apparent acceptance of evidence "that magazines

---

[8]  In the *Updated Assessment* at 1 (ER000248), Koper cited an estimate that "Approximately 18% of civilian-owned firearms and 21% of civilian-owned handguns were equipped with LCMs as of 1994."  He does not state whether this estimate for handguns included revolvers, which do not have magazines, as part of the universe.  He further does not state whether the estimate for firearms included shotguns as part of the universe.  In nearly all cases shotguns do not have detachable box magazines (many do not have magazines at all, and those that do typically have fixed tubular magazines of under ten round capacity).  If revolvers and shotguns are included in the universes against which guns with "LCMs" are compared, the percentage of handguns and firearms with magazines over ten rounds will be decreased.

having a capacity to accept more than ten rounds make up approximately 47 percent of all magazines owned. Curcuruto Decl. ¶ 8." ER000007.

As can be seen, many of these statistics rely on a definitional artifice. By arbitrarily defining a perfectly ordinary article—a standard capacity magazine, sold with half of the firearms in this country—as "large capacity," it is inevitable that a sizable percentage of instances in which firearms are misused for criminal purposes will involve such magazines. Banning them because of that fact is like trying to ban beer because a large percentage of alcoholics drink beer. Of course they do. But it has nothing to do with beer being more likely to cause alcoholism than wine, or bourbon, or scotch, or vodka. Beer just makes up a large percentage of sales of such beverages in the market, purchased by alcoholics and non-alcoholics alike, and so it is likely, *based on market share alone*, often to be associated with the evils of alcoholism.

Koper's Declaration and his *Updated Assessment* are rife with such examples. Here's another: "[In] New York City, the New York State Division of Criminal Justice Services reported that, in 1993, at least 16%, and as many as 25%, of guns recovered in murder investigations were equipped with LCMs." Koper Decl. ¶ 17 (ER000228). Again, that is close to what one would expect based on market share alone.

Koper argues that the federal ban was "intended to reduce gunshot victimizations by limiting the national stock of semiautomatic firearms with *large*

23

*ammunition capacities – which enable shooters to discharge many shots rapidly – and other features conducive to criminal uses.*" *Updated Assessment* at 1 (ER000248) (emphasis added). *Amici* respectfully take issue with the proposition that a large capacity magazine is somehow especially "conducive to criminal use." What makes a firearm or component conducive to criminal use is that it is possessed by a criminal with criminal intent. As working law enforcement officers know, in the hands of law enforcement personnel or law-abiding citizens that same magazine is conducive to maintenance of public safety, protection of officers, and defense of self and others.

## IV. THE DISTRICT COURT'S OPINION ILLOGICALLY CONCLUDES THAT MAGAZINES OVER TEN ROUNDS ARE USEFUL FOR CRIMINAL PURPOSES BUT ARE NOT USEFUL FOR LEGITIMATE SELF-DEFENSE BY CITIZENS AND OFF DUTY OFFICERS.

Relying on Koper, the District Court made the unfortunate error of concluding that magazines of over ten round capacity are somehow useful to criminals, but not useful to citizens for purposes of self-defense. The District Court repeated Prof. Koper's claim that such magazines "are particularly dangerous because they facilitate the rapid firing of high numbers of rounds" and thereby "*potentially*" increase "injuries and death from gun violence." ER000014.

Though plaintiffs made the obvious—and obviously correct—point that criminals don't obey the law, and a law banning possession of magazines holding more

24

than ten rounds will only affect possession by the law-abiding, the Court dismissed that observation with a single irrelevant statistic: that (allegedly) 75% of the *guns* used in mass shootings were obtained legally. ER000014. First, the statistic applies to firearms, not magazines. Second, mass shooters are not typical of criminals in general, and their victims represent only a tiny percentage of the annual victims of criminal misuse of firearms. Third, the fact that a few criminals (mass shooters) might obtain firearms legally entirely misses the point. If they obtained firearms legally, *it was because the firearms were not illegal.* If firearms or magazines are *banned*, however, criminals will not be deterred from obtaining them illegally, whereas law-abiding citizens will be deterred from possessing them at all. The relevant consideration is what happens when a ban, like Sunnyvale's, is actually in place. The effect is to empower criminals who disobey it, and to place the law abiding who obey it at a disadvantage.

