No. 14-15408

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

───────────────

LEONARD FYOCK, et al.,
*Plaintiffs-Appellants*,

v.

CITY OF SUNNYVALE, et al.,
*Defendants-Appellees*.

─────────────────────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(CV 13-05807-RMW)

─────────────────────────────

**APPELLANTS' REPLY BRIEF**

─────────────────────────────

C. D. Michel (S.B.N. 144258)
Glenn S. McRoberts (S.B.N. 144852)
Clinton B. Monfort (S.B.N. 255609)
Anna M. Barvir (S.B.N. 268728)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Tel. No: (562) 216-4444
Fax No: (562) 216-4445
E-mail: cmichel@michellawyers.com

**Counsel for Plaintiffs-Appellants**

## <u>TABLE OF CONTENTS</u>

PAGE(S)

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      FYOCK IS LIKELY TO SUCCEED ON THE MERITS. . . . . . . . . . . . . . . . . . . 2

      A.    The City's Ban on Magazines Commonly Preferred for
           Self-Defense Demands No Less Than Strict Scrutiny. . . . . . . . . . 2

      B.    The City's Ban on the Possession of Standard-Capacity
           Magazines Is Unconstitutional Under Any Level of
           Heightened Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.     THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR
      RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      A.    Irreparable Harm Must Be Presumed Because the
           City's Magazine Ban Violates the Second Amendment. . . . . . . 28

      B.    The Balance of Harms and the Furtherance of the
           Public Interest Compel Relief. . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

i

## TABLE OF AUTHORITIES

**PAGE(S)**

### FEDERAL CASES

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*Buckley v. Am. Constitutional Law Found., Inc.*,
    525 U.S. 182 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Caruso v. Yamhill Cnty. ex rel. Cnty. Com'r*,
    422 F.3d 848 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*District of Columbia v. Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Heller v. District of Columbia (Heller II)*,
    670 F.3d 1244 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jackson v. City and Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kachalsky v. Cnty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 22

ii

## <u>TABLE OF AUTHORITIES (CONT.)</u>

PAGE(S)

### <u>FEDERAL CASES (CONT.)</u>

*McCullen v. Coakley*,
   No. 12-1168, Slip Op. at 14 (U.S. June 26, 2014)   . . . . . . . . . . . . . . . . . 22

*McDonald v. City of Chicago*,
   130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Monterey Mech. Co. v. Wilson*,
   125 F.3d 702 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of*
*Alcohol, Tobacco, Firearms, & Explosives*,
   700 F.3d 185 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   No. 13-291S, 2013 WL 6909955 (W.D.N.Y. Dec. 31, 2013). . . . . . . . . . 15

*Peruta v. Cnty. of San Diego*,
   742 F.3d 1144 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

*Pest Comm. v. Miller*,
   626 F.3d 1097 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Reno v. Am. Civil Liberties Union*,
   521 U.S. 844 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

iii

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

### FEDERAL CASES (CONT.)

*Se. Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Shew v. Malloy*,
   No. 13-739, 2014 WL 346859 (D. Conn. Jan. 30, 2014). . . . . . . . . . . . . . 15

*Spence v. State of Washington*,
   418 U.S. 405 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

*Timmons v. Twin Cities Area New Party*,
   520 U.S. 351 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Booker*,
   644 F.3d 12 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 19

*United States v. Ensminger*,
   567 F.3d 587 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Hinkson*,
   585 F.3d 1247 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

iv

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

### FEDERAL CASES (CONT.)

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 26

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

*United States v. Miller*,
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Reese*,
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . 7

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Vincenty v. Bloomberg*,
    476 F.3d 74 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*World Wide Rush, LLC v. City of Los Angeles*,
    606 F.3d 676 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>**TABLE OF AUTHORITIES (CONT.)**</u>

**PAGE(S)**

<u>**STATUTES, RULES & REGULATIONS**</u>

Cal. Penal Code § 28220. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cal. Penal Code § 11106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Sunnyvale, Cal., Mun. Code § 9.44.040. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24


<u>**BOOKS, ARTICLES, EDITORIALS & OTHER AUTHORITY**</u>

David B. Kopel,
  *The First Amendment Guide to the Second Amendment*,
  81 Tenn. L. Rev. 419, 447 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**INTRODUCTION**

The City relies on two main arguments to support its confiscation of protected arms from Sunnyvale residents. First, it claims that the "subset" of magazines it bans—that the court found make up 47% of all magazines—are not actually protected because the Second Amendment only protects conduct, not arms. This argument directly contravenes Supreme Court authority. Citing *District of Columbia v. Heller*, 554 U.S. 570 (2008), the district court below found that the Second Amendment not only protects "arms," but also the specific magazines the City has banned.

Its other main argument is that Americans have no right to possess protected arms unless they can pass an additional, novel test. That test asks whether the arms are "crucial" for "responsible" self-defense, and whether "other options" remain. Applying this new standard, the City concludes that because smaller magazines will suffice in many cases, standard magazines may be banned. The district court employed similar reasoning to avoid applying strict scrutiny despite the fact that the law bans the possession of protected arms in the home, where Second Amendment guarantees are at their apex. This mode of analysis would render constitutional protections for common arms meaningless. Few arms, if any, are "crucial" for self-defense. And municipalities inclined to take extreme steps by

1

confiscating protected arms from the homes of law-abiding citizens can always argue that other arms remain available. This approach cannot be reconciled with decisions of the Supreme Court in the Second Amendment and other fundamental rights contexts.