The Court based its opinion that citizens don't need magazines that hold more than ten rounds on three points.

1. First, the court opined that "It is rare that anyone will need to fire more than ten rounds in self-defense." ER000014. Although that statement depends on what the term "rare" means, it is also beside the point. When circumstances arise in which more than ten rounds are needed—and those circumstances do arise--the *average* number of

shots fired in a defensive firearm use are of little importance to the person trying to protect himself or incapacitate a criminal. That individual needs more rounds, now. This is precisely why magazines of over ten rounds are standard equipment for duty carry by law officers, and why many officers prefer them for off duty use.

As noted by Stephen Helsley, a veteran peace officer from the California Department of Justice who held several high level positions with that agency, law enforcement agencies beginning in the 1970s transitioned from six shot revolvers to double action semi-automatic pistols as issue sidearms. Helsley Decl. at ¶ 9 (ER000624). These pistols had magazines with capacities as large as 19 rounds. *Id.* Firearms, tactics, and police expert Massad Ayoob notes that the first Glock, the Glock 17 chambered for 9mm ammunition, established itself as "a 'service pistol' par excellence." Ayoob Supp. Dec. at 4 (ER000077). The Glock 17 has a 17 round magazine. *Id.* Not long after, the Glock 22 was introduced, chambered for the .40 cal. S & W round and having a standard magazine capacity of 15. *Id.* This pistol "is believed to be in use by more American police departments than any other…." *Id.*

These two Glock pistols, along with the Glock 19 chambered for 9mm, the Glock 23 in .40 cal. S & W, and the Glock 21SF in .45 cal., are the standard issue handguns for the Sunnyvale police. *Sunnyvale Public Records Production* at 80, 82, 84, 86, 88, 91, 93, 94, and 97. The Glock models 19, 23, and 21SF come equipped

26

with standard magazines of 15 rounds, 13 rounds, and 13 rounds, respectively. Supp. Ayoob. Decl. at 6 (ER000079). New York City issues several Glock models as duty handguns for its police department, with the 15 round Model 19 accounting for the majority. *Id.* at 5 (ER000078). The Glock 23 is standard issue for the FBI and the Boston Police Department. *Id.* In any sizable police department, it is now unusual for anything but pistols with magazines over ten rounds to be the predominant standard issue handgun.

It goes without saying that law enforcement agencies have nearly universally adopted these pistols with magazine capacities of over ten rounds for legitimate defensive use, not because they are "conducive to criminal use" or facilitate "gun violence." The same is true for ordinary citizens and for off duty peace officers. As stated in Officer Helsley's declaration, "The retired peace officer, concealed weapon permit holder and the home-owner want[] a pistol that can hold significantly more cartridges than a revolver for the same reason a law enforcement [officer] or soldier wants one—to increase his or her chances of staying alive." Helsley Decl. at ¶ 11 (ER000625). Banning such magazines for legitimate defensive use by the law-abiding and off duty officers (while violent criminals will disregard it) frustrates rather than improves public safety, and may result in loss of life or severe injury to the innocent. It

is inconceivable that a criminal bent on homicide or other armed violence will refrain from using a magazine over ten rounds because possessing one would be a crime.

2. Second, the District Court dismissed plaintiffs' evidence of the lawful use of magazines holding more than ten rounds as mere "anecdotes," and contended that "Plaintiffs do not supply any quantitative data showing that banning such magazines would negatively impact public safety." ER000014. Ironically, the Court itself relied on a single anecdote to justify the assertion that "Sunnyvale itself has experienced the danger presented to police and the public by a criminal suspect armed with such magazines," citing the case of Shareef Allman in 2011. ER000018. However, Allman apparently did not fire at law enforcement officers, and died by his own hand during a standoff with three Santa Clara County sheriff's deputies, who fortunately were adequately armed.[9] Plaintiffs have supplied numerous examples, by renowned experts on defensive use of firearms, of real-world situations where more than ten shots were fired or needed for lawful defense—*see* especially the Declaration of Massad Ayoob (ER000629-ER000641).