The City also attempts to justify its ban by raising a straw man argument. It suggests that Fyock believes that the City is foreclosed from regulating protected arms. Not so. Certainly, the City may regulate standard magazines to promote public safety. But the government cannot remove protected arms from American homes because it thinks confiscation is in the citizenry's best interest.

In short, if the City's ban is subjected to heightened scrutiny—the kind applied to other fundamental, enumerated rights—it must fall.

## ARGUMENT

## I.  FYOCK IS LIKELY TO SUCCEED ON THE MERITS

### A.  The City's Ban on Magazines Commonly Preferred for Self-Defense Demands No Less Than Strict Scrutiny

It is established that Americans overwhelmingly choose standard-capacity magazines for self-defense, with the most popular handguns typically holding 15-17 rounds.[1]  There can be no serious dispute that the removal of these protected

---

[1] A.O.B. 5-8; E.R. I 006, 010-11; II 077-80; IV 428-30, 432-523, 525-49; V 596-97, 600-01, 604-05, 608-09, 612-13, 616-18, 623-25, 637; *see also*

arms from the homes of all law-abiding citizens burdens core Second Amendment conduct. While the core right to keep and bear arms for self-defense is not confined to the home, *see Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1155-67 (9th Cir. 2014), the home is "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. Accordingly, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

Precisely because Second Amendment rights are "at their zenith" in the home, *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012), any law that would burden the exercise of those rights by law-abiding adults within the sanctity of their own homes would be subject to strict scrutiny. *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).

Settled precedent in other constitutional rights contexts makes this clear. For instance, when considering restrictions on core political speech, courts "ordinarily appl[y] strict scrutiny *without first determining that the . . . law*

---

International Law Enforcement Trainers and Educators Association, et al., Amicus Curiae Brief ("Law Enforcement Br.") 5, 7, 25-27. The historical evolution of these magazines and the lack of historical justification for artificially restricting ammunition capacity is also discussed in-depth in the Center for Constitutional Jurisprudence, et al., Amicus Curiae Brief ("CCJ Br.") 4-24.

3

*severely burdens speech*." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring) (emphasis added); *see, e.g.*, *Pest Comm. v. Miller*, 626 F.3d 1097, 1107 (9th Cir. 2010) (strict scrutiny applies if a law implicates core political speech *or* severely burdens speech); *Caruso v. Yamhill Cnty. ex rel. Cnty. Com'r*, 422 F.3d 848, 855-56 (9th Cir. 2005) (laws regulating communications for which First Amendment protections are at their "zenith" demand strict scrutiny).[2] As these cases reflect, "because restrictions on core political speech so plainly impose a 'severe burden,' " strict scrutiny applies. *Buckley*, 525 U.S. at 208 (Thomas J., concurring).

Here, the district court correctly held that the City's ban restricts conduct "near the core of the Second Amendment right," even conceding that its "conclusion points to strict scrutiny as the proper standard." E.R. I 010-11. The court acknowledged that the magazines are "in common use" for self-defense, are therefore *not* "dangerous and unusual," and are protected by the Second

---

[2] While the City correctly notes that courts may consider the severity of the burden in election law challenges, the comparison fails. In those cases, consideration of the burden in determining scrutiny is appropriate *only* if the law "regulates 'the mechanics of the electoral process,' not speech." *Buckley*, 525 U.S. at 207-08 (Thomas, J., concurring) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995)). Though such laws sometimes impact core speech, courts apply varying degrees of scrutiny because the constitution *expressly* grants broad authority to regulate elections. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); U.S. Const. art I, § 4, cl. 1.

Amendment. E.R. I 007-08. Because the law bans possession, dictating to residents which protected arms they may keep for self-defense, the trial court rightly found the City's ban reaches core conduct. E.R. I 011.

Without support, the City claims "the Ordinance is far outside the core" because the items it bans are "not in common use for self-defense" and are "dangerous and unsuitable" for that purpose. A.A.B. 18-19. Nowhere does the City admit that the district court disagreed with it on that point, nor does it argue the court's contrary finding was improper. And it cannot. The record amply supports the district court's finding that magazines over ten rounds are commonly chosen for self-defense.

The City's suggestion that the Second Amendment does not actually protect any arms borders on the frivolous, as does its citation to *Heller* and *Peruta* for that proposition. A.A.B. 22-23. Indeed, *Heller* repeatedly references the scope of the Second Amendment in terms of which *arms* are protected. *See, e.g.*, 554 U.S. at 627 (recognizing "that the *sorts of weapons protected* were those 'in common use at the time' ") (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (emphasis added). Even if common arms weren't protected, the conduct protected

5

is the right to *possess and use* them—the very conduct the City bans.[3]

Ultimately, the City asks this Court to apply intermediate scrutiny—and a very weak form of it at that. *See* A.O.B. 34, 38-52; *see also infra* Part I.B.1. The City's invitation disregards the Supreme Court's admonishment that the Second Amendment may not be "singled out for special—and specially unfavorable—treatment." *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3043 (2010). Restrictions on conduct at the core of other enumerated rights demand strict scrutiny, and so too must restrictions on core Second Amendment activity.