---

[9] *See* Michael Winter, *Calif. quarry killer died from self-inflicted gunshot,* USA TODAY, Oct. 11, 2011 (available at http://content.usatoday.com/communities/ondeadline/ post/2011/10/coroner-calif-quarry-killer-died-from-self-inflicted-gunshot/1?csp=34 news#.U32yT3JOXIU); Sean Webby & Lisa Fernandez, *How Cupertino homicide suspect Shareef Allman eluded huge manhunt for 22 hours*, SAN JOSE MERCURY-NEWS, Oct. 6, 2011 (available at

The complaint by the Court that plaintiffs did not submit quantitative evidence to show that magazines holding over ten rounds should not be banned is not true. The Declaration of Gary Kleck ¶ ¶ 20-34 (ER000550-ER000594), to take one example, provides extensive data about defensive gun uses in the United States, including estimates of instances likely requiring the use of more than ten rounds, and the balance of harm likely created by bans on magazines holding more than ten rounds. But more importantly, by this statement the Court reverses the burden of proof. Even under intermediate scrutiny the burden is on defendants to show that the supposed benefits of a ban are narrowly tailored and outweigh the constitutional burdens on law-abiding citizens. This the defendants have not done.

3. Third, although the Court asserted that the City had provided "pages" of credible evidence (ER000015), that evidence is in fact scanty and unreliable, and divorced from the realities of law enforcement. Sometimes one must have first-hand experience in gun fights to fully appreciate the importance of being sufficiently supplied with ammunition in a single firearm. Veteran law enforcement officer Stephen Helsley recounts two such personal experiences in his Declaration. (ER000621-ER000628). In the first, he describes being wounded and running out of

---

http://www.mercurynews.com/crime-courts/ci_19053663).

ammunition in a gunfight because his magazine would only accept eight rounds and he couldn't reload:

> During my early years as a narcotic agent with the California Department of Justice, I was conducting an undercover investigation of a significant heroin dealer. After purchasing an ounce and a half of heroin from him and the arrest was initiated, he shot me with a .45 first breaking my left arm and severing an artery…and then bouncing another round off my spine that exited my right leg. From a prone position I returned fire at the suspect who was mostly concealed by the trunk of his car. My shots that struck the vehicle failed to penetrate sufficiently to reach him. In the exchange that followed I had another round pass through my right leg, while another entered my left side and lodged in the disc between L3 and L4 - where it remains today. Having emptied the 8 rounds in my pistol, I tried to reload. However, with a broken arm and temporary paralysis from the waist down, I was unable to reach my spare magazine in my left rear pants pocket. Fortunately, at that time the suspect quickly surrendered to my converging surveillance team. Very little pain was initially associated with my wounds and I could have 'fought on' if more ammunition had been available. A total of 18-rounds were fired.

Helsley Decl. at ¶14 (ER000626-ER000627). Officer Helsley also describes another gunfight against criminals for which he was awarded the Medal of Valor, in which 28 rounds were fired with only two hits to the suspects. As he notes in his Declaration, "The 'take away' from these incidents is that serious bullet wounds aren't necessarily incapacitating and that gunfights can require lots of ammunition." Helsley Decl. at ¶ 15 (ER000627-ER000628). He concludes from his experiences:

Gunfights frequently involve a lot of 'missing.' This can be the result of improper aim or impact with barriers such as vehicles or walls. *One would be hard pressed to find someone who had been in a gunfight that complained about having too much ammunition.*

*Id.* at ¶ 11 (ER000625) (emphasis added). Officer Helsley now carries a Glock 17 with a 19 round magazine. He is authorized to carry a loaded and concealed firearm pursuant to California law, but "should my travels take me into Sunnyvale, I would be prohibited from using my magazines for such travel…." *Id.* at ¶ 16 (ER000628). Such are the effects of the Sunnyvale ordinance on the law abiding, while the effects on criminals are nil.

## CONCLUSION

For the reasons stated above, the denial of the preliminary injunction should be reversed.

Respectfully submitted,

/s/ Dan M. Peterson
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com

Counsel for *Amici Curiae*

31

## CERTIFICATE OF COMPLIANCE

I hereby certify that the attached opening brief complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure.  According to the word count feature of the word-processing system used to prepare the brief, it contains 6,952 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6).  It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

Date: May 23, 2014

32

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2014, an electronic PDF of the foregoing Brief of *Amici Curiae* International Law Enforcement Educators and Trainers Association *et al.* in Support of Plaintiffs-Appellants and in Support of Reversal was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

/s/ Dan M. Peterson
Dan M. Peterson

33