Indeed, in most contexts, *any* law that interferes with "fundamental constitutional rights" is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973). And yet, according to the City and the trial court, strict scrutiny does not apply even when the government restricts conduct the Second Amendment "elevates above all other interests." *Heller*, 554 U.S. at 635. Such treatment relegates the Second Amendment to exactly the kind of "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," that the Supreme Court has declared it is not.

---

[3] The City continues to press that magazines are not "arms." A.A.B. 18. This argument is unpersuasive and lacks supporting authority. Even those courts that approved of banning protected magazines never found that they "do not qualify as arms." E.R. I 008-09 (citations omitted).

6

*McDonald*, 130 S. Ct. at 3044.

Contrary to the City's reasoning, nothing in *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013), permits the conclusion the trial court reached. To be sure, *Chovan* instructs courts to consider "how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden" in determining the applicable standard of scrutiny. *Id.* at 1138. But, as in the First Amendment context, when a law imposes restrictions on activity at *the very core* of the Second Amendment, "it makes little difference whether [courts] determine burden first *because [such] restrictions . . . so plainly impose a 'severe burden.'*" *Buckley*, 525 U.S. at 208 (Thomas, J., concurring) (emphasis added).

The City cites a series of cases, not one from this circuit and only one dealing with arguably core conduct, to suggest that every appellate court "that has considered a gun restriction falling short of a prohibition on armed self-defense has applied something less than strict scrutiny," and asks this Court to follow their lead.[4] But the approach the City advocates would effectively render *Chovan*'s two-

---

[4] A.A.B. 17-18 (citing *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010); *United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 205-07 (5th Cir. 2012); *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010)).

7

step analysis meaningless. For if nothing short of wholesale bans on self-defense that are already invalid under *Heller* were sufficiently "severe" to trigger strict scrutiny, then the *Chovan* test would always produce the same result—intermediate scrutiny. Surely that is not the result this Court intended in *Chovan*—or a result the Supreme Court would endorse.[5]

Regardless, the burden imposed by the City's ban is particularly harsh. It severely burdens law-abiding individuals in the many circumstances that are likely to require more than ten shots. Even if it did not, such would not diminish the law's burden on Second Amendment rights. For it *confiscates protected arms* from the *homes of law-abiding citizens*. Few laws are more extreme.

Turning first to the law's impact on the right to armed self-defense, it cannot be overstated that restricting residents to less than ten rounds imposes a *fatal burden* when more than ten shots are required. Even if such circumstances aren't

---

[5] The City cites to *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014), to counter the weight of constitutional authority confirming that restrictions on core conduct impose severe burdens triggering strict scrutiny. A.A.B. 27-28. To the extent that *Jackson* held otherwise, it conflicts with Supreme Court precedent in other rights contexts, treating the Second Amendment as a lesser right in conflict with *Heller* and *McDonald*. For these reasons, an en banc petition is currently pending on this issue. Appellants' Pet. For Reh'g or Reh'g En Banc, *Jackson*, 746 F.3d 953 (9th Cir. 2013) (No. 12-17803), ECF No. 70. In light of this conflict, at the very least, this Court should treat burdens on core rights as presumptively severe, with the government bearing the burden of overcoming that presumption. Here, the City can come nowhere close. *See infra* pp. 8-14.

that frequent, the burden on one's rights does not rest on the number of people harmed, but on how severe that burden is for each person harmed. Indeed, *Heller* required no showing that the need to use handguns in self-defense arose with regularity, just that such arms are commonly owned for that purpose. 554 U.S. at 629.

Likewise, the number of times ten shots are fired in self-defense does not determine the burden. The district court purported to respect this principle when it observed that "Second Amendment rights do not depend on how often the magazines are used" for self-defense. E.R. I 008. But it promptly disavowed it when reasoning that Fyock's rights were not violated because standard magazines are not "crucial" for self-defense and are only "necessary" in limited circumstances.[6] E.R. I 011, 015.

But circumstances likely to require more than ten shots are, in fact, not at all uncommon. *Over 333,000* attacks involving four or more attackers occur annually. E.R. II 116. One would have to be quite the accurate shooter to fend off so many with ten shots—certainly more accurate than trained police officers. E.R. V 560-561; Pink Pistols Amicus Curiae Brief ("P.P. Br.") 16. Despite this reality, the

---

[6] The Center for Constitutional Jurisprudence highlights the court's departure from Supreme Court precedent on this point. CCJ Br. 27-28.

9

district court and the City take issue with the fact that their aren't studies concerning the need to fire more than ten shots in self-defense.[7] E.R. I 014-15; A.A.B. 40. This would be akin to requiring studies of how often individuals would not be able to effectively defend themselves without a handgun. Of course, Mr. Heller did not need to fund a comprehensive study evaluating how often a handgun would be required in self-defense (as opposed to another firearm) to vindicate his right to own a handgun. Similarly, Fyock need not conduct studies examining how often Americans require standard magazines to prevent the government from seizing them.

In any event, the New York Police Department concluded its officers require more than ten shots *over 29% of the time* to thwart attackers. P.P. Br. 14. Although police have many advantages over civilians, they still require more than ten shots nearly one third of the time. It follows that ordinary citizens will require more than ten shots with significant regularity, particularly given how often they face multiple attackers.[8] E.R. II 115-16; V 560-61, 625, 630-36; P.P. Br. 16; CCJ

---

[7] While instances requiring over ten shots certainly occur, and circumstances likely to give rise to these situations occur frequently, the number of shots fired by civilians are not typically recorded or available. E.R. V 632.

[8] Nor is it feasible for residents to change magazines while under attack, which the City does not dispute. A.O.B. 7-8; E.R. V 560-63, 637-40.

10

Br. 27.

But again, how often individuals "need" the magazines for self-defense is not determinative. The City's ban imposes a severe burden by confiscating protected arms that are commonly kept *for that purpose*. A.O.B. 22-23, 28; Law Enforcement Br. 5, 7, 25-27. It is *no answer* to say that an arms ban imposes only a "light" burden because other arms are available. *Contra* A.A.B. 28; E.R. I 011-12. Arguing to the contrary, the City quotes the district court:

> [The] [m]agazines . . . are *hardly crucial* for citizens to exercise their right to [keep and] bear arms. The Sunnyvale ordinance does not place any restrictions on smaller magazines, which are the most popular magazines for self-defense. Individuals have *countless other handgun and magazine options* to exercise their Second Amendment rights. The evidence thus establishes that the banned magazines make up *just one subset* of magazines, which interoperate only with a subset of all firearms. Accordingly, a prohibition on possession of magazines having a capacity to accept more than ten rounds applies only the most minor burden on the Second Amendment.

A.A.B. 19 (quoting E.R. I 011-12) (citations omitted, emphasis added).

But this cannot be the test. If it were, virtually any protected firearms or ammunition could be confiscated from American homes. Changing the banned item in the above paragraph from a large subset of magazines to large subset of firearms illustrates the point. For example, based on the district court's novel test, the City could ban handguns of many popular calibers:

11

> *Handguns of greater than .38 caliber* are *hardly crucial* for citizens
> to exercise their right to [keep and] bear arms. The Sunnyvale
> ordinance does not place any restrictions on *smaller caliber*
> *handguns*, which are the most popular handguns for self-defense.
> Individuals *have countless other arms and caliber* options to exercise
> their Second Amendment rights. The evidence thus establishes that
> the banned *handguns* make up just one subset of *firearms*. . . .
> Accordingly, a prohibition on possession of *handguns of greater than*
> *.38 caliber* applies only the most minor burden on the Second
> Amendment.

This exercise could be repeated with any subset of firearms and

ammunition. The City could similarly ban all shotguns under the district court's

"hardly crucial–countless options" test because shotguns are "just one subset" of

all firearms, and individuals have countless long gun and handgun options

available. In short, a "ban" cannot be a "light burden"—even if it applies to "just

one subset" of protected arms.

This conclusion is compelled by *Heller* and *McDonald*. In *Heller*, the Court

flatly rejected the notion "that it is permissible to ban the possession of handguns

so long as the possession of other firearms (*i.e.*, long guns) is allowed." 554 U.S.

at 629. And as the decision affirmed by *Heller* declared, the District's attempt to

justify its handgun ban on the ground that " 'residents still have access to hundreds

more' " types of firearms was "frivolous." *Parker v. District of Columbia*, 478

F.3d 370, 400 (D.C. Cir. 2007). Banning the possession of a preferred means of

12

exercising the right necessarily imposes a severe burden on the core of the right itself.

The City's claim that a law is minimally burdensome because other "suitable" tools are available has been squarely rejected in other rights contexts. In *Spence v. State of Washington*, the Supreme Court rejected a finding that the burden on speech was "minuscule and trifling" because there were "thousands of other means available . . . for the dissemination of his personal views." 418 U.S. 405, 411 n.4 (1974). And in *Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997), the Supreme Court invalidated a law restricting the transmission of indecent messages via certain Internet modalities. Although the government argued that it still allowed speakers to "engage in the restricted speech" in some form online, the Court quickly dismissed this contention as "equivalent to arguing that a statute could ban leaflets on certain subjects as long as individuals are free to publish books." *Id.* at 879-80.

To rebut this clear guidance from the Supreme Court, the City attempts to shoehorn its ban into the First Amendment time, place, and manner framework. It is a poor fit. For it cannot be that laws banning protected arms merely regulate the "manner" in which Second Amendment rights are exercised because "alternative channels" exist. *Contra* A.A.B. 20-21 (citing *Heller v. District of Columbia*

13

*(Heller II)*, 670 F.3d 1244, 1262 (2011)). Such an understanding conflicts with *Heller*. While the *Heller II* court looked to "alternative channels" to validate a similar magazine ban because other arms remained, *Heller* flatly rejects this approach. 554 U.S. at 629. It afforded *no consideration* to the availability of other arms. *Id.* Plainly, laws banning protected arms cannot stand on the grounds that "alternatives" exist.

Indeed, the First Amendment doctrine of alternative channels is used to evaluate restrictions on the dissemination of protected communications in public—it is *not* used to justify prohibiting the dissemination or possession of materials communicating those views. David B. Kopel, *The First Amendment Guide to the Second Amendment*, 81 Tenn. L. Rev. 419, 447 (2014) (" 'Alternative channels' is a theory for why leafleting may be limited at a state fair on public property; it is not a theory allowing the criminalization of the possession of leaflets within one's home.") (footnote omitted).

In conclusion, because the City bans magazines commonly preferred for self-defense, the Court erred in rejecting strict scrutiny. While the government may *regulate* protected arms, banning them altogether is no more a regulation of

14

the Second Amendment than banning protected books is a regulation of the First.[9]

## B. The City's Ban on the Possession of Standard-Capacity Magazines Is Unconstitutional Under Any Level of Heightened Scrutiny

The City's ban is unconstitutional because it imposes an outright denial of the right to possess magazines protected by the Second Amendment. Rather than regulate them, the City has flatly banned possession by all law-abiding citizens. The City's ordinance is thus irreconcilable with the Second Amendment's protections, and the Court need not select a level of scrutiny to declare it invalid. A.O.B. 19-25; CCJ Br. 18-26.

Despite this common-sense conclusion, the City insists that its ordinance cannot be invalidated without resort to means-end scrutiny because it does not ban the use of arms entirely. As the City puts it, because the law "does not totally disarm Sunnyvale citizens" and it "is not a total ban on self-defense," it cannot be

---

[9] The City cites three non-binding, marginally relevant, and very recent district court cases to support its magazine. A.A.B. 19-20. But "a district court opinion does not have binding precedential effect, especially one from another federal circuit." *United States v. Ensminger*, 567 F.3d 587, 591 (9th Cir. 2009) (citations and quotations omitted). And the cases cited are largely distinguishable. *Shew v. Malloy*, No. 13-739, 2014 WL 346859 (D. Conn. Jan. 30, 2014) (applying a framework specific to the Second Circuit while considering a magazine limit and "assault weapons" ban); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, No. 13-291S, 2013 WL 6909955 (W.D.N.Y. Dec. 31, 2013) (same). Any drop of possible persuasive value dissipates considering that each law is of recent vintage and the opinions are not based on settled precedent.

15

stricken in the means that the Supreme Court invalidated the two ordinances at

issue in *Heller*. A.A.B. 24, 26. Ultimately, the City asks this Court to disavow the

approach employed by the Supreme Court because the magazine ban is "nothing

like the complete prohibitions on operable guns at issue in *Heller*." A.A.B. 26.

The City's argument misconstrues the nature of the restrictions at issue in

*Heller*, and it contravenes the approach taken by the Supreme Court to overturn

them. To be sure, *Heller* invalidated an ordinance that prohibited residents from

rendering any firearm operable for self-defense. 554 U.S. at 636. But the Court

*separately* invalidated a law that prohibited the possession of a subset of firearms.

Regardless of whether D.C. residents could use long guns for self-defense, the

handgun ban itself was invalid without resort to means-end scrutiny. If there could

be any doubt about this, the Supreme Court removed it when it invalidated

Chicago's handgun ban, despite the fact that residents were permitted to use

countless other firearms for self-defense. *McDonald*, 130 S. Ct. at 3050. Contrary

to the City's claims, the Supreme Court twice struck down ordinances without

resort to means end-scrutiny—regardless of the fact that neither law "totally

disarm[ed]" residents nor effected a "total ban on self-defense." *Compare* A.A.B.

24, 26, *with Heller*, 554 U.S. at 636; *McDonald*, 130 S. Ct. at 3050.

While writing for the plurality in *McDonald*, Justice Alito explained the

16

*Heller* Court's reasoning for striking the handgun ban:

> [I]n *Heller*, we held that individual self-defense is the central
> component of the Second Amendment right . . . . [W]e found that this
> right applies to handguns because they are the most preferred firearm
> in the nation to keep and use for protection of one's home and family.
> Thus, we concluded, citizens must be permitted to use handguns for
> the core lawful purpose of self-defense.

130 S. Ct. at 3036 (citations, emphasis, quotation marks, and brackets omitted).

Because the Second Amendment "*applies* to handguns," the Court

concluded that "citizens *must* be permitted to" use them. *Id.* (emphasis added). As

a result, D.C.'s complete ban on their possession and use was plainly

unconstitutional. Similarly, the City's magazine ban is necessarily invalid despite

the fact that it does not completely disarm residents. Because the Second

Amendment clearly applies to magazines that account for nearly half of those in

circulation and come standard with the most common handguns in American

society, the City's complete prohibition on their possession and use must fall.

A.O.B. 18-25.

Rather than address this point, the City incorrectly suggests that Fyock

argues that if standard magazines are protected under the Second Amendment,

then they are totally immune from regulation. A.A.B. 23, n.6 ("Under Plaintiffs

proposed interpretation of the Second Amendment, once an arm has been

17

classified as protected (*e.g.* like the handgun in *Heller*) no regulation of that arm would pass constitutional scrutiny.") Fyock has never countenanced such a position. Surely arms protected under the Second Amendment are not exempt from meaningful regulation.

For example, the very arms found to be protected in *Heller* are subject to an array of regulations aimed at keeping them from criminals. That the Supreme Court confirmed handguns are protected under the Second Amendment means that law-abiding citizens have a right to possess and use them—it does not mean that all laws that regulate them are invalid. Here too, the fact that standard magazines are protected under the Second Amendment means that law-abiding citizens have a right to possess and use them—it does not mean that all laws that regulate them are unconstitutional.

In sum, the City's confiscation of common magazines from the homes of law-abiding citizens is wholly inconsistent with the Second Amendment right to possess and use them. It is invalid regardless of the level of scrutiny applied.

1.    Application of Means-End Scrutiny

Should the Court choose to apply a particular level of scrutiny to declare the City's ban invalid, strict scrutiny must be that test. Because the City strips magazines that are commonly preferred for self-defense from the homes of law

18

abiding citizens, where Second Amendment rights are at their zenith, no other level of scrutiny could apply. *See supra* Part I.A. The City has not even attempted to meet its burden under this standard, and it cannot, as the City's ban lacks the required fit under any level of heightened scrutiny.

Even under intermediate scrutiny, the City must establish a "reasonable fit" or a "substantial relationship" between the ban and a "significant, substantial, or important" government objective. *Chovan*, 735 F.3d at 1139 (citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010)). This requires a demonstration that the law is likely to advance that interest "to a material degree." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996). The City's "burden is not satisfied by mere speculation or conjecture," instead, it "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them . . . ." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001).

Even though the district court found that the City's law prohibits conduct at the core of a fundamental right, it applied a water-downed intermediate scrutiny test that relieved the City of its burden to establish that the law is likely to advance its interests to a "material degree."[10]

---

[10] Contrary to the City's claims, Fyock never asked for the district court's factual findings to be reviewed de novo. Rather, the Court's failure to apply the correct legal standards should be reviewed de novo. *Stormans, Inc. v. Selecky*, 586

Instead, the court improperly relied on speculation from a discredited witness who concluded that the ban could *possibly* have some benefit. E.R. I 014; E.R. III 240; Law Enforcement Br. 20-24. This is precisely the type of "speculation and conjecture" that the Supreme Court has warned is insufficient to carry the day under intermediate scrutiny. *Lorillard Tobacco*, 533 U.S. at 528. In finding the City's evidence satisfactory, the district court committed reversible error twice over.

In the first instance, the court abused its discretion by finding that the ordinance promotes public safety. Such a finding is not supported by the record. If a law that largely banned sales of the same magazines the City bans throughout the entire nation had no impact, it is unfathomable that a law that removes them from the homes of law-abiding citizens in one municipality will further public safety. A.O.B. 41-43; E.R. III 343-44. Koper's suggestion that the federal law could possibly have had some impact if it remained in effect longer cannot overcome this reality.

Moreover, Koper admitted he was *unable to establish any causal link between the use of magazines over ten rounds and increased casualties*. E.R. III 249, 343. And as Fyock noted, Koper testified that the most comprehensive data

---

F.3d 1109, 1134 (9th Cir. 2009).

set he has evaluated "cannot support a finding that pistols with magazines over ten rounds are more lethal than revolvers." A.O.B. 42; E.R. II 108-10; III 331.

Tellingly, the City never addresses these concessions. It was indeed "illogical" and "implausible" for the district court to conclude that the City's ban was supported by evidence sufficient to satisfy intermediate scrutiny. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009). In fact, that conclusion conflicts with Koper's own hypothesis about the "potential" effectiveness of the City's ban. E.R. III 240. The court's conclusion that the City's ban "may" further public safety, E.R. I 013-14, is thus "without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1262. And in *no* case does such evidence establish that the ordinance is *likely* to advance public safety, as it must.[11] E.R. I 013-14. *But see 44 Liquormart Inc.*, 517 U.S. at 505.

Second, the district court erred in holding that controverted testimony that the law "has the potential to" further public safety satisfied the City's burden under intermediate scrutiny. E.R. I 014. The court's unique approach to evaluating Second Amendment challenges ignores any "effect the law may have" and focuses only on the "relationship" between the law and public safety. E.R. I 013. The

---

[11] Again, the overwhelming majority of law enforcement officers oppose standard magazine bans and do not believe they promote public safety. E.R. V 654; *see also* Law Enforcement Br. 16-19.

21

adoption of a novel test to uphold a restriction on core conduct "irrespective of how Sunnyvale's law impacts public safety," E.R. I 013, is reversible error subject to de novo review. *Lorillard Tobacco*, 533 U.S. at 555; *Stormans, Inc.*, 586 F.3d at 1134.

Critically, the district court's decision does not even subject the City's restriction on core conduct to the same rigorous standard of scrutiny that governs in the First Amendment time, place, and manner context. Again, the City is mistaken that its ban is a time, place, and manner restriction in the first place. *See supra* Part I.A. But even *those* restrictions still must be "narrowly tailored to serve a substantial government interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 798-800 (1989); *accord McCullen v. Coakley*, No. 12-1168, slip op. at 14 (U.S. June 26, 2014).

As this Court made clear, narrow tailoring under intermediate scrutiny requires that a law not be more extensive than necessary to serve its interest. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 825 (9th Cir. 2013) (citing *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010)). The City never addresses or explains how its decision to ban all lawful possession isn't an overbroad approach. And the district court never tasked the City with doing so, concluding instead that the law is "reasonably tailored" because it does not ban

22

residents from possessing magazines it has not banned. E.R. I 013, 015.

Whether the City's law is narrowly tailored to the City's public safety interests warrants careful examination by this Court.

According to the district court, the City's ban on standard handgun magazines is appropriately tailored to furthering the City's goal of reducing criminal access and misuse. E.R. I 014, 017. But even a cursory analysis of the ordinance readily confirms that it is a vastly overbroad means of furthering those interests. The law sweeps in all law-abiding gun owners, requiring them to dispose of their protected magazines regardless of whether there is a child, prohibited person, or anyone else present who might try to gain access. And it does so regardless of whether gun owners keep their magazines secured to prevent access by unauthorized users.

As for any interest in preventing thieves from breaking in and stealing the prohibited magazines, the very purpose of the Second Amendment is to protect individuals' rights to keep and bear arms to defend against those who would do harm to their person or property. The City does not regulate standard magazines to keep them out of the hands of dangerous individuals—it takes them out of the hands of all law-abiding gun owners, including those with heightened self-defense needs. P.P. Br. 1, 13-15. Requiring law-abiding citizens to surrender protected

23

arms to prevent them from being stolen turns the Second Amendment on its head.

The City's only counter is that it is "not proscribed from enacting laws to deter crime merely because those laws might also impact the law-abiding." A.A.B. 34. Fyock doesn't disagree, and he has never argued to the contrary. Nor does he "contend" that *Heller* established "a categorical rule that a city cannot impose *regulations* on the use of 'constitutionally protected arms.'" A.A.B. 34 n.13 (emphasis added). Again, the notion that removing protected arms from law-abiding citizens is an unconstitutional means of reducing criminal access does not mean that the government cannot enact regulations aimed at keeping them from dangerous individuals. *See supra* Part I.A. Today, there are countless regulations that seek to accomplish this very goal that inevitably impact the law-abiding—but not one of them removes protected arms from responsible citizens. *See, e.g.*, 18 U.S.C.A. § 922(t) (requiring background checks to purchase firearms); Cal. Penal Code § 28220 (same); Cal. Penal Code § 11106 (b) (requiring registration of firearms); Sunnyvale, Cal., Mun. Code § 9.44.040 (requiring firearms to be locked when not under personal control). Surely the government will continue to experiment with regulations aimed at keeping dangerous arms out of the hands of the wrong people. But it may not achieve its interest by taking those arms out of the hands of law-abiding citizens. Contrary to

24

the City's repeated mis-characterization of Fyock's arguments, the right to possess protected arms and the government's regulation of those arms are not mutually exclusive.[12]

Because the City misconstrued Fyock's argument, its counter-point is a bit of a non-sequitur. The City argues that it may enact laws that "affect" the rights of the law-abiding "in order to deter crime." A.A.B. 34. In support, it cites two cases, one that upheld a voter compliance law, and another that affirmed a prohibition on the possession of firearms without serial numbers. A.A.B. 34. As Fyock acknowledges that the government may enact legislation affecting law-abiding citizens, he does not disagree with the City's citation of these authorities for this point.

The City's attempt to liken these cases to its ban on protected conduct, however, is without merit. In *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008), the Supreme Court considered a law that required voters to jump

---

[12]  The City also claims that 75% of firearms used in shootings involving multiple victims were obtained legally. A.A.B. 34. This is incorrect. The sources relied upon do not indicate whether the shooter purchased the gun legally or whether it was obtained by someone else and given to the shooter. Moreover, this statistic includes cases where it was *unknown* how the firearm was obtained. In any event, that a fraction of individuals who buy firearms lawfully might use them for illicit purposes does not authorize the government to ban the entire law-abiding population from possessing them.

25

through additional hoops before casting their votes. The Court concluded that placing restrictions on voters was a permissible means of reducing the likelihood that certain individuals would cast fraudulent votes. *Id.* at 185-89. Similarly, laws requiring individuals to comply with various requirements to purchase protected arms are presumably valid regulations of law-abiding individuals to deter criminals. But rather than regulate standard magazines to prevent criminal misuse, the City has banned lawful possession outright.

Nor is the City's ban akin to a federal law requiring handguns to have serial numbers intact. *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010). While the identification requirement serves an important interest in tracing firearms, nothing in that law prohibits individuals from possessing the *exact same* firearms with a serial number. Here, it is not as if Sunnyvale residents have the option of possessing identical magazines without a serial number removed. Instead, they have no option for possessing them and must select a less optimal magazine.

Finally, that the City thinks the magazines are too dangerous to be appropriate for "responsible self-defense" does not give the City carte blanche to ban them. A.A.B. 18-19. Such dangerous characteristics cannot be determinative, as the same traits that the City claims make them dangerous are the very reasons why they are preferred for self-defense by the American public and law

26

enforcement—including Sunnyvale's own officers.[13] That is precisely why *Heller* stressed that the government may prohibit arms only when they are both "dangerous *and unusual*." 554 U.S. at 627 (emphasis added).[14]

2. Banning Lawful Use to Prevent Criminal Misuse is Not Tolerated in Other Rights Contexts

Governmental bans on the lawful use of constitutionally protected items to prevent criminal access is never tolerated in other rights contexts. As the Supreme Court made clear, banning law-abiding citizens from purchasing markers and spray paint outright is not a permissible means of preventing them from falling into the hands of criminal users. *Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir. 2007) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)). And it

---

[13] The City never addresses its memorandum that implausibly reads the ban to authorize law enforcement to keep their *personally owned* magazines for *in-home self-defense while off-duty*. A.O.B. 8 n.7. This undermines the City's claim that the magazines are "unsuitable for responsible self-defense." A.A.B. 19. *But see* E.R. III 388.

[14] The City argues that the Supreme Court did not find that the government's attempt to ban handguns would fail intermediate scrutiny. This is false. Despite D.C.'s lengthy arguments concerning the dangers of handguns and their popularity amongst criminals, the Supreme Court expressly held that the law "would fail constitutional muster" "[u]nder *any* of the standards of scrutiny that we have ordinarily applied to fundamental rights." *Heller*, 554 U.S. at 628 (emphasis added). The Supreme Court is surely aware that both strict and intermediate scrutiny are frequently applied to restrictions on such rights.

27

goes without saying that confiscating common tools of communication from the American public would not be a permissible means of preventing terrorists from using them to detonate explosives. The City offers no explanation why its method of reducing criminal access would not be tolerated in the First Amendment context, but should be tolerated in the Second Amendment context. And surely it cannot. Such unequal treatment would improperly single the Second Amendment out for "special—and specially unfavorable—treatment," in direct contravention of the Supreme Court's admonition that the Second Amendment is not "a second-class right." *McDonald*, 130 S. Ct. at 3042, 3044.

## II. THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR RELIEF

### A. Irreparable Harm Must Be Presumed Because the City's Magazine Ban Violates the Second Amendment

The deprivation of a fundamental right is sufficient irreparable harm to warrant preliminary relief. A.O.B. 52-54. Fyock's irreparable harm is the violation of his fundamental right, *any* loss of which is irreparable harm per se. *See Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). Every minute Sunnyvale residents are denied their constitutional right to possess commonly owned magazines for self-defense in their homes, they suffer irreparable harm. And irrespective of whether a prohibited magazine is locked inside a safety-

deposit box in another city while litigation is pending, should Fyock run out of ammunition during a home invasion, he and his family will suffer the *most* irreparable of harms.

**B.    The Balance of Harms and the Furtherance of the Public Interest Compel Relief**

When laws trample on fundamental rights, the balance of equities and the public interest sharply favor injunction. A.O.B. 54-57; *see Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). Indeed, as the district court acknowledged, an injunction would be favored notwithstanding that the ordinance was enacted by the "will of the people." E.R. I 018 ("[I]f the Court found that Plaintiffs were likely to succeed in proving that the Sunnyvale ordinance infringes the Second Amendment, the Court would necessarily invoke the Second Amendment to protect the minority against the ordinance's infringement on their rights. In that case, the consideration that a 66 percent majority passed the law would not weigh against an injunction.").

The City's counterweight is that its laws must not be stricken lest this Court "miscalculate" Second Amendment rights and be "responsible for some unspeakably tragic act of mayhem." A.A.B. 46. But because the sale of standard magazines is already unlawful in California, an injunction will not flood the City

29

with any new magazines. Indeed, the City provided only *one* incident that *ended* in Sunnyvale where a criminal suspect possessed a prohibited magazine. E.R. I 018. Any potential harm is sharply outweighed by the ongoing denial of Sunnyvale citizens' fundamental rights *and* the possibility that such citizens will be unable to effectively protect themselves and their families before falling victim to an "unspeakabl[e] . . . act of mayhem" themselves.

## CONCLUSION

The approach advocated by the City and employed by the district court contravenes the Supreme Court's admonition that the Second Amendment is not "a second-class right." *McDonald*, 130 S. Ct. at 3044. The Court should reverse the denial of Fyock's motion to restore his right to possess constitutionally protected arms in his home.

Date: July 1, 2014                    MICHEL & ASSOCIATES, P.C.


                                      /s/ C. D. Michel
                                      C. D. Michel
                                      Attorney for *Plaintiffs-Appellants*

30

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the attached APPELLANTS' REPLY BRIEF complies with Rule 32(a)(7)(c) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 6982 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in WordPerfect X5.

Date: July 1, 2014                    MICHEL & ASSOCIATES, P.C.


                                      /s/ C. D. Michel
                                      C. D. Michel
                                      Attorney for *Plaintiffs-Appellants*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2014, an electronic PDF of APPELLANTS'
REPLY BRIEF was uploaded to the Court's CM/ECF system, which will
automatically generate and send by electronic mail a Notice of Docket Activity to
all registered attorneys participating in the case. Such notice constitutes service on
those registered attorneys.

Date: July 1, 2014                    MICHEL & ASSOCIATES, P.C.


/s/ C. D. Michel
C. D. Michel
Attorney for *Plaintiffs-Appellants*

